1  John J. McLeod, Esq., State Bar No. 174169
2  john@mcleodlawgroup.com
   Paul C. Hirst, Esq., State Bar No. 234460
3  pchirst@mcleodlawgroup.com
   McLEOD LAW GROUP, A.P.C.
   701 B Street, Suite 1570
4  San Diego, California 92101
   Telephone:  (619) 236-9938
5  Facsimile:  (619) 236-9943

6  Attorneys for Plaintiff,
   IRONWOOD COUNTRY CLUB
7

8           **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

10 IRONWOOD COUNTRY CLUB,          CASE NO. 13-00996-VAP (DTBx)

11
              Plaintiff,            **MEMORANDUM OF POINTS AND**
12                                  **AUTHORITIES IN SUPPORT OF**
        v.                          **PLAINTIFF'S MOTION FOR**
13                                  **PARTIAL SUMMARY JUDGMENT**

14 LIBERTY INSURANCE
   UNDERWRITERS, INC. and DOES 1    Hearing Date:   January 27, 2014
15 through 100,                     Hearing Time:   2:00 p.m.
                                    Courtroom:      Hon. Virginia A. Phillips
16            Defendants.

17                                  Date Complaint Filed: May 1, 2013
18                                  Trial Date: August 5, 2014

19
                                    Filed concurrently with:
20                                      1.  *Notice of Motion and Motion;*
21                                      2.  *Statement of Undisputed Facts;*
                                        3.  *Declaration of Bryan R. Gerstel;*
22                                      4.  *Declaration of Joshua Tanner;*
                                        5.  *Declaration of Alan Lux;*
23                                      6.  *Declaration of Robert C. Manion;*
24                                      7.  *Declaration of John J. McLeod;*
                                        8.  *Request for Judicial Notice; and*
25                                      9.  *[Proposed] Order.*
26

27

28

# **TABLE OF CONTENTS**

I.    **INTRODUCTION** ...............................................................................1

II.   **STATEMENT OF FACTS** ..................................................................1

   A.   **The Liberty Policy** ....................................................................1

   B.   **Ironwood's Vote to Change**
        **One of Its Business Practices** ...............................................2

   C.   **The Underlying Action (the Cobb Matter)** ..........................3

   D.   **Liberty Agrees to Defend Ironwood** ....................................3

   E.   **Ironwood Inadvertently Submits**
        **Pre-Tender Invoices to Liberty** ............................................3

   F.   **Liberty Fails to Pay Any Money Toward Ironwood's Defense** ...............5

   G.   **Liberty Withdraws Coverage and Abandons Ironwood's Defense** ..........5

III.  **ARGUMENT** ...................................................................................5

   A.   **Liberty's Duty to Defend Ironwood in the Underlying Action** ................5

        1.   **Liberty's Bad Faith Coverage Denial** ........................6

        2.   **Coverage Limitations Are Narrowly Construed** ..........7

        3.   **Liberty's Coverage Position Lacks Any Legal Support** ........9

        4.   **Liberty's Coverage Position Lacks Any Factual Support** ............10

        5.   **Liberty Improperly Relied on Privileged Information**
             **that Ironwood Inadvertently Disclosed** ....................11

        6.   **Liberty Cannot Justify Its Coverage Denial by Hindsight** ............12

        7.   **This Motion Is Not Premature** ................................13

   B.   **Liberty Must Reimburse Ironwood for Defense Fees and Costs** ............18

   C.   **Liberty Must Return the Pre-Tender Invoices to Ironwood** ................20

        1.   **Ironwood Has Not Waived the Attorney-Client Privilege** ............22

        2.   **The "Crime-Fraud" Exception Does Not Apply** ..........24

IV.   **CONCLUSION** ................................................................................25

/ / /

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Allstate Ins. Co. v. Erickson*, 227 F.2d 755, 756 (9th Cir. 1955)……………………………7, 8

*Ashley v. Am. Mut. Liab. Ins. Co.* 167 F. Supp. 125, 131 (N.D. Cal. 1958)……………………8

*Atmel Corp. v. St. Paul* 416 F. Supp. 2d 802 (N.D. Cal. 2006)…………………………...14, 15

*Bank of Calif., N.A. v. Opie*, 663 F.2d 977 (9th Cir. 1981)……………………………………5

*Endurance American Specialty Ins. Co. v. WFP Securities Corp.*, 2012 U.S. Dist. LEXIS
153864, 9-10, 11-cv-2611 JAH (KSC) (S.D. Cal., Sept. 28, 2012)………………………13, 15

*Rocklin Park Place Condominium Owners Assoc. v. Liberty Ins. U'wtrs, Inc.*,
2013 U.S. Dist. LEXIS 127669, 2:12-cv-02247-TLN-CKD (E.D. Cal., Sept. 6, 2013)…14, 15

*Unionamerica Ins. Co. v. The Fort Miller Group. Inc.*,
590 F.Supp.2d 1254 (N.D. Cal. 2008)……………………………………………………..8


**State Cases**

*Advanced Micro Devices v. Great Am. Surplus Lines Ins. Co.*,
199 Cal. App. 3d 791, 245 Cal. Rptr. 44 (1988)…………………………………………10

*Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal.4th 38,
70 Cal. Rptr. 2d 218 (1997)…………………………………………………………………19

*Buss v. Superior Court*, 16 Cal.4th 35, 65 Cal. Rptr. 2d 366 (1997)……………………..5, 15

*City & County of San Francisco v. Superior Court*, 37 Cal. 2d 227, 231 P.2d 26 (1951)….21

*Costco Wholesale Corp. v. Superior Court*, 47 Cal.4th 725, 732,
101 Cal. Rptr. 3d 758 (2009)……………………………………………………………..20, 21

*Dickerson v. Superior Court*, 135 Cal.App.3d 93, 185 Cal. Rptr. 97 (1982)………………25

*Glade v. Superior Court*, 76 Cal. App. 3d 738, 143 Cal. Rptr. 119 (1978)…………………24

*Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 54 Cal. Rptr. 104 (1966)………………5, 6, 10, 15

*Grey v. Superior Court*, 62 Cal. App. 3d 698, 703-04, 133 Cal. Rprtr. 318 (1976)……..11, 12

*Haskel, Inc. v. Superior Court*, 33 Cal. App. 4th 963,
39 Cal. Rptr. 2d 520 (1995)……………………………………………10, 12, 13, 17, 18

*Horace Mann Ins. Co. v. Barbara B,* 4 Cal.4th 1076, 17 Cal. Rptr. 2d 210 (1993)…………6

*Intergulf Develop., LLC v. Superior Court*, 183 Cal. App. 4th 16,

107 Cal. Rptr. 3d 162 (2010)……………………………………………………………18

*Janopaul + Block Cos., LLC v. Superior Court*, 200 Cal. App. 4th 1239,

133 Cal. Rptr. 3d 380 (2011)……………………………………………………………18

*Jefferson Standard Life Ins. Co. v. Anderson*, 236 Cal. App. 2d 905,

46 Cal. Rptr. 480 (1965)……………………………………………………………..7, 8

*Marie Y. v. General Star Indem. Co.*, 110 Cal. App. 4th 928,

2 Cal. Rptr. 3d 133 (2003)………………………………………………………………19

*Metropolitan Life Ins. Co. v. Devore* 66 Cal. 2d 129, 56 Cal. Rptr. 881 (1967)………….7, 8

*MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 3 Cal. Rptr. 3d 228 (2003)………………7

*Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287,

24 Cal. Rptr. 2d 467 (1993)……………………………………………6, 10, 12, 15, 16

*Mullen v. Glens Falls Ins. Co.*, 73 Cal. App. 3d 163, 140 Cal. Rptr. 605 (1977)………12, 13

*Resure, Inc. v. Superior Court*, 42 Cal. App. 4th 156, 49 Cal. Rptr. 2d 354 (1996)……….10

*Roberts v. Superior Court*, 9 Cal. 3d 330, 107 Cal. Rptr. 309 (1973)……………………..22

*State of Calif. v. Pacific Indem. Co.,* 63 Cal.App.4th 1535, 75 Cal. Rprtr. 2d 69 (1998)….19

*State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal.3d 94, 109 Cal. Rptr. 811 (1973)…….7

