John J. McLeod, Esq., State Bar No. 174169
john@mcleodlawgroup.com
Paul C. Hirst, Esq., State Bar No. 234460
pchirst@mcleodlawgroup.com
McLEOD LAW GROUP, A.P.C.
701 B Street, Suite 1570
San Diego, California 92101
Telephone:  (619) 236-9938
Facsimile:  (619) 236-9943

Attorneys for Plaintiff,
IRONWOOD COUNTRY CLUB

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| IRONWOOD COUNTRY CLUB, | CASE NO. 13-00996-VAP (DTBx) |
| Plaintiff, | **DECLARATION OF ALAN LUX IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| LIBERTY INSURANCE UNDERWRITERS, INC. and DOES 1 through 100, | Hearing Date:    January 27, 2014 |
| | Hearing Time:   2:00 p.m. |
| Defendants. | Courtroom:      Hon. Virginia A. Phillips |

Date Complaint Filed: May 1, 2013
Trial Date: August 5, 2014

Filed concurrently with:
1. *Notice of Motion and Motion;*
2. *Points and Authorities;*
3. *Statement of Undisputed Facts;*
4. *Declaration of Bryan R. Gerstel;*
5. *Declaration of Joshua Tanner;*
6. *Declaration of Robert C. Manion;*
7. *Declaration of John J. McLeod;*
8. *Request for Judicial Notice; and*
9. *[Proposed] Order.*

---

Declaration of Alan Lux ISO Ironwood's Motion for Partial Summary Judgment

**I, ALAN LUX, declare:**

1.     I am the Vice President of the insurance brokerage firm Tanenbaum-Harber of CA, Inc. ("Tanenbaum-Harber"). I have personal knowledge of the matters set forth herein and if called upon to testify I could and would competently do so, except as to those matters stated on information and belief and, as to those matters, I believe them to be true.

2.     I began my employment with Tanenbaum-Harber in 1989. I have been a licensed insurance broker since that time and, overall, I have worked for more than 25 years in the insurance industry. In my position as an insurance broker for Tanenbaum-Harber, I am a licensed, professional intermediary that represents the interests of clients in various industries in the purchase of insurance, surety and risk management products.

3.     Ironwood Country Club ("Ironwood") has been a client of Tanenbaum-Harber for approximately 10 years. Throughout that time, I have been Ironwood's primary point of contact at Tanenbaum-Harber. Since about February 2010, my primary points of contact at Ironwood have been its General Manager and Chief Operating Officer, Joshua Tanner, and its Controller, Lydia Magat. Since that time I have worked with Mr. Tanner with respect to the marketing and procurement of insurance policies to suit Ironwood's coverage needs. I also work with Mr. Tanner with respect to the handling of claims and suits against Ironwood, including providing notice of such claims or suits to Ironwood's insurance carriers.

4.     I was the insurance broker for Ironwood for, among others, a Philadelphia Insurance Company ("Philadelphia") policy affording Directors & Officers Liability coverage and Employment Practices Liability coverage for the policy period of October 1, 2010 to October 1, 2011, as well as a Liberty Insurance Underwriters, Inc. ("Liberty") policy that replaced the Philadelphia policy for the period of October 1, 2011 to October 1, 2012.

/ / /

---

1

Declaration of Alan Lux ISO Ironwood's Motion for Partial Summary Judgment

5.     In or about the mid-2011, Philadelphia informed me that it would not be renewing its policy.  Accordingly, in July 2011, I began working with Mr. Tanner with respect to marketing and procuring a policy to replace the outgoing Philadelphia policy. To that end, I marketed Ironwood's coverage needs to several different insurance companies in an effort to obtain quotes for a policy to replace the Philadelphia policy. One such quote Ironwood received was from Liberty.

6.     Throughout this process, my primary point of contact with Liberty was a wholesale broker, Robin Schmitt of ARC Excess & Surplus, LLC ("ARC").  As such, Mr. Schmitt was the intermediary for all communications between my firm, on behalf of Ironwood, and Liberty.  Indeed, Mr. Schmitt and his firm, ARC, has been my primary point of contact with Liberty since the policy was placed and purchased by Ironwood.

7.     On or about October 5, 2011, I received from Mr. Tanner a completed "Application for Nonprofit Executive Advantage Policy" for the proposed Liberty policy.  I thereafter submitted the completed application to Liberty.

8.     It was recently brought to my attention that Liberty contends that Ironwood provided a "no" response to Question #14 on the abovementioned application.  I have discussed this issue with Mr. Tanner and I am informed and believe that the application Ironwood has in its files does not include a response to Question #14.  I reviewed my files for the Liberty policy and conferred with other members of my firm and with Mr. Tanner and I am not aware of who provided a "no" response to Question #14.

9.     Liberty thereafter issued a "Nonprofit Executive Advantage Policy" to Ironwood, policy number DOCH216747-211, for the policy period of October 1, 2011 to October 1, 2012 ("Policy").  A true and correct copy of the Liberty Policy that was delivered to me by ARC, on behalf of Liberty, is attached hereto as Exhibit 1.  The Policy attached hereto as Exhibit 1 has been redacted so as not to reveal confidential premium information set forth on the "Declarations" page.

10.     During the week of May 7, 2012, Mr. Tanner contacted me about a demand letter that Ironwood had received from William S. Cobb, Jr.   I asked Mr. Tanner to forward the letter to me so that I could put Liberty on notice of the claim, which he did.

11.     On May 15, 2012, at my request, Tanenbaum-Harber's office manager, Diane Kemp, forwarded to Ms. Schmitt of ARC a copy of Mr. Cobb's May 7, 2012 demand letter.

12.     On or about May 16, 2012, Ms. Kemp received an email from Michelle Cioni of ARC, which attached a letter from Liberty to Ms. Schmitt dated May 16, 2012. In the normal course of business, Ms. Kemp gave me a copy of said May 16, 2012 email and letter for my files, a true and correct copy of which is attached hereto as Exhibit 2.

13.     For the next two weeks, I exchanged several phone calls and emails with Mr. Schmitt of ARC hoping to find out the name and contact information for the claims adjuster assigned by Liberty to handle the Cobb claim.   In the normal course of business, I kept a log of these emails and phone calls, a true and correct copy of which is attached hereto as Exhibit 3.

14.     Finally, on June 1, 2012, I received an email from Mr. Schmitt of ARC confirming that Liberty's adjuster on the file was Christine Testaverde.   A true and correct copy of Mr. Schmitt's June 1, 2012 email to me is attached hereto as Exhibit 4.

15.     I thereafter had several conversations with Ms. Testaverde about the Cobb claim and kept her apprised of significant developments.   At the time, I was Ironwood's primary point of contact with Liberty about the Cobb claim.

16.     I am informed and believe that, on or about August 21, 2012, Mr. Cobb filed a lawsuit against Ironwood regarding many of the same issues set forth in his May 7, 2012 demand letter.

/ / /

/ / /

3

Declaration of Alan Lux ISO Ironwood's Motion for Partial Summary Judgment

17.     On or about September 13, 2012, I had a telephone conversation with Ms. Testaverde, during which she informed me that Liberty had agreed to defend Ironwood in the Cobb matter.  She indicated that a formal letter confirming Liberty's agreement to defend Ironwood would be forthcoming.  During our conversation, Ms. Testaverde asked me to forward to her copies of any and all bills that Ironwood had received for legal fees and costs in connection with the Cobb matter.  She indicated that Liberty needed to review the bills so that it could see what amounts would be reimbursed to Ironwood after deducting the $10,000 retention under the Policy.

18.     Accordingly, on September 13, 2012, I called Josh Tanner and asked him to send me all of Ironwood's invoices for legal fees and costs in connection with the Cobb claim.  During my conversation with Mr. Tanner, I did not tell him to limit the scope of Ironwood's invoices to only those for legal fees that post-dated the May 15, 2012 notice of the Cobb claim to Liberty.  That same day, I received an email from Ironwood's Controller, Ms. Magat, forwarding me several invoices, which I then forwarded via email to Ms. Testaverde.  I did not review the invoices prior to forwarding them to Ms. Testaverde.  A true and correct copy of my September 13, 2012 email exchange with Ms. Magat and Ms. Testaverde (without attachments) is attached hereto as Exhibit 5.

