John J. McLeod, Esq., State Bar No. 174169
john@mcleodlawgroup.com
Paul C. Hirst, Esq., State Bar No. 234460
pchirst@mcleodlawgroup.com
McLEOD LAW GROUP, A.P.C.
701 B Street, Suite 1570
San Diego, California 92101
Telephone: (619) 236-9938
Facsimile: (619) 236-9943

Attorneys for Plaintiff,
IRONWOOD COUNTRY CLUB

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| IRONWOOD COUNTRY CLUB,<br><br>　　　　Plaintiff,<br>　v.<br><br>LIBERTY INSURANCE UNDERWRITERS, INC. and DOES 1 through 100,<br><br>　　　　Defendants. | CASE NO. 13-00996-VAP (DTBx)<br><br>**DECLARATION OF ROBERT C. MANION IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:　January 27, 2014<br>Hearing Time:　2:00 p.m.<br>Courtroom:　Hon. Virginia A. Phillips<br><br>Date Complaint Filed: May 1, 2013<br>Trial Date: August 5, 2014<br><br>Filed concurrently with:<br>　1. *Notice of Motion and Motion;*<br>　2. *Points and Authorities;*<br>　3. *Statement of Undisputed Facts;*<br>　4. *Declaration of Bryan R. Gerstel;*<br>　5. *Declaration of Joshua Tanner;*<br>　6. *Declaration of Alan Lux;*<br>　7. *Declaration of John J. McLeod;*<br>　8. *Request for Judicial Notice; and*<br>　9. *[Proposed] Order.* |

Declaration of Robert C. Manion ISO Ironwood's Motion for Partial Summary Judgment

**I, ROBERT C. MANION, declare:**

1.  I am a member of Ironwood Country Club ("Ironwood') and I currently serve as a member of Ironwood's Board of Directors ("Board"). I have personal knowledge of the matters set forth herein and if called upon to testify I could and would competently do so, except as to those matters stated on information and belief and, as to those matters, I believe them to be true.

2.  I joined Ironwood as a club member in 1998. In March 2010 and March 2013, respectively, I was elected to serve a three-year term on the Board. During my initial three-year term, I held several different positions. From March 2010 through March 2011, I served as the Board's Planning Committee Chair. From March 2011 through March 2012, I served as the Board's Golf Committee Chair. And from March 2012 through March 2013, I served as the Board's President. Since my re-election to the Board in March 2013, I have served as the Board's Vice President and Planning Committee Chair. I have been involved in just about every formal decision made by the Board since being elected in March 2010, including the January 19, 2012 decision discussed herein.

3.  In 1999, as a club member, I voted to approve an assessment of $25,500 per member ("Assessment"). At the time, the specific details of the proposed Assessment did not concern me. So, while I read the statement of information provided to club members prior to the vote, I did not attend any of the briefings held by the Board to discuss the Assessment. Indeed, it was only after I was elected to the Board in 2010 that I learned the specific details of the Assessment.

4.  Specifically, in 2010, soon after my initial three-year term began, I learned that the Assessment was to be repaid to a member when they subsequently sold their membership. Members sold their memberships by placing them on a resale list. I further learned that in addition to members selling their memberships, some members had forfeited their membership to the club rather than have it sold to an incoming member. The forfeited memberships became club property and were called Treasury

1

memberships. I learned that the club had a business practice of selling these Treasury memberships to incoming new members and repaying the Assessment to the original member when that Treasury sale occurred years after the member forfeited it. Sometime after my initial three-year term began, the Board was discussing the nature and terms of its business practice of repaying the Assessment to a forfeiting member when the Treasury membership was sold. I am informed and believe that dating back several years before my initial three-year term began, previous Boards had been intermittently discussing the nature and terms of this business practice.

5. To that end, in discussing whether or not to cease repaying the Assessment to forfeiting members, the Board performed substantial due diligence about the potential risks and benefits of altering this business practice so as to make an informed decision. This included consultation with many individuals, including past Presidents, Ironwood's management team, and Ironwood's counsel, Bryan Gerstel. In my position as a Board member, I have attended nearly all Board meetings during my tenure. Prior to January 2012, the matter of changing this business practice was never presented to the Board for a vote by motion or otherwise. It was simply a matter that had been discussed a number of times. Indeed, prior to January 2012, there was not a consensus among Board members as to whether or not Ironwood should consider changing this business practice. Thus, the Board had not made any decision and/or voted on this issue prior to January 2012. And, since the matter had never come up to the Board for a vote or decision prior to January 19, 2012, neither I personally nor the Board had any knowledge or information of any fact or circumstance that might give rise to a claim against Ironwood or the Board regarding the discussed change to Ironwood's business practice of repaying the Assessment to forfeiting members at any time prior to January 2012.