*Truck Ins. Exch. v. Unigard Ins. Co.*, 79 Cal. App. 4th 966,

94 Cal. Rprtr. 2d 516 (2000)……………………………………………………………12

*Wausau Underwriters Ins. Co. v. Unigard Sec. Ins. Co.*,

68 Cal. App. 4th 1030, 80 Cal. Rptr. 2d 688 (1998)………………………………………12, 13

*Wells Fargo Bank, N.A. v. Superior Court*, 22 Cal. 4th 201, 91 Cal. Rptr. 2d 716 (2000)…20

*White v. Western Title Ins. Co.*, 40 Cal.3d 870, 221 Cal. Rptr. 509 (1985)…………………24

*Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.*,

64 Cal. App. 3d 261, 134 Cal. Rptr. 427 (1976)…………………………………………10

**Federal Statutes and Rules**

Fed. R. Civ. Proc. 56 …………………………………………………………..1

Fed. R. Evid. 501 …………………………………………………………….20

**State Statutes and Rules**

Cal. Civ. Code § 2860(d)……………………………………………...…12

Cal. Evid. Code, § 911……………………………………………………20

Cal. Evid. Code, § 914(b)………………………………………………..20

Cal. Evid. Code, § 917(a)………………………………………………..21

Cal. Evid. Code, § 952 …………………………………………………..21

Cal. Evid. Code, § 953(a) ………………………………………………23

Cal. Evid. Code, § 954 ………………………………………………20, 21

Cal. Evid. Code, § 956 …………………………………………………24

**Other**

Hon. H. Walter Croskey, et al.,

Rutter Group Practice Guide: Ins. Lit.; Ch. 7B-A, ¶ 7:506 (2013 ed.)……………………19

Hon. H. Walter Croskey, et al.,

Rutter Group Practice Guide: Ins. Lit.; Ch. 7B-H, ¶ 7:691 (2013 ed.)……………………19

Plaintiff, Ironwood Country Club ("Ironwood"), respectfully submits the following memorandum of points and authorities in support of its motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.   **INTRODUCTION**

This case arises from an insurance coverage dispute between Ironwood and its insurance company, Liberty Insurance Underwriters, Inc. ("Liberty").   Ironwood submits that there is no genuine dispute as to any material fact and that Ironwood is entitled to judgment as a matter of law on the following issues: (1) that Liberty has a duty to defend Ironwood in the underlying lawsuit entitled *Cobb, et al. v. Ironwood County Club* (the "Cobb Lawsuit"); (2) that Liberty must immediately reimburse Ironwood the sum of $56,569.36 for the fees and costs Ironwood incurred (at the agreed-upon hourly rate of $275 and after subtracting Ironwood's payment of the $10,000 retention under the Liberty policy) in defense of the Cobb Lawsuit from May 15, 2012 (the date that Ironwood gave notice to Liberty) to February 26, 2013 (the date that Liberty withdrew from Ironwood's defense in the Cobb Lawsuit)[1]; and (3) that Liberty must immediately return to Ironwood any and all copies (digital, paper or otherwise) of Bryan R. Gerstel, APC's attorney billing statements dated June 30, 2011, September 6, 2011, October 13, 2011, December 8, 2011, March 5, 2012, April 3, 2012, and May 1, 2012 (collectively "Pre-Tender Invoices"), and Liberty is prohibited from using said Pre-Tender Invoices in any way and for any purpose in this action.   The undisputed facts that are material to these three issues are as follows.

## II.   **STATEMENT OF FACTS**

### A.   **The Liberty Policy**

In July 2011, Ironwood's General Manager and Chief Operating Officer, Joshua Tanner, began working with Ironwood's insurance broker, Alan Lux, to purchase a

---

[1] Ironwood reserves all of its rights under California law to seek additional defense fees and costs incurred by Ironwood.

1  policy affording directors and officers liability coverage for the period of October 2011

2  to October 2012.  Statement of Undisputed Facts filed concurrently herewith ("SUF"),

3  No. 1.  To that end, on October 5, 2011, Ironwood submitted to Liberty an "Application

4  for Nonprofit Executive Advantage Policy" ("Liberty Application").   SUF, No. 2.[2]

5  Liberty thereafter issued a policy to Ironwood affording Directors & Officers Liability

6  coverage for the period of October 1, 2011 to October 1, 2012 ("Policy").  SUF, No. 3.

7  ## B.    Ironwood's Vote to Change One of Its Business Practices

8  In 1999, Ironwood's members approved an assessment of $25,500 per member

9  ("Assessment").  SUF, No. 4.  The Assessment was to be repaid to a member when the

10  member subsequently sold their membership.   SUF, No. 5.   Members sold their

11  memberships by placing them on a resale list.  SUF, No. 6.  However, some members

12  forfeited their membership to the club rather than have it sold to an incoming member.

13  SUF, No. 7.   The forfeited memberships became club property and were called

14  Treasury memberships.   SUF, Nos. 8-9.   Prior to 2010, Ironwood had a business

15  practice of selling these Treasury memberships to incoming new members and repaying

16  the Assessment to the forfeiting member when that Treasury sale occurred, which was

17  typically years after the member forfeited it.  SUF, Nos. 10-11.

18  For several years before 2010, Ironwood's prior Boards had intermittently

19  discussed the nature and terms of this business practice.  SUF, No. 12.  And, in 2010,

20  the Board was discussing this very same topic.  SUF, No. 13.  In discussing whether or

21  not to cease repaying the Assessment to forfeiting members, the Board consulted with

22  many individuals, including Ironwood's counsel, Bryan Gerstel.  SUF, No. 14.  Prior to

23  January 2012, the matter was never presented to the Board for a vote.  SUF, No. 15.

24

---

25  [2] Liberty has since claimed that Ironwood provided a "no" response to Question No. 14 on the Liberty
26  Application.  Ironwood does not know who, if anyone, provided a "no" response to this question. *See*
    Declaration of Joshua Tanner filed concurrently herewith ("Tanner Decl."), ¶ 6; Declaration of Alan
27  Lux filed concurrently herewith ("Lux Decl."), ¶ 8.  However, whether or not Ironwood provided a
    "no" response to Question No. 14 is not a material fact for purposes of this motion.  For the reasons
28  set forth herein, even if, as Liberty contends, Ironwood responded "no" to Question No. 14, Ironwood
    is still entitled to an order in its favor on the three discrete issues that are the subject of this motion.

On January 19, 2012, nearly four months after Ironwood submitted the Liberty Application, Ironwood's Board voted to stop the practice of repaying the Assessment to forfeiting members. SUF, Nos. 18-19.  This was the first time the Board voted on whether to change this business practice.  SUF, No. 18.

### C.    The Underlying Action (the Cobb Matter)

On May 7, 2012, more than seven months after Ironwood submitted to Liberty the Liberty Application, Ironwood received a demand letter from William Cobb, which asserted claims arising out of Ironwood's January 2012 vote.  SUF, No. 21.  Mr. Cobb's May 2012 letter was the first claim of which Ironwood was aware regarding the January 2012 vote.  SUF, No. 22.  Mr. Cobb subsequently filed a lawsuit against Ironwood, which asserts claims arising out of that vote.  SUF, No. 26.

### D.    Liberty Agrees to Defend Ironwood

On May 15, 2012, Ironwood provided notice of the Cobb claim to Liberty.  SUF, Nos. 15-16.  On or about September 13, 2012, Liberty informed Ironwood (through Mr. Lux) that it would defend Ironwood in the Cobb matter.  SUF, No. 27.  Around this time, Liberty agreed to retain Ironwood's counsel, Mr. Gerstel, to defend Ironwood in the Cobb matter.  SUF, Nos. 35-36.  On September 25, Mr. Gerstel sent a letter to Liberty confirming that Liberty had agreed to pay him to defend Ironwood at a reduced hourly rate of $275.  SUF, No. 36.  On October 25, 2012, Liberty sent Ironwood a letter confirming its agreement to defend Ironwood in the Cobb matter.  SUF, No. 37.