19.     I am informed and believe that sometime shortly thereafter, Ms. Testaverde spoke to Ironwood's counsel, Bryan Gerstel, and agreed to pay Mr. Gerstel's firm to defend Ironwood in the Cobb matter.  Indeed, on September 18, 2012, I received an email from Josh Tanner asking me to send him Ms. Testaverde's contact information so that he could forward the same to Mr. Gerstel.  I exchanged emails with Ms. Testaverde regarding this request on September 18 and September 19, 2012.  A true and correct copy of my September 18 and September 19, 2012 email exchanges with Mr. Tanner and Ms. Testaverde is attached hereto as Exhibit 6.

/ / /

/ / /

Declaration of Alan Lux ISO Ironwood's Motion for Partial Summary Judgment

20.     On September 26, 2012 and October 24, 2012, I exchanged emails with Ms. Testaverde inquiring whether she had yet reviewed Ironwood's bills that I had forwarded to her earlier and whether she had sent the letter confirming Liberty's agreement to defend Ironwood in the Cobb matter.   A true and correct copy of the September 26, 2012 and October 24, 2012 emails that I exchanged with Ms. Testaverde is attached hereto as Exhibit 7.

21.     On October 25, 2012, I received an email from Ms. Testaverde, which attached a coverage position letter from Liberty to Ironwood of that same date.   A true and correct copy of the October 25, 2012 email and letter is attached hereto as Exhibit 8.

22.     On February 13, 2013, I received an email from Seon Choi of Liberty indicating that Ms. Testaverde was no longer with their office.   A true and correct copy of Ms. Choi's February 13, 2013 email to me (without attachment) is attached hereto as Exhibit 9.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at _San Diego_, California, on December _23_, 2013.

_Alan Lux_
Alan Lux

# EXHIBIT 1

# LIBERTY INSURANCE UNDERWRITERS INC.

55 Water Street, 18th Floor
New York, New York 10041
(a member of the Liberty Mutual Group and hereinafter "the insurer")
Liberty Insurance Underwriters Inc.'s toll free number is: 800-677-9163

# NONPROFIT EXECUTIVE ADVANTAGE POLICY

## DECLARATIONS

NOTICE: THIS IS A CLAIMS-MADE POLICY. THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 60 DAYS AFTER THE END OF THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.

THE INSURER HAS THE DUTY TO DEFEND.

| | |
|---|---|
| POLICY NUMBER:  DOCH216747-211 | PRODUCER:  ARC Excess & Surplus, LLC |
| RENEWAL OF:     NA | |

**ITEM I.   NAME AND ADDRESS OF PARENT ORGANIZATION:**

Ironwood Country Club
73-735 Irontree Dr.
Palm Desert, CA 92260

**ITEM II.      POLICY PERIOD:**   Inception Date: 10/1/11  Expiration Date: 10/1/12
(12:01 A.M. at the address set forth in Item I)

**ITEM III.     LIMIT OF LIABILITY:**   $2,000,000 in the aggregate for the Policy Year

**ITEM IV.     RETENTION:**   $10,000 – Directors & Officers in the aggregate each Claim

**ITEM V.      PRIOR LITIGATION DATE:**   10/1/11

**ITEM VI.     PREMIUM:**   $:

**ITEM VII.    ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE: 3**

This Declarations page, together with the Application, the attached Nonprofit Executive Advantage Policy Form, and all endorsements thereto, shall constitute the contract between the Insurer and the Insureds. This Policy is valid only if signed below by a duly authorized representative of the Insurer.

_____
Authorized Representative

LIU09DO030010507

Exhibit ___1___
Page ___1___

# LIBERTY INSURANCE UNDERWRITERS INC.

## (A Stock Insurance Company, hereinafter the "Insurer")

### NONPROFIT EXECUTIVE ADVANTAGE POLICY

(Words and phrases printed in **bold**, other than
in the headings, are defined in Section 23 below.)

In reliance upon the truthfulness and accuracy of the statements made in the **Application**, in consideration of, and subject to, the payment of premium when due, and subject to the terms, conditions, and exclusions of this Policy, the Insurer and the **Insureds** agree as follows:

1. **Insuring Agreement:** The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**.

2. **Defense Costs and Settlements:**

   2.1   It shall be the right and duty of the Insurer to defend any **Claim**.   The Insurer may investigate, as it deems appropriate, any **Claim**, circumstance, or **Wrongful Act** involving the **Insureds**.

   2.2   The **Insureds** shall not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld.  The Insurer shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements, or settlements made by the **Insureds** without the Insurer's prior written consent.

   2.3   The Insurer has the right to negotiate the settlement of any **Claims** it deems expedient, but only with the **Insured's** consent.  If the **Insureds** withhold consent to such settlement, the Insurer's liability for such **Claim** is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the **Insured** consented to the settlement, and 70 percent (70%) of any additional covered **Loss**, including **Defense Costs**, incurred subsequent to such refusal to settle.

3. **Cooperation:** As a condition precedent to the **Insureds'** rights under this Policy, they shall give to the Insurer all information and cooperation as the Insurer reasonably may require and shall do nothing that may prejudice the Insurer's position or its rights of recovery.

4. **Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured**:

   4.1   for:

      (a)   bodily injury, sickness, disease, death; or

      (b)   emotional distress, mental anguish, false arrest or imprisonment, abuse of process, malicious prosecution, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction; or

Exhibit ___1___
Page ___2___

(c)     libel, slander, defamation; or

(d)     damage to, destruction of, or loss of use of any tangible property;

provided that parts (b) and (c) of this exclusion shall not apply to any **Claim** brought by or on behalf of any **Third Person**, or any past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**; also provided that part (c) of this exclusion shall not apply to any **Claim** for any other **Wrongful Act** other than an **Employment Practices Wrongful Act**. However, coverage afforded for libel, slander or defamation for **Wrongful Acts** other than **Employment Practices Wrongful Acts** shall be excess of any coverage afforded by the **Insured's** general liability policy;

4.2     for any error, misstatement, misleading statement, act, omission, neglect or breach of duty by **Insured Persons** of any **Subsidiary** in such capacity or by the **Subsidiary** itself if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a **Subsidiary**;

4.3     based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time;

4.4     for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar federal, state, local or common law;

4.5     based upon, arising from, or in any way related to:

(a)     any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or

(b)     the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding;

4.6     brought or maintained by or on behalf of the **Insured Organization**;

4.7     based upon, arising from, or in any way related to the actual, alleged, or threatened discharge, dispersal, release or escape of **Pollutants, Fungi** or **Microbes**, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants, Fungi** or **Microbes**;

4.8     based upon, arising from, or in any way related to an **Insured Person** serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the **Insured Organization**; or

4.9     based upon, arising from, or in any way related to:

(a)     any **Insureds** gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled; or

Exhibit     1
Page       3

    **(b)**    any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured**;

    provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred.

For purposes of determining the applicability of Section 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

5.    **Loss Exclusions:** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim:**

    **5.1**    for any obligation of the **Insured Organization** to modify any building or property in order to affect compliance with the Americans With Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common laws; or

    **5.2**    for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement.

Provided, however, that these exclusions shall not apply to the Insurer's duty to defend and to pay **Defense Costs.**

6.    **Application Representations and Severability:**

    **6.1**    The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such statements and representations.

    **6.2**    The **Insureds** agree that if the **Application** contains any statements or representations that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person.**

7.    **Reporting Requirements:**

    **7.1**    The **Insureds**, as a condition precedent to their rights under this Policy, shall report every **Claim** to the Insurer as soon as practicable from the date any **Executive Officer** has knowledge of the **Claim**, and in no event later than ninety (90) days after the end of the **Policy Period.**

    **7.2**    Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded to Liberty **International Underwriters, 55 Water Street, 18th Floor, New York, NY 10041 Attention: Specialty Casualty Claims.**

    **7.3**    All notices under this Policy shall be sent in writing by mail, prepaid express courier, or facsimile and shall be effective upon receipt thereof by the addressee.

8.    **Notice of Circumstance or Wrongful Act:** If during the **Policy Period** or the Discovery Period the **Insureds** become aware of any circumstance or **Wrongful Act** that reasonably may be expected to give rise to a **Claim**, and if such circumstance or **Wrongful Act** is reported to the Insurer

LIUI00DO010010507                **3 of 11**

Exhibit ___1___
Page ___4___

during the **Policy Period** in writing with details as to the nature and date of such circumstance or **Wrongful Act**, the identity of any potential claimant, the identity of any **Insured Person** involved in such circumstance or **Wrongful Act**, and the manner in which the **Insureds** first became aware of such circumstance or **Wrongful Act**, then any **Claim** subsequently arising from such circumstance or **Wrongful Act** shall be deemed under this Policy to be a **Claim** made during the **Policy Period** in which the circumstance or **Wrongful Act** was first duly reported to the Insurer.