6. On January 19, 2012, I attended the regularly-scheduled meeting of the Board. During this meeting, the Board voted to change the practice of repaying the Assessment to former members who had resigned from the club, stopped paying dues,

and forfeited their membership. The Board voted to cease all such repayments going forward. I am informed and believe that this was the first time any Board ever voted on the issue of whether to change this business practice.

7. On January 24, 2012, the Board's then-President, Ken Delf, sent a letter to Ironwood's members summarizing the decisions that were made during the January 19 Board meeting, including the vote to stop repaying the Assessment to forfeiting members. This letter was reviewed and approved by the other Board members, including me, prior to Mr. Delf sending it out to the club members. I received a copy of Mr. Delf's January 24 letter in the normal course of being a Board member. A true and correct copy of Mr. Delf's January 24 letter is attached hereto as Exhibit 1.

8. From 2010 (when I learned the Board was discussing a change to its business practice of repaying the Assessment to forfeiting members) up through January 19, 2012 (when the board for the first time voted to change its business practice), I was not aware of any fact or circumstance that might give rise to a claim against Ironwood or the Board as a result of the Board considering making the change to its practice of repaying the Assessment to forfeiting members.

9. In the normal course of business, Mr. Tanner kept the Board informed about the insurance policies affording coverage for Ironwood. I am informed and believe that Mr. Tanner caused to be submitted an insurance application to Liberty Insurance Underwriters, Inc. on or about October 5, 2011. As of October 5, 2011, neither I personally nor the Board had any knowledge or information of any fact or circumstance that might give rise to a claim against Ironwood or the Board regarding the possibility of a future change to Ironwood's business practices. Indeed, the decision to change that business practice was not made until January 19, 2012 – more than three months after October 5, 2011.

///

///

///

3

Declaration of Robert C. Manion ISO Ironwood's Motion for Partial Summary Judgment

10. On or about May 7, 2012, I received via email a demand letter from William S. Cobb, Jr. Mr. Cobb's May 7 letter was the first claim of which I was aware regarding Ironwood's above-described January 19, 2012 vote. A true and correct copy of Mr. Cobb's May 7 letter is attached hereto as Exhibit 2.

11. I am informed and believe that several invoices that Ironwood's counsel, Bryan Gerstel, had previously issued to Ironwood were inadvertently sent to Liberty in connection with the Cobb matter.

12. As Ironwood's General Manager and Chief Operating Officer, Mr. Tanner does not have authority to waive any privileges, including the attorney-client privilege, on behalf of the Board and/or Ironwood. Any such waiver would require authorization from Ironwood's Board. Mr. Tanner did not ask for and did not receive authority from the Board to waive any privileges applicable to the invoices that were submitted to Liberty in connection with the Cobb matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at ___HINSDALE___, Illinois, on December _26_, 2013.

_Robert C. Manion_
Robert C. Manion

4

# EXHIBIT 1



**IRONWOOD COUNTRY CLUB**

January 24, 2012

Dear Members,

Our last Board meeting was held January 19th. The more important decisions and discussions follow.

We continue to perform well against the operating budget and we believe that we have an excellent chance of equalling or exceeding the dues revenue for the full fiscal year that we achieved last year. All departments are functioning ahead of plan, reflecting the excellent efforts by management and staff and increasing member usage of the club. Revenues in all departments are up over last year while costs have been contained to approximately last year's levels.

I am constantly asked about membership levels, the key factor in our success. At the end of December 2011, half way through our fiscal year, our membership sales results are:

- We have added 2 proprietary, 8 CTIM and 9 TFS, for a total of 19 new members.

- At the end of December 2011 we have 660 total members versus 659 on June 30.

- Golfing members (Charter and Regular Proprietary, CTIM, Non-Proprietary, and Emeritus) totalled 517 versus 522 a year ago.

We've added members in all categories in January so we will have more up to date figures at the Annual Meeting later this week.

We monitor this very closely and continue to remind members that we need to always be looking for prospective members. A big thank you to all of you who have introduced new members!