### E.    Ironwood Inadvertently Submits Pre-Tender Invoices to Liberty

Upon agreeing to defend Ironwood, Liberty asked Ironwood (through Mr. Lux) to submit copies of any bills that Ironwood had received for legal fees and costs in connection with the Cobb matter.  SUF, No. 28.  Accordingly, on September 13, 2012, Mr. Lux asked Mr. Tanner to send him copies of all bills that Ironwood had received. SUF, No. 29.  Mr. Lux did not tell Mr. Tanner to limit the scope of the invoices to only those that post-dated the May 15, 2012 notice to Liberty.  SUF, No. 30.  That same day, Mr. Lux received several invoices from Ironwood, which he then forwarded to Liberty

1    without reviewing.  (SUF, Nos. 33-34.)

2        The bills that Ironwood sent to Mr. Lux included invoices dating back to June

3    2011 – almost a year prior to Mr. Cobb's May 2012 demand letter.  SUF, Nos. 32-33 &

4    38.  Mr. Tanner, who is not an attorney and does not have any formal legal training, did

5    not understand that Liberty was only asking for the bills reflecting legal fees incurred in

6    defense of the Cobb matter.  SUF, No. 31.  Thus, by innocent mistake, invoices pre-

7    dating the May 2012 Cobb demand letter were disclosed to Liberty.  SUF, Nos. 32 &

8    42.  Indeed, the invoices submitted to Liberty inadvertently included invoices that Mr.

9    Gerstel had previously issued to Ironwood for work performed between June 2011 and

10   April 2012 (i.e., the Pre-Tender Invoices). SUF, No. 38.

11       These Pre-Tender Invoices do not include any billing entries related to the

12   defense of the Cobb matter.  SUF, No. 39.  Instead, they contain attorney-client

13   communications describing legal services performed by Mr. Gerstel for Ironwood on

14   various matters unrelated to the defense of the Cobb claim.  SUF, No. 40.  Ironwood

15   and Mr. Gerstel have always kept the Pre-Tender Invoices and their contents

16   confidential.  SUF, No. 41.  As such, the Pre-Tender Invoices were mistakenly and

17   inadvertently disclosed to Liberty and were not provided to Liberty with any intention

18   of waiving the attorney-client privilege.  SUF, No. 42.  In fact, Mr. Tanner does not

19   have authority to waive any privileges on behalf of Ironwood, as any such waiver

20   would require authorization from Ironwood's Board, which Mr. Tanner neither asked

21   for nor received.  SUF, Nos. 43-46.

22       Furthermore, the Pre-Tender Invoices were sent to Liberty without Mr. Gerstel's

23   knowledge or authorization.  SUF, Nos. 47-48.  If Mr. Gerstel had been asked to send

24   Liberty the Pre-Tender Invoices, he would have refused to do so.  SUF, No. 49.

25       Upon learning that the Pre-Tender Invoices had been mistakenly sent to Liberty,

26   Ironwood, through its counsel in this action, McLeod Law Group, made no less than six

27   written requests for the immediate return of the Pre-Tender Invoices.  SUF, Nos. 56-57.

28   To date, Liberty has not returned the Pre-Tender Invoices.  SUF, Nos. 58-59.

### F.   Liberty Fails to Pay Any Money Toward Ironwood's Defense

After Liberty acknowledged its duty to defend Ironwood in the Cobb Action and agreed to retain Bryan Gertsel to defend it, Ironwood made several written demands on Liberty to pay all defense fees and costs incurred after the date of notice of the Cobb claim (i.e., after May 15, 2012).  SUF, No. 72.  On or about February 21, 2013, Ironwood paid its defense counsel, Mr. Gerstel, $10,000.00 to satisfy the $10,000.00 retention under the Liberty Policy.  SUF, No. 60.   Using the $275 hourly rate that Liberty agreed to pay for Ironwood's defense, the amount of defense fees and costs unpaid by Liberty from May 15, 2012 through February 26, 2013 totals $56,569.36 after subtracting the $10,000 retention payment made by Ironwood.  SUF, Nos. 62-71.  To date, Liberty has not paid any money toward Ironwood's defense.  SUF, No. 73.

### G.   Liberty Withdraws Coverage and Abandons Ironwood's Defense

On February 26, 2013, Liberty (through its new claims adjuster Seon Choi) informed Ironwood that it was withdrawing coverage in connection with the Cobb matter based solely on Ironwood's "no" response to Question No.14 on the Liberty application.  SUF, No. 61.

## III.   ARGUMENT

In diversity cases such as this, substantive issues are determined in accordance with state law.  *See, e.g.*, *Bank of Calif., N.A. v. Opie*, 663 F.2d 977, 980 (9th Cir. 1981).  Accordingly, California law applies to the issues that are the subject of this motion.

### A.   Liberty's Duty to Defend Ironwood in the Underlying Action

Under California law, the duty to defend arises <u>immediately</u> upon notice of a covered claim against its insured.  *Buss v. Superior Court*, 16 Cal.4th 35, 49, 65 Cal. Rptr. 2d 366 (1997).   An insurer must defend any suit that potentially seeks damages within the coverage of the policy.  *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275, 54 Cal. Rptr. 104 (1966).  The duty to defend arises whenever the lawsuit against the insured seeks damages on any theory that, if proved, would be covered by the policy.  Thus, a defense is excused only when a complaint can, by <u>no</u> conceivable theory, raise a single

1   issue that could bring it within the policy coverage. *Montrose Chem. Corp. v. Superior*
2   *Court* ("*Montrose I*"), 6 Cal.4th 287, 295, 24 Cal. Rptr. 2d 467 (1993); *Gray*, 65 Cal.2d
3   at 275, fn. 15.  The insured need only show that the underlying claim may fall within
4   policy coverage, while the insurer must prove it cannot.  *Montrose I*, 6 Cal. 4th at 300.
5   A bare 'potential' or 'possibility' of coverage is the trigger of a defense duty.  *Id.*
6   Accordingly, any doubt as to whether a potential for coverage exists is resolved in the
7   insured's favor.  *Id.* at 299-300; *Horace Mann Ins. Co. v. Barbara B.* 4 Cal.4th 1076,
8   1081, 17 Cal. Rptr. 2d 210 (1993).

9   Here, Ironwood tendered the Cobb claim to Liberty on May 15, 2012.  SUF, Nos.
10  24-25.   Liberty has already acknowledged that the claims being asserted against
11  Ironwood in the underlying Cobb matter are potentially covered.  SUF, No. 37; *See*
12  Tanner Decl., ¶ 27, Ex. 5, p. 2; Lux Decl. ¶ 21, Ex. 8, p. 6.)  Thus, it is undisputed that
13  Liberty's duty to defend Ironwood was triggered as of May 15, 2012.

### 1.   Liberty's Bad Faith Coverage Denial

15  Liberty's sole basis for withdrawing coverage and abandoning Ironwood's
16  defense is the alleged "no" response to Question No.14 on the Liberty Application,
17  which asked whether Ironwood was aware of an "act, error, omission, fact, or
18  circumstance" that could give rise to a later claim.  SUF, No. 61; *See* Declaration of
19  John J. McLeod filed concurrently herewith ("McLeod Decl."), ¶ 9, Ex. 7, pp. 2-4.
20  Liberty contends that the billing entries set forth in the Pre-Tender Invoices show that
21  prior to the October 2011 application for the Liberty policy, Ironwood was aware of
22  facts and circumstances which might give rise to a claim.  *Id.*  Liberty thus concludes
23  that Ironwood lied on its application and that the Question No. 14 Exclusion applies
24  and bars all coverage for the underlying Cobb action.  McLeod Decl., ¶ 9, Ex. 7, pp. 2-
25  4.  As follows, Liberty's position lacks legal and factual support.  Liberty cannot cite
26  any authority in support of its position and has absolutely no evidence – let alone
27  unequivocal evidence – that would conclusively show that Ironwood was aware of an
28  "act, error, omission, fact, or circumstance" that could give rise to a later claim when it

1   submitted Liberty Application.  So, Liberty's coverage position necessarily fails.

2   ## 2.   Coverage Limitations Are Narrowly Construed

3       Under California law, Liberty must apply and construe exclusions and limitations

4   on coverage narrowly in favor of Ironwood.  *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v.*

5   *Partridge*, 10 Cal.3d 94, 101, 109 Cal. Rptr. 811 (1973).  If there is any doubt with

6   respect to coverage, it must be resolved in the insured's favor.  *MacKinnon v. Truck*

7   *Ins. Exch.*, 31 Cal.4th 635, 656, 3 Cal. Rptr. 3d 228 (2003).  These rules apply equally

8   to questions in applications for insurance.  *Metropolitan Life Ins. Co. v. Devore* 66 Cal.