9. **Limit of Liability:**

    9.1    The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations. Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability.

    9.2    All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

    9.3    With respect to all **Claims** deemed to have been made in a **Policy Year**, should the Limit of Liability be exhausted by payment of **Loss** resulting from one or more of such **Claims**, the Insurer's duty to defend shall cease and any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished and the Insurer shall have no further obligations hereunder of any kind or nature.

10. **Retentions:** The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations. Such Retention shall not be applicable to **Defense Costs** except in the instance noted in Section 2.3 in which the **Insureds** withhold consent to settlement. Such applicable Retention shall be uninsured and shall be borne by the **Insured Organization**. However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0. This change in Retention shall not affect any other terms or conditions of this Policy.

11. **Allocation:** If a **Claim** gives rise to **Loss** covered under this Policy and loss not covered under this Policy, either because a **Claim** includes both covered and uncovered matters or both covered and uncovered parties, the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered loss.

12. **Other Insurance:** If any **Loss** arising from any **Claim** is insured by other valid and collectible insurance, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

13. **Discovery Period:**

    13.1    If the Insurer or the **Parent Organization** fails or refuses to renew this Policy or if the **Parent Organization** cancels this Policy, any **Insured** shall have the right to an extension of the coverage granted by this Policy following the effective date of such cancellation or

Exhibit _1_
Page _5_

non-renewal. Such extension of coverage shall apply solely with respect to **Wrongful Acts** taking place before the effective date of such cancellation or non-renewal.

13.2 If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discovery Period** of ninety (90) days. If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period**. Such Discovery Period Premium shall be deemed fully earned as of such date. This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

13.3 If the **Parent Organization** fails or refuses to renew or cancels this Policy the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**. Such Discovery Period Premium shall be deemed fully earned as of such date.

13.4 The extension of coverage for the **Discovery Period** shall not in any way increase the Limit of Liability set forth in Item III of the Declarations. For purposes of the Limit of Liability, the **Discovery Period** is considered to be part of and not in addition to the last **Policy Year**.

13.5 If the **Parent Organization** shall cancel or non-renew this Policy for any reason other than being sold, acquired or bankrupt, each director or officer that was an **Insured**, but did not serve as a director or officer at the time of cancellation or non-renewal, shall be provided an unlimited extension of coverage granted by this Policy to report any **Claim(s)** first made against the director or officer after the date of such cancellation or non-renewal. However, this extension of coverage shall only be afforded in the event that the **Wrongful Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extension period, is in effect at the time the **Claim** is made.

14. **Conversion to Automatic Run-off:**

14.1 In the event of a **Change in Control** during the **Policy Period**, coverage under this Policy shall continue until the end of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** taking place prior to the effective date of such **Change in Control**. The entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**.

14.2 The **Parent Organization** shall give written notice of such **Change in Control** to the Insurer as soon as practicable, together with such information as the Insurer may reasonably require.

15. **Subrogation:** If the Insurer pays any **Loss** under this Policy, the Insurer shall be subrogated to the extent of such payment to all rights of recovery thereof. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in

Exhibit _____1_____
Page _____6_____

the name of the **Insureds**. The obligations of the **Insureds** pursuant to this Section 15 survive the termination of the **Policy Period**.

16. **Parent Organization as Authorized Representative**: The **Insureds** agree that the **Parent Organization** shall act on their behalf with respect to all matters under this Policy, including without limitation the giving and receiving of notices hereunder, the payment or return of premiums, and the negotiation and acceptance of endorsements.

17. **Amendment, Assignment and Headings:**

   17.1   Any amendment to this Policy or assignment of an interest in this Policy, in whole or in part, shall be effective only if made by endorsement to this Policy signed by an authorized representative of the Insurer.

   17.2   The headings to the provisions in this Policy, including those found in any endorsements attached hereto, are provided for convenience only and do not affect the construction hereof.

18. **Territory**:  This Policy applies to **Wrongful Acts** occurring anywhere in the world, provided that a **Claim** is brought against the **Insured** within the United States of America, its territories or possessions or Canada.

19. **Spousal Benefit**:  If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse where the claimant asserts such claim by reason of spousal status or seeks to obtain recovery against property in which such spouse has an interest, the amount which such spouse becomes legally obligated to pay in respect of such **Claim** (including defense costs) shall be deemed the **Loss and Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions.  In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse.

20. **Estates and Legal Representatives**:  In the event of the death, incapacity, or bankruptcy of an **Insured Person**, any Claim made against the estate, legal representatives, heirs, or the assigns of such **Insured Person** for a **Wrongful Act** by such **Insured Person** shall be deemed to be a **Claim** against such **Insured Person**.

21. **Termination:**

   21.1   The Insurer may not cancel this Policy except for non-payment of premium when due.  Such cancellation shall be effective as of the inception date of the **Policy Period**.

   21.2   The **Parent Organization** may cancel this Policy by sending notice of cancellation to the Insurer.  Such cancellation shall be effective on the date the Insurer receives such notice. The **Parent Organization** may not cancel this Policy in anticipation of or after the effective date of a **Change in Control**.  In the event the **Parent Organization** cancels this Policy, the Insurer shall retain the customary short rate premium.  Payment of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

   21.3   If the Insurer elects not to renew this Policy, the Insurer shall provide the **Parent Organization** with not less than sixty (60) days advance notice thereof.

22. **Action Against Insurer:**

LIUI00DO010010507                          6 of 11

Exhibit _____1_____
Page _____2_____

22.1    No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, or the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial, or by written agreement of the **Insureds**, the claimant and the Insurer.

22.2    No person or organization shall have the right under this Policy to join the Insurer as a party to any action against the **Insureds**, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives.

23.    **Definitions:**

23.1    **"Application"** means all signed applications, including attachments and materials submitted therewith or as a part thereof, or incorporated therein, for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a direct or indirect renewal or replacement. All such applications, attachments, and materials are deemed attached to and incorporated into this Policy.

23.2    **"Change in Control"** means:

   (a)    the acquisition by another entity of voting rights resulting in voting control by such other entity of more than 50% of the outstanding voting rights representing the present right to vote for election of directors or equivalent positions of the **Parent Organization;**

   (b)    the merger of the **Parent Organization** into another entity such that the **Parent Organization** is not the surviving entity, or the consolidation of the **Parent Organization** with another entity; or

   (c)    the loss of the **Parent Organization's** not-for-profit tax status.

23.3    **"Claim"** means:

   (a)    a written demand for monetary or non-monetary relief against an **Insured;**

   (b)    the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured;** or

   (c)    the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured**, including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency ;

   Including any appeal therefrom. A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

23.4    **"Defense Costs"** means reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim** and cost of attachment or

Exhibit _1_
Page _8_

similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers or employees of the **Insured Organization**.

23.5    "**Discovery Period**" means the period of time set forth in Section 13.

23.6    "**Employment Practices Wrongful Act**" means:

(a)    wrongful dismissal or discharge or termination of employment, whether actual or constructive;

(b)    discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation or disability;

(d)    sexual or other harassment in the workplace;

(e)    employment related misrepresentation;

(f)    violation of employment laws;

(g)    wrongful failure to employ, promote or grant tenure;

(h)    wrongful discipline;

(i)    negligent evaluation;

(j)    retaliation; and/or

(k)    failure to provide adequate workplace or employment policies or procedures.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Wrongful Act** means any actual or alleged, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Insured Person** in his/her capacity as an **Insured Person** or by the **Insured Organization**.

23.7    "**Executive Officer**" means the president, chief executive officer, chief operating officer, chief financial officer, managing director, any executive vice president and any equivalent executive position of the **Insured Organization**.

23.8    "**Fungi**" means any form of fungus, including but not limited to yeast, mold, mildew, rust, smut or mushroom, and any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of fungi.

23.9    "**Insolvency**" means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage, or liquidate the **Insured Organization**, or the **Insured Organization** becoming an insolvent debtor-in-possession.

Exhibit _1_
Page _9_

23.10  "Insured(s)"   means the **Insured Persons** and the **Insured Organization**.

23.11  "**Insured Organization**" means any entity named in Item I of the Declarations and any **Subsidiary**, including any such entity operating as a debtor-in-possession.