Our Annual General Membership meeting is January 28, at 3 pm. We urge you to attend, listen to the committee reports, and take the opportunity to ask questions.

The Board passed resolutions as follows:

1. Rules. "The Board may waive one or more provisions of Rule 8 for promotional or membership development purposes." This is not detrimental or a change in anything we are doing now.

Exhibit  I
Page  I

2. In order to increase the use of the tennis courts we have authorized non-members, who are renters from Ironwood/Monterra/The Summit property owners, to use the tennis facility by paying normal guest fees. We expect that this will increase exposure to our wonderful facility and attract permanent members. In addition, it helps all leasing brokers with leasing Ironwood member property.

3. The Board has voted informally to build the three-hole, par 3 course at the South end of the driving range behind the putting and chipping greens. The final decision will occur at our next Board meeting. The total cost will be less than $80,000 and the work will mostly be done by our staff this coming summer. The existing pitching area would be relocated to two locations, one at each end of the main driving range. After two years of study we have concluded that such a facility will provide another important dimension to Ironwood for new and experienced golfers alike. It will provide a great opportunity to improve the short game, provide those who wish less of a challenge an excellent venue, and be an attraction to new golfers who may be intimidated by the full course experience. We encourage all members to walk the site. You will soon receive notice as to when "tours" will be held. We encourage you to attend one of these guided tours to preview first hand this beautiful site and receive more detail. Delaying the final approval until our February meeting will allow us to conduct tours of the site, provide more detail to members, and further review our capital spending priorities. We have received many comments and the majority are in favor of this addition. Every new amenity is a key selling point to prospective members.

4. The Board has agreed to help the Ironwood Community Association (ICA) by providing interim financial assistance to fund the redevelopment of the front entrance gate at Mariposa and Portola. The assistance is in the form of prepayment of our normal share of dues and minimal contingency financing. Any funds advanced will be fully repaid with repayment protected by a promissory note. The bottom line is that the full cost of the Mariposa Gate Project, which will greatly benefit the Club, will be paid by the ICA. We all look forward to arriving back next November and celebrating this most needed improvement. Congratulations and thank you to the ICA for their hard work on this project.

5. Over the last year the Board had three major goals:

   a) Membership;
   b) Capital Reserve analysis; and
   c) Detailed forward planning.

   Items (a) and (c) are well in hand and item b), the study of Capital Reserves has come a long way.

Exhibit 1
Page 2

Our review and analysis has revealed a mistaken belief, that began in about 2003, which led to a Club practice of repaying the $25,500 Land Assessment to members who resigned from the Club, stopped paying dues, and forfeited their memberships, rather than selling the memberships through the procedures set up by the Club.

After substantial due diligence, including consultation with past Presidents, our auditor and Counsel, this Board has concluded that the practice of repaying the Land Assessment to forfeiting members, when their forfeited membership is subsequently sold by the Club as a Treasury membership, must cease effectively immediately. Of course, this does NOT apply to any member who sells his/her active membership through the club procedures. The Club will continue to repay the Assessment to all such members when they sell their membership.

A forfeiting member (one who has resigned and stopped paying dues) whose forfeited membership is subsequently sold by the Club as a Treasury membership may, if circumstances warrant it, seek repayment of the assessment and have that request considered on an individual basis.

In appreciation for the financial commitment made at the time and in order to allow current members to enjoy some financial benefit from that commitment while they are still at the Club, the Board has created an option for any current member who is willing to waive the repayment. The offer and a letter of explanation have been mailed by separate cover to those current members who participated in the program. This is a **voluntary** program only and any current member wishing to be paid in full when they sell their membership, may certainly do so.

6. We are pleased to announce that the Nominating Committee has concluded their work and has selected Blomberg, Ray Coad, and Gene Grant be supported by the Board as the regular ticket nominees for election to the Board of Directors. If you have missed this process thus far you can, with the support of 25 proprietary members, submit you name for the ballot. We want to ensure that anyone who has the interest and requisite experience and knowledge of Ironwood is not overlooked.

7. Tarbell Realtors has brought the Young Americans and more recently Annika Sorenstam to the club to sold out audiences. We thank them for their generous support. Many members have asked how they might help out the Sorenstam Foundation. If you are interested in supporting her initiative, click on www.annikafoundation.org.