9   2d 129, 136, 56 Cal. Rptr. 881 (1967); *Jefferson Standard Life Ins. Co. v. Anderson*,

10  236 Cal. App. 2d 905, 912, 46 Cal. Rptr. 480 (1965); *see also Allstate Ins. Co. v.*

11  *Erickson*, 227 F.2d 755, 756 (9th Cir. 1955).  Because Question No. 14 and the

12  purported "exclusion" in the application must be narrowly construed and applied,

13  Question No. 14 can only be read as requiring Ironwood to provide information about

14  an actual "act, error, omission, fact, or circumstance," that has <u>already</u> taken place and

15  that actually may give rise to a later claim.

16      Here, it is undisputed that at the time Ironwood submitted the Liberty

17  Application (October 2011), the Board had not voted on the issue.  SUF, Nos. 2 & 15-

18  19.  Indeed, as of October 2011, the only thing the Board had done was to start talking

19  about the nature and terms of an on-going business practice.  *See* Declaration of Robert

20  C. Manion filed concurrently herewith ("Manion Decl."), ¶ 5; Tanner Decl., ¶ 9.   The

21  fact that such discussions were taking place when Ironwood submitted the Liberty

22  Application does not come close to constituting something that might give rise to a

23  claim.  After all, talking does not give rise to claims; only decisions do.  And no

24  decision was made (or vote even held) until January 2012, more than three months <u>after</u>

25  the Liberty Application was submitted.  SUF, Nos. 18-19; *See* Manion Decl., ¶ 5;

26  Tanner Decl., ¶ 9.  The mere consideration of possibly taking some action in the future

27  <u>did not</u> give rise to the underlying Cobb matter.  Nor could it give rise to any future

28  lawsuit.  What gave rise to the Cobb action was Ironwood's January 19, 2012 vote to

1    stop re-paying the Assessment.  That decision was made many months <u>after</u> the Liberty

2    Application was submitted in October 2011.

3           Nevertheless, contrary to California law, Liberty abandoned Ironwood's defense

4    based solely on the notion that Ironwood was required to disclose more than what the

5    application sought and more than what Ironwood could have reasonably understood

6    was purportedly being sought.  If Liberty wanted to know what Ironwood was talking

7    about possibly doing, California law required it to actually ask that question.  Having

8    not done so, it cannot deny coverage based on information for which it did not ask.

9    (*See Ashley v. Am. Mut. Liab. Ins. Co.* 167 F. Supp. 125, 131 (N.D. Cal. 1958) (insurers

10    must use language as to make questions in an application clear to the ordinary mind);

11    *Metropolitan*, 66 Cal.2d at 136; *Jefferson*, 236 Cal. App. 2d at 912; *Allstate*, 227 F. 2d

12    at 756 (insurer could have printed questions in the application if it desired more

13    detailed or other information); and *Unionamerica Ins. Co. v. The Fort Miller Group.*

14    *Inc.* 590 F.Supp.2d 1254, 1260 (N.D. Cal. 2008) (insured not required to disclose

15    information not asked for in application).

16           Furthermore, if, in fact, a prospective insured is required to disclose that it is

17    considering a new or different business practice or procedure (it is not), at what point in

18    the decision making process does it have to answer "Yes" to a question like Question

19    No. 14?  Question No. 14 certainly does not give any clue as to when on the spectrum

20    of the decision-making process such contemplations would have to be disclosed.  If a

21    board member merely informally suggests a new or different business practice, does

22    that trigger a "Yes" response to Question No. 14?  If one or more board members are,

23    or a committee is, tasked with evaluating a contemplated change in procedure, does that

24    trigger a "Yes" response to Question No. 14?  If the contemplated change in procedure

25    is put up for a vote by the board, does that trigger a "Yes" response to Question No. 14?

26    What if the board seeks the advice of counsel regarding the contemplated change in

27    procedure, does that trigger a "Yes" response to Question No. 14?  Whatever answers

28    Liberty may suggest in response to these questions, there is nothing in the language of

Question No. 14 that makes those parameters clear.  Whatever Liberty's intentions, Liberty's failure to clearly phrase the question to get that information precludes it from trying to impose that unexpressed intent on its insured after the fact.  There is nothing in the language of Question No. 14 that put Ironwood on notice that Liberty was seeking the disclosure of such information.

Furthermore, no purpose would be served by requiring a prospective insured to disclose that it was merely contemplating taking some action in the future.  It is undisputed that the Board's vote to stop re-paying the Assessment, which later gave rise to the Cobb claim, did not occur until many months <u>after</u> the Liberty application was submitted by Ironwood.  SUF, Nos. 2 & 15-19.  Accordingly, there was nothing that Ironwood was required to or could disclose on the Liberty Application.  Indeed, Ironwood's mere discussion of doing something in the future is not responsive to Question No. 14.  After all, when Ironwood completed the application, there was no "act, error, omission, fact, or circumstance[3], which may give rise to a Claim, which may fall within the scope of the proposed insurance."  Ironwood was not sued by Mr. Cobb because it was <u>discussing</u> changing its practice of re-paying the Assessment. Instead, as Liberty knows, Ironwood was sued because it voted on January 19, 2012 to actually stop re-paying the Assessment.  That was the only "act, error, omission, fact or circumstance" that gave rise to the Cobb claim and it occurred months <u>after</u> submission of the Liberty Application.  Accordingly, when Ironwood submitted the application, there was nothing it was required to disclose that was responsive to Question No. 14.

### 3.   <u>Liberty's Coverage Position Lacks Any Legal Support</u>

No California court has held that a prospective insured is required to disclose the fact that it is thinking about doing something or thinking about changing a business

---

[3] The word "circumstance" is not defined in the Liberty application.   Webster's defines "circumstance" as "a particular incident or occurrence."   Under this definition, there was no "circumstance" that would have required Ironwood to answer Question No. 14 with a "Yes," because there had not yet been an "incident" or "occurrence" that "may give rise to a Claim."

practice that, if done, might lead to a later claim.  Indeed, no California court has ever construed a question like Question No. 14 to require a prospective insured to disclose what the insured was merely discussing doing, if at all, in the future.  The cases that that have addressed the failure to disclose facts or circumstances on an application (or the insured's prior knowledge of such facts or circumstances) that could later give rise to a claim concern situations where a wrongful act or accident had <u>already</u> occurred or a demand letter and threat of future litigation had <u>already</u> been received.  *See, e.g.*, *Advanced Micro Devices v. Great Am. Surplus Lines Ins. Co.*, 199 Cal. App. 3d 791, 245 Cal. Rptr. 44 (1988); *Resure, Inc. v. Superior Court*, 42 Cal. App. 4th 156, 158-159, 49 Cal. Rptr. 2d 354 (1996); *Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.*, 64 Cal. App. 3d 261, 269-70, 134 Cal. Rptr. 427 (1976).  That is not the situation in this case.  Here, when Ironwood submitted the application to Liberty in October 2011, Ironwood had not voted to change its business practices or policies.  Therefore, there was no claim that had <u>already</u> been made against Ironwood or evidence of a problem of which Ironwood was <u>already</u> aware and that would lead it to believe that a claim would be asserted.

### 4. <u>Liberty's Coverage Position Lacks Any Factual Support</u>

Liberty cannot properly withdraw from Ironwood's defense based solely on Ironwood's supposed omission in the Liberty Application.  As discussed above, Liberty has a duty to defend against any claims where there exists a potential for coverage.  *Gray*, 65 Cal.2d at 275.  Liberty can avoid its duty to defend only if "the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage."  (*Montrose I*, 6 Cal. 4th at 300.)  Indeed, insureds like Ironwood are entitled to a defense if they "show a potential for coverage …, and (2) the insurers do not produce undisputed evidence which conclusively eliminates any possibility of coverage."  *Haskel, Inc. v. Superior Court*, 33 Cal. App. 4th 963, 968, 39 Cal. Rptr. 2d 520 (1995).  Here, Liberty does not have and cannot produce "undisputed evidence which conclusively eliminates any possibility of coverage."  Instead, and rather

glaringly, Liberty can only speculate as to what Ironwood may or may not have been aware as of October 5, 2011, when the application was submitted, and is relying exclusively on that speculation to justify its abandonment of Ironwood's defense.