23.12  "**Insured Person(s)**" means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization**, or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

23.13  "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes.

23.14  "**Loss**" means:

(a)   sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

(b)   any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

**Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

23.15  "**Microbes**" means any non-fungal microorganisms or non-fungal colony-form organisms that causes infection or disease including but not limited to any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of microbes.

23.16  "**Parent Organization**" means the **Insured Organization** first named in Item I of the Declarations.

23.17  "**Policy Period**" means the period from the inception date set forth in Item II of the Declarations to the expiration date set forth in Item II of the Declarations, or its earlier termination pursuant to Section 21.

23.18  "**Policy Year**" means the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the **Policy Period**; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period.

23.19  "**Pollutants**" means any substance exhibiting hazardous characteristics as is or may be identified on any list of hazardous substances issued by the United States Environmental Protection Agency, or any state, local, or foreign counterpart. This definition shall include, without limitation, any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products,

Exhibit _1_
Page _13_

radiation, asbestos or asbestos-containing products, waste (including material to be recycled, reconditioned or reclaimed), and any electric, magnetic or electromagnetic field of any frequency, as well as any air emission, waste water, infectious medical waste, nuclear materials, or nuclear waste.

23.20 **"Subsidiary"** means any entity which qualifies as a not-for-profit organization under the Internal Revenue Code and for which the **Parent Organization** has or controls the right to elect or appoint more than fifty percent (50%) of the Board of Directors or other governing body of such entity if such right exists:

    (a)    prior to inception date of the **Policy Period**;

    (b)    after the inception date of the **Policy Period** and the assets of such entity do not exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement; or

    (c)    after the inception date of the **Policy Period** and the assets of such entity exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement but only upon the condition that the **Parent Organization**:

        (i)    give written notice of such transaction to the Insurer within 90 days after the effective date of such transaction;

        (i)    provide the Insurer with such information as the Insurer may require; and

        (ii)    pay any additional premium required by the Insurer.

23.21 **"Third Party"** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Insured Organization.**

23.22 **"Wrongful Act"** means:

    (a)    any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, or **Employment Practices Wrongful Act** committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization**; or

    (b)    any matter claimed against the **Insured Persons** solely by reason of their status as **Insured Persons.**

23.23 **"Outside Entity"** means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended).

23.24 **"Outside Position"** means the position of director, officer, trustee, or other equivalent position held by an **Insured Person** in any **Outside Entity**, if service in such position is with the knowledge and express consent or at the express request of the **Insured Organization.**

**24.   Outside Position Liability:**

Exhibit _____1_____
Page _____1\_____

24.1   This Policy, subject to its terms, conditions, and exclusions, covers any **Insured Person** serving in an **Outside Position**.  Such coverage shall be specifically excess of any: (i) indemnification provided by the **Outside Entity** in which the **Insured Person** serves in such **Outside Position**; and (ii) insurance available from or provided by such **Outside Entity**, regardless of whether or not such other insurance policy is written specifically excess of this Policy or refers to this Policy's policy number.

24.2   Payment by the Insurer or any member company of the Liberty Mutual Group under another insurance policy as a result of a **Claim** against an **Insured Person** in an **Outside Position** shall reduce, by the amount of such payment, the Insurer's Limit of Liability under this Policy.

24.3   Coverage under this Section 2 shall not apply to any **Claim** that is brought or maintained with the solicitation, assistance or participation of the **Outside Entity** in which an **Insured Person** serves in an **Outside Position** or any director, officer, trustee, regent, governor or employee of such **Outside Entity**.

24.4   Nothing in this Section 24 shall be construed to extend coverage under this Policy to the **Outside Entity** in which such **Insured Person** serves in such **Outside Position**, or to the other directors, officers, or employees of such **Outside Entity**.


In Witness Whereof, the Insurer has caused this Policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.


President                                      Secretary

Exhibit ___1___
Page ___12___



### LIBERTY INSURANCE UNDERWRITERS INC.

### ENDORSEMENT NO. 1

This endorsement, effective October 1, 2011          forms part of

Policy No. DOCH216747-211          issued to Ironwood Country Club

---

#### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### Application of Retention to Defense Costs

It is agreed that Section 23.14 (a) of the Policy is deleted and replaced as follows:

23.14 (a)      sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including **Defense Costs**, damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

It is further agreed that for such **Claims**, Section 10 is deleted and replaced with the following:

10.     **Retention:** The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations. Such applicable Retention shall be uninsured, shall be applicable to **Defense Costs** and shall be borne by the **Insured Organization.** However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0. This change in Retention shall not affect any other terms or conditions of this Policy.

      All other terms, conditions, and exclusions of this Policy remain unchanged.

LIU100DO381290207

Exhibit ___1___
Page ___13___



LIBERTY INSURANCE UNDERWRITERS INC.

ENDORSEMENT NO. 2

This endorsement, effective October 1, 2011    forms part of

Policy No. DOCH216747-211    issued to Ironwood Country Club

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Sub-Retention Endorsement

It is agreed that Item IV of the Declarations Page is hereby amended by the addition of the following:

ITEM IV.    RETENTION: $100,000 in the aggregate each Claim

It is further agreed that the Retention provided under this endorsement shall only apply as respects to:

EMPLOYMENT PRACTICES LIABILITY

All other terms, conditions, and exclusions of this Policy remain unchanged.

LIUI00DO380300507

Exhibit _____1_____
Page _____14_____



**LIBERTY INSURANCE UNDERWRITERS INC.**

**ENDORSEMENT NO. 3**

This endorsement, effective October 1, 2011          forms part of

Policy No. DOCH216747-211                             issued to Ironwood Country Club

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

This endorsement modifies insurance provided under the above captioned policy.

**A.  Cap On Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.  Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

Exhibit _____ 1

Page _____ 15

## DISCLOSURE - TERRORISM RISK INSURANCE ACT

**THIS ENDORSEMENT IS MADE PART OF YOUR POLICY PURSUANT TO THE TERRORISM RISK INSURANCE ACT.**

In accordance with the Terrorism Risk Insurance Act, including all amendments, ("TRIA" or the "Act"), we are required to provide you with a notice of the portion of your premium attributable to coverage for "certified acts of terrorism," the federal share of payment of losses from such acts, and the limitation or "cap" on our liability under the Act.

**Disclosure of Premium**

The Company has made available coverage for "certified acts of terrorism" as defined in the Act. If purchased, the portion of your premium attributable to coverage for "certified acts of terrorism" is shown in the Declarations, Declarations Extension Schedule or elsewhere by endorsement in your policy.

**Federal Participation In Payment Of Terrorism Losses**

If an individual insurer's losses exceed a deductible amount specified in the Act, the federal government will reimburse the insurer for 85% of losses paid in excess of the deductible, provided that aggregate industry losses from a "certified act of terrorism" exceed $100 million.

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. Nor shall Treasury make any payment for any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

TRIA-N004-0208

Exhibit ___1___
Page ___10___

# EXHIBIT 2

**Diane Kemp**

| | |
|---|---|
| **From:** | Michelle Cioni <MCioni@arcxs.com> |
| **Sent:** | Wednesday, May 16, 2012 6:42 AM |
| **To:** | Diane Kemp |
| **Cc:** | Robin Schmitt |
| **Subject:** | FW: Ironwood Country Club - CIM (CHISPC000006429) |
| **Attachments:** | Ironwood Country Club - CIM.pdf |

Diane,

Please see attached claim acknowledgement we received from Liberty in regards to the above captioned matter.

Best Regards,

*Michelle Cioni for Robin Schmitt*
*ARC Excess & Surplus, LLC*
*The ARC Group, LLC*
*Robin's Direct Phone: 516-408-5727*
*Robin's Direct Fax: 516-408-5772*
*Rschmitt@arcxs.com*
*Michelle's Direct Phone: 516-408-1828*
*Mcioni@arcxs.com*

*RS: mlc/encls.*

**From:** Fenn, James (New York-LIU) [mailto:James.Fenn@LibertyIU.Com]
**Sent:** Wednesday, May 16, 2012 9:05 AM
**To:** Robin Schmitt
**Cc:** Weber, Todd (Chicago-LIU); Michelle Cioni; kempd@tanharca.com
**Subject:** Ironwood Country Club - CIM (CHISPC000006429)

Please review the attached acknowledgement letter.