We constantly strive to build on the sense of community we share, deliver the best product we can in both the short and long term interests of the Club, and continue to find ways to better the experience of being an Ironwood member. As this current board has only one more meeting as a group I would like to thank those who have served us so well and are leaving the Board after a

Exhibit 1
Page 3

three year term, Barbara Sue Seal (served two three year terms), Al Olson and Mike Flood. Please take a moment and thank them for their tireless effort on our behalf.

See you on the course.

Sincerely,

President
Ironwood Board of Directors

Exhibit 1
Page 4

# EXHIBIT 2

William S. Cobb, Jr.
73-132 Carrizo Circle
Palm Desert, CA 92260

May 7, 2012

<u>Via Email</u>

Bob Manion, Board President
Ironwood Country Club
73-735 Iron Tree Drive
Palm Desert, CA 92260

RE: <u>Repayment of $25,500 Loan</u>

Dear Bob:

As you have no doubt become aware, a large number of current and former members of Ironwood Country Club ("ICC") have become very concerned about the manner in which ICC is repaying the $25,500 loans to former members whose memberships have sold. Briefly stated, the Board is calculating the loan reimbursement and the net membership refund upon sale as one transaction, instead of as two separate transactions, which is required by the Board's loan approval correspondence to ICC members and ICC's financial statements, among other documentation.

Many former members who resigned are also concerned about the Board's new policy announced in January, 2012, to the effect that resigned members will no longer receive reimbursement of their loans when their treasury memberships are sold, reversing the Board's previous position and practice.

These concerned members and I have formed Concerned ICC Members ("CIM") to bring these and other important issues to your attention and to reach a satisfactory resolution. As of the date of this letter, more than 50 current and former members have joined CIM and more are joining every day. Furthermore, I have retained an attorney to represent me in this matter.

Enclosed is a list of the demands of CIM. If you have a genuine interest in settling this matter out of court, we request that you provide a positive written response within seven (7) days of the date of this letter. If I do not receive a timely affirmative response from you, CIM will have no choice but to conclude that the Board is not interested in reaching a settlement.

Exhibit 2
Page 1

CIM Demands
May 7, 2012

### Proper Repayment of the $25,500 refundable assessment.

1) According to the Club, 280 members who paid the $25,500 have sold their memberships. These members were not paid in accordance with the transaction approved by the members in 1999.
   a) As such, the Club underpaid these members by approximately $5 to $6 million.
   b) Our demand is that the Club pay the required additional monies to any former member in this group that contacts the Club and requests the adjusted payment.
2) Resigned/converted (Proprietary to Tennis, Social & Fitness or Emeritus) members must be repaid the $25,500, or the portion they paid, once their corresponding Treasury membership is resold.
3) According to the Club, 76 existing members are on the Members Sales List. Based upon the level of membership resignations and conversions, it is also apparent that far more than 100 former equity members are on the Treasury Sales List.
   a) Our first demand is for the Club to reduce its initiation fee to no more than $25,500, until the Club has at least 500 Proprietary members. As of April 30, 2012, the Club had 440 Proprietary members.
   b) Second, the sales ratio should be changed from three Treasury membership sales for one Member's membership sale to two Treasury membership sales for one Member's membership sale, as this is more consistent with the number of memberships in each category.
   c) Third, the Members Sales List, the Treasury Sales List and the combined list should be provided to any current or former member listed thereon upon request.
   d) Fourth, when a Member's membership is sold in the future, the selling member would receive the sales proceeds specified by the By-Laws plus $25,500, or the portion, if any, of the refundable assessment he or she paid.

### Treat all members in the same membership class equally.

As evidenced most recently by the Board's decision to forgive unpaid $25,500 installment payments from approximately 30 members, the Club has not always treated all members in the same class equally. This must stop now. Adjustments to correct existing discrepancies within each membership class should also be made immediately.

### Follow the By-Laws.

As I have pointed out before, the Club has violated and continues to violate its own By-Laws. Our demand is that this be stopped immediately.

Exhibit 2
Page 2

Bob Manion, Board President
May 7, 2012
Page 2

    Since additional litigation would not be in the best interest of ICC or its members, we look forward to hearing from you soon and reaching a fair resolution.

                                              Sincerely,

                                        WILLIAM S. COBB, JR.

Enclosure: CIM Demands

Cc: Concerned ICC Members (via email)
Steven W. DeLateur, Esq. (via email)
ICC Board of Directors (via email)
Josh Tanner (via email)
Dale Echols (via email)

Exhibit 2
Page 3