Indeed, the language used in Liberty's February 2012 letter withdrawing coverage is telling. Nowhere does Liberty state that the facts unequivocally show that there is no potential that Ironwood was not aware of an "act, error, omission, fact, or circumstance," that could give rise to a later claim. Instead, Liberty repeatedly makes the following concessions: "there <u>appears</u> to be no coverage," "it <u>appears</u> that [Ironwood] and its counsel were considering 'Insurance issues re potential claims and coverage," "the response in the Application to question [SIC] <u>appeared</u> to have been inaccurate" and "[Ironwood] and its board members <u>appear</u> to have been aware of facts and circumstances which gave rise to the Complaint." SUF, No. 61; *See* McLeod Decl., ¶ 9, Ex. 7, pp. 1-4.) Liberty surmising that there "appears" to be no coverage is not a sufficient basis to deny a duty to defend. For all the reasons set forth above, California law requires a much higher showing. Liberty's position is based solely on speculation and, thus, there is no way it can (or would ever be able to) demonstrate that there is no potential duty to defend the Cobb matter.

## 5. <u>Liberty Improperly Relied on Privileged Information that Ironwood Inadvertently Disclosed</u>

Liberty's refusal to defend is based on speculation derived from privileged and protected information that was inadvertently disclosed to Liberty (i.e., the Pre-Tender Invoices). For the reasons discussed in more detail below, it is undisputed that the Pre-Tender Invoices are protected by the attorney-client privilege. Liberty's reliance on this privileged information in denying coverage, is wrong, unreasonable and not supported by California law. Indeed, because California law precludes an insurer from receiving privileged/protected information from its insured, it logically follows that an insurer cannot rely on that privileged/protected information as a basis to refuse to defend its insured. *Grey v. Superior Court*, 62 Cal. App. 3d 698, 703-04, 133 Cal.

11

Rprtr. 318 (1976); *Truck Ins. Exch. v. Unigard Ins. Co.*, 79 Cal. App. 4th 966, 975-76, 94 Cal. Rprtr. 2d 516 (2000); Cal. Civ. Code § 2860 (d).

The *Grey* case is instructive here.  In *Grey*, the insurer sought to avoid having to provide policy benefits under a life insurance policy.  62 Cal. App. 3d at 702.  The only way it could prove that a suicide exclusion was applicable (and thus avoid having to pay out under the policy) was to invade the patient-psychiatrist privilege and question the insured's former psychiatrist about his treatment of the deceased.  *Id.* at 703.  The court denied the insurer's attempt to invade this privilege even though it meant that insurer was left without any evidence to support its denial of policy benefits.  *Id.* at 704.  Like the insurer attempted to do in *Grey*, Liberty <u>is</u> relying on Ironwood's privileged/protected information as the sole basis to abdicate its duty to defend Ironwood in the Cobb matter.  California law does not permit such conduct.

### 6.  <u>Liberty Cannot Justify Its Coverage Denial by Hindsight</u>

Even if the attorney-client privilege does not apply to the Pre-Tender Invoices (for all the reasons discussed above and below, it does), any other information or documents Liberty might seek through discovery is simply not relevant in this coverage action.  As a matter of law, the only relevant matters that are considered in determining whether Liberty owes a defense are: (1) the terms of the policy; (2) the allegations of the third party's complaint against Ironwood; and (3) the extrinsic facts known to Liberty from any source.  *Montrose I*, 6 Cal. 4th at 295-96.  Furthermore, and more to the point, determining the existence of a duty to defend turns upon the facts known by the insurer <u>at the time of the inception of a third party lawsuit</u>.  *Haskel*, 33 Cal. App. 4th at 974.  Liberty, therefore, cannot use subsequently discovered facts to justify by hindsight its earlier refusal to defend.  *See, e.g.*, *Mullen v. Glens Falls Ins. Co.*, 73 Cal. App. 3d 163, 173-74, 140 Cal. Rprtr. 605 (1977); *Wausau Underwriters Ins. Co. v. Unigard Sec. Ins. Co.*, 68 Cal. App. 4th 1030, 1044, 80 Cal. Rprtr. 2d 688  (1998).  And subsequently discovered facts do not retrospectively apply to justify Liberty's earlier refusal to defend.  *Wausau*, 68 Cal. App. 4th at 1047.  Consequently, in determining

Liberty's duty to defend Ironwood in the underlying Cobb action, the only potentially relevant information, documents and/or materials are those on which Liberty relied at the time it withdrew coverage and refused to defend Ironwood.  Accordingly, Liberty cannot rely on any other newly-discovered facts to justify its prior refusal to defend Ironwood in the Cobb matter.

### 7.   <u>This Motion Is Not Premature</u>

During the meet and confer process, Liberty argued that this motion is premature, because discovery has not yet been conducted in this case.   Liberty is wrong. California law is directly to the contrary.  (*See, e.g.*, *Haskel*, 33 Cal. App. 4th at 974. Other U.S. District courts have rejected this very same argument.  (*See, e.g.*, *Endurance American Specialty Ins. Co. v. WFP Securities Corp.*, 2012 U.S. Dist. LEXIS 153864, 9-10, 11-cv-2611 JAH (KSC) (S.D. Cal., Sept. 28, 2012) (citing *Haskel*).  For all the reasons previously discussed, Liberty does not need to conduct any discovery on the three discrete issues that are the subject of the instant motion, as determining the existence of a duty to defend turns upon the facts known by the insurer <u>at the time of the inception of a third party lawsuit</u>.  *Haskel*, 33 Cal. App. 4th at 974.  Liberty simply cannot use subsequently discovered facts to justify by hindsight its earlier refusal to defend. *See, e.g.*, *Mullen*, 73 Cal. App. 3d at 173-74; *Wausau*, 68 Cal. App. 4th at 1044. Accordingly, any argument that this motion is premature until after discovery has commenced should be rejected.

In addition, Liberty argued that its "affirmative defense of rescission" renders this motion premature.  The most glaring problem is that Liberty's answer does not include rescission as an affirmative defense.   Request for Judicial Notice filed concurrently herewith ("RFJN"), ¶ 3, Ex. 3.  Indeed, it was not until December 20, 2013 (and only after Ironwood advised that it was proceeding with this motion) that Liberty requested <u>for the very first time</u> that Ironwood stipulate to Liberty amending its answer to add rescission as an affirmative defense.  McLeod Decl., ¶ 27, Ex. 25.  By waiting until December 20, Liberty made it practically impossible for Ironwood to

1   respond during a holiday week (when many of its Board members are unavailable).

2          Indeed, not once prior to December 20, 2013 did Liberty ever formally notify

3   Ironwood that it is seeking to rescind the policy.  Liberty's October 2012 reservation of

4   rights letter does not indicate that Liberty might seek to rescind the policy.  SUF, No.

5   37; *See* Tanner Decl., ¶ 27, Ex. 5; Lux Decl., ¶ 21, Ex. 8.  Neither does Liberty's

6   February 2013 letter withdrawing coverage.  SUF, No. 61; *See* McLeod Decl., ¶ 9, Ex.

7   7.  After abandoning Ironwood's defense, Liberty did not file an action to rescind the

8   policy and, upon the filing of this action, Liberty did not include rescission as an

9   affirmative defense in its answer.  RFJN, ¶ 3, Ex. 3.  Liberty also did not mention

10  rescission in its portion of the joint discovery plan or in its initial disclosures.  RFJN, ¶

11  4, Ex. 4; McLeod Decl., ¶ 31, Ex. 28.  And, when the parties were meeting and

12  conferring about this motion back in July and August 2013, Liberty never once raised

13  rescission as a reason why Ironwood's motion should not proceed.  *See* McLeod

14  Decl."), ¶¶ 15-24; Exs. 13-22.  It was not until December 20, 2013 – and only <u>after</u>

15  Ironwood notified Liberty that it was moving forward with this motion – that Liberty

16  suddenly felt compelled to seek to amend its answer to add rescission as an affirmative

17  defense.  Given the suspect timing of this request and the fact that Liberty had prior

18  knowledge of the alleged facts supporting its rescission claim since long before

19  choosing to omit rescission from in its initial answer in this action, this would seem to

20  be nothing more than a litigation tactic aimed at delaying Ironwood's instant motion.