Regards,

James Fenn

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for

1

Exhibit ___2___
Page ___1___



Liberty
International
Underwriters

James Fenn
55 Water Street, 18th Floor
New York, NY 10041
Telephone (212) 898-4309
Fax (212) 208-2855
James.Fenn@libertyiu.com

May 16, 2012

Robin Schmitt
ARC Excess & Surplus, LLC
The ARC Group, LLC

| | |
|---|---|
| Insured: | Ironwood Country Club |
| Insurer: | Liberty Insurance Underwriters |
| Policy#: | DOCH216747-211 |
| Policy Period: | 10/01/11 – 10/01/12 |
| File: | CIM |
| File No.: | CHISPC000006429 |

Dear Ms. Schmitt:

This will acknowledge our receipt of the correspondence dated May 15, 2012 notifying Liberty International Underwriters of the above-referenced matter. We are currently reviewing this matter and will contact you shortly. In the interim, we reserve all of Liberty's rights accordingly.

An adjuster will be assigned and will contact you shortly. Please forward to us all correspondence you receive from all parties involved in this matter. We also ask that you keep us apprised of any material developments that arise.

Very truly yours,

*James Fenn*

James Fenn

Cc:     Todd Weber/Liberty International Underwriters, Inc.
        kempd@tanharca.com
        Mcioni@arcxs.com

Exhibit _____2____
Page _____2____

# EXHIBIT 3

# CLAIMS TELEPHONE DISCUSSION

| | |
|---|---|
| **Date:** 5/15/2012 | **Insured:** Ironwood CC |
| **Claimant:** C/M - Concerned ICC Members | **Insured Driver:** |
| **Insurance Company** Liberty Ins U/W Inc | **Phone #** |
| **Claim #** | **Date of Loss:** 5/7/12 |
| **Adjuster Name:** Chris Testaverde | **Adjuster Phone #** 212-898-4360 |

5/14 - emailed to Robin Schmidt @ Acc Exces
5/17 - 1st emailed & called Robin for adjuster info
5/17 - no adjuster assigned yet per Robin email
5/21 emailed Robin again
5/29 - emailed Robin again
5/31 - Called Robin - will ck & call back

Exhibit ____ 3
Page ____
(2009/1
0901)

# EXHIBIT 4

**Alan Lux**

| | |
|---|---|
| **From:** | Robin Schmitt <RSchmitt@arcxs.com> |
| **Sent:** | Friday, June 01, 2012 7:48 AM |
| **To:** | Alan Lux |
| **Cc:** | Jackie Sanchez; Michelle Cioni |
| **Subject:** | FW: Ironwood Country Club - CIM (CHISPC000006429)  5th request.. |

Alan,  Finally.  Please see below..  I'll  try to get more, but you can also  e-mail  her..  Thanks..

Regards and Best Wishes
Robin A Schmitt
ARC Excess & Surplus, LLC
113 South Service Road
Jericho, NY 11753
Direct Dial: (516) 408-5727
Direct Fax: (516) 408-5772
Tel (V) (516) 747-4100 ext. 5727


**From:** Fenn, James (New York-LIU)
**Sent:** Friday, June 01, 2012 10:31 AM
**To:** Robin Schmitt; Michelle Cioni
**Cc:** Weber, Todd (Chicago-LIU)
**Subject:** RE: Ironwood Country Club - CIM (CHISPC000006429) 5th request..

The adjuster on the file is Christine Testaverde, Christine.testaverde@libertyiu.com

**From:** Robin Schmitt [mailto:RSchmitt@arcxs.com]
**Sent:** Friday, June 01, 2012 8:21 AM
**To:** Fenn, James (New York-LIU); Michelle Cioni
**Cc:** Weber, Todd (Chicago-LIU)
**Subject:** RE: Ironwood Country Club - CIM (CHISPC000006429) 5th request..

Can someone please respond  on this? Thanks

Regards and Best Wishes
Robin A Schmitt
ARC Excess & Surplus, LLC
113 South Service Road
Jericho, NY 11753
Direct Dial:  (516) 408-5727
Direct Fax:  (516) 408-5772
Tel (V) (516) 747-4100 ext. 5727

Exhibit ___4___
Page ___

# EXHIBIT 5

From: Alan Lux [mailto:luxa@tanharca.com]
Sent: Tuesday, December 04, 2012 10:58 AM
To: Joshua Tanner
Subject: FW: Legal Fees/ Land Assessment

Here you go. Lydia sent these to me.

Alan Lux
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984
luxa@tanharca.com<mailto:luxa@tanharca.com>

*Please note my new email address*

From: Alan Lux
Sent: Thursday, September 13, 2012 11:34 AM
To: christine.testaverde@libertyiu.com
Subject: FW: Legal Fees/ Land Assessment

Chris,
As you requested here are the bills and payments made so far to Bryan Gerstel on the Ironwood claim.

Alan

Alan Lux
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984
luxa@tanharca.com<mailto:luxa@tanharca.com>

*Please note my new email address*

From: Lydia Magat
[mailto:lmagat@ironwoodcountryclub.com]<mailto:[mailto:lmagat@ironwoodcountr
yclub.com]>
Sent: Thursday, September 13, 2012 11:27 AM
To: Alan Lux
Cc: Joshua Tanner
Subject: Legal Fees/ Land Assessment

Per Josh, for reimbursement.

Lydia

Exhibit ___5___
Page _____1_____

2

Exhibit _____ 5 _____
Page _____ 2 _____

# EXHIBIT 6

From: Alan Lux [mailto:luxa@tanharca.com]
Sent: Wednesday, September 19, 2012 11:33 AM
To: Joshua Tanner
Subject: FW: Carrier

Josh,
Here is the contact information you requested.

AJ

Alan Lux
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984
luxa@tanharca.com<mailto:luxa@tanharca.com>

*Please note my new email address*

From: Testaverde, Christine (New York-LIU) [mailto:Christine.Testaverde@LibertyIU.Com]
Sent: Wednesday, September 19, 2012 11:28 AM
To: Alan Lux
Subject: RE: Carrier

Hi Alan,

I just received your voice message.  Here is my contact information:

Christine J. Testaverde
Liberty Insurance Underwriters
55 Water Street, 18th Floor
New York, New York 10041
P- (212) 898-4360
F- (212) 208-4290

Would you also like to speak further?  Please let me know.

Thanks and regards,

Chris

From: Alan Lux [mailto:luxa@tanharca.com]<mailto:[mailto:luxa@tanharca.com]>
Sent: Tuesday, September 18, 2012 3:29 PM
To: Testaverde, Christine (New York-LIU)
Subject: FW: Carrier

Chris,

Exhibit ____6____
Page ____(____

Can you please e mail me your complete mailing address so I can forward it to Bryan Gerstel. He would like to send you a letter confirming your agreement on the rate to be charged to defend the Ironwood claim.

Thanks,

Alan

Alan Lux
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984
luxa@tanharca.com<mailto:luxa@tanharca.com>

*Please note my new email address*

From: Joshua Tanner
[mailto:jtanner@ironwoodcountryclub.com]<mailto:[mailto:jtanner@ironwoodcountryclub.com]>
Sent: Tuesday, September 18, 2012 12:21 PM
To: Alan Lux
Subject: Carrier

Alan,

Can you send me all the contact information for our carrier.  I need to forward to Bryan Gerstel so he can send her a letter about agreeing to her rate.

Respectfully,


Joshua Tanner, CCM
General Manager/COO
760-766-1090

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

Exhibit _____ 6
Page _____ 2

# EXHIBIT 7

From: Alan Lux [mailto:luxa@tanharca.com]
Sent: Wednesday, October 24, 2012 2:24 PM
To: Joshua Tanner
Subject: FW: Carrier

JT,
Please see below response from Chris.

AJ

Alan Lux
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984
luxa@tanharca.com<mailto:luxa@tanharca.com>

*Please note my new email address*

From: Testaverde, Christine (New York-LIU) [mailto:Christine.Testaverde@LibertyIU.Com]
Sent: Wednesday, October 24, 2012 2:20 PM
To: Alan Lux
Subject: RE: Carrier

Alan,

Working on it as I write to you.  I will get it to you both by tomorrow.

Thanks,

Chris

From: Alan Lux [mailto:luxa@tanharca.com]<mailto:[mailto:luxa@tanharca.com]>
Sent: Wednesday, October 24, 2012 5:17 PM
To: Testaverde, Christine (New York-LIU)
Subject: RE: Carrier

Chris,
Did you send the letter that we talked about to Ironwood yet. I have not received a copy nor did Josh.