21         In the meantime, though, even if Liberty had asserted rescission as an affirmative

22  defense in this case, it would <u>not</u> render this motion premature.  Liberty cites two cases

23  for the proposition that an insured cannot obtain summary judgment on the duty to

24  defend until after the insurer's rescission defense is resolved – *Rocklin Park Place*

25  *Condominium Owners Assoc. v. Liberty Ins. U'wtrs, Inc.*, 2013 U.S. Dist. LEXIS

26  127669, 2:12-cv-02247-TLN-CKD (E.D. Cal., Sept. 6, 2013) and *Atmel Corp. v. St.*

27  *Paul* 416 F. Supp. 2d 802 (N.D. Cal. 2006).  Liberty's reliance on these two cases is

28  misplaced.  The *Rocklin Park Place* case relied exclusively on the *Atmel* decision.

1  And, the *Amtel* decision is factually distinguishable, because, unlike here, the insured
2  sought partial summary judgment on the insurer's rescission claim and <u>not</u> on the duty
3  to defend.  Thus, neither of these cases support Liberty's position.

4        Furthermore, both *Rocklin Park Place* and *Amtel* turn California law regarding
5  the duty to defend on its head.  As discussed above, the duty to defend arises
6  <u>immediately</u> upon notice of a covered claim against its insured.  *Buss*, 16 Cal. 4th at 49.
7  A defense is excused only when a complaint can, by <u>no</u> conceivable theory, raise a
8  single issue that could bring it within the policy coverage.  *Montrose I*, 6 Cal. 4th at
9  295; *Gray*, 65 Cal.2d at 275, fn. 15.  Thus, the *Rocklin Park Place* and *Amtel* decisions
10 are contrary to California's well-established law on the <u>immediate</u> the duty to defend.

11       Indeed, court's that have actually taken into account California law on the duty to
12 defend have rejected the wait and see argument that Liberty is making here.  For
13 example, in *Endurance*, the insured sought partial summary judgment on the duty to
14 defend.  2012 U.S. Dist. LEXIS 153864, 17-21.  The insurer – just like Liberty –
15 argued that its rescission claim precluded judgment on the duty to defend claim.  *Id.*
16 The court rejected this argument, citing *Haskel* and explaining that the duty to defend
17 turns on the facts known to the insurer at the inception of the third party lawsuit and not
18 on the ultimate issue of coverage.  *Id.*  The *Endurance* court held that the insured was
19 entitled to summary judgment on their duty to defend claim.  *Id.* at 32.  Accordingly,
20 Liberty's argument has been rejected by court's that, unlike *Rocklin Park Place*,
21 actually base their decisions on California law.

22       In addition, the practical consequences of the wait and see approach that Liberty
23 wishes for would result in a windfall for insurance companies and a disaster for their
24 insureds.  It would allow an insurer like Liberty to assert a claim for rescission, refuse
25 to defend, and thereafter unilaterally impose a substantial delay and litigation costs on
26 the insured.  By asserting rescission and refusing to defend, insurers like Liberty could
27 employ this tactic in an effort to avoid claims altogether, which would directly
28 contradict the entire purpose of the <u>immediate</u> duty to defend.  *See, e.g.*, *Montrose I*, 6

Cal.4th at 295-96.  Accordingly, Liberty's wait and see approach should be rejected.

Ironwood anticipates that Liberty will also argue that this motion is premature because it plans to file a motion to stay this coverage action pending resolution of the underlying Cobb action.  For several reasons, Liberty has no right or standing to seek a stay of this coverage case.  In this case, Liberty is not providing (and has never provided) a defense to Ironwood.  As such, a stay would have the highly prejudicial effect of compelling the insured, Ironwood, to defend the Cobb action through trial, using only its own resources.  That would directly contradict the entire purpose of the duty to defend under an insurance policy.  *See, e.g.*, *Montrose I*, 6 Cal.4th at 295-96.  After all, the fact that Ironwood filed this action now, rather than waiting until conclusion of the Cobb action, evidences the concern that Ironwood has about having to fund its own defense without the assistance of the superior resources of Liberty.

Moreover, Ironwood is not aware of any legal authority (and Liberty has not provided any) that stands for the proposition that a motion to stay can be used to compel an insured, like Ironwood, to face and defend a third party claim on its own and without resort to insurance resources for which Ironwood paid a substantial premium.  Indeed, California courts have seemingly held the very opposite:

> In a case where there is no potential conflict between the coverage issues and the issues in the third party action, the carrier may obtain an early trial date in the coverage action… Where that cannot be done, however, the carrier gets to keep paying and paying and paying.  *Montrose Chemical Corp. of Calif.*, 25 Cal. App. 4th at 910.

Here, Liberty contends that there is a conflict between the coverage issues in this case and the issues in the underlying Cobb action.  The difference is that Liberty is <u>not</u> paying for Ironwood's defense.  Liberty acknowledged its duty to pay. SUF, Nos. 27 & 35-36.  Liberty subsequently agreed to pay for Ironwood's defense counsel.  SUF, Nos. 35-36.  But, it later refused to do so and reneged on its agreement to defend Ironwood. SUF, No. 61 & 73.  Thus, Ironwood has had to pay for its entire defense. By doing so, Liberty has created the problem in which it now finds itself.  It cannot justify (much

less carry its burden of proof) on its coverage defenses without discovery in this case; but, Liberty has now apparently realized that it cannot obtain that discovery without subjecting Ironwood to potentially significant prejudice in the Cobb action. It is therefore with no degree of irony that Liberty would suggest that the coverage case be stayed (to the sole prejudice of its insured, Ironwood), because Liberty cannot now prove its coverage arguments. Unfortunately for Liberty, that is not the law. At best, Liberty's arguments (if established) would only support a stay of the litigation (and any permissible discovery) as to only Liberty's coverage arguments, but not a stay of Ironwood's claims for a defense and for damages arising out of Liberty's failure to afford Ironwood an immediate and entire defense in the Cobb Action, including *Brandt* fees and punitive damages.

Directly on point to this very circumstance is *Haskel*, 33 Cal. App. 4th 963, which summarized the issue as follows:

> This case raises the question of just how that rule [requiring an insurer provide an immediate defense upon tender] impacts upon the right of an insurer, who has denied any defense obligation, to conduct discovery on an insured's motion for summary adjudication of the defense issue…. We conclude that Haskel was entitled to have its summary adjudication motion considered and, if (1) a showing of a potential for coverage under the several policies is made, and (2) the insurers do not produce undisputed evidence which conclusively eliminates any possibility of coverage, the motion should be granted. We also conclude that Haskel is entitled to a stay of prejudicial discovery. *Id.* at 968.

In this case, Liberty has already acknowledged that the claims asserted against Ironwood in the Cobb action are potentially covered. SUF, ¶ 37. Liberty's sole basis for withdrawing from the defense is a coverage argument that Liberty now acknowledges it cannot prove without conducting discovery (to which it is not entitled). Thus, by suggesting that this case needs to be stayed, Liberty has effectively admitted that it has no evidence (or at least the undisputed evidence that conclusively eliminates any possibility of coverage) to support its current coverage position and, thus, no evidence to support its abandonment of Ironwood's defense in this case.

1    In any event, it is now clear that Liberty must defend Ironwood in the Cobb

2  action, that it must do so immediately and entirely and, because of its wrongful refusal

3  to defend Ironwood up to this point in time, Liberty has waived its right to control the

4  defense.  Indeed, by wrongfully failing to fund any portion of Ironwood's defense and

5  wrongfully and unreasonably abandoning the defense of Ironwood in the Cobb action,

6  Liberty is precluded from relying on California Civil Code section 2860 and the hourly

7  rate limitations set forth therein.  *Intergulf Develop., LLC v. Superior Court*, 183 Cal.

8  App. 4th 16, 107 Cal. Rptr. 3d 162 (2010); *Janopaul + Block Cos., LLC v. Superior

9  Court*, 200 Cal. App. 4th 1239, 133 Cal. Rptr. 3d 380 (2011).  Instead, Liberty is

10 obligated to fund the entire defense of the Cobb action and is liable for, among other

11 things, the fees and costs incurred by Ironwood in this case in order to obtain coverage

12 that was unreasonably withheld (i.e., *Brandt* fees).