Thanks,

Alan

Alan Lux
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984

Exhibit _____7_____
Page _____1_____

luxa@tanharca.com<mailto:luxa@tanharca.com>

*Please note my new email address*

From: Testaverde, Christine (New York-LIU)
[mailto:Christine.Testaverde@LibertyIU.Com]<mailto:[mailto:Christine.Testaverde@LibertyIU.Com]>
Sent: Wednesday, September 26, 2012 4:17 PM
To: Alan Lux
Subject: RE: Carrier

Alan,

I will be out of the office, unexpectedly, for the next two days.  I did not complete my review of the statements and I am not able to give you a good idea for your conversation with Mr. Tanner.  I promise to make this a priority upon my return.

Thanks,

Chris

From: Alan Lux [mailto:luxa@tanharca.com]<mailto:[mailto:luxa@tanharca.com]>
Sent: Wednesday, September 26, 2012 7:00 PM
To: Testaverde, Christine (New York-LIU)
Subject: Re: Carrier

Chris
I am heading out to Ironwood tomorrow to see Josh Tanner. Have you had a chance to review the legal bills I sent you. I would like to give him an idea how much of those bills might be able to be covered and applied to the deductible.

Thanks

Alan

From: Testaverde, Christine (New York-LIU)
[mailto:Christine.Testaverde@LibertyIU.Com]<mailto:[mailto:Christine.Testaverde@LibertyIU.Com]>
Sent: Wednesday, September 19, 2012 01:27 PM
To: Alan Lux
Subject: RE: Carrier

Hi Alan,

I just received your voice message.  Here is my contact information:

Christine J. Testaverde
55 Water Street, 18th Floor
New York, New York 10041
P- (212) 898-4360
F- (212) 208-4290

Would you also like to speak further?  Please let me know.

Thanks and regards,

3

Exhibit ___7___
Page ___1___

Chris

From: Alan Lux [mailto:luxa@tanharca.com]<mailto:[mailto:luxa@tanharca.com]>
Sent: Tuesday, September 18, 2012 3:29 PM
To: Testaverde, Christine (New York-LIU)
Subject: FW: Carrier

Chris,
Can you please e mail me your complete mailing address so I can forward it to Bryan Gerstel. He would like to send you a letter confirming your agreement on the rate to be charged to defend the Ironwood claim.

Thanks,

Alan

Alan Lux
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984
luxa@tanharca.com<mailto:luxa@tanharca.com>

*Please note my new email address*

From: Joshua Tanner [mailto:jtanner@ironwoodcountryclub.com]<mailto:[mailto:jtanner@ironwoodcountryclub.com]>
Sent: Tuesday, September 18, 2012 12:21 PM
To: Alan Lux
Subject: Carrier

Alan,

Can you send me all the contact information for our carrier.  I need to forward to Bryan Gerstel so he can send her a letter about agreeing to her rate.

Respectfully,


Joshua Tanner, CCM
General Manager/COO
760-766-1090

---

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Exhibit _____ 7
Page _____ 1

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

_____

_____

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

_____

_____

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

_____

Exhibit ____7____
Page ____4____

# EXHIBIT 8

## Alan Lux

| | |
|---|---|
| **From:** | Testaverde, Christine (New York-LIU) <Christine.Testaverde@LibertyIU.Com> |
| **Sent:** | Thursday, October 25, 2012 12:55 PM |
| **To:** | Alan Lux |
| **Subject:** | RE: Carrier |
| **Attachments:** | [Untitled].pdf |

Alan,

Attached please find a copy of Liberty's coverage response.  I thought I would send this along to you while I looked for Josh's email address.

Please feel free to give me a call once you have had the chance to consider same.

My best,

Chris

**From:** Alan Lux [mailto:luxa@tanharca.com]
**Sent:** Wednesday, October 24, 2012 5:17 PM
**To:** Testaverde, Christine (New York-LIU)
**Subject:** RE: Carrier

Chris,
Did you send the letter that we talked about to Ironwood yet. I have not received a copy nor did Josh.

Thanks,

Alan

*Alan Lux*
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984
luxa@tanharca.com

**\*Please note my new email address\***

**From:** Testaverde, Christine (New York-LIU) [mailto:Christine.Testaverde@LibertyIU.Com]
**Sent:** Wednesday, September 26, 2012 4:17 PM
**To:** Alan Lux
**Subject:** RE: Carrier

Alan,

Exhibit _____ 8
Page _____ 1

1

I will be out of the office, unexpectedly, for the next two days. I did not complete my review of the statements and I am not able to give you a good idea for your conversation with Mr. Tanner. I promise to make this a priority upon my return.

Thanks,

Chris

**From:** Alan Lux [mailto:luxa@tanharca.com]
**Sent:** Wednesday, September 26, 2012 7:00 PM
**To:** Testaverde, Christine (New York-LIU)
**Subject:** Re: Carrier

Chris
I am heading out to Ironwood tomorrow to see Josh Tanner. Have you had a chance to review the legal bills I sent you. I would like to give him an idea how much of those bills might be able to be covered and applied to the deductible.

Thanks

Alan

**From:** Testaverde, Christine (New York-LIU) [mailto:Christine.Testaverde@LibertyIU.Com]
**Sent:** Wednesday, September 19, 2012 01:27 PM
**To:** Alan Lux
**Subject:** RE: Carrier

Hi Alan,

I just received your voice message. Here is my contact information:

Christine J. Testaverde
55 Water Street, 18th Floor
New York, New York 10041
P- (212) 898-4360
F- (212) 208-4290

Would you also like to speak further? Please let me know.

Thanks and regards,

Chris

**From:** Alan Lux [mailto:luxa@tanharca.com]
**Sent:** Tuesday, September 18, 2012 3:29 PM
**To:** Testaverde, Christine (New York-LIU)
**Subject:** FW: Carrier

Chris,
Can you please e mail me your complete mailing address so I can forward it to Bryan Gerstel. He would like to send you a letter confirming your agreement on the rate to be charged to defend the Ironwood claim.

2

Exhibit ____ 8
Page ____ 2

Thanks,

Alan

*Alan Lux*
Tanenbaum Harber of CA, Inc.
11610 Iberia Place, Suite 200
San Diego, CA 92128
P 858.487.8839 / F 858.487.3984
luxa@tanharca.com

**\*Please note my new email address\***

**From:** Joshua Tanner [mailto:jtanner@ironwoodcountryclub.com]
**Sent:** Tuesday, September 18, 2012 12:21 PM
**To:** Alan Lux
**Subject:** Carrier

Alan,

Can you send me all the contact information for our carrier.  I need to forward to Bryan Gerstel so he can send her a
letter about agreeing to her rate.

Respectfully,

Joshua Tanner, CCM
General Manager/COO
760-766-1090

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the
intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy
or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically
states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for
viruses or unauthorized use and for other lawful business purposes.

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the
intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy
or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically
states them to be the views of Liberty International Underwriters.

Exhibit ____ B
Page ____ 3

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

---

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

---

4

Exhibit ___8___
Page ___4___



Christine J. Testaverde
55 Water Street, 18th Floor
New York, NY 10041
Telephone No: (212) 898-4360
Fax No: (212) 208-4290
Email: Christine.Testaverde@LibertyIU.com

October 25, 2012

**BY E-MAIL and**
**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Mr. Josh Tanner
Ironwood Country Club
73-735 Irontree Drive
Palm Desert, California 92260

|  |  |
|---|---|
| Re: | Nonprofit Executive Advantage Policy |
| Insured: | Ironwood County Club |
| Insurer: | Liberty Insurance Underwriters Inc. |
| Policy No: | DOCH216747-211 |
| Policy Period: | October 1, 2011 to October 1, 2012 |
| Limit of Liability: | $2 million in the Aggregate for the Policy Year |
| Retention: | $10,000 in the Aggregate each Claim |
| Matter: | *William S. Cobb, Jr., et al. v. Ironwood Country Club* |
| File No.: | CHISPC000006429 |

Dear Mr. Tanner:

Further to our prior correspondence,[1] Liberty International Underwriters, on behalf of Liberty Insurance Underwriters Inc. ("Liberty"), has received information regarding the captioned matter, including a copy of the complaint filed in the action styled *William S. Cobb, Jr., Patrick J. Kelley, Helen H. Riedstra and Elizabeth Richards v. Ironwood Country Club* (the "Complaint"), pending in the Superior Court of California, in and for the County of Riverside, Indio Branch, naming Ironwood Country Club ("ICC") as a defendant (the "Action"). The

---

[1] This letter adopts, incorporates and supplements all prior correspondence to, or on behalf of the Insureds regarding the captioned matter.