13    Indeed, in suggesting that it needs discovery in order to defeat Ironwood's claim

14 for a defense, Liberty places itself in exactly the same position as the carriers in *Haskel*,

15 which, in turn, makes the following observation by the *Haskel* court particularly apt:

16    The insurers were either aware of such [underline]undisputed[/underline] extrinsic
    evidence which <u>conclusively</u> establishes that there is no
17   potential for coverage] or they were not; they did not need
     discovery from Haskel to determine the existence of that
18   evidence.… If, on the other hand, they did not have such
     conclusive evidence, then they could not successfully oppose
19   Haskel's claim for an immediate judicial recognition of the fact
     that a defense obligation <u>then</u> existed. *Id.* at 977.
20

21    Here, Liberty is either aware of evidence to support its denial or it is not.  And, if

22 it does not have that evidence now (without additional discovery), then Liberty acted

23 wrongfully in refusing to defend Ironwood and in abandoning Ironwood's defense in

24 the Cobb action.  And, for all the reasons set forth above, Liberty cannot seek discovery

25 to try to justify, after-the-fact, its denial of coverage and abandonment of Ironwood.  In

26 short, none of the issues raised by Liberty support a stay of the action.

27    **B.    <u>Liberty Must Reimburse Ironwood for Defense Fees and Costs</u>**

28    An insurer such as Liberty waives its right to control the defense of an action by

18

1   refusing to defend.  Hon. H. Walter Croskey, et al., Rutter Group Practice Guide: Ins.

2   Lit.; Ch. 7B-A, ¶ 7:506 (2013 ed.).  Where an insurer refuses to defend, and coverage is

3   ultimately established, the insurer is required to pay <u>all</u> of the defense costs reasonably

4   incurred by the insured, including attorney fees allocable to non-covered claims.  (<u>Id.</u> at

5   ¶ 7:506.2.)   Indeed, where an insurer has breached its duty to defend, and where the

6   insured retains counsel to defend the claim, the insured is entitled to recover the costs

7   incurred in the defense of the action.  Hon. H. Walter Croskey, et al., Rutter Group

8   Practice Guide: Ins. Lit.; Ch. 7B-H, ¶ 7:691 (2013 ed.); *Marie Y. v. General Star*

9   *Indem. Co.*, 110 Cal. App. 4th 928, 960-61, 2 Cal. Rptr. 3d 133 (2003).  This includes

10   'reasonable and necessary' investigative costs to minimize or avoid liability.  *Aerojet-*

11   *General Corp. v. Transport Indem. Co.*, 17 Cal.4th 38, 64, 70 Cal. Rptr. 2d 218 (1997).

12   This also includes defense costs allocable to non-covered claims.  *State of Calif. v.*

13   *Pacific Indem. Co.,* 63 Cal.App.4th 1535, 1551, 75 Cal. Rprtr. 2d 69  (1998).

14        Here, it is undisputed that Ironwood tendered the defense to Liberty on May 15,

15   2012.  SUF, Nos. 24-25.  While it initially agreed to defend Ironwood at a discounted

16   hourly rate of $275, when Liberty subsequently withdrew coverage and abandoned

17   Ironwood's defense without paying any defense costs, Liberty waived its right to

18   control the defense and must now reimburse Ironwood for all of the defense fees and

19   costs incurred in defending the Cobb matter at Mr. Gerstel's full hourly rate ($425).

20        That said (and while reserving all of its rights under California law to seek

21   additional defense fees and costs incurred by Ironwood), for purposes of the instant

22   motion, Ironwood is seeking and order that Liberty must immediately reimburse

23   Ironwood for the fees and costs Ironwood incurred (at the discounted hourly rate of

24   $275 and after subtracting Ironwood's payment of the $10,000 retention under the

25   Liberty policy) in defense of the Cobb Lawsuit from May 15, 2012 (the date that

26   Ironwood gave notice to Liberty) to February 26, 2013 (the date that Liberty withdrew

27   from Ironwood's defense in the Cobb Lawsuit).

28        To that end, it is undisputed that on or about February 21, 2013, Ironwood paid

its defense counsel, Mr. Gerstel, $10,000.00 to satisfy the $10,000.00 retention under the Liberty Policy.  SUF, No. 60.  It is also undisputed that, using the discounted $275 hourly rate that Liberty agreed to pay for Ironwood's defense, the amount of defense fees and costs unpaid by Liberty from May 15, 2012 through February 26, 2013 totals $56,569.36 after subtracting the $10,000 retention payment made by Ironwood.  SUF, Nos. 62-71.   Accordingly, Ironwood hereby respectfully submits that the Court should order Liberty to immediately reimburse Ironwood the sum of $56,569.36.

### C.   Liberty Must Return the Pre-Tender Invoices to Ironwood

Ironwood has repeatedly demanded that Liberty return the Pre-Tender Invoices. SUF, No. 57.  Liberty has refused and has now stated in its initial disclosures that it intends to use the Pre-Tender Invoices to support its defenses in this coverage action. SUF, Nos. 58-59; McLeod Decl., ¶ 31, Ex. 28, p. 9.   As follows, the Pre-Tender Invoices are subject to a properly asserted claim of privilege and, thus, good cause exists for an order directing Liberty to immediately return to Ironwood any and all copies (digital, paper or otherwise) of the Pre-Tender Invoices and prohibiting Liberty from using said invoices in any way and for any purpose in this action.

In diversity cases such as this, privilege issues must be determined in accordance with state law.  Fed. R. Evid., 501.  Under California law, a timely claim of privilege furnishes an automatic ground for exclusion or nondisclosure of the privileged information unless and until the court overrules the privilege claim and orders disclosure.  Cal. Evid. Code, § 914(b).  Statutorily-created privileges such as the attorney-client privilege are strictly construed and courts may not create exceptions to such privileges.  (Cal. Evid. Code, § 911, Comment; *see e.g.*, *Wells Fargo Bank, N.A. v. Superior Court*, 22 Cal. 4th 201, 209, 91 Cal. Rptr. 2d 716 (2000).

To that end, a client may refuse to disclose, and prevent another from disclosing, a confidential communication between the client and their lawyer.  Cal. Evid. Code, § 954.  This privilege has been "a hallmark of Anglo-American jurisprudence for almost 400 years."  *Costco Wholesale Corp. v. Superior Court*, 47 Cal.4th 725, 732, 101 Cal.

20

Rptr. 3d 758 (2009) (internal quotations omitted).   Its fundamental purpose is to preserve the confidentiality of communications between clients and their attorneys "so as to promote full and open discussion of the facts and tactics surrounding individual legal matters."   *Id.*   And, while the application of the privilege may result in the suppression of relevant evidence, the California legislature has determined that such concerns are outweighed by the importance of preserving the attorney-client relationship.   *Id.*   Thus, the privilege "is absolute and disclosure may not be ordered without regard to relevance, necessity or any particular circumstances peculiar to the case."   *Id.*

For example, in the *Costco* case, the California Supreme Court held that an attorney's opinion letter was entirely protected from disclosure, despite the fact that some information in the letter may have been discoverable through other means.   47 Cal. 4th at 741.   The Court concluded that the party seeking to uphold the privilege need only establish the confidential nature of the communication and not that "its case would be prejudiced by the discovery of the [privileged] letter."   *Id.*   Thus, the attorney-client privilege applies even when the information sought is relevant and even when it prevents disclosure of information prejudicial to the party asserting the privilege.

The broad scope of the attorney-client privilege protects confidential communications between the attorney and client.   Cal. Evid. Code, § 954.   A "confidential communication" means information transmitted between the attorney and their client in the course of the attorney-client relationship and in confidence.   Cal. Evid. Code, § 952. A "communication" is broadly construed to refer to *any* means of conveying information.   *City & County of San Francisco v. Superior Court*, 37 Cal. 2d 227, 235-36, 231 P.2d 26 (1951).   And, any and all communications between an attorney and their client are presumed to have been made in confidence, thereby shifting the burden to the opposing party to establish the communication was somehow not confidential.   Cal. Evid. Code, § 917(a).   Thus, Liberty has the burden to establish that the Pre-Tender Invoices are not subject to the attorney-client privilege.