Exhibit _8_
Page _5_

Action has been submitted for coverage under the Nonprofit Executive Advantage Policy No.
DOCH216747-211 (the "Policy"), issued to ICC by Liberty.

We have considered the provisions of the Policy in light of the allegations contained in the
information provided to us, including the Complaint. Liberty recognizes that the allegations
against ICC are entirely unsubstantiated and nothing in this letter is intended to imply that
Liberty believes the allegations have any factual or legal merit. Based on our preliminary review
of this matter, Liberty confirms the defense that Liberty has agreed to provide to ICC and that
coverage is triggered for the Action, subject to the reservation of rights discussed below.

We are directing this letter to you in your capacity as the authorized representative of ICC. If
you are not acting in this capacity, please forward this letter to the appropriate party and let us
know immediately.

<u>Background and Complaint</u>

On May 7, 2012, William S. Cobb, Jr. issued a letter to Bob Manion, listed as Board President of
ICC. The caption indicates that the letter pertains to the "Repayment of $25,500 Loan."[2]

Mr. Cobb represents that "a large number of current and former members" of ICC have become
concerned regarding the "manner in which ICC is repaying the $25,500 loans to former members
whose memberships have been sold. Mr. Cobb raises an issue regarding the accounting for the
transactions. Mr. Cobb also raises a concern on behalf of former members who resigned,
regarding a "new" policy announced by the Board in January 2012. In particular, Mr. Cobb
represents that pursuant to the new policy, resigned members will no longer receive
reimbursement of their loans when their "Treasury" memberships are sold. According to Mr.
Cobb, the new policy reverses the Board's previous position and practice.

Mr. Cobb indicates that he has formed a committee to bring these and other issues to the
attention of Mr. Manion and to provide a list of demands to the Board. Included in the list of
general demands are the proper repayment of the $25,500 refundable assessment; the treatment
of all members in the same membership class equally; and a demand to follow the by-laws.
There are also several additional items, such as a demand to reduce the initiation fee; a demand
to change the sales ratio between "Treasury membership" sales and "Member membership"
sales; and the demand to receive the sales proceeds specified in the by-laws, plus $25,500 or the
portion of the refundable assessment a Member paid, when a Member's membership is sold in
the future.

Mr. Cobb requests a positive written response within seven days of the date of his letter. Mr.
Cobb also indicates that additional litigation would not be in the best interests of ICC or its
members and looked forward to a "fair resolution."

---

[2] Mr. Cobb's May 7, 2012 letter was reported to Liberty on or about May 16, 2012. The letter was reported as
"notice only."

Exhibit _____ 8 _____
Page _____ 10

We understand that the firm of Lavely & Singer, on behalf of ICC, issued a letter to Mr. Cobb, dated June 7, 2012. The letter includes a demand that Mr. Cobb cease and desist from making any further false accusations pertaining to ICC's business practices and that he cease and discontinue all communications with current, former and prospective members "that are intended to interfere with ICC's current or prospective business relationships with those individuals or in any manner dissuade current and prospective members from continuing and/or commencing their membership with ICC respectively." ICC threatens litigation against Mr. Cobb, should he ignore the demand to cease and desist.

On or about August 21, 2012, ICC was served with the Complaint. Mr. Cobb, Patrick J. Kelley, Helen H. Riedstra and Elizabeth Richards are the named plaintiffs. ICC is the sole defendant.

The plaintiffs allege that in or about late 1998 or early 1999, ICC "devised a plan" to purchase the real estate surrounding the club from the Coachella Valley Water District, for approximately $14,860,000. According to the plaintiffs, ICC's plan was to purchase and make loan payments on the subject property by using $15,054,595 worth of "interest free loans" collected from approximately 588 members at the time. In connection with the transaction, a "Statement of Information / Loan Agreement" was provided to the members, which governed the terms of the land purchase. The Statement of Information / Loan Agreement provides that a land purchase assessment for each Proprietary Member will be $25,500. The Statement of Information / Loan Agreement also details ICC's obligation to repay the assessment.

On or about April 17, 1999, the membership, including the plaintiffs, approved the acquisition of the land and the loan funding proposal contained in the Statement of Information / Loan Agreement.

The plaintiffs contend, however, that ICC has not properly repaid the loan amounts to its members. In particular, the plaintiffs contend that in January 2012, ICC made the decision to breach the Statement of Information / Loan Agreement by unilaterally restructuring and/or redefining the terms and conditions of its loan repayment obligations, which "directly affected all members of" ICC, past and present. Toward this end, ICC's President, Ken Delf, sent a letter to the membership, dated January 24, 2012, advising that ICC would no longer repay the $25,500 Land Assessments "to Members who had or will *resign* and thereby *forfeit* their membership from the Club."

The plaintiffs further contend that ICC issued a document, dated May 15, 2012, which "attempted to *explain and/or further clarify*" ICC's position. The May 15, 2012 letter also offered an enhanced benefit package to members willing to forgive the $25,500 repayment right. The plaintiffs contend, however, that the May 15, 2012 letter "created even greater confusion and contradiction."

The plaintiffs allege that ICC has breached, and will continue to breach, the Statement of Information / Loan Agreement in several ways, as well as its contractual duties and other obligations owed to the plaintiffs. The plaintiffs contend that ICC has wrongfully profited from each of the loan transactions with its members, including the plaintiffs. The plaintiffs also allege that ICC breached its duty of good faith and fair dealing with the plaintiffs. Further, the

Exhibit _8_
Page _7_

plaintiffs contend that ICC breached its fiduciary duty to "appropriately handle, administer and fairly transact" all membership sales transactions. As such, ICC has been unjustly enriched.

The Complaint is comprised of one cause of action, seeking declaratory relief. The plaintiffs seek a declaration that: ICC owes each plaintiff the specific amount in each applicable "Members' Land Purchase Account" at the time of the ultimate sale of their club membership "however and by whomever held"; ICC's representation that it will no longer repay its $25,500 loan obligations to any former club member who resigned his or her membership to the club, or any current club member who decides to resign his/her membership at any time in the future, constitutes an anticipatory breach of contract by ICC and breach of contractual and fiduciary obligations, if the sale has already occurred; the current loan repayment accounting methodology being used by ICC violates the Statement of Information / Loan Agreement and is prohibited; and ICC has underpaid its past members by using an inappropriate payment methodology, and that such sums wrongfully withheld shall be calculated and set aside in trust. The plaintiffs also seek attorneys' fees under California Civil Procedure §1021.5.

<u>Status of the Action</u>

At ICC's request, Bryan R. Gerstel of Green Bryant & French LLP, was appointed to defend ICC in connection with the Action. A demurrer and motion to strike were filed by Mr. Gerstel on behalf of ICC, in response to the Complaint. To our knowledge, the briefing of the demurrer and motion to strike has not yet been completed.

<u>The Policy</u>

Consistent with its terms, conditions, provisions and exclusions, the Policy provides that Liberty will pay on behalf of the **Insureds**[3] all **Loss** that they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**. The **Policy Period** is October 1, 2011 to October 1, 2012. The Policy includes a **Limit of Liability** of $2 million in the aggregate for the **Policy Year**, subject to a $10,000 Retention applicable in the aggregate to each **Claim** pursuant to Item IV of the Declarations. Liberty shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention.

Pursuant to Section 2 of the Policy, it is the right and duty of Liberty to defend any **Claim**. The **Insureds** shall not incur any **Defense Costs**, admit to any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without Liberty's prior written consent, which shall not be unreasonably withheld. Liberty shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements or settlements made by the **Insureds** without Liberty's prior written consent.

Paragraph 23.14 of the Policy, as modified by Endorsement No. 1, provides that "**Loss**" includes sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including **Defense Costs**, damages, judgments, settlement amounts, legal fees and

---

[3] Please note that the terms in bold in this letter correspond to their definitions set forth in the Policy.