Here, it is undisputed that the Pre-Tender Invoices constitute information transmitted between an attorney (Mr. Gerstel) and his client (Ironwood).  SUF, Nos. 40-49.   It is also undisputed that the Pre-Tender Invoices contain attorney-client communications describing legal services performed by Mr. Gerstel for Ironwood on various matters unrelated to the defense of the Cobb matter.   SUF, No. 40. Furthermore, it is undisputed that Ironwood and Mr. Gerstel have always kept the Pre-Tender Invoices and their contents confidential in the normal course of their attorney-client relationship.  SUF, No. 41.  As such, it is undisputed that the Pre-Tender Invoices constitute information transmitted between an attorney (Mr. Gerstel) and his client (Ironwood) in the course of the attorney-client relationship and in confidence.  The Pre-Tender Invoices therefore constitute confidential communications between the attorney and client and are absolutely protected by the attorney-client privilege.  The same is true for the Lavely & Singer invoices.  *See* Tanner Decl., ¶ 24; Gerstel Decl., ¶ 17.

### 1.        Ironwood Has Not Waived the Attorney-Client Privilege

In response to Ironwood's repeated demands that Liberty return the Pre-Tender Invoices, Liberty has argued that Ironwood waived the attorney-client privilege by submitting them to Ironwood for reimbursement.   However, under California law, waiver of a statutory privilege is narrowly construed.  *Roberts v. Superior Court*, 9 Cal. 3d 330, 342-43, 107 Cal. Rptr. 309 (1973). The waiver must be a voluntary and knowing act that is done with sufficient awareness of the relevant circumstances and likely consequences.  *Id.*  Thus, any waiver of the attorney-client privilege must be intentional and the privilege cannot be waived by inadvertent disclosure.

Here, there was no voluntary and knowing waiver that was done with sufficient awareness of the relevant circumstances and likely consequences.  Instead, the Pre-Tender Invoices were inadvertently disclosed to Liberty.  Ironwood's insurance broker, Mr. Lux, who was Ironwood's primary point of contact with Liberty and served as the conduit for the exchange of information between Ironwood and Liberty, asked Mr. Tanner to send all invoices that Ironwood had received in the Cobb matter.  SUF, No.

29.  Mr. Lux did not advise Mr. Tanner to limit the scope of the invoices to only those that post-dated the May 15, 2012 notice to Liberty.  SUF, No. 30.  And, Ironwood did not understand that Liberty was only asking for the post-tender bills reflecting the legal fees incurred in defense of the Cobb matter.  SUF, No. 31.  Consequently, it was by innocent mistake that invoices pre-dating May 2012 were disclosed to Liberty.

Furthermore, even if Mr. Tanner was sufficiently aware of the relevant circumstances and likely consequences of disclosing the Pre-Tender Invoices to Liberty (he was not) so as to arguably constitute a "voluntary and knowing waiver," the fact of the matter is that Ironwood (and not Mr. Tanner) is the holder of the privilege.  Cal. Evid. Code, § 953(a).  Mr. Tanner does not have authority to waive any privileges on behalf of Ironwood.  SUF, No. 43.  Any such waiver would require authorization from Ironwood's Board, which Mr. Tanner neither asked for nor received.  SUF, Nos. 44-46.  In addition, the Pre-Tender Invoices were sent to Liberty without Mr. Gerstel's knowledge or authorization.  SUF, Nos. 47-48.  If he had been asked to send Liberty the Pre-Tender Invoices, Mr. Gerstel would have refused to do so.  SUF, No. 49.

Moreover, as discussed above, Ironwood and Mr. Gerstel always kept Mr. Gerstel's invoices and their contents confidential in the normal course of its attorney-client relationship.  SUF, No. 41.  Consequently, the Pre-Tender Invoices, which were sent to Liberty without Mr. Gerstel's or the Board's approval or authorization, were not provided to Liberty with any intention of waiving the attorney-client privilege.  SUF, No. 42.  Thus, Liberty's waiver argument fails as a matter of law.

Furthermore, when Ironwood realized that the Pre-Tender Invoices had been inadvertently disclosed to Liberty, Ironwood took immediate steps to have Liberty return the invoices and destroy any and all copies in their possession.  Indeed, Ironwood's counsel in this matter has made no less than six written requests for the return of the Pre-Tender Invoices.  SUF, No. 57.  Thus, Ironwood took immediate steps to assert and preserve the attorney-client privilege once it became aware that the Pre-Tender Invoices had been inadvertently disclosed.  In short, given the circumstances of

this case, Liberty cannot reasonably maintain that Ironwood intentionally waived the privilege – especially when the scope of the privilege is so broadly applied and the waiver doctrine so narrowly construed.

Ironwood anticipates that Liberty will argue that the delay in bringing this motion somehow waived Ironwood's privilege claims.  However, any delay in bringing this motion was a direct result of Liberty's actions in this case.  In advance of the mediation (which took place on November 20, 2013), the parties were preparing to file a joint stipulation/discovery motion on the privilege issues surrounding the Pre-Tender Invoices.  McLeod Decl. ¶¶ 32-36 & 40.  The idea was to have the hearing date on the joint motion shortly after this mediation so that both sides would have a greater incentive to resolve the case with a decision on the privilege issue looming.  *Id.*

On the eve of filing the joint stipulation/discovery motion (literally), things went sideways.  Liberty insisted on including verbatim quotations from the very billing entries in dispute (i.e., the billing entries that Ironwood contends are privileged).  McLeod Decl. ¶¶ 35-36, Ex. 30.  For obvious reasons, Ironwood could not agree to a public filing of the privileged billing entries and, so, requested that Liberty either agree to file a redacted version or seek leave to file the joint stipulation/discovery motion under seal.  *Id.*  Liberty declined and the joint stipulation was never filed.  *Id.*

### 2.   The "Crime-Fraud" Exception Does Not Apply

Liberty has argued that the "crime-fraud" exception to the attorney-client privilege applies in this case.  This specious argument does little more than underscore Liberty's bad faith claims handling, which continues to apply during litigation.  *White v. Western Title Ins. Co.*, 40 Cal.3d 870, 221 Cal. Rptr. 509 (1985) (superseded by statute on unrelated grounds).  Under California law, the applicability of the "crime-fraud" exception is extremely limited.  Cal. Evid. Code, § 956.  This narrow exception applies only when the client seeks legal assistance to plan or perpetrate a crime or fraud.  *Glade v. Superior Court*, 76 Cal. App. 3d 738, 746, 143 Cal. Rptr. 119 (1978).  And, a mere allegation of fraud is insufficient to make the exception applicable.

*Dickerson v. Superior Court*, 135 Cal.App.3d 93, 100, 185 Cal. Rptr. 97 (1982). Here, Liberty cannot offer any evidence (let alone admissible evidence) to support a finding that Ironwood sought Mr. Gerstel's legal assistance to plan or perpetrate a fraud. Such an exception to the rules of privilege cannot be established by mere allegations. Liberty's unsubstantiated claim that Ironwood and Mr. Gerstel were working together to plan or perpetrate a fraud constitutes bad faith *per se*.

For all the foregoing reasons, Ironwood respectfully submits that the Pre-Tender Invoices are protected by the attorney-client privilege. Good cause therefore exists for this Court to order Liberty to return the Pre-Tender Invoices to Ironwood and prohibit Liberty from using them in any manner and for any purpose in this litigation.

## IV.   **CONCLUSION**

Based upon the foregoing facts and authorities, Ironwood respectfully requests that the Court grant Ironwood's motion for partial summary judgment and order as follows: (1) Liberty has a duty to defend Ironwood in the underlying Cobb Lawsuit; (2) Liberty must immediately reimburse Ironwood the sum of $56,569.36 for the fees and costs Ironwood incurred (at the agreed-upon hourly rate of $275 and after subtracting Ironwood's payment of the $10,000 retention under the Liberty policy) in defense of the Cobb Lawsuit from May 15, 2012 (the date that Ironwood gave notice to Liberty) to February 26, 2013 (the date that Liberty withdrew from Ironwood's defense in the Cobb Lawsuit); and (3) Liberty must immediately return to Ironwood any and all copies (digital, paper or otherwise) of the Pre-Tender Invoices and Liberty is prohibited from using said invoices in any way and for any purpose in this action.

DATED: December 30, 2013          McLEOD LAW GROUP, A.P.C.


By:   /s/ Paul C. Hirst
          John J. McLeod, Esq.
          Paul C. Hirst, Esq.
           Attorneys for Plaintiff, Ironwood Country Club