Page 4

Exhibit ___8___
Page ___8___

costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award.  **Loss** does not include coverage for certain taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

Section 23.3 provides that a **"Claim"** shall mean a written demand for monetary or non-monetary relief against an **Insured** or the commencement of a civil judicial proceeding against an **Insured**.  In addition, Section 23.22(a) provides that **"Wrongful Act"** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted by the **Insured Organization**. Pursuant to Section 23.13, **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

<u>Coverage Discussion</u>

The Demand Letter received by or on behalf of ICC on or after May 7, 2012, which involves allegations that ICC failed to pay members in accordance with the transaction approved in 1999, constitutes a **Claim** first made during the **Policy Period** against the **Insured** for a **Wrongful Act**.  In addition, the Action, commenced by the service of the Complaint on ICC on or about August 21, 2012, which involves allegations that ICC has not properly repaid the loan amounts to its members, also constitutes a **Claim** first made during the **Policy Period** against the **Insureds** for a **Wrongful Act**.  Accordingly, Liberty will provide a defense for the Action to the Association, and coverage is triggered.

We note that Section 9.2 of the Policy provides that all **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. The Demand Letter and the Action involve the same allegations that ICC has not properly repaid the 1999 loan amounts to its members.  As such, the Demand Letter and the Action shall be deemed to be one **Claim**, subject to a single limit of liability of $2 million and one Retention.

<u>Reservation of Rights</u>

Although coverage for the **Claim** is triggered, the Policy contains certain provisions that could limit or otherwise preclude coverage in its entirety with respect to the Action.  Therefore, Liberty reserves the right to apply the following and any other applicable Policy provisions in connection with this matter:

Exclusion 4.3 provides that the Policy does not apply to any **Claim** made against any **Insured** based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time.

Please advise whether ICC reported this matter to any prior carrier. In the interim, Liberty must reserve its rights pursuant to Exclusions 4.3.

Exhibit ___8___
Page ___9___

Exclusion 4.9(a) provides that the Policy does not apply to any **Claim** made against any **Insured** based upon, arising from, or in any way related to any **Insureds** gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled. This exclusion applies, however, only if it is finally adjudicated that such conduct in fact occurred.

The plaintiffs allege that ICC has wrongfully profited from each of the loan transactions with its members, including the plaintiffs. In the event there is a final adjudication that ICC gained in fact any personal profit, remuneration or advantage to which it was not legally entitled, Liberty reserves its rights pursuant to Exclusion 4.9(a).

The Policy, at Section 5.2, provides that Liberty shall not be liable to pay any **Loss** in connection with any **Claim** for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement. This exclusion shall not apply to Liberty's duty to defend and to pay **Defense Costs**. In light of the plaintiffs' allegations, including but limited to the contention that ICC breached the Statement of Information / Loan Agreement, Liberty reserves its rights pursuant to Section 5.2.

Section 12 provides that the Policy shall only apply as excess over any other valid and collectible insurance. Please provide us with a copy of the notice letters to, and the coverage responses from, any other carriers that were placed on notice of this matter.

Liberty also directs your attention to the **Application**, dated October 5, 2011. Specifically, question 6, *Prior Knowledge*, asks whether anyone for whom insurance is sought has any knowledge or information of any act, error, omission, fact or circumstance which may give rise to a **Claim** which may fall within the scope of the proposed insurance. The answer to question 6 in the **Application** is "no."

The **Application** further provides that:

> It is understood and agreed that if anyone for whom this insurance is sought has any knowledge of any such act, error, omission, fact or circumstance, any Claim emanating therefrom shall be excluded from coverage under the proposed insurance.

Recently, ICC submitted several billing statements to Liberty, for services rendered by Mr. Gerstel and Lavely & Singer, to consider for coverage in connection with this **Claim**. All of the billings are for services rendered to ICC without the knowledge of Liberty and thus, without Liberty's prior written consent, as required by Section 2 of the Policy. At the request of Alan Lux, of Tanenbaum Harber, Liberty has agreed to examine these statements. However, no waiver of any rights or defenses under the Policy shall be assumed by virtue of Liberty's review of same. All such rights and defenses are specifically reserved.

Nevertheless, Liberty has been provided with a billing statement for Mr. Gerstel, dated September 6, 2011, for "Legal Services Months July & August 2011." This statement includes the entry "telecom Tanner re additional information on Insurance and sales of memberships."

Exhibit ___8___
Page ___13___

An additional statement from Mr. Gerstel, dated October 13, 2011, for "Legal Services Month of September 2011," includes the following entry:

> Review and analyze legal issues and facts re: Assessment, Mistake of Fact and Law issues, Estoppel, Class action issues and Liability; Declaratory Relief issues and Liability; Insurance issues re potential claims and coverage; Transferability of assessment rights; Contractual liability for assessment payments by forfeiting members; potential for present member claims; analysis of statutes, case law and Club documentation re issues; prepare Memo to Board of Directors on these issues[.]

In light of this information, the response in the **Application** to question 6 may have been inaccurate at the time the **Application** was executed. Specifically, it appears that ICC and counsel were considering "Insurance issues re potential claims and coverage," prior to the execution of the **Application** on October 5, 2011. Thus, by necessity, Liberty reserves its right to invoke the provisions of the **Application** quoted above.

In order for Liberty to further consider this issue, please explain the reason for such an analysis in July, August and September 2011. Also, please provide to us a copy of the memorandum referenced above, as well as any additional information that you believe Liberty should consider in connection with same.

Moreover, the preamble to the Policy provides that the Policy is issued in reliance upon the truthfulness and accuracy of the statements made in the **Application**. Section 6.1 of the Policy provides that the **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by Liberty under the Policy. Moreover, Section 6.1 provides that the Policy was issued in reliance upon the truth of such statements and representations. Section 6.2 of the Policy indicates that the **Insureds** agree that if the **Application** contains any material statements or representations that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.

In light of the above, Liberty necessarily reserves its rights pursuant to Section 6.1 and 6.2 of the Policy.

*   *   *

Liberty expressly reserves all of its rights and defenses under the Policy, at law, and in equity, including the right to recoup **Defense Costs** paid in connection with the defense of the Action, and the right to deny and/or void coverage on any of the foregoing bases and to deny and/or void coverage on additional and alternative bases as other terms, conditions, provisions and exclusions of the Policy, including matters contained in any **Application,** are found to apply. Liberty's position with respect to coverage for this matter is based on a review of the allegations in the Demand Letter, the Complaint and the exhibits attached thereto, the billing statements provided to us, and currently known facts. We also reserve the right to supplement Liberty's

Exhibit ___ 8

Page ___

position based upon the submission of any additional information regarding this matter, including but not limited to the information requested herein.

If you have any questions or concerns regarding your insurance coverage, you are entitled to have your claim reviewed by the California Department of Insurance.   Your inquiry may be directed as follows:

California Department of Insurance
Consumer Services Division
300 South Spring Street, 11th Floor
Los Angeles, California 90013
(800) 927-4357 / (213) 897-5961

Of course, we encourage you to first contact the undersigned with any questions or comments you may have regarding the foregoing.

Very truly yours,

Christine J. Festaverde
Liberty International Underwriters
for Liberty Insurance Underwriters

cc: Mr. Todd Weber / Liberty International Underwriters
    Mr. Alan Lux / Tanenbaum Harber of CA, Inc.

Exhibit ___8___
Page ___12___

# EXHIBIT 9

**Alan Lux**

| | |
|---|---|
| **From:** | Choi, Seon (New York-LIU) <Seon.Choi@LibertyIU.Com> |
| **Sent:** | Wednesday, February 13, 2013 11:58 AM |
| **To:** | Alan Lux |
| **Subject:** | FW: Cobb, et al. v. Ironwood |
| **Attachments:** | Testaverde (resp to 011113 ltr) - 020713.pdf |

Alan,

As we discussed today, Christine Testeverde is no longer with our office.  I will be handling this matter going forward for Liberty.  Attached is the letter from Ironwood declining to provide the information requested by Liberty.  Among other things, Liberty has requested a copy of the memorandum which is referenced in the September 2011 invoice voluntarily submitted by Ironwood along with their initial request for reimbursement of those invoices from Liberty.  Liberty is also requesting an explanation for the work performed by Green, Bryant,  & French LLP as reflected in their July, August,  and September 2011 invoices.

Liberty  is requesting that this information be provided to us as soon as possible and we also remind Ironwood of its cooperation obligations under the Policy.  In the meanwhile, Liberty reserves all rights under the Policy and at law.

Thank you,

Seon Choi
AVP, Specialty Casualty Claims
Liberty International Underwriters
55 Water Street, 18th Street
New York, New York 10041
(347) 324-7924 blackberry

Please report all notices of claims or potential claims to:  DandONotice@libertyiu.com
Please send request for all loss run request to: DandONotice@libertyiu.com

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

Exhibit ___9___
Page ___1___