John J. McLeod, Esq., State Bar No. 174169
john@mcleodlawgroup.com
Paul C. Hirst, Esq., State Bar No. 234460
pchirst@mcleodlawgroup.com
McLEOD LAW GROUP, A.P.C.
701 B Street, Suite 1570
San Diego, California 92101
Telephone:  (619) 236-9938
Facsimile:  (619) 236-9943

Attorneys for Plaintiff,
IRONWOOD COUNTRY CLUB

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| IRONWOOD COUNTRY CLUB,<br><br>              Plaintiff,<br><br>    v.<br><br>LIBERTY INSURANCE UNDERWRITERS, INC. and DOES 1 through 100,<br><br>              Defendants. | CASE NO. 13-00996-VAP (DTBx)<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:    January 27, 2014<br>Hearing Time:   2:00 p.m.<br>Courtroom:      Hon. Virginia A. Phillips<br><br>Date Complaint Filed: May 1, 2013<br>Trial Date: August 5, 2014<br><br>Filed concurrently with:<br>　1.  *Notice of Motion and Motion;*<br>　2.  *Points and Authorities;*<br>　3.  *Statement of Undisputed Facts;*<br>　4.  *Declaration of Bryan R. Gerstel;*<br>　5.  *Declaration of Joshua Tanner;*<br>　6.  *Declaration of Alan Lux;*<br>　7.  *Declaration of Robert C. Manion;*<br>　8.  *Declaration of John J. McLeod; and*<br>　9.  *[Proposed] Order.* |

Plaintiff, Ironwood Country Club ("Ironwood"), hereby requests that, pursuant to Federal Rules of Evidence 201, the Court take judicial notice of the below-listed court records in support of Ironwood's motion for summary adjudication.  Rule 201 permits the Court to take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Ironwood therefore requests that the Court take judicial notice of the following:

1.     The Complaint filed on August 21, 2012 in the action entitled *Cobb, et al. v. Ironwood Country Club*, Riverside County Superior Court – Indio Branch, Case No. INC 1205888, a certified copy of which is attached hereto as Exhibit 1; and

2.     Ironwood's Complaint filed in this action on May 1, 2013, a true and correct copy of which (without exhibits) is attached hereto as Exhibit 2.

3.     Defendant, Liberty Insurance Underwriters, Inc.'s Answer filed in this action on June 10, 2013, a true and correct copy of which is attached hereto as Exhibit 3.

4.     The parties' Joint Discovery Plan Report Pursuant to Fed. R. Civ. P. 26(f) and L.R. 26-1 filed in this action on August 30, 2013, a true and correct copy of which is attached hereto as Exhibit 4.

DATED: December 29, 2013          McLEOD LAW GROUP, A.P.C.


                                   By:   /s/ Paul C. Hirst
                                      John J. McLeod
                                      Paul C. Hirst
                                      Attorneys for Plaintiff, Ironwood Country
                                      Club

---

1

Request for Judicial Notice ISO Ironwood's Motion for Partial Summary Judgment

# EXHIBIT 1

1    Thomas S. Slovak, Esq., SBN 062815
     David A. Smith, Esq. SBN 113816
2    SLOVAK BARON & EMPEY LLP
     1800 East Tahquitz Canyon Way
3    Palm Springs, California 92262
     Telephone (760) 322-2275 / Facsimile (760) 322-2107
4    sartain@sbelawyers.com

5    Attorneys for Plaintiffs WILLIAM S. COBB, JR.;
6    PATRICK J. KEELEY; HELEN H. RIEDSTRA and
     ELIZABETH RICHARDS
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          IN AND FOR THE COUNTY OF RIVERSIDE, INDIO BRANCH

10

11   WILLIAM S. COBB, JR., an Individual;          Case No. **INC 1205888**
12   PATRICK J. KEELEY, an Individual;
     HELEN H. RIEDSTRA, an Individual;             The Honorable _____, presiding
13   ELIZABETH RICHARDS, an Individual;            Department _____

14            Plaintiffs,                          **COMPLAINT FOR DECLARATORY
                                                   RELIEF**
15   v.

16   IRONWOOD COUNTRY CLUB, a
17   California Nonprofit Mutual Benefit
     Corporation and DOES 1 through 50,
18   inclusive.

19            Defendants

20

21       PLAINTIFFS, WILLIAM S. COBB, PATRICK J. KEELEY, HELEN H. RIEDSTRA,

22   AND ELIZBETH RICHARDS ALLEGE:

23                                    I.

24                                 **PARTIES**

25       1.   Plaintiff WILLIAM S. COBB, JR. (hereinafter referred to as "PLAINTIFF

26   COBB" or when collectively identified with other named Plaintiffs, referred to as

27   "PLAINTIFFS"), previously held a *"Regular Proprietary Membership"* with DEFENDANT

28   IRONWOOD COUNTRY CLUB ("IRONWOOD"), which membership was assigned on or

     about 2009 to his spouse, BARBARA P. COBB, who resigned her assigned membership with

                                      1
                                 COMPLAINT

IRONWOOD in 2011.  While an active member with IRONWOOD, in or about 1999, PLAINTIFF COBB (*along with approximately 588 other members of the Club*) entered into a loan agreement with Ironwood Country Club wherein PLAINTIFF COBB lent to IRONWOOD the sum of $25,500.00 as more fully set forth herein below.  Further, PLAINTIFF COBB is, and at all times mentioned herein was, a Resident of the State of California.

2.     Plaintiff PATRICK J. KEELEY (hereinafter referred to as "PLAINTIFF KEELEY" or when collectively identified with other named Plaintiffs, referred to as "PLAINTIFFS") is a *Charter Proprietary Member*" of IRONWOOD whose membership is *currently active* at said Club. In or about 1999, PLAINTIFF KEELEY (*along with approximately 588 other members of the Club*) entered into a loan agreement with Defendant Ironwood Country Club wherein he, too, lent to IRONWOOD the sum of $25,500.00 as more fully set forth herein below.

3.     Plaintiff HELEN H. RIEDSTRA (hereinafter referred to as 'PLAINTIFF RIEDSTRA" or when collectively identified with other named Plaintiffs, referred to as "PLAINTIFFS") is a *Charter Proprietary Member*" of Defendant IRONWOOD COUNTRY CLUB, whose membership is currently active at said Club.  In or about 1999, PLAINTIFF RIEDSTRA (*along with approximately 588 other members of the Club*) entered into a loan agreement with Ironwood Country Club wherein she lent to IRONWOOD the sum of $25,500.00. PLAINTIFF RIEDSTRA elected to lend the money under the "installment plan" offered by IRONWOOD at the time the Loan Agreement was entered into. PLAINTIFF RIEDSTRA is still regularly making the required payments to IRONWOOD under the "installment plan".

4.     Plaintiff ELIZABETH RICHARDS (hereinafter referred to as "PLAINTIFF RICHARDS" or when collectively identified with other named Plaintiffs, referred to as "PLAINTIFFS") is a *Former Regular Proprietary Member*" of Defendant IRONWOOD COUNTRY CLUB, whose membership was sold in February of 2010. In or about 1999, PLAINTIFF RICHARDS (*along with approximately 588 other members of the Club*) entered in a loan agreement with Ironwood Country Club wherein she too lent to IRONWOOD the sum of $25,500.00. Upon the sale of her Club Membership in February of 2010, PLAINTIFF

Exhibit ____1____
Page ____2____

1  RICHARDS was improperly underpaid and/or not fully reimbursed for that loan as promised

2  in the loan agreement. Further, PLAINTIFF RICHARDS is, and at all times mentioned herein

3  was, a Resident of the State of California.

4       5.      IRONWOOD is, and at all times herein was a non-profit mutual benefit

5  corporation existing under and by virtue of the laws of the State of California.

6       6.      The true names and capacities of those defendants sued herein as Does 1

7  through 50, inclusive, are presently unknown to Plaintiffs, who therefore sues said defendants

8  by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of

9  the fictitiously named defendants are responsible in some manner for the occurrences herein

10  alleged and that Plaintiffs' injuries and damages as alleged were proximately caused by these

11  defendants' actions.

12       7.      Plaintiffs are informed and believe and thereon allege that IRONWOOD,

13  including Does 1 through 50, and each of them, were corporations, non-profit corporations,

14  business entities, associations, partnerships, joint ventures, trusts, and/or individuals who

15  conducted business in the County of Riverside, State of California. These Defendants

16  participated in the Membership Loan Agreement/Land Purchase process with IRONWOOD

    as complained of herein below.

17                              **II.**

18                    **JURISDICTION AND VENUE**

19       8.      The acts and attributable damages alleged herein which are the basis of this

20  action occurred in the County of Riverside in the State California.

21       9.      IRONWOOD operates and does business in the County of Riverside, State of

22  California.

23       10.     IRONWOOD has its principal and executive offices as well as its corporate

24  headquarters in the County of Riverside State of California.

25       11.     Accordingly, pursuant to <u>CALIFORNIA CODE of CIVIL PROCEDURE</u>

26  ("CCP") §395(a) and §395.5 this Court is the proper Court, and this action is properly filed in

27  the Superior Court in the County of Riverside, Indio Judicial District, in the State of

    California.

28

Exhibit _____ 1
Page _____ 3

## III.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

12.   Commencing in or about late 1998 or early 1999, IRONWOOD devised a plan to purchase 391 acres of real estate surrounding the existing club from the Coachella Valley Water District for the sum of approximately $14,860,000.00. Pursuant to IRONWOOD's plan, it would purchase and make loan payments on the subject matter property by using, in large part, $15,054,595.00 worth of *interest free loans* collectively borrowed from its approximately 588 members.

13.   On March 24, 1999, IRONWOOD sent all 588 members, including PLAINTIFFS, an information package requesting their approval for the purchase of the 391 acres of land along with a proposed assessment/loan program for their review and consideration.   This information included: (a) the "Ironwood Country Club Statement of Information Proposed Purchase of Leased Land and Proposed Assessment to Fund the Purchase" (hereinafter referred to as "Statement of Information" and/or "Loan Agreement"); and (b) the applicable ballot for the proposed assessment/land purchase. (*A copy of the March 24, 1999 Loan Agreement (Statement of Information) has been attached hereto and marked as Exhibit "1". Additionally, a copy of the Applicable Ballot referencing the Loan Agreement (Statement of Information) has been attached hereto and marked as Exhibit 2.*)

14.   In relevant part, the key provisions of the Loan Agreement prepared by the club for its members' consent and approval are the following:

    (a)   "*The amount of the Land Purchase Assessment will be $25,500 for each Proprietary Member.*" <u>See Provision 1 Page 2 of the 'Loan Agreement'</u> (*Exhibit 1*);

    (b)   "*The Land Purchase Assessment will be treated as an advance by each Member to the Club. A <u>separate account</u> (called a 'Land Purchase Account') will be maintained for each Proprietary Member. (Emphasis Added)*" <u>See Provision 4 on Page 2 of the 'Loan Agreement'</u> *Exhibit 1;*

    (c)   "*The principal amount of the Land Purchase Assessment paid in by each Member will be accounted for as <u>an obligation by the Club to each Member</u>. (Emphasis Added)*" <u>See Provision 5 on Page 2 of the 'Loan Agreement'</u> (*Exhibit 1*);

4
COMPLAINT

Exhibit _____ 1
Page _____ 4

(d)   *"When a Member sells the Member's Membership, <u>the Club shall be absolutely obligated to pay to the Selling Member the entire amount then standing in the Member's Land Purchase Account.</u>(Emphasis Added)"* <u>See Provision 6 on Page 2 of the 'Loan Agreement'</u> (*Exhibit 1*);

(e)   *"New Members who purchase Memberships after the imposition of the Land Purchase Assessment will have the following obligations:*

    *(a) **In addition to the Initiation Fee** (emphasis added), New Members, upon admission, will be required to pay an amount equal to the principal amount which would have built up in a hypothetical member's Land Purchase Account had the hypothetical member elected to amortize the Land Purchase Assessment over the 20 year installment plan. The Member would receive a credit in the new Member's Land Purchase Account equal to that payment.*

    *(b) The New Member would be obligated to pay the remaining unamortized portion of the Land Purchase Assessment which would be payable by a hypothetical member who elected the fully amortizing installment plan. The New Member would receive credit in the new Member's Land Purchase Account equal to the principal portions of such payments. New Members may also elect to pay principal in advance.*

    *(c) For instance, if a New Member purchases a Membership three years after the Loan Purchase Assessment goes into effect, in addition to the Initiation Fee, the New Member would pay to the Club an amount equal to the principal pay-down under a fully amortizing 20 year loan ($1,756) and would assume an obligation to pay the balance over 17 years ($23,744) payable at approximately $215 per month assuming an 8% interest rate)."* See Provision 10 Subsections (a) (b) & (c) on Page 3 of the 'Loan Agreement' (*Exhibit 1*).

    15.  Despite having a built-in provision (Provision 10 (a) (b) & (c) as set forth above), that specifically authorized IRONWOOD, and in fact "required" them to collect the $25,500.00 from any and all new members who joined Ironwood Country Club and bought memberships after the March 24, 1999 Loan Agreement was entered into, IRONWOOD, inexplicably failed to do so.  PLAINTIFFS are informed and believe and on that basis allege that IRONWOOD's failure to collect the $25,500.00 from any and all *"new members"* as required by Provision 10 (a) (b) & (c), ultimately put IRONWOOD in a difficult financial

Exhibit    ( 

Page     5

1    bind that ultimately forced them to renege on the loan agreement with its original lending

2    Members including PLAINTIFFS. Regardless, Provision 10, in and of itself, confirms that the

3    membership initiation fee and the land purchase loan (*Member's Land Purchase Account*) are

4    in fact, two separate and distinct contractual obligations of IRONWOOD.

5         16.    On or about April 17, 1999, by ballot, and based entirely upon (a) statements

6

7    contained in the March 24, 1999 Statement of Information/Loan Agreement (*Exhibit 1*); and

8    (b) the accompanying ballot (*Exhibit 2*), the Membership, including PLAINTIFFS approved

9    the acquisition of the land and loan funding proposal described above.

10        17.    Shortly thereafter on approximately September 1, 1999, IRONWOOD began

11   soliciting from its Members, including PLAINTIFFS, the agreed upon loan sum of Twenty-

12   Five Thousand Five Hundred Dollars ($25,500.00) *each*. Some members, including

13   PLAINTIFFS COBB, KEELEY, RICHARDS paid the $25,500.00 in full while other

14   members like  PLAINTIFF RIEDSTRA elected to pay IRONWOOD via an installment

15   payment plan that was offered by IRONWOOD. Those members that paid in full, as did

16   PLAINTIFFS COBB, KEELEY AND RICHARD received a '*Certificate*' from IRONWOOD,

17   signed by then President, Roy Mullins that certifies that the member has:

18       "*(Members Name)...paid in full the $25,500 Land Purchase
         Assessment which was described in the Statement of Information
19       dated <u>March 24, 1999</u>, approved by the Membership effective as of
         <u>April 17, 1999</u> and invoiced to the Members on September 1, 1999.*"

20
21       (*A redacted copy of an ICC's Certificate has been attached hereto and

22   marked as Exhibit 3*).

23        18.    The above referenced Certificates (*Exhibit 3*) and Ballots (*Exhibit 2*) issued by

24   IRONWOOD both expressly identify the operative Loan Agreement as the March 24, 1999

     <u>Statement of Information</u> (*See Exhibit 1*) as the sole and exclusive document containing the
25
     operable terms and conditions for the 'Land Purchase Assessment/Loan'. To PLAINTIFFS
26
     knowledge, there are no other documents which would in any way alter or change the
27
     operative loan terms and conditions that were set forth (*and agreed to*) in the above referenced
28
     Statement of Information (*Exhibit 1*).

Exhibit ___ \
Page ___ ᴸ

19.     Shortly after entering into the Loan Agreement, IRONWOOD documented its unequivocal contractual obligation to fully repay any and all portions of the $25,500.00 member loans to Members of the Club, including PLAINTIFFS, as evidenced in Note 7 ('*Assessment Receivable and Refundable*') to Ironwood Country Club Audited Financial Statements dated September 30, 2000 and 1999. Note 7 in relevant part reads as follows:

> "*Upon the sale of the membership, the Club will repay the member the assessment amount, if the amount was fully paid by the departing member. Members electing to pay in installments will receive the principal amount of the installments paid. The refundable assessments are not interest bearing. No payments are required before the sale of a member's certificate*" (*Emphasis added*).

IRONWOOD's September 30, 2000 and 1999 Financial Statement makes no distinction as to IRONWOOD's repayment obligation to certain 'membership classes' or 'types of memberships being sold', but rather expressly provides that *each departing member will be repaid upon the sale of the membership*. Further, there is no distinction or limitation of this obligation based on who ultimately sells the membership i.e. the member him or herself, or the Club.

20.     Eleven (11) years later, IRONWOOD's audited financial statements continue to steadfastly acknowledge its contractual obligation to repay all of its members for the $25,500.00 loans made to the Club. As evidence, Note 5 (*Assessment Receivable and Payable)* to the Ironwood Country Club Audited Financial Statements dated June 30, 2011 and 2010 states, in relevant part, that:

> "*During 1999, the Proprietary members approved an assessment of $25,500 per member to purchase approximately 391 acres of land which had previously been leased. The Club is obliged to repay the assessed amount to the member only upon the sale of his/her membership; accordingly, the aggregate amount of this assessment, net of amounts repaid is recorded in the balance sheet as a liability. The assessment liability does not bear interest, and no repayment is required prior to the sale of the member's certificate. The Proprietary members could elect to pay the assessment in installments with a balloon payment after 10 years. The balloon payment was due October 2009. The board of Directors have extended the installment payment period for five years until October 2014. At June 30, 2011 and 2010, the installments receivable bear interest at 4% per annum and may be paid in full at any time without penalty. These assessments receivable are recorded as an asset in the accompanying balance sheet. Any unpaid balance must be paid to the Club upon sale of a member's certificate.*" (*Emphasis added*)

7
COMPLAINT

Exhibit ___1___
Page ___7___

21.     The difference in the two underlined Financial Statement Notes above clearly reflect a change in IRONWOOD'S loan repayment policy pertaining to those members that elected to loan the Club $25,500.00 pursuant to the 'installment plan option.' Further, the Note to the 2000/1999 Financial Statements (referenced above) accurately reflects the installment repayment provisions as set forth in Provision 6 of the March 24, 1999 Loan Agreement document (*Exhibit 1*). In contrast, however, the Note in the September 2011/2010 Financial Statement and other IRONWOOD Financial Statements commencing in or around 2005 indicates that IRONWOOD unilaterally changed its repayment policy to installment plan members without formal notice, approval or installment paying member consent. As a result of this change in repayment methodology, the "installment loaning members" are effectively underpaid monies owed to them, to the unjust enrichment of IRONWOOD when they sold, or subsequently sell their memberships in the future (PLAINTIFF RIEDSTRA).

(*A copy of both the above referenced Note sections to the Ironwood Country Club's Audited Financial Statements dated September 30, 1999 and 2000 and September 16, 2010 and 2011 have been attached hereto and marked collectively as Exhibit 4*).

22.     Upon resigning their respective Ironwood memberships, most, if not all 'Resigned Members', who had paid all or part of the $25,500.00, received a letter from IRONWOOD confirming their resignation and indicating their loan amount would be repaid once their corresponding 'Treasury Membership(s)' were sold by the Club. (*Two redacted copies of Defendant's confirmation letter to 'Resigned Members, one dated January 16, 2009 and the other dated February 7, 2011 have been collectively attached hereto and marked as Exhibit 5*). These IRONWOOD confirmation letters further evidence and, in fact, document the Club's stated recognition of its obligation to repay *all* Members, including but not limited to 'Resigned Members.'

23.     On or about April 14, 2012, at a "Town Hall" meeting, IRONWOOD announced that from 2003 through January 2012, it had honored its obligation and paid back the $25,500.00 loan to ten (10) 'Resigned Members' whose memberships had been sold as *Treasury Memberships*. That announcement by IRONWOOD confirmed both its obligation and intention to pay all members who lent the club money regardless of their expressed membership

Exhibit ____1____
Page ____8____

classification. Accordingly, and to the detrimental reliance of both its past and present membership, IRONWOOD has treated the $25,500.00 loan obligations as a separate and distinct contractual obligation irrespective of the member's current status with the Club, i.e. whether an individual was or was not a current dues paying member of the Club.

24.    As further evidence of IRONWOOD's recognition of its obligation to fully repay the loans made to them by all of the Members *regardless of their current equity, non-equity or resigned status*, two different letters expressing that obligation were sent out by IRONWOOD's General Manager, Josh Tanner, in 2010. The first letter, sent out on April 9, 2010, from IRONWOOD specifically  memorializes Defendant's ongoing duty and obligation to  repay the $25,500.00 loan back to the club's 'Resigned Members' (such as PLAINTIFF COBB), and provides in relevant part as follows:

> *"The purpose of this letter is to inform you of matters involving your resignation of your Proprietary Golf membership from Ironwood Country Club. During the term of your membership, you loaned $25,500.00 to the Club to purchase land from the Coachella Valley Water District. The Club will reimburse you for the loan principal upon sale of your membership to a new member. Your forfeited membership became a Treasury Membership upon your resignation. Currently, there are a large number of Treasury Memberships being held for sale by the Club. Because of anticipated long delays until your membership sells, Ironwood requests that you execute the attached Agreement. Your execution of this Agreement is entirely voluntary. Its purpose is to clarify that it is your obligation to keep Ironwood informed as to your mailing address and that, in the event Ironwood cannot locate you when your loan is to be repaid, the funds will not be turned over to the State of California or some other State as unclaimed property. If you would like to waive your right to repayment of the loan principal, you may record that intent on the attached agreement as well. If that is your decision, there will be no need for you to provide us with current contact information through the years ahead."*

(*A redacted copy of the April 9, 2010 letter with the attached Agreement from Defendant's General Manager to 'Resigned Members of Ironwood' is attached hereto and collectively marked as Exhibit 6*).

25.    The second letter sent out by Defendant's General Manager Josh Tanner, dated May 27, 2010 was addressed to '*Current Ironwood Members*' (such as PLAINTIFFs KEELEY and RIEDSTRA ), which states in relevant part:

> *"This letter is being sent to over 300 current members of Ironwood who loaned the Club $25,500 pursuant to the Land Purchase Assessment in 1999. The purpose of the letter is to include herewith a form of Agreement the Club is*

9
COMPLAINT

Exhibit  1
Page  9

*hopeful you will voluntarily agree to execute, and to explain why this Agreement has been prepared. We have an expanding communication problem with respect to those members who loaned the Club $25,500 ("Loan") and who leave the Club by resignation, forfeiting their equity rather than by selling their membership. In this instance, the Loan is not repaid at the time the members forfeit their equity. As you may know, the Club has adopted a practice, which it continues to follow, of repaying the Loan at such time in the future as that forfeited membership sells as a Treasury Membership. Charter Members who sell their Memberships by finding their own buyers, and other Members holding the $25,500 Loans whose Memberships are sold from the Sales List, are repaid their $25,500 Loans at the time of sale of their Membership."*

Collectively, Tanner's two letters expressly acknowledge, without any qualification(s), that <u>*all past Resigned and Current Members*</u> who paid the land purchase assessment would be reimbursed by Defendant once the member's membership(s) is sold. (*A redacted copy of the May 27, 2010 letter with the attached Agreement from Defendant's General Manager to 'Current Ironwood Members' is attached hereto and collectively marked as* **Exhibit 7**).

26.    Despite these clear acknowledgements of their contractual obligations, *sometime in January of 2012,* IRONWOOD made the decision to breach the March 24, 1999 Loan Agreement by unilaterally restructuring and or redefining the terms and conditions of its loan repayment obligations which directly affected all members of Ironwood Country Club, both past and present.

27.    In furtherance of its decision to breach the Agreement, IRONWOOD's President Ken Delf, on January 24, 2012, sent out a letter to its membership announcing that contrary to past acts, agreements and written commitments, IRONWOOD would no longer repay the "$25,500.00 Land Assessments" to Members who had or will *resign* and thereby *forfeit* their membership from the Club. More specifically, Club President Delf's letter in relevant part provides:

*"After substantial due diligence, including consultation with past Presidents, our auditor and Counsel, this Board has concluded that the practice of repaying the Land Assessment to forfeiting members, when their forfeited membership is subsequently sold by the Club as a Treasury membership, must cease effectively immediately."*

(*A true and correct copy of the January 24, 2012 Letter from Defendants to its current members denouncing its loan repayment obligations has been attached hereto and marked as* **Exhibit 8**).

10<br>COMPLAINT

Exhibit ____ (<br>Page ____ 10

28.   IRONWOOD's President's January 24, 2012 letter makes no attempt to explain the "*due diligence*" involved, or for that matter, the legal basis or rationale in reaching the conclusion that IRONWOOD no longer has any obligation to repay its loan obligation to any individuals who have, or ultimately will, resign/forfeit their IRONWOOD memberships.

29.   As announced, IRONWOOD's January 24, 2012 correspondence represents an admitted *anticipatory breach of contract* for the expressed  purpose of unjustly enriching IRONWOOD at the expense of various '*Resigned* or *Resigning Members*' in direct defiance of not only the terms and conditions of the Loan Agreement, but IRONWOOD's implied covenant of good faith and fair dealing arising thereunder.

30.   In yet another letter from Club President Ken Delf, also dated January 24, 2012, IRONWOOD offered its first 'benefit package' proposal to its 'Current Members'. Specifically, in a further attempt to avoid its financial obligation to fully repay membership loans, IRONWOOD's January 14, 2012 correspondence offered to exchange certain additional 'club benefits' to 'Current Proprietary Members' and certain 'Emeritus Members' who would be willing to forgo collecting the $25,500.00 loan repayment owed to them by IRONWOOD. (A true and correct copy of the January 24, 2012 Letter from Defendant's President offering benefit packages in exchange for loan repayment obligations has been attached hereto and marked as Exhibit 9).

31.   Shockingly, the January announcement affected more than just the "*Resigned Members*" who were now being told that they would not be paid back the money that they had lent to the Club. Rather, IRONWOOD's newly stated contractual position had the effect of forcing *all* "*Current Members*" of the Club, who may have been contemplating resigning their memberships to hold off doing so or risk being denied repayment of their $25,500.00 loans from IRONWOOD. IRONWOOD's newly stated *contractual position* forced many members of the Club, including PLAINTIFF KEELEY and PLAINTIFF RIEDSTRA, to continue to write checks and pay their monthly membership dues to IRONWOOD so as to preserve their contractual right to repayment of their $25,500.00 loans contrary to and inconsistent with: (1) the Loan Agreement; (2) prior Club communications with the Members; and (3) years of repayment to earlier Resigned and/or paid Members, as alleged above.

Exhibit _____ \
Page _____

32. Approximately four months later, on May 15, 2012, IRONWOOD's Board President, Robert C. Manion, sent out to its members a twenty-one (21) page document which attempted to *explain and/or further clarify* Defendant's newly-stated positions that (a) IRONWOOD no longer has any obligation to repay the loans made to the Club by 'Resigned Members'; and (b) that IRONWOOD's ongoing methodology for calculating the distribution of the membership sale proceeds, when repayment of a membership loan is involved, was correct. IRONWOOD's May 15, 2012 letter also offered enhanced 'Benefit Packages' to those willing to forgive the $25,500.00 repayment right. (*A copy of the May 15, 2012 Ironwood Correspondence offering Benefit Packages has been attached hereto and marked as Exhibit 10*).

33. Unfortunately, IRONWOOD's May 15, 2012 correspondence created even greater confusion and contradiction by offering a 'Benefits Package' to current '*Non-equity Members*,' 'Social/Tennis/Fitness Members' and 'Emeritus Members,' *who had 'previously loaned the Club $25,500.00 and then subsequently resigned their proprietary memberships'* at Ironwood Country Club. As such, the May 15, 2012 correspondence is an expressed acknowledgement by Defendant that this particular class of '*Resigned Members*' should in fact still be paid and/or compensated for the $25,500.00 loans that they made to the Club.

34. Either IRONWOOD's May 15, 2012 correspondence was issued for the specific purpose of: (a) revoking its earlier declaration on January 24, 2012 that it would no longer be repaying its loan obligations to "*Resigned Members*", or alternatively (b) that it was creating and giving preferential treatment to specific types of "*Resigned Members*" of IRONWOOD that would in fact be compensated for their earlier loans to the Club.

35. Further, as stated in the May 15, 2012 correspondence, the same 'Package B' is offered as loan forgiveness compensation to both 'Current Proprietary Members' and '*Non-equity Members*'. This puts these particular '*Resigned Members*' on equal status with '*Non-Resigned*' or '*Current Proprietary Club Members.*' As such, the offer in IRONWOOD's May 15, 2012 correspondence is in direct contradiction to IRONWOOD's earlier declaration made in its January 24, 2012 correspondence which declared that it no longer has any obligation to repay the $25,500.00 loan sums back to any member that *resigned* his/her membership.

Exhibit ____(____

Page ____12____

36.    Additionally, the May 15, 2012 correspondence issued by IRONWOOD's President attempts to justify a loan repayment methodology that characterizes a transfer fee waiver (*maximum 25% of the actual loan amount*) as being full payment for the member's separate and distinct *Land Purchase Account* when the member sells their IRONWOOD membership. Accordingly, by using the repayment methodology advanced in Manion's May 15, 2012 letter, IRONWOOD has effectively been able to underpay its lending Members (such as PLAINTIFF RICHARDS) the actual amount of the Member's *Land Purchase Account* balance due and owing them as required by the March 24, 1999 Loan Agreement (*Exhibit 1*).[1]

37.    As such, by adopting the above described partial loan payment methodology, IRONWOOD, in order to relieve its Land Purchase Account obligations to its Members on its financial books and records, is now writing off most, if not all, of the Members *Land Purchase Account* and adding it to one of the Club's *Equity General Ledger Accounts* when the Member sells their membership (as was done with PLAINTIFF RICHARDS).

38.    PLAINTIFF KEELEY has not received an accounting for these underpaid funds despite a written demand issued on June 12, 2012 for a formal inspection of IRONWOOD's financial books and records pursuant to Article 20 of IRONWOOD's By-Laws. Nonetheless, PLAINTIFFS are informed and believe and on that basis allege that the sum of money underpaid by IRONWOOD to it Members between 1999 and the present date is in excess of Five Million Dollars ($5,000,000.00).

39.    Finally, on June 7, 2012, Ironwood Board President, Robert C. Manion sent the '*Resigned Club Members*' formal notice that they would not be repaid for whatever part of the $25,500.00 that they had previously lent the Club. Mr. Manion's June 7, 2012 correspondence states in applicable part:

> "... the Board concluded that repayment to resigned members was not required by the governing Statement of Information and that continuing the practice of repayment under such circumstances would be a breach of its fiduciary duty to the Club."

---

[1] *As the Members made/make principal payments toward their $25,500.00 loan obligations, whether in lump sum or via installments, each member's Land Purchase Account was/is updated to reflect the total amount of the $25,500.00 that they have paid to date. Pursuant to the Loan Agreement, and without any qualification or restriction, the balance in the Members' Land Purchase Account is owed to each Member (in full) at the time of the sale of their respective membership.*

Exhibit _____
Page _____

*(A true and correct copy of Defendant's June 7, 2012 Correspondence reflecting its change of position regarding repaying its loan obligations has been attached and marked hereto as Exhibit 11).*

40.     As a result of IRONWOOD's recent pronouncements, former Board Members and at least one past Club President of IRONWOOD have come forward taking exception to the expressed intent by IRONWOOD to breach its contractual obligations.     Specifically, IRONWOOD Board President from 2003-2005, Pam Carlson sent an email dated February 12, 2012 to IRONWOOD's then current Board of Directors and certain past Club Presidents which read in applicable part:

> *"I believe the letter written on January 24, 2012 gave the impression that all of the past presidents of the club were supportive of the new policy adopted by the Board regarding the $25,500 loan to the Club. I for one was informed of the change only days before the letter was sent and clearly after the decision had been made. I told Ken I was troubled by the decision of the board during our phone call. I also advised him that my recollection was that the loan documents were so poorly written it was highly likely a lawsuit would result if the repayment policy was changed in the manner he described. If I had been consulted about the proposal earlier, I would have argued against its adoption. There is now a perception among most members that not only were past practices in error, but that the past presidents agree with that conclusion and approve of the new policy. I personally don't believe our practices were in error; I don't support the new policy and I would like the board to either reconsider their actions or send a letter to the members explaining that all the past presidents are not in agreement with the Board's decision. In my opinion, it would be in the best interest of the Club to reconsider the repayment policy adopted. There are tremendous divisions developing over this issue and I believe it is entirely avoidable situation. Ironwood has suffered through the years over divisions like this. This one is self-inflicted and should be corrected quickly before more damage is done...I am only in disagreement with you over the decision to take away an asset of value from the members who leave the club and whose memberships are held by the Club for resale. In particular, I don't know how you can take away an asset from the 100 or so members who have already left the club when they had the clear understanding they would receive the $25,500 upon the eventual resale of their membership."*

*(A copy of Former Ironwood President Pamela C. Carlson's February 21, 2012 E-mail has been attached hereto and marked as Exhibit 12).*

## IV.

## TOLLING OF STATUTE OF LIMITATIONS

41.     As set forth above, IRONWOOD has engaged in an ongoing orchestrated campaign to unilaterally change, or in the alternative, circumvent the terms and conditions of their loan repayment obligations to past and present members of the Club. IRONWOOD has sought to differentiate between membership classes and types of membership, and to set or offer different standards for repayment, or non-payment, of the sums which are unequivocally owed to all members equally and without discrimination under the Loan Agreement. More specifically, IRONWOOD, without any consent, discussion or formal approval of its Members, has unlawfully implemented new club policies and/or accounting procedures that allowed them to 'partially repay,' or in certain cases 'avoid repaying,' the full loan amounts due and owing to PLAINTIFFS when their Club Memberships are ultimately sold or resigned. Although IRONWOOD continued to publically acknowledge its loan obligation debts, it deliberately concealed its true intention to avoid fully repaying the membership loans by using an unauthorized offset calculation whenever a Club Membership interest was sold.

42.     Further, IRONWOOD has fraudulently misrepresented and/or led the selling members to believe that the 'offset calculation' had actually been ratified by the Members of the Club, when in reality, it had not. IRONWOOD's campaign of deception, disinformation and/or suppression of material information regarding their loan repayment obligations has effectively served to quiet Club Member suspicion and discourage or totally quell inquiry into IRONWOOD's wrong-doing for many years. As a result, any applicable Statute of Limitation for the various declarations set forth herein below must equitably be tolled.

## V.

## CAUSE OF ACTION FOR DECLARATORY RELIEF

## (Against DEFENDANT IRONWOOD COUNTRY CLUB and DOES 1-100)

43.     PLAINTIFS re-allege and incorporate by reference all of the preceding paragraphs of this complaint as though fully set forth herein.

Exhibit ___1___
Page ___15___

44.   An actual controversy has arisen and now exists relating to the respective rights, duties and obligations of the parties herein with respect to the agreements and events hereinabove alleged. PLAINTIFFS contend that IRONWOOD has breached, and will continue to breach, the March 24, 1999 Loan Agreement in several ways, as well as its contractual duties and other obligations owed to PLAINTIFFS arising by reason of the facts and relationships identified hereinabove. Specifically, PLAINTIFFS contend:

(a)   The March 24, 1999 Land Purchase Assessment/Loan Agreement approved by Ballot on April 17, 1999 by and between IRONWOOD and its 588 Proprietary Members (*Exhibit 1*) creates an independent contractual obligation between IRONWOOD and its participating (lending) Members;

(b)   PLAINTIFFS' "Land Purchase Accounts", as created, identified and specifically referenced in the Loan Agreement (*Exhibit 1*), and which are maintained by IRONWOOD, *are separate and distinct accounts* from PLAINTIFFS' Club Membership Accounts (which are also being maintained and administered by IRONWOOD);

(c)   Pursuant to the Loan Agreement (*Exhibit 1*), IRONWOOD is contractually obligated to pay to PLAINTIFFS the actual amount of the $25,500.00 they loaned to IRONWOOD (Land Purchase Account Balance) upon the ultimate sale of their respective memberships without any deductions and whether or not that membership was earlier assigned by the lending member, as was the case with PLAINTIFF COBB, to another including a spouse, recognizing that the repayment date of the loan would then be upon the date of the sale of that assigned membership, whenever or however occurring, resigned or not resigned, as it is a standing, remaining, independent loan obligation;

(d)   Any attempt by IRONWOOD to '*tie-in*,' '*offset*' or in any way '*deny*' the Club's contractual obligation to repay PLAINTIFFS' 'Land Purchase Accounts' based on the *status* of PLAINTIFFS' Club Memberships (e.g. current, resigned or otherwise) is unlawful, void, and beyond the authority of IRONWOOD and its Board of Directors.

16
COMPLAINT

Exhibit ___ 1
Page ___ 16

(e)     The actions of IRONWOOD seeking to intermingle the sale of Membership proceeds with the separate and distinct Land Purchase Account repayment obligations is unauthorized by any contractual agreement between IRONWOOD and PLAINTIFFS;

(f)     IRONWOOD may not alter its contractual obligations due and owing to PLAINTIFFS by unilateral fiat or Board action as reflected in its January 24, 2012 letter (*Exhibit 8*) which allegedly reflects decisions made at a Board meeting held on January 19, 2012;

(g)     The Board action taken by IRONWOOD on January 19, 2012 is contrary to the obligations of the Loan Agreement (*Exhibit 1*), as well as to the many other IRONWOOD actions and/or communications and as referenced herein, are void and without force or effect thereby requiring IRONWOOD, as a matter of law, to refrain from taking the actions at issue herein;

(h)     IRONWOOD's announcement in its May 15, 2012 (*Exhibit 10*) and June 7, 2012 (*Exhibit 11*) letters that it would no longer repay the $25,500.00 loan amount to any past or present Club Member that has resigned their membership(s) and are awaiting repayment, *or that resigns their membership at any time in the future*, constitutes an '*anticipatory breach*' of the March 24, 1999 Loan Agreement Contract;

(i)     The unauthorized loan repayment method used by IRONWOOD, which characterizes a transfer fee waiver (*maximum 25% of the actual loan amount*) as being full payment for the member's separate and distinct *Land Purchase Account* when the member sells their IRONWOOD membership has resulted in IRONWOOD underpaying large sums of money.

(j)     IRONWOOD has wrongfully profited off of each of the $25,500.00 loan transactions it entered into with its Members, including PLAINTIFFS, by the concealment of material facts regarding how those loans/*Land Purchase Accounts* would ultimately be repaid and/or to whom they would be repaid;

17
COMPLAINT

Exhibit ____ 1
Page ____ 17

(k)   IRONWOOD breached its duty of good faith and fair dealing with PLAINTIFFS or otherwise engaged in unfair, fraudulent or wrongful conduct by continually changing and/or otherwise misrepresenting, their contractual obligation to fully repay the *Land Purchase* loans made by PLAINTIFFS as reflected in the applicable *Members' Land Purchase Accounts*;

(l)   IRONWOOD is in breach of its  implied covenant of good faith and fair dealing by deliberately underpaying and/or refusing to pay its loan/*Land Purchase Account* obligations to PLAINTIFFS, and other similarly situated past and current Club Members, as required pursuant to the express terms and conditions set forth in the March 24, 1999 Loan Agreement (*Exhibit 1*).

(m)   IRONWOOD has failed to properly repay and or account for large portions of the loan amount/*Members' Land Purchase Accounts* due and owing to Club Members at the time of their membership sale(s). Accordingly, IRONWOOD should be ordered to provide a full and complete Accounting to PLAINTIFFS;

(n)   As a result of IRONWOOD's breach of its fiduciary duty to appropriately handle, administer and fairly transact during all membership sales transactions, IRONWOOD has been unjustly enriched;

(o)   Pursuant to Paragraph 10 (a) (b) & (c) on Page 3 of the Loan Agreement (*Exhibit 1*), provisions were in place for IRONWOOD to continue to collect the $25,500.00 loan from any and all '*New Members*' who purchased memberships at IRONWOOD *after the initial 1999 assessment/loans were made.* This provision, if enforced by IRONWOOD, would have provided sufficient funds to repay PLAINTIFFS and/or other past Ironwood Members the full amount of their loans when their memberships were resold. However, IRONWOOD was in further breach of the Loan Agreement by failing to enforce those specific provisions of the March 24, 1999 Loan Agreement. As such, no such funds are now available to repay the loan obligations owed to PLAINTIFFS; and

Exhibit ____
Page ____

(p)    As a result of IRONWOOD's wrongful conduct, *which affected virtually 588 different proprietary members who individually made loans to IRONWOOD pursuant to the March 24, 1999 Loan Agreement, and were ultimately either under-repaid or not repaid at all as alleged herein,* PLAINTIFF'S are entitled to attorney fees under Civil Procedure §1021.5, as authorized under the "common fund doctrine," and as authorized by the "substantial benefit" doctrine.

45.    Contrary to the contentions of PLAINTIFFS as set forth above and confirming that an actual controversy has arisen and now exists between the Parties, PLAINTIFFS are informed and believe and thereon allege that IRONWOOD contends the following:

(a) IRONWOOD does not have any independent contractual obligation to its members solely upon the terms and conditions of the March 24, 1999 Loan Agreement (*Exhibit 1*);

(b) The "Member's Land Purchase Accounts" set forth and described in the March 24, 1999 Loan Agreements (*Exhibit 1*) are directly tied to and correlated with a Members Ironwood Country Club Membership Account;

(c) IRONWOOD, is free to make any adjustments that it deems to be appropriate before repaying the loan amounts made to it by any current member, as reflected in the Member's Land Purchase Account who ultimately sells his/her membership (such as PLAINTIFF KEELEY). Accordingly, IRONWOOD is therefore free to make such adjustment even though they are not authorized by the Club's By-Laws (*a true and correct copy of the Club's By-Laws are attached hereto and marked as Exhibit 13*) nor by the March 24, 1999 Loan Agreement (*Exhibit 1*);

(d) IRONWOOD is legally justified to 'tie-in', 'offset' or even deny its contractual obligations under the March 24, 1999 Loan Agreement based upon the status of a lending Club Member's Membership (i.e. equity, non-equity or resigned etc.);

19
COMPLAINT

(e) IRONWOOD is free to intermingle membership sale proceeds with the Members' *Land Purchase Accounts* without any contractual agreement authorizing it to do so;

(f) IRONWOOD was authorized to unilaterally disavow its contractual obligations to certain of its "Resigned Members' (including PLAINTIFF COBB) as set forth in its January 24, 2012 correspondence (Exhibit 8);

(g) The action taken by IRONWOOD's Board on or about January 19, 2012 to unilaterally disavow its contractual obligations to its lending members under the March 24, 1999 Loan Agreement was lawful and appropriate;

(h) IRONWOOD's unilateral and unauthorized decision to no longer repay the *Members' Land Purchase Account* balance to any past resigned member(s) or any current member who may resign his/her membership in the future, as set forth and announced in its letter of June 7, 2012, does not constitute an 'anticipatory breach' of the Club's contractual obligation under the March 24, 1999 Loan Agreement;

(i) IRONWOOD was justified in implementing an accounting formula or calculation that allowed it to blend its contractual obligations to its members including their *Membership Land Purchase Accounts* and their Club Membership Accounts, so as to deliberately underpay its members certain sums of money due and owing them under the specific terms and conditions of the March 24, 1999 Loan Agreement;

(j) IRONWOOD was justified in concealing material facts and unilaterally changing its loan obligations to its members under the March 24, 1999 Loan Agreement so as to profit on the loans/*Members' Land Purchase Accounts* to the expense and detriment of its members (including PLAINTIFFS);

(k) IRONWOOD was justified in engaging in misleading, deceptive, unfair, fraudulent and wrongful conduct to unilaterally change its contractual obligations to avoid repaying the Land Purchase Loans (*Members' Land Purchase Accounts*) as required under the March 24, 1999 Loan Agreement;

Exhibit ____
Page ____

(l) IRONWOOD did not breach its implied covenant of good faith and fair dealing by willfully underpaying or refusing to pay its members, including PLAINTIFFs, sums of monies due and owing to them pursuant to the March 24, 1999 Loan Agreement;

(m) IRONWOOD has no obligation to account for the *Members' Land Purchase Account* monies that it has underpaid, withheld or refused to pay its Members pursuant to the March 24, 1999 Loan Agreement;

(n) IRONWOOD had no fiduciary duty or obligation to properly or fairly handle, administer or account for sale proceeds from the sale of club memberships or the payment of the *Member's Land Purchase Account* pursuant to the March 24, 1999 Loan Agreement;

(o) IRONWOOD had no responsibility or obligation to enforce Provision 10 Subsections (a) (b) or (c) of the Loan Agreement (Exhibit 1) which required them to collect the $25,500.00 loan sum from all '*New Members*' that purchased memberships in IRONWOOD after the individual loans were made by the original 588 Proprietary Members (including PLAINTIFFS). IRONWOOD further maintains that its failure to fulfill that specific contractual obligation does not constitute a breach of contract under the March 24, 1999 Loan Agreement; and

(p) IRONWOOD should not have to pay attorney fees to PLAINTIFFS for bringing this action pursuant to Code of Civil Procedure §1921.5 under the "common fund doctrine" and as authorized by the "substantial benefit" doctrine.

46.     PLAINTIFFS desire a judicial determination of their respective rights, duties and obligations under the subject matter Loan Agreement entered into by and between PLAINTIFFS and IRONWOOD on or about April 17, 1999 as set forth in a Statement of Information dated March 24, 1999 (identified herein above as the 'Loan Agreement'). Further, PLAINTIFFS desire a judicial determination regarding each of the issues arising from the

Exhibit ____1____
Page ____21____

subject matter Loan Agreement as set forth above, and, specifically, which party's interpretation of those issues is correct.

47.     Further, a judicial declaration is necessary and appropriate at this time under the circumstances in order that PLAINTIFFS may ascertain their rights, duties and obligations under the March 24, 1999 Loan Agreement, in that IRONWOOD has recently expressed in writing that it will no longer repay its $25,500.00 loan obligations (*Members' Land Purchase Account Balances*) to any former Club Member that has *resigned* his/her Membership to the Club (PLAINTIFF COBB) -or- any *Current Club Member* who ultimately decides to resign his/her IRONWOOD membership at any time in the future (PLAINTIFF KEELEY).

WHEREFORE, PLAINTIFFS pray for judgment as follows:

1.     A Declaration that IRONWOOD owes to PLAINTIFFS the specific amount in each applicable *Members' Land Purchase Account* at the time of the ultimate sale of their Club Membership, however and by whomever held;

2.     A Declaration that IRONWOOD's expressed representation that it will no longer repay its $25,500.00 loan obligations (*Members' Land Purchase Account Balance*) to any former Club Member that has *resigned* his/her Membership to the Club (PLAINTIFF COBB) -or- any *Current Club Member* who ultimately decides to resign his/her IRONWOOD membership at any time in the future (such as PLAINTIFF KEELEY and/or PLAINTIFF RIEDSTRA) constitutes an "*Anticipatory Breach of Contract*" by IRONWOOD and for breach of contractual and fiduciary obligations, if the sale has already occurred.

3.     A Declaration that the current loan repayment accounting methodology being used by IRONWOOD directly violates the March 24, 1999 Loan Agreement (*Exhibit 1*) and is prohibited;

4.     A Declaration that IRONWOOD has underpaid its past members (including PLAINTIFF RICHARDS) by using an inappropriate repayment methodology, and that such sums wrongfully withheld thereby shall be computed, set aside, and held in Trust by Ironwood;

Exhibit ____1____
Page ____22____

5.      A Declaration that as a result of IRONWOOD's wrongful conduct alleged herein against all of its 588 lending Members, PLAINTIFFS are entitled to attorney fees under Civil Procedure §1021.5, as authorized under the "common fund doctrine", and as authorized by the "substantial benefit" doctrine;

6.      Such other declarations as plead in Paragraphs 41, 42, and 44(a) through (p) and any other declarations deemed necessary and proper.

Dated: 8-21-12                          Respectfully submitted,

                                        SLOVAK BARON & EMPEY, LLP


                                        By: _Thomas R. Slovak_
                                           THOMAS S. SLOVAK, ESQ.
                                           DAVID A. SMITH, ESQ.
                                           Attorneys for Plaintiffs
                                           William S. Cobb, Jr.;
                                           Patrick J. Keeley; Helen H. Riedstra
                                           and Elizabeth Richards

Exhibit     1
Page        23

# EXHIBIT "1"

Exhibit ___1___
Page ___24___

IRONWOOD COUNTRY CLUB

STATEMENT OF INFORMATION

PROPOSED PURCHASE OF LEASED LAND
and
PROPOSED ASSESSMENT TO FUND THE PURCHASE

March 24, 1999

The Proposed Purchase of Leased Lands

The following discussion is a summary of the important terms of the proposed Purchase and Sale Agreement ("Purchase Agreement") and is not a complete statement of all of the terms of the Purchase Agreement. The terms of the proposed Purchase Agreement are subject to negotiation and may change.

Property

The property ("Property") that is the subject of the Purchase is land which comprises substantially all of the South Course, a major portion of North Course and substantially all of the practice range.

Purchase Price

The proposed purchase price is $14,860,000.00.

Conditions to the Purchase

Consummation of the Purchase is subject to the following conditions: (a) the District must comply with California Government Code Section 54222 regarding the offering of the Property to other agencies; (b) the Club must obtain approval from the Proprietary Members; (c) the Club must obtain financing for the purchase price; and (d) the Club must approve the condition of the title to the Property.

Additional Terms

- District will obtain a quitclaim from the Living Desert Reserve conveying all right, title and interest in its right to reversion for the portion of the south Course lying Easterly of the Wash if the preliminary title report shows that the reversion still exists.

- The legal description of the Property to be purchased will be adjusted so that the property line of the Property to be purchased will go to the Westerly side of Hole No. 15 North.

The Proposed Land Purchase Assessment

The Proposed Land Purchase Assessment has the following features:

189579
C37732/106663
03/24/99 4.32 PM

Exhibit ____1____
Page ____25____

1.  The amount of the Land Purchase Assessment will be $25,500 for each Proprietary Member.

2.  All or any part of the Land Purchase Assessment may be paid in cash when it is levied.

3.  All or any part of the Land Purchase Assessment may be paid in installments. If the installment plan is elected by a Member, the installment plan will have the following features:

    a.  The unpaid principal balance of the Land Purchase Assessment will bear interest at the interest rate being charged to the Club by Lender as described below which may change from time to time. Based on preliminary discussions with potential lenders, if the interest rate is 8%, the monthly payment under the installment plan will be $215 plus or minus approximately $8.00 per month for each ½ percentage point change in interest rates.

    b.  Installments of principal and interest will be paid so as to amortize the unpaid principal amount of the Land Purchase Assessment and interest thereon in monthly installments over 20 years.

    c.  The amount of the monthly installments will vary as the interest rate changes.

    d.  Principal may be paid in advance at any time without penalty. Advance payment will not reduce the monthly payments.

4.  The Land Purchase Assessment will be treated as an advance by each Member to the Club. A separate account (called a "Land Purchase Account") will be maintained for each Proprietary Member.

5.  The principal amount of the Land Purchase Assessment paid in by each Member will be accounted for as an obligation by the Club to each Member. A Member's Land Purchase Account will be increased by the principal amount of each payment received by the Club under the installment plan (but will not be increased by the interest portion thereof).

6.  When a Member sells the Member's Membership, the Club shall be absolutely obligated to pay to the Selling Member the entire amount then standing in the Member's Land Purchase Account. The Club may elect to make payment of the Land Purchase Account in not more than four equal annual installments without interest.

7.  The Club is not obligated to pay the Land Purchase Account before the sale of any Member's Membership.

8.  The Club may elect to repay all or portions of the Land Purchase Account from extraordinary sources such as from the sale of surplus lands. In such event, those

2

Exhibit 1
Page 26

Members who paid their Land Purchase Assessments in cash up front will receive cash. Those Members who elected the installment plan will have their unpaid balances credited against the last installments to become due.

9. The Club may not charge a transfer fee with respect to payment of a Member's Land Purchase Account.

10. New Members who purchase Memberships after the imposition of the Land Purchase Assessment will have the following obligations:

    a. In addition to the Initiation Fee, New Members, upon admission, will be required to pay an amount equal to the principal amount which would have built up in a hypothetical member's Land Purchase Account had the hypothetical member elected to amortize the Land Purchase Assessment over the 20 year installment plan. The New Member would receive credit in the new Member's Land Purchase Account equal to that payment.

    b. The New Member would be obligated to pay the remaining unamortized portion of the Land Purchase Assessment which would be payable by a hypothetical member who elected the fully amortizing installment plan. The New Member would receive credit in the new Member's Land Purchase Account equal to the principal portions of such payments. New Members may also elect to pay principal in advance.

    c. For instance, if a New Member purchases a Membership three years after the Land Purchase Assessment goes into effect, in addition to the Initiation Fee, the New Member would pay to the Club an amount equal to the principal paydown under a fully amortizing 20 year loan ($1,756) and would assume an obligation to pay the balance over 17 years ($23,744) payable at approximately $215 per month assuming an 8% interest rate).

11. Approximately one month before the expected close of escrow, Members will be billed for the Land Purchase Assessment. Those Members who wish to pay in cash will deposit their payments in a special account with the Escrow Holder. If the purchase is completed, the deposited amounts will be used in the closing (thereby reducing the amounts to be borrowed under the Loan described below). If the purchase is not completed, the deposited amounts will be returned.

### Potential Loans

Since the purchase of the Land is for cash and since many Members will probably opt for an installment plan, the Club will no doubt have to finance a large part of the purchase price through a loan obtained from a bank or other lending institution.

Several banks have expressed a willingness to lend the Club up to the full purchase price under varying arrangements and terms. The best arrangement thus far is a 20-year fully amortizing loan for which the interest rate at this writing would be in the 8% to 8.5% range. The interest rate will depend upon interest rates in effect at the time of closing the loan which may be several months from now. A key factor is that the loan would be

3

Exhibit ___ (
Page ___ 27

prepayable without penalty.  The interest rate would be set for five years and would reset every five years thereafter.

Potential lenders will require a favorable vote of the members to purchase, an appraisal, an environmental report and representation by our attorneys that all necessary legal steps have been taken to be in a position to close.

Potential lenders have expressed willingness to loan directly to members seeking to get a tax deduction for the interest cost through use of home mortgage or home equity financing.  In that case the member could borrow the amount of the Assessment ($25,500) pay it into the special account, and arrange a repayment plan with the bank that is mutually satisfactory.

## Surplus Land

Approximately 50 acres Westerly of Holes 16 and 17 South Course are surplus land. It is possible that, following the purchase, the Club will be able to realize value from the 50 acres.  However, any such plan and the use of proceeds from such plan will require numerous decisions by future Boards of Directors and will also require consent of the membership as then constituted.

## Insurance Coverage

Questions have been raised at the informative sessions regarding insurance coverage for actions taken or not taken by the Club and its officers, directors and employees.  An insurance policy has been issued insuring the Club and its officers, directors and employees against loss arising out of Wrongful Acts.  The policy contains provisions which prohibit the Club, itself, from attempting to collect on the policy or from prejudicing defenses of the insurance company against claims made under the policy.

If claims are made under the policy or if litigation is commenced against the Club or former or present officers, directors or employees, the claims or litigation will have to be reported to the Lender.

It is probable that Lenders will decline to make the loan to the Club if such claims are made or litigation is commenced.

## Indemnity

Section 7 of Article XI of the By-Laws of the Club require the Club to indemnify present and former officers, directors and employees of the Club from expenses, judgments, fines and other obligations arising out of lawsuits (whether or not the Club is named as a party defendant) incurred while such officer, director or employee was acting on behalf of the Club if the Board determines that the officer, director or employee was acting "...in good faith within what such person reasonably believed to be the scope of such person's authority and for a purpose which such person reasonably believed to be in the best interests of the Club or its members."

4

Exhibit ___1___
Page ___28___

### Recommendation

The Board of Directors of the Club has unanimously determined that the Purchase of the Property and proposed Assessment is in the best interests of the Club and its Proprietary Members. The Board unanimously recommends that the Proprietary Members vote "Yes" to approve the purchase and the Assessment.

Exhibit 1
Page 25

# EXHIBIT "2"

Exhibit ___1___
Page ___30___

[Please complete the Ballot per the instructions set forth below and return the Ballot in the enclosed self-addressed envelope so that the Club will receive it on or before

2:00 PM on April 17, 1999.

You may fax your completed Ballot to the Club at 760/773-4858 and forward a completed hard copy by mail in the enclosed envelope.]

BALLOT

The undersigned is a Proprietary Member of Ironwood Country Club. The undersigned acknowledges receipt of the Statement of Information dated March 24, 1999 describing the proposed purchase of portions of the golf course leased from Coachella Valley Water District and the proposed Assessment to fund the cost of such purchase in the amount of $25,500 for each Proprietary Member under the terms as more fully described in the Statement of Information.

The undersigned votes as follows:

☐ <u>YES</u>. The undersigned votes in favor of the proposed purchase and the proposed Assessment.

☐ <u>NO</u>. The undersigned votes against the proposed purchase and the proposed assessment.

[Please check one block. If you check neither block, this ballot will be voted "Yes", in favor of the proposed purchase and the proposed assessment.]

Signature: _____

Print Name: _____

Member No: _____

Date: _____

Please sign your name exactly as it appears on your membership certificate. Executors, administrators, trustees and other fiduciaries should state their full title.

6

Exhibit     1
Page     31

# EXHIBIT "3"

Exhibit ___1___
Page ___32___

IRONWOOD COUNTRY CLUB

# C E R T I F I C A T E

October 4, 1999

This certifies that *Name of Member + Member #*

paid in full the $25,500 Land Purchase Assessment which was

described in the Statement of Information dated March 24, 1999,

approved by the Membership effective as of April 17, 1999 and

invoiced to the Members on September 1, 1999.

Ironwood Country Club

By: _____
Roy E. Mullins

Its: President

IRONWOOD COUNTRY CLUB • 79-785 IRONTREE DRIVE, PALM DESERT, CALIFORNIA 92260-6999 • (760) 346-0551

Exhibit ___1___
Page ___33___

# EXHIBIT "4"

Exhibit ___1___
Page ___34___

IRONWOOD COUNTRY CLUB

FINANCIAL STATEMENTS

AND

INDEPENDENT AUDITORS' REPORT

SEPTEMBER 30, 2000 AND 1999

---

# EGAN & EGAN

CERTIFIED PUBLIC ACCOUNTANTS

7056 DESOTO AVENUE

CANOGA PARK, CALIFORNIA 91304

(818) 346-0026   FAX (818) 704-6009

## Independent Auditors' Report

Board of Directors
Ironwood Country Club
Palm Desert, California

We have audited the accompanying balance sheet of Ironwood Country Club ("Club") as of September 30, 2000, and the related statements of income, members' equity and cash flows for the year then ended. These financial statements are the responsibility of the Club's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of Ironwood Country Club as of September 30, 1999, were audited by other auditors whose report dated November 9, 1999, expressed an unqualified opinion on those statements.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Ironwood Country Club as of September 30, 2000 and the results of its operations and its cash flows for the year then ended in conformity with generally accepted accounting principles.

*Egan & Egan*

November 20, 2000

1

Exhibit _L_
Page _35_

IRONWOOD COUNTRY CLUB

BALANCE SHEETS

ASSETS

| | SEPTEMBER 30, | |
| --- | ---: | ---: |
| | 2000 | 1999 |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 893,930 | 90,551 |
| Cash collected for land acquisition | - | 7,156,482 |
| Member accounts receivable, net of allowance for doubtful accounts of $60,000 as of September 30, 2000 | 1,491,952 | 1,451,240 |
| Other receivables | 66,590 | 134,754 |
| Assessments receivable, current portion (Note 7) | 89,562 | - |
| Inventories (Note 2) | 136,394 | 105,845 |
| Prepaid expenses | 28,310 | 53,354 |
| Total current assets | 2,706,738 | 8,992,026 |
| ASSESSMENTS RECEIVABLE, net of current portion (Note 7) | 4,108,984 | 40,192 |
| RECEIVABLE FROM INTERMEDIATE MEMBERS | 30,476 | |
| PROPERTY AND EQUIPMENT (Notes 3 and 4) | 30,003,212 | 15,294,211 |
| DEPOSITS AND OTHER ASSETS | 16,140 | 242,657 |
| | $36,865,550 | 24,569,086 |

LIABILITIES AND MEMBERS' EQUITY

| | | |
| --- | ---: | ---: |
| CURRENT LIABILITIES | | |
| Current portion of long-term debt (Note 4) | $ 89,562 | 265,960 |
| Accounts payable | 67,093 | 326,430 |
| Accrued liabilities | 376,596 | 7,156,482 |
| Land acquisition payable (Note 7) | - | - |
| Members' dues and fees billed in advance | 1,399,440 | 1,407,285 |
| Total current liabilities | 1,932,791 | 9,156,157 |
| LONG-TERM DEBT, net of current portion (Note 4) | 4,663,666 | - |
| REFUNDABLE ASSESSMENTS (Note 7) | 15,182,105 | - |
| COMMITMENTS AND CONTINGENCIES (Notes 11 and 12) | | |
| Total liabilities | 21,778,562 | 9,156,157 |
| MEMBERS' EQUITY | 15,086,988 | 15,412,929 |
| | 26,865,550 | 24,569,086 |

The accompanying notes are an integral part of these financial statements.

2

IRONWOOD COUNTRY CLUB

STATEMENTS OF INCOME

| | FOR THE YEARS ENDED SEPTEMBER 30, | |
| --- | ---: | ---: |
| | 2000 | 1999 |
| REVENUES | | |
| Membership dues | $4,106,227 | 3,794,483 |
| Food and beverage | 1,002,639 | 1,065,380 |
| Golf related | 1,260,229 | 1,282,325 |
| Pro shops | 530,109 | 449,158 |
| Tennis and fitness | 38,398 | 31,644 |
| Property management | 352,482 | 350,237 |
| Resale | 214,421 | 227,306 |
| Other | 23,730 | 22,762 |
| Total revenues | 7,528,235 | 7,223,295 |
| OPERATING EXPENSES | | |
| Food and beverage | 1,239,080 | 1,388,684 |
| Golf related | 3,442,878 | 3,245,245 |
| Pro shops | 433,507 | 415,738 |
| Tennis and fitness | 117,573 | 115,726 |
| Property management | 317,573 | 371,337 |
| Clubhouse, general and administrative | 1,769,922 | 1,748,201 |
| Total operating expenses | 7,322,191 | 7,295,481 |
| OPERATING INCOME (LOSS) | 206,044 | (72,172) |
| OTHER INCOME (EXPENSE) | | |
| Interest, net (Note 4) | 69,592 | 32,052 |
| Initiation fees | 143,000 | 109,000 |
| Transfer fees | 349,000 | 127,600 |
| Gain (loss) on disposition of assets | 60,359 | (8,928) |
| Loss on leasehold interest (Note 10) | | (3,324,783) |
| | 621,951 | (3,065,059) |
| Income (loss) before depreciation | 827,995 | (3,137,231) |
| DEPRECIATION | 718,436 | 776,106 |
| Income (loss) before income taxes | 109,559 | (3,913,404) |
| PROVISION FOR INCOME TAXES (Note 5) | 10,500 | 4,679 |
| Net income (loss) | $ 99,052 | (3,918,083) |

The accompanying notes are an integral part of these financial statements.

3

Exhibit 1
Page 26

IRONWOOD COUNTY CLUB
STATEMENTS OF CASH FLOWS

| | YEARS ENDED SEPTEMBER 30, | |
|---|---:|---:|
| | 2000 | 1999 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net income (loss) | $ 99,052 | (3,918,083) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Depreciation | 718,436 | 776,166 |
| Allowance for doubtful accounts | 60,000 | - |
| Proceeds from sale of assets | 119,025 | - |
| (Gain) loss on disposition of assets | (60,359) | 8,929 |
| Loss on leasehold interest | - | 3,324,783 |
| Changes in operating assets and liabilities: | | |
| Member receivables | (100,712) | (139,684) |
| Other receivables | 67,964 | (77,632) |
| Inventories | (30,549) | (2,301) |
| Prepaid expenses | 25,044 | 88,775 |
| Accounts payable | (198,867) | (57,975) |
| Accrued liabilities | 50,266 | (5,619) |
| Members' dues, fees billed in advance | (7,845) | 148,480 |
| Total adjustments | 642,403 | 4,063,904 |
| Net cash provided by operating activities | 741,462 | 145,821 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Purchases of property and equipment | (15,486,103) | (418,956) |
| Change in deposits | 226,517 | (207,406) |
| Net cash used by investing activities | (15,259,586) | (626,362) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Capital from membership certificates | 70,000 | 225,000 |
| Decrease in membership receivables | 9,716 | 42,573 |
| Repurchase of membership certificates | (495,000) | - |
| Assessments from members | 3,916,639 | - |
| Borrowing of long-term debt | 7,534,296 | 7,156,482 |
| Payments of long-term debt | (2,870,630) | - |
| Net cash provided by financing activities | 8,165,021 | 7,424,055 |
| Net (decrease) increase in cash | (6,353,103) | 6,943,514 |
| CASH, Beginning of year | 7,247,033 | 303,519 |
| CASH, End of year | $ 893,930 | 7,247,033 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | |
| Cash paid during the year for: | | |
| Interest | $ 460,991 | 7,200 |
| Income taxes | $ 15,087 | |

The accompanying notes are an integral part of these financial statements.

5

---

IRONWOOD COUNTRY CLUB

STATEMENTS OF MEMBERS' EQUITY

FOR THE YEARS ENDED SEPTEMBER 30, 2000 AND 1999

| | Membership Certificates | Accumulated Deficit | Total Members' Equity |
|---|---:|---:|---:|
| Balance at September 1, 1998 | $25,490,673 | (6,384,661) | 19,106,012 |
| Capital from members | 225,000 | - | 225,000 |
| Net loss | - | (3,918,083) | (3,918,083) |
| Balance at September 30, 1999 | 25,715,673 | (10,302,744) | 15,412,929 |
| Capital from members, net | 70,000 | - | 70,000 |
| Memberships repurchased (Notes 4 and 12) | (495,000) | - | (495,000) |
| Net income | - | 99,052 | 99,052 |
| Balance at September 30, 2000 | $25,290,673 | (10,201,685) | 15,086,988 |

The accompanying notes are an integral part of these financial statements.

4

Exhibit 1
Page 38

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999

NOTE 1 - OVERVIEW AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a) Overview - The Ironwood County Club ("the Club") is a California corporation formed as a non-profit mutual benefit corporation for the purpose of operating a member owned club. The Club offers golf, tennis, fitness, real property management and dining facilities to its membership. The Club purchased certain assets, assumed certain liabilities and assumed the rights and obligations of the predecessor organization upon the formation of the Club.

(b) Membership - The Club's Bylaws provide for membership classifications as follows:

Proprietary - Membership confers an ownership interest and a voting right in all affairs of the Club. Membership is transferable with the approval of the Board of Directors. Proprietary members may be assessed upon written approval by 60% of the Proprietary members. The price of a proprietary membership is established by the Board of Directors. At September 30, 2000 and 1999, the price of a proprietary membership is $75,000. For memberships purchased after October 1, 1998, the Club receives 40% of the price of a proprietary membership after recoupment of the land assessment where applicable. For memberships purchased prior to October 1, 1998, the Club receives 25% of the selling price after recoupment of the land assessment (See Note 7).

Charter Proprietary - Membership rights are equivalent to Proprietary membership with the transfer fee limited to 20% of the then existing Initiation Fee, after the recoupment of the land assessment. After December 31, 1993, no Transfer fee is assessed on the first $25,000 of proceeds from the sale of the membership. Charter Membership is transferable with the new member becoming a Proprietary member.

Lifetime Membership - Lifetime memberships were assumed from the predecessor organization. Such memberships are nonvoting and non-assessable. Certain Lifetime memberships are transferable, under specified conditions, and are subject to an Initiation fee equal to approximately 50% of the Proprietary Member Initiation Fee, not to exceed $25,000 through August 2, 2002. Lifetime membership does not confer an ownership interest. At September 30, 2000, nine Lifetime members were subject to this bylaw provision, see note 12.

Tennis, Social, Honorary - Memberships are nonvoting, nontransferable and not subject to assessments. Use of Club facilities are restricted, including access to the golf course.

The bylaws limit golfing memberships to 800 memberships. The Board of Directors has limited the memberships to 700 members. At September 30, 2000 and 1999, the Club had 678 and 696 golfing membership, respectively.

(c) Intermediate Memberships - Intermediate Memberships represent amounts paid by Intermediate Members to be applied toward the purchase of a Proprietary membership. New Intermediate Members over 23 years of age and under the age of 50 are required to pay an initial fee with additional amounts due as specified by the Club bylaws. The balance of the initiation fee is payable in installments not to exceed ten annual installments. Intermediate Members who have not purchased a Proprietary membership forfeit all privileges of membership.

(d) Cash - The Club considers as cash amounts deposited in checking, certificates of deposit, and money market accounts and short-term investments.

(e) Inventories - Inventories are stated at the lower of cost or market. Cost is determined by the first-in, first-out method.

(f) Property and Equipment - The cost of buildings and equipment is depreciated on a straight-line basis over the following useful lives:

| | Life (Years) |
| --- | --- |
| Golf courses and land improvements | 15 - 30 |
| Buildings and improvements | 5 - 35 |
| Furniture, fixtures and equipment | 5 - 15 |

Additions, renewals and betterments that add materially to productive capacity or extend the life of an asset are capitalized. Expenditures for maintenance and repairs which do not extend the life of the applicable asset are charged to expense as incurred. Upon retirement or disposal of an asset, the asset and accumulated depreciation accounts are adjusted accordingly. Any resulting gain or loss is recorded to operations.

(g) Members' dues and fees billed in advance - The Club bills dues and related fees in advance. Accordingly, the related unearned income is reflected as a liability in the accompanying balance sheets.

Exhibit 1
Page 38

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999
(Continued)

(h)  Reclassifications and Basis of Presentation - The financial statements as of September 30, 1999 reflect certain reclassifications to conform with the presentation as of September 30, 2000.  The presentation as of September 30, 1999 presented the financial statements in accordance with, Statement of Financial Accounting Standards No. 117 ("FAS" 117) Financial Statements of Not-for-Profit Organizations.  The presentation herein reflects the ownership interests and economic benefits of the members.  Accordingly, FAS No. 117 was not applied.

(i)  Concentration of Risk - The Club's accounts receivable and revenues principally relate to dues and charges to members for usage of facilities.  Should unpaid accounts arise, they are recoverable as an offset to the proceeds from the sale of the membership certificate..

(j)  Estimates - The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period,  Actual results could differ from those estimates.

(k)  Fair Value of Instruments - The carrying value of the Club's financial instruments are considered to approximate fair value.  Cash, receivables, accounts payable and accrued liabilities are settled within a time period that results in settlement not significantly different from the stated amounts.  Debt instruments bear interest at market rates.

NOTE 2 - INVENTORIES

Inventories consist of:

|  | 2000 | 1999 |
| --- | --- | --- |
| Golfing merchandise and equipment | $ 96,524 | 75,461 |
| Tennis merchandise and equipment | 15,842 | 11,660 |
| Food and beverage | 24,028 | 18,724 |
|  | $136,394 | 105,845 |

8

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999
(Continued)

NOTE 3 - PROPERTY AND EQUIPMENT

Property and equipment, at cost, includes:

|  | 2000 | 1999 |
| --- | --- | --- |
| Land | $20,032,771 | 4,932,000 |
| Golf courses and improvements | 7,924,443 | 7,727,602 |
| Buildings and improvements | 6,416,027 | 6,438,207 |
| Furniture, fixtures and equipment | 1,924,372 | 3,192,950 |
| Construction in process | 142,736 | |
|  | 36,440,349 | 22,290,759 |
| Less accumulated depreciation | (6,437,137) | (6,996,548) |
| Total property and equipment | $30,003,212 | 15,294,211 |

On October 18, 1999, the Club purchased for approximately $15.1 million, 391 acres of land primarily covered by a prior leasehold interest.  The land includes approximately 316 acres, on which 28 holes of the two golf courses and the driving range are situated.  Some of the acreage may include land consisting of a golf hole on 7 acres classified as flood plain and land which may be saleable for development.

NOTE 4 - LONG-TERM DEBT

Long-term debt consists of the following:

|  | Amounts Outstanding at September 30, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Mortgage loan | $4,368,827 | - |
| Settlement notes | 384,401 | - |
|  | 4,753,228 | - |
| Less current maturities | 89,562 | - |
| Total long-term debt | $4,663,666 | - |

The mortgage loan, dated October 15, 1999, was initially $7,149,595 payable in monthly payments of $65,060 with a balloon payment of the remaining balance at November 1, 2009.  Payments include principal at 8.971% fixed through November 1, 2004.  At November 1, 2004 the interest rate adjusts to 3.150% over the bank's index rate.  The original loan amount represents the unpaid portion of the member assessment.  The Club

9

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999
(Continued)

NOTE 6 - PROVISION FOR INCOME TAXES

The Club is exempt from income taxes under Internal Revenue Code Section 501(c)(7) and related state of California provisions. It is subject to tax on its net unrelated business income. Unrelated business income is net income from nonmember sources and interest income.

The provision for tax consists of the following:

| | For the years ended September 30, | |
| | 2000 | 1999 |
| --- | --- | --- |
| Federal | $ 2,900 | - |
| State | 7,600 | 4,679 |
| | $10,500 | 4,679 |

NOTE 7 - ASSESSMENT RECEIVABLE AND REFUNDABLE

The Proprietary members approved an assessment of $25,500 per member to purchase approximately 391 acres of land previously leased from the local water district. The member could elect to pay the assessment in installments.

The installments bear interest equal to that amount charged the Club under the mortgage loan. Installments of principal and interest are payable in order to amortize the unpaid assessment in monthly installments over 20 years. Unpaid assessments may be prepaid without penalty. The interest income from members is approximately equal to the interest expense paid on the mortgage loan.

Upon the sale of the membership, the Club will repay the member the assessment amount, if the amount was fully paid by the departing member. Members electing to pay in installments will receive the principal amount of the installments paid. The refundable assessments are non-interest bearing. No payments are required before the sale of a member's certificate. The Club can elect to repay the assessment in not more than four equal annual installments without interest. Members may be repaid from the net proceeds of the sale of excess land, if any.

The Club will not charge a transfer fee on that portion of the members' certificate relating to the refundable assessment for those who became members prior to January 1, 2000.

11

---

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999
(Continued)

provides members the option of prepaying the assessment twice annually in order to reduce the principal amount of the loan. The Bank agreed to re-amortize the loan balance upon receipt of the prepayments. As a result of prepayments, the bank re-amortized the loan balance such that monthly payments of $40,268 are payable at September 30, 2000. The loan is secured by the Club land and certain property. Interest paid on the loan during the year ended September 30, 2000 was $460,991. Interest income received from members offsets the interest expense. For the year ended September 30, 2000, the accompanying statement of income includes interest expense reduced by the interest income from members as a component of interest income, net.

Settlement notes to former members bear interest at 8% per annum, payable quarterly, due November 2001 and December 2001. Notes are repayable prior to the due dates upon the receipt of indemnification insurance proceeds, if any, or the sale of repurchased membership in excess of the land assessment and related costs. The settlement notes were executed to repurchase members certificates and resolve all claims against the Club and its Board of Directors relating to the lapse of the leasehold interest. The repurchase of membership certificates is reflected in the accompanying statements of members' equity.

Payments on long-term debt are as follows:

| Years ending September 30, | |
| --- | --- |
| 2001 | $ 89,562 |
| 2002 | 482,457 |
| 2003 | 107,355 |
| 2004 | 116,475 |
| 2005 | 128,591 |
| Thereafter | 3,828,788 |
| | $4,753,228 |

NOTE 5 - LINE OF CREDIT

The Club has a line of credit with a bank for borrowings up to $750,000 at the bank's prime interest rate. The line expires on June 30, 2001. No amounts were outstanding during the fiscal year ended September 30, 2000.

10

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999
(Continued)

NOTE 8 - 401(K) PLAN

The Club sponsors a 401(k) defined contribution plan covering substantially all regular employees. The Club's matching contribution is at the discretion of the Board of Directors. For the years ended September 30, 2000 and 1999, the Board of Directors approved matching 50% of the employee's contribution subject to a maximum of 5% of the employee's eligible annual earnings. For the years ended September 30, 2000 and 1999, the Club contributed $44,380 and $34,657, respectively.

NOTE 9 - LOSS ON DISPOSITION OF ASSETS

During 1999, the Club installed a new accounting system that included features that enabled the Club to account for individual assets acquired and calculate the related depreciation for each asset. At the implementation of this system, individual assets were physically identified, abandoned, previously disposed of and lost assets were removed from the property and equipment accounts. A net loss on disposition of $8,929 is reflected in the accompanying statements of income. Adjustments to accumulated depreciation for revisions to estimated useful lives resulted in a reduction of depreciation expense of $88,429 during the year ended September 30, 1999.

NOTE 10 - LOSS ON LEASEHOLD

Upon its formation as a member-owned social club, the Club assumed a lease with a local water district ("District"). Approximately 391 acres of land was leased subject to the lease. The original lease, entered into in 1971, was for a period of 25 years with an option to renew for another 25 years. Upon formation of the club, an extension of 10 years was negotiated and the period covered by the renewal was 35 years. The terms of the lease required notification to the District of the intent to renew six months prior to the expiration of the original lease term of 1996. The District did not receive the written notification. The District and the Club were unable to resolve the issue of notification. In order to maintain the use and enjoyment of the majority of the Club's golf facilities, the Club pursued the purchase of the land.

The original purchase price of the Club included an amount ascribed to the value of the leasehold. The original allocated value of $4,855,650 was amortized over the life of the lease including the potential option periods. At September 30, 1999, the unamortized leasehold value of $3,324,783 was written-off in the accompanying statements of income.

12

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999
(Continued)

NOTE 11 - COMMITMENTS

Master Association

The Club is a member of a master association which maintains and preserves property such as streets, lighting, security gates and landscaping. The Club has a 20% voting interest in the association. The Club must pay its prorata share of association expenses. For the years ended September 30, 2000 and 1999, master association expense included in the statements of income was $132,840 and $132,840, respectively.

Golf Course Maintenance

Effective January 1, 2000, the Club entered into a two-year golf course maintenance agreement with a golf management entity. The agreement provided for the sale of golf course equipment to the management company at the equipment's fair value. The Club recognized a gain on sale of the equipment of $60,359. The agreement requires the management company to maintain the golf courses to a "First-Class" standard. The management company receives $216,667 per month plus an amount equal to the increase in the cost of water or electricity over the previous year. The annual management fee increases in accordance with the Consumer Price Index. In connection with the management agreement, the Club assigned the rights and obligations under certain equipment lease purchase agreements.

Upon termination of the management agreement, the Club must repurchase the golf course equipment based on appraised values and assume the obligation for the equipment leases. At September 30, 2000, the obligations for leases was $142,000 through the termination of the leases.

NOTE 12 - CONTINGENCIES

Lifetime Membership

During fiscal year 2000, the Club executed agreements with each of 88 of the 97 lifetime members. The agreement with each Lifetime member amends the bylaws such that Lifetime membership terminates upon the sale of the member's home and the membership can not be transferred to the new homeowner. The new homeowner obtains a priority right to apply for a proprietary membership. As a result of the amendment, those Lifetime members who sell their homes located within Ironwood to a buyer who is

13

Exhibit ___
Page ___ 41

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999
(Continued)

not at that time a Proprietary member of Ironwood and upon the termination of their Lifetime membership will receive a payment of 25% of the price of the Proprietary Membership. The amount is payable 10 days after the close of escrow and termination of membership. However, for the two year period commencing June 30, 2000, the Club has the option of making payment in the form of a one-year, noninterest bearing promissory note. The Club will have the option of renewing the note for an additional year with interest at 8%, payable at maturity.

At September 30, 2000, the Club had 97 lifetime members of which approximately 76 lived in homes located within Ironwood. At the current price of a Proprietary membership the lifetime member would receive $18,750. The accompanying financial statements do not reflect amounts payable to lifetime members as the amount payable is not reasonably estimable.

Member Settlements

For settlements entered into after January 1, 2000, the Club's insurance carrier under a Directors and Officers liability policy agreed to finance amounts paid to members upon the surrender of the membership and in settlement of certain claims against the Club. The settlement amounts are equal to the amount the member paid for the Club membership. Upon the resale of the membership, the Club will repay the insurance carrier the proceeds of the resale less the portion relating to the member assessment and related fees. At September 30, 2000, the Club settled two memberships for a total of $70,000. The amount payable to the insurance carrier is included in other liabilities in the accompanying balance sheet.

Litigation

As of September 30, 2000, the Club and it's Board of Directors were defendants in four suits brought by members arising from the lapse of the leasehold interest, the assessment and representations made to its membership and other matters arising in the normal course of its operations. The Club's insurance carrier has agreed to provide defense against these actions under a Directors and Officers liability policy, subject to a policy limit of $5,000,000. In connection with claims made by the Club and/or the insurer against third parties, the Club entered into an agreement with the insurer to share any proceeds equally.

A settlement of one of the four suits, a derivative action, brought by a member was approved by the Superior Court on November 17, 2000.

14

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

SEPTEMBER 30, 2000 AND 1999
(Continued)

Under the terms of the settlement, the Club will receive $2,000,000 less an award of $375,000 in fees to the plaintiff's attorneys. Payment will be made after the expiration of an appeal period of 60 days with no appeal being filed. Because the question of an appeal is uncertain, the accompanying financial statements do not reflect any amounts from the settlement.

As the remaining suits are being defended by its insurance carrier, management does not expect the outcome of these suits to adversely affect the financial position of the club.

15

Exhibit 1
Page 42

## EGAN & EGAN

CERTIFIED PUBLIC ACCOUNTANTS

877 EGAN 4 US          EGANEGAN.COM

### Independent Auditors' Report

The Board of Directors
Ironwood Country Club
Palm Desert, California

We have audited the accompanying balance sheets of Ironwood Country Club ("Club") as of June 30, 2011 and 2010, and the related statements of operations, changes in members' equity and cash flows for the years then ended.  These financial statements are the responsibility of the Club's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.   An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Ironwood Country Club as of June 30, 2011 and 2010, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Egan & Egan*

September 16, 2011

4

Exhibit _____ 1
Page _____ 43

IRONWOOD COUNTRY CLUB

BALANCE SHEETS

AS OF JUNE 30, 2011 AND 2010

|  | 2011 | 2010 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash | $ 3,342,945 | $ 3,236,666 |
| Member accounts receivable, net of allowance for doubtful accounts of $50,000 and $45,876 in 2011 and 2010, respectively | 1,748,536 | 1,653,984 |
| Member installment receivables | 24,000 | 45,463 |
| Assessments receivable, current portion | 44,904 | 44,903 |
| Inventories | 154,284 | 132,614 |
| Prepaid expenses | 61,825 | 61,777 |
| Total current assets | 5,376,494 | 5,175,407 |
| ASSESSMENTS RECEIVABLE, net of current portion | 338,825 | 388,005 |
| PROPERTY AND EQUIPMENT, net | 35,723,871 | 36,492,763 |
| OTHER ASSETS | 28,855 | 12,334 |
|  | $ 41,468,045 | $ 42,068,509 |
| **LIABILITIES AND MEMBERS' EQUITY** | | |
| CURRENT LIABILITIES | | |
| Current portion of long-term debt | $ 364,381 | $ 262,039 |
| Accounts payable | 157,140 | 56,524 |
| Accrued liabilities | 788,418 | 690,829 |
| Members' dues and fees billed in advance | 3,784,728 | 3,801,867 |
| Total current liabilities | 5,094,667 | 4,811,259 |
| LONG-TERM DEBT, net of current portion | 10,787,673 | 11,019,928 |
| ASSESSMENTS PAYABLE | 7,639,810 | 7,947,367 |
| Total liabilities | 23,522,150 | 23,778,554 |
| MEMBERS' EQUITY | 17,945,895 | 18,289,955 |
|  | $ 41,468,045 | $ 42,068,509 |

The accompanying notes are an integral part of these financial statements.

Exhibit

## IRONWOOD COUNTRY CLUB

### STATEMENTS OF OPERATIONS

### FOR THE YEARS ENDED JUNE 30, 2011 AND 2010

|  | 2011 | 2010 |
|---|---|---|
| **REVENUES** | | |
| Membership dues | $ 6,570,347 | $ 6,668,557 |
| Food and beverage | 1,352,281 | 1,289,165 |
| Golf related | 1,146,613 | 1,152,330 |
| Pro shops | 523,463 | 474,592 |
| Tennis and fitness | 234,120 | 193,720 |
| Resale and other | 355,483 | 208,455 |
| Total revenues | 10,182,307 | 9,986,819 |
| | | |
| **OPERATING EXPENSES** | | |
| Food and beverage | 1,706,632 | 1,641,542 |
| Golf related | 4,477,348 | 4,523,063 |
| Pro shops | 497,124 | 451,272 |
| Tennis and fitness | 545,930 | 513,928 |
| Clubhouse, general and administrative | 2,632,923 | 2,586,292 |
| Total operating expenses | 9,859,957 | 9,716,097 |
| | | |
| Operating income | 322,350 | 270,722 |
| | | |
| **OTHER INCOME  (EXPENSE)** | | |
| INTEREST INCOME | 24,768 | 28,923 |
| INTEREST EXPENSE | (655,544) | (687,741) |
| | (630,776) | (658,818) |
| | | |
| Loss before depreciation | (308,426) | (388,096) |
| | | |
| DEPRECIATION | (1,659,119) | (1,673,847) |
| | | |
| Net loss | $ (1,967,545) | $ (2,061,943) |

The accompanying notes are an integral part of these financial statements.

6

Exhibit ___ 1
Page ___ 45

IRONWOOD COUNTRY CLUB

STATEMENTS OF CHANGES IN MEMBERS' EQUITY

FOR THE YEARS ENDED JUNE 30, 2011 AND 2010

|  | MEMBERS' EQUITY | ACCUMULATED DEFICIT | TOTAL MEMBERS' EQUITY |
|---|---|---|---|
| Balance, July 1, 2009 | $   38,559,026 | $   (20,008,418) | $   18,550,608 |
| Sales of memberships, net | 815,240 |  | 815,240 |
| Facilities capital charge | 986,050 |  | 986,050 |
| Net loss |  | (2,061,943) | (2,061,943) |
| Balance, June 30, 2010 | $   40,360,316 | $   (22,070,361) | $   18,289,955 |
| Sales of memberships, net | 558,080 |  | 558,080 |
| Facilities capital charge | 1,065,405 |  | 1,065,405 |
| Net loss |  | (1,967,545) | (1,967,545) |
| Balance, June 30, 2011 | $   41,983,801 | $   (24,037,906) | $   17,945,895 |

The accompanying notes are an integral part of these financial statements.

7

Exhibit _____ 1
Page _____ 46

IRONWOOD COUNTRY CLUB

STATEMENTS OF CASH FLOWS

FOR THE YEARS ENDED JUNE 30, 2011 AND 2010

|  | 2011 | 2010 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (1,967,545) | $ (2,061,943) |
| Adjustments to reconcile net loss | | |
| to cash (used) provided by operating activities: | | |
| Depreciation | 1,659,119 | 1,673,847 |
| Increase (decrease) in allowance | | |
| for doubtful accounts | 4,124 | (12,079) |
| Changes in operating assets and liabilities: | | |
| Member receivables | (98,676) | 294,958 |
| Inventories | (21,670) | (13,724) |
| Prepaid expenses and other assets | (16,569) | 19,313 |
| Accounts payable | 100,616 | 15,661 |
| Accrued liabilities | 97,589 | 45,760 |
| Members' dues, fees billed in advance | (17,139) | 191,947 |
| Total adjustments | 1,707,394 | 2,215,683 |
| Net cash (used) provided by operating activities | (260,151) | 153,740 |
| | | |
| **NET CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchases of property and equipment | (890,227) | (237,918) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Capital from sales of membership | 558,080 | 478,945 |
| Reduction of assessments payable | (307,557) | (238,358) |
| Change in member installment receivables | 21,463 | 271,693 |
| Change in assessments receivable | 49,179 | 109,161 |
| Borrowings on long-term debt | 11,200,000 | - |
| Payments on long-term debt | (11,329,913) | (236,838) |
| Payments on capital leases | - | (60,457) |
| Facilities capital assessments | 1,065,405 | 986,050 |
| Net cash provided by financing activities | 1,256,657 | 1,310,196 |
| | | |
| Net increase in cash | 106,279 | 1,226,018 |
| | | |
| CASH, Beginning of year | 3,236,666 | 2,010,648 |
| CASH, End of year | $ 3,342,945 | $ 3,236,666 |

The accompanying notes are an integral part of these financial statements.

8

Exhibit 1
Page 47

**IRONWOOD COUNTRY CLUB**

**NOTES TO FINANCIAL STATEMENTS**

NOTE 1 – OVERVIEW AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a)   Overview – The Ironwood Country Club ("the Club") is a California nonprofit mutual benefit corporation operating under section 501(c)(7) of the Internal Revenue Code. The Club is owned by its Proprietary Members and offers golf, tennis, fitness, dining facilities and various other services to its membership. The Club generates revenues primarily through membership dues and various other fees and charges to its members.

Proprietary Membership, which includes Regular and Charter Proprietary members, confers an ownership interest and a voting right in respect of matters on which members are entitled to vote. Proprietary members may be assessed only upon written approval by 60% of the Proprietary members voting, so long as 50% of the Proprietary members vote on the proposed assessment. The price of Proprietary membership is established by the Board of Directors from time to time, and the proceeds from new membership sales are credited to Members' Equity. When a Proprietary member sells their membership, the Club receives a portion of the proceeds as a transfer fee, the amount of which varies depending on the date at which the membership was purchased by the transferring member; such transfer fees are credited to Members' Equity. Charter Proprietary members have rights identical to those of Proprietary Members, but the Club is entitled to lesser amounts of transfer fees when such memberships are transferred. When a Charter Proprietary membership is transferred, the new member becomes a Proprietary member; the Club does not issue new Charter Proprietary memberships.

The Club offers various other membership categories which permit use of the Club's facilities under the conditions proscribed for each such membership. These memberships do not convey ownership or voting rights, are non-transferable and are not subject to assessment. Initiation fees for these memberships are reported in Other Income in the accompanying Statements of Operation.

The Bylaws limit the number of golfing memberships to 685.

(b)   Cash – for purposes of the Statement of Cash Flows, the Club considers cash as amounts deposited in checking accounts, certificates of deposit and short-term investments.

(c)   Inventories – Inventories are stated at the lower of cost or market. Cost is determined by the first-in, first-out method.

(d)   Property and Equipment – The cost of buildings and equipment is depreciated on a straight-line basis over the following useful lives:

| | Life (Years) |
|---|---|
| Golf courses and land improvements | 15 - 30 |
| Buildings and improvements | 5 - 35 |
| Furniture, fixtures and equipment | 5 - 15 |

9

Exhibit _____ 1
Page _____ 48

## IRONWOOD COUNTRY CLUB

## NOTES TO FINANCIAL STATEMENTS

### NOTE 1 - OVERVIEW AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, continued

Additions, renewals and betterments that materially extend the life of an asset are capitalized. Expenditures for maintenance and repairs which do not extend the life of the applicable asset are charged to expense as incurred.   Upon retirement or disposal of an asset, the asset and accumulated depreciation accounts are adjusted accordingly.  Any resulting gain or loss is recorded in the Statement of Operations.

Management reviews the carrying value of property and equipment for impairment whenever events and circumstances indicate that the carrying values of these assets may not be recoverable from the estimated future cash flows expected to result from their use and eventual disposition.  Factors considered by Management include current operating results, trends and prospects, the manner in which the property is used, and the effects of obsolescence, demand, competition and other economic factors.  No impairment was determined to exist at June 30, 2011 or 2010.

(e)    Member dues and fees billed in advance - The Club bills dues and certain fees in advance, and any unearned portions are deferred and included in liabilities in the accompanying balance sheets.

(f)    Facilities Capital Charge – In order to provide funds to service its long term debt, the Club assesses a Facilities Capital Charge ("FCC") of $150 per Proprietary member per month.  The FCC continues until the long term debt is repaid, and is credited to Members' Equity in these financial statements.  For the years ended June 30, 2011 and 2010, the Board also allocated an additional $20 and $10, respectively, per Proprietary member per month from dues income to the FCC fund, and these amounts of $113,440 in 2011 and $57,800 in 2010 are also included in the FCC amount credited to Members' Equity

(g)    Estimates - The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, expenses and disclosures in the financial statements. Actual results could differ from those estimates.

(h)    Supplemental disclosure of cash flow information – Cash paid for interest for the years ended June 30, 2011 and 2010 was $655,544 and $687,714, respectively.  No cash was paid for income taxes.

(i)    Concentration of risk - The Club is dependent on its members for dues, operating revenues and its Facilities Capital Charge to provide working capital for Club operations,  cash flow for debt service and asset replacement.

(j)    Reclassifications - Certain items in the prior year financial statements have been reclassified to conform with the current year presentation.

(k)    Subsequent events - Management has evaluated subsequent events through the date the financial statements were available to be issued.  Management has determined that there are no material events that would require adjustment to or disclosure in these financial statements.

Exhibit  1
Page  49

## IRONWOOD COUNTRY CLUB

### NOTES TO FINANCIAL STATEMENTS

### NOTE 2 - INVENTORIES

Inventories consist of:

| | AS OF JUNE 30, | |
|---|---|---|
| | 2011 | 2010 |
| Golf merchandise and equipment | $ 97,354 | $ 88,682 |
| Tennis merchandise and equipment | 17,204 | 12,992 |
| Food and beverage | 39,726 | 30,940 |
| | $ 154,284 | $ 132,614 |

### NOTE 3 - PROPERTY AND EQUIPMENT

Property and equipment, at cost, includes:

| | AS OF JUNE 30, | |
|---|---|---|
| | 2011 | 2010 |
| Land and land improvements | $ 9,696,857 | $ 9,624,776 |
| Golf courses and improvements | 11,226,176 | 10,422,753 |
| Buildings and improvements | 20,790,857 | 20,790,857 |
| Furniture, fixtures and equipment | 5,457,780 | 5,238,980 |
| Improvements in process | – | 204,076 |
| | 47,171,670 | 46,281,442 |
| Less accumulated depreciation | (11,447,799) | (9,788,679) |
| Total property and equipment | $ 35,723,871 | $ 36,492,763 |

Substantially all of the Club's real property collateralizes its debt obligation (see note 6).

### NOTE 4 - MEMBER INSTALLMENT RECEIVABLES

The Club provides prospective members the option to purchase equity memberships in installments. The membership secures the installments receivable. A member's failure to pay any installments when due result in forfeiture of the membership and all amounts previously paid.

11

## IRONWOOD COUNTRY CLUB

## NOTES TO FINANCIAL STATEMENTS

### NOTE 5 – ASSESSMENTS RECEIVABLE AND PAYABLE

During 1999, the Proprietary members approved an assessment of $25,500 per member to purchase approximately 391 acres of land which had previously been leased. The Club is obliged to repay the assessed amount to the member only upon the sale of his/her membership; accordingly, the aggregate amount of this assessment, net of amounts repaid, is recorded in the balance sheet as a liability. The assessment liability does not bear interest, and no repayment is required prior to the sale of the member's certificate. Upon resale of the membership, the $25,500 assessment is not subject to a transfer fee. The Club may, at its sole option, repay the assessment in not more than four equal annual installments without interest.

The Proprietary members could elect to pay the assessment in installments with a balloon payment after 10 years. The balloon payment was due October 2009. The Board of Directors have extended the installment payment period for five years until October 2014. At June 30, 2011 and 2010, the installments receivable bear interest at 4% per annum and may be paid in full at any time without penalty. These assessments receivable are recorded as an asset in the accompanying balance sheet. Any unpaid balance must be paid to the Club upon sale of a member's certificate.

### NOTE 6 - DEBT

Effective April 15, 2011, the Club entered into a new credit agreement providing a $2,000,000 revolving line of credit, a $500,000 equipment financing facility, and an $11,200,000 long term debt facility. All borrowings under the credit agreement are collateralized by substantially all of the Club's assets.

The $2,000,000 revolving line of credit bears interest, at the Club's option, at either the lender's prime rate (5.6% at June 30, 2011) or at rates fixed for up to one year based on LIBOR plus 2.35%. Any borrowings under the line are due in full on April 30, 2013. There were no borrowings against the line during the year ended June 30, 2011.

The $500,000 equipment financing line bears interest, at the Club's option, at either the lender's prime rate or at rates fixed for up to one year based on LIBOR plus 2.55%. Borrowings require monthly payment of interest only through May 2012, then monthly payment of interest and principal through April 2016. There were no borrowings against the line during the year ended June 30, 2011.

The proceeds of the $11,200,000 long term debt facility were used to repay an existing long term loan bearing interest at 6.18% and maturing in March 2017. The new long term debt facility bears interest at 4.92% and requires monthly payments of interest and principal of $71,372.92 through April 16, 2018 with a lump sum payment of approximately $8.7 million on that date. The loan agreements require that certain financial and other covenants be maintained, and the Club was in compliance with all such covenants at June 30, 2011.

12

Exhibit _____ 1
Page _____ 51

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

NOTE 6 – DEBT, continued

Future principal payments of long-term debt are as follows:

| Fiscal Year Ended June 30, | | |
|---|---|---|
| 2012 | $ | 364,381 |
| 2013 | | 384,319 |
| 2014 | | 403,660 |
| 2015 | | 423,974 |
| Thereafter | | 9,575,720 |
| | $ | 11,152,054 |

NOTE 7 - INCOME TAXES

The Club is exempt from income taxes under Internal Revenue Code Section 501(c)(7) and related State of California provisions.  It is subject to tax on net unrelated business income in excess of $1,000.   The Club did not have any income tax expense for the years ended June 30, 2011 and 2010, respectively.

NOTE 8 – 401(k) PLAN

The Club sponsors a 401(k) defined contribution plan covering eligible employees.  The Club's matching contribution is at the discretion of the Board of Directors. For the years ended June 30, 2011 and 2010, the Board of Directors suspended the Club's matching contribution.

NOTE 9 - COMMITMENTS

Community Association

The Club is a member of a community association which maintains and preserves property such as streets, lighting, security gates and landscaping.  Through December 31, 2009, the Club had a 20% voting interest in the association and paid 20% of the association's expenses. Beginning January 1, 2010, the Club's voting interest and pro rata share of the associations expenses decrease as follows:

| Effective Date | Percent |
|---|---|
| January 1, 2010 | 17% |
| January 1, 2011 | 14% |
| January 1, 2012,  and thereafter | 11% |

For the years ended June 30, 2011 and, 2010, community association expense included in the Statements of Operations under Clubhouse, general and administrative was $307,986 and 380,136, respectively.

13

Exhibit ___1___
Page ___52___

IRONWOOD COUNTRY CLUB

NOTES TO FINANCIAL STATEMENTS

**Lifetime Memberships**

During fiscal year 2000, the Club executed agreements with each of 88 of the then 97 Lifetime members. The agreement provides that such Lifetime members are entitled to receive a payment of 25% of the price of the Proprietary Membership upon sale of their residence located within Ironwood and termination of their Lifetime membership. The amount is payable 10 days after the close of escrow and termination of membership.

At June 30, 2011, 30 Lifetime members are subject to these agreements as they reside within Ironwood. The amounts which may ultimately be payable to these Lifetime members is not estimable because the payment date is not known and the price of a Proprietary membership can vary; accordingly, no liability under these agreements is recorded in the accompanying balance sheets. The amount paid to the Lifetime members is recorded as a reduction to the Club's equity upon payment.

**Litigation**

In the normal course of its operations the Club is from time to time subject to litigation. Management does not expect the outcome of these matters to adversely affect the financial position of the Club, and, accordingly, no liabilities relating to such matters are recorded in the accompanying financial statements.

Exhibit ___|___
Page ___52___

# EXHIBIT "5"

Exhibit ___1___
Page ___54___

FEB-04-2012 SAT 09:59 AM                    FAX NO. 760 773 5872                    P. 02/05



**'ONWOOD**
**:OUNTRY CLUB**

-735 Irontree Drive
in Desert, California
260-6999
: 760/346-0551
: 760/773-4858

January 16, 2009

Re:    Proprietary Golf Membership #:

Dear Mr. _

JARD OF DIRECTORS

ON BLACK
esident

ALE C. LANDON
:o President

~HARD BEMIS
etary
_

HIN A. HINDS
1asurer

ILL COBB

ETER HANNON

REY LYONS

HIL STEVENS

ICHARD TURNER

Per your letter of resignation received on this date, I have processed the necessary paperwork for the resignation of your Proprietary Golf membership and forwarded the file to the Accounting Department for processing.

In accordance with Article IV, Section 7 of the Ironwood By-laws, such resignation unequivocally provides that the member forgoes any portion of the Initiation Fee regarding such membership. The resignation will become effective January 31, 2009 per your request.

The Accounting Office staff will settle your account and prepare a closing statement. If there are outstanding charges, you will receive a statement. If there are credits on your account, you will be sent a check.

With regard to the $25,500 refundable assessment, the Club will reimburse the principal amount paid to date on that obligation upon the sale of your membership to a new member. Obviously we do not know when that will occur. All treasury memberships, which yours becomes upon the resignation, are sold in the order in which they are received.

On behalf of the Club, I would like to express our appreciation for your past patronage, and should you decide at some future date to again join Ironwood, we will be most happy to assist you.

Sincerely yours,

Dale Linda Echols,
Director of Administrative Services

EST. 1974
ronwoodCountryClub.com

Exhibit _____1_____
Page _____55_____

Jun 16 12 08:08p          Bill Creagan                    (760)341-8657                    p.1



**IRONWOOD**
COUNTRY CLUB

*73-735 Irontree Drive*
*Palm Desert, California*
*92260-6999*
*tel: 760/346-0551*
*fax: 760/773-4858*

February 7, 2011

Re:    Resignation of Charter Proprietary Membership # . . 1 and
       Conversion to Tennis/Fitness/Social #(

Dear ,

In accordance with your written instructions, we have processed the resignation of your Charter Proprietary Golf membership and conversion to a Tennis/Fitness/Social membership. The resignation and conversion is effective immediately.

The Accounting Office staff will settle your account and transfer all balances to your new membership number.

On May 27th you were sent a letter (copy enclosed) explaining that during the term of your Charter Proprietary Membership #      you loaned $25,500 to the Club to purchase land from the Coachella Valley Water District. The Club will reimburse you for the loan principal upon sale of your membership to a new member. The proprietary membership you forfeited became a Treasury Membership upon your resignation and it is now in the      th position on the Treasury list.

Ironwood requests that you execute the enclosed Agreement; however your execution of this Agreement is entirely voluntary. Its purpose is to clarify that it is your obligation to keep Ironwood informed as to your mailing address and that, in the event Ironwood cannot locate you when your loan is to be repaid, the funds will not be turned over to the State of California or some other State as unclaimed property.

Sincerely yours,

Joshua Tanner
General Manager

*EST. 1974*
*IronwoodCountryClub.com*

Exhibit   1
Page   56

# EXHIBIT "6"

Exhibit ____1____
Page ____57____



**IRONWOOD COUNTRY CLUB**

73-735 Irontree Drive
Palm Desert, California
92260-6999
tel: 760/346-0551
fax: 760/773-4858

April 9, 2010

Re:   Forfeited Proprietary Golf Membership #1331

Dear

The purpose of this letter is to inform you of matters involving your resignation of your Proprietary Golf membership from Ironwood Country Club.

During the term of your membership, you loaned $25,500 to the Club to purchase land from the Coachella Valley Water District. The Club will reimburse you for the loan principal upon sale of your membership to a new member. Your forfeited membership became a Treasury Membership upon your resignation. Currently, there are a large number of Treasury Memberships being held for sale by the Club.

Because of anticipated long delays until your membership sells, Ironwood requests that you execute the attached Agreement. Your execution of this Agreement is entirely voluntary. Its purpose is to clarify that it is your obligation to keep Ironwood informed as to your mailing address and that, in the event Ironwood cannot locate you when your loan is to be repaid, the funds will not be turned over to the State of California or some other State as unclaimed property.

The Club will contact you when your former membership is approaching a sale date. As outlined in the attached agreement, it is _your_ responsibility to make sure the Club has the proper information to locate you, no matter how many years may elapse between now and the date your membership may sell. If we are unable to locate you, as stated in the agreement, you waive your right to repayment and Ironwood will retain the funds as capital rather than require that the funds be turned over to the State of California or some other State as unclaimed property.

If you would like to waive your right to repayment of the loan principal, you may record that intent on the attached agreement as well. If that is your decision, there will be no need for you to provide us with current contact information through the years ahead.

If you decide at some future date to rejoin Ironwood, we will be most happy to review our reinstatement policy with you.

Sincerely yours,

Josh Tanner,
General Manager

BOARD OF DIRECTORS

RICHARD TURNER
President

DALE C. LANDON
Vice President

PETE STEVENS
ary

MICHAEL FLOOD
Treasurer

PETER HANNON

KAY HESSEY

ALAN OLSON

ROB REISCHNEIDER

BARBARA SUE SEAL

EST. 1974
IronwoodCountryClub.com

Exhibit ___1___
Page ___58___



**Paul & Barb Reynolds**
1745 Tattenham Rd.
Encinitas, CA 92024



**IRONWOOD**
COUNTRY CLUB

## AGREEMENT

This Agreement, effective _____, is by and between Ironwood Country Club, a non-profit mutual benefit corporation located at 73-735 Irontree Drive, Palm Desert, California ("Ironwood"), and _____ (hereafter "Lender"), who is either a current or former member of Ironwood, residing at _____

### RECITALS

WHEREAS, on or about September 17, 1999, Lender, together with other members of Ironwood, each loaned to Ironwood the sum of $25,500 ("Loan") to provide funds for the purchase by Ironwood of certain land from the Coachella Valley Water District, a California municipal utility:

WHEREAS, Ironwood and Lender desire to enter into this Agreement in order to provide for the retention by Ironwood of Loan amounts otherwise due to Lender upon the occurrence of certain conditions specifically identified below.

Now therefore, in consideration of the above Recitals and for further and additional valuable consideration, the receipt of which is hereby acknowledged by Lender, and without waiving any legal rights Ironwood may have to the contrary with respect to those Lenders who do not agree to the terms and conditions contained herein, the parties hereto agree as follows:

1. On and after the date Lender resigns his membership from Ironwood, Lender or Lenders heirs shall be solely responsible to keep Ironwood informed in writing of an address that Ironwood may use to deliver written notification ("Notice") to Lender in order for Ironwood to repay the Loan.

2. At such time as the Treasury Membership designated as Lender's former membership sells or is about to sell to a new member, Ironwood will send the Notice, certified mail return receipt requested, to the last address provided to Ironwood by Lender requesting written instructions deemed necessary to repay the Loan. Upon receipt of adequate instructions from Lender, Ironwood will repay the Loan pursuant to those instructions. If the repayment is to Lender's heirs, documentation of the right to repayment satisfactory to Ironwood will be required.

3. If after 60 days following the date of mailing of the Notice, Ironwood is not in receipt of repayment instructions from Lender or if the Notice is returned to Ironwood with no receipt acknowledged, Lender hereby agrees: (1) that Lender shall be deemed to have irrevocably waived and right to repayment; (2) that the amount of the repayment shall be retained and used by Ironwood in the same manner as other revenue received by Ironwood; (3) that Ironwood shall be excused from any further obligations to Lender with respect to the Loan.

4. This Agreement shall be binding on and insure to the benefit of the successors in interest, heirs and assigns of the respective parties hereto.

Exhibit ____1____
Page ____55____

Agreement
Page 2

WHEREUPON, the parties have executed this Agreement on the date set forth below and agree that it is binding upon Lender and his heirs and legal representatives, and upon Ironwood, its Board of Directors, and any successors or assigns of Ironwood and its Board of Directors.

_____                    Ironwood Country Club
Lender

                                           By: _____
                                               Josh A Tanner, General Man

                                           Date: ___4/18/10_____

Address

Date: _____


Lender understands the terms and conditions of the Agreement as set forth above and rather than agree to those terms and conditions, Lender instead herewith waives Lender's right to repayment of the Loan and hereby releases Ironwood from any further obligation with respect thereto.

_____                    Ironwood Country Club
Lender
                                           By: _____

Date: _____                      Date: _____


Ironwood Country Club * 73-735 Irontree Drive, Palm Desert, CA 92260 * (760) 766-1091

Exhibit ___1___
Page ___60___

# EXHIBIT "7"

Exhibit ___1___
Page ___61___



May 27, 2010

Dear Member;

This letter is being sent to over 300 current members of Ironwood who loaned the Club $25,500 pursuant to the Land Purchase Assessment in 1999. The purpose of this letter is to include herewith a form of Agreement the Club is hopeful you will voluntarily agree to execute, and to explain why this Agreement has been prepared.

We have an expanding communication problem with respect to those members who loaned the Club $25,500 ("Loan") and who leave the Club by resignation, forfeiting their equity rather than by selling their membership. In this instance, the Loan is not repaid at the time the members forfeit their equity. As you may know, the Club has adopted a practice, which it continues to follow, of repaying the Loan at such time in the future as that forfeited membership sells as a Treasury Membership. The expanding problem is that, given the number of Treasury Memberships available for sale (currently 170), the rate of forfeitures that occur each year, and the number of membership sales that occur each year, it is likely that it will be many years into the future before the Loan will be repaid to any who choose to forfeit their equity when they leave the Club.

In those intervening years between the time a member chooses to leave the Club by forfeiting their equity and the time for repayment of the Loan, that former member or that former member's heirs may fail to keep the Club informed as to a current address, the address of their heirs, if needed, and so forth. Should the Club be unable to repay the Loan because the former member or the heirs of the former member cannot be found or properly identified, the proceeds of the Loan are required by law to escheat to the State of California or some other State or Country of residence as unclaimed property. The Club does not want that to happen and it is believed that you would not want that to happen either. So, the Agreement included with this letter solves that problem and states in pertinent part as follows:

1. That you agree it is your responsibility to keep the Club informed as to your address.
2. That at the time your designated Treasury Membership sells, the Club agrees to send a Notice, certified mail return receipt requested, to the address provided, informing of the sale and the fact that the Loan is ready to be repaid.

Exhibit ___1___
Page ___62___



3. That if there is no positive response to the Notice for 60 days, you agree your right to repayment of the Loan is irrevocably waived and that the Club is entitled to retain the proceeds of the Loan in the same manner as other revenue received by the Club.

4. At the bottom of the Agreement is an alternative; a provision that is again voluntary, which provides that you agree now to waive your right to repayment of the Loan upon execution of the Agreement.

Charter Members who sell their Memberships by finding their own buyers, and other Members holding $25,500 Loans whose Memberships are sold from the Sales List, are repaid their $25,500 Loans at the time of sale of their Membership. The problem described above applies ONLY to Members who have left, or will leave, the Club by resignation.

We ask that you give the enclosure serious consideration. If you are willing to agree to one of the two alternative solutions provided in the Agreement, please execute the Agreement on the appropriate signature line and present the executed Agreement to the Club General Manager for his signature. You will be given a copy of the Agreement signed by both you and the General Manager.

If you have any questions, please call me at 760-766-1091.

Thank you,

Josh Tanner
General Manager

Exhibit _____ 1
Page _____ 63



**IRONWOOD**
COUNTRY CLUB

## AGREEMENT

This Agreement, effective _____, is by and between Ironwood Country Club, a non-profit mutual benefit corporation located at 73-735 Irontree Drive, Palm Desert, California ("Ironwood"), and _____ (hereafter "Lender"), who is either a current or former member of Ironwood, residing at _____.

### RECITALS

WHEREAS, on or about September 17, 1999, Lender, together with other members of Ironwood, each loaned to Ironwood the sum of $25,500 ("Loan") to provide funds for the purchase by Ironwood of certain land from the Coachella Valley Water District, a California municipal utility:

WHEREAS, Ironwood and Lender desire to enter into this Agreement in order to provide for the retention by Ironwood of Loan amounts otherwise due to Lender upon the occurrence of certain conditions specifically identified below.

Now therefore, in consideration of the above Recitals and for further and additional valuable consideration, the receipt of which is hereby acknowledged by Lender, and without waiving any legal rights Ironwood may have to the contrary with respect to those Lenders who do not agree to the terms and conditions contained herein, the parties hereto agree as follows:

1. On and after the date Lender resigns his membership from Ironwood, Lender or Lenders heirs shall be solely responsible to keep Ironwood informed in writing of an address that Ironwood may use to deliver written notification ("Notice") to Lender in order for Ironwood to repay the Loan.

2. At such time as the Treasury Membership designated as Lender's former membership sells or is about to sell to a new member, Ironwood will send the Notice, certified mail return receipt requested, to the last address provided to Ironwood by Lender requesting written instructions deemed necessary to repay the Loan.  Upon receipt of adequate instructions from Lender, Ironwood will repay the Loan pursuant to those instructions.  If the repayment is to Lender's heirs, documentation of the right to repayment satisfactory to Ironwood will be required.

3. If after 60 days following the date of mailing of the Notice, Ironwood is not in receipt of repayment instructions from Lender or if the Notice is returned to Ironwood with no receipt acknowledged, Lender hereby agrees: (1) that Lender shall be deemed to have irrevocably waived any right to repayment; (2) that the amount of the repayment shall be retained and used by Ironwood in the same manner as other revenue received by Ironwood; (3) that Ironwood shall be excused from any further obligations to Lender with respect to the Loan.

4. This Agreement shall be binding on and insure to the benefit of the successors in interest, heirs and assigns of the respective parties hereto.

Exhibit _____
Page _____

Agreement
Page 2

WHEREUPON, the parties have executed this Agreement on the date set forth below and agree that it is binding upon Lender and his heirs and legal representatives, and upon Ironwood, its Board of Directors, and any successors or assigns of Ironwood and its Board of Directors.

Ironwood Country Club:

_____
Lender (Please Print)

By: _____
Joshua Tanner, General Manager

_____
Lender (Signature)

Date: _____

_____
Lender's Address

_____
Lender's Address

_____
Lender's Telephone

Date: _____

Lender understands the terms and conditions of the Agreement as set forth above and rather than agree to those terms and conditions, Lender instead herewith waives Lender's right to repayment of the Loan and hereby releases Ironwood from any further obligation with respect thereto.

Ironwood Country Club:

_____
Lender

By: _____
Joshua Tanner, General Manager

Date: _____

Date: _____

Ironwood Country Club * 73-735 Irontree Drive, Palm Desert, CA 92260 * (760) 766-1091

Exhibit ____1____
Page ____65____



**IRONWOOD**
**COUNTRY CLUB**

79-735 Irontree Drive
Palm Desert, California
92260-6999
Tel. 760/346-0551
Fax: 760/773-4958

November 29, 2011

Re:     Proprietary Golf Membership #

Dear

Per your email instructions received on this date, the paperwork for the resignation of your Proprietary Golf membership has been processed and submitted to the accounting office for handling.

By-laws Article 4, Section 4.7 states that such resignation unequivocally provides that the member forgoes any portion of the Initiation Fee regarding such membership. Please deliver to the club your Member Certificate endorsed on the back, at your earliest convenience.

In accordance with Section 4.7, the resignation of your proprietary golf membership is effective immediately; provided, however, that the Member shall remain liable to the Club for all dues, assessments, charges and other amounts owning to the Club, which accrued prior to such resignation.  Your email request, states that you would like this resignation to become effective                        and we will comply with your request.

Thank you for being a member of Ironwood since           . Should you decide at some future date to again join Ironwood, we will be most happy to assist you.

Sincerely yours,

Joshua Tanner
General Manager

# EXHIBIT "8"

Exhibit ___1___
Page ___67___



**IRONWOOD**
**COUNTRY CLUB**

January 24, 2012

Dear Members,

Our last Board meeting was held January 19th. The more important decisions and discussions follow.

We continue to perform well against the operating budget and we believe that we have an excellent chance of equalling or exceeding the dues revenue for the full fiscal year that we achieved last year. All departments are functioning ahead of plan, reflecting the excellent efforts by management and staff and increasing member usage of the club. Revenues in all departments are up over last year while costs have been contained to approximately last year's levels.

I am constantly asked about membership levels, the key factor in our success. At the end of December 2011, half way through our fiscal year, our membership sales results are:

> We have added 2 proprietary, 8 CTIM and 9 TFS, for a total of 19 new members.

> At the end of December 2011 we have 660 total members versus 659 on June 30.

> Golfing members (Charter and Regular Proprietary, CTIM, Non-Proprietary, and Emeritus) totalled 517 versus 522 a year ago.

We've added members in all categories in January so we will have more up to date figures at the Annual Meeting later this week.

We monitor this very closely and continue to remind members that we need to always be looking for prospective members. A big thank you to all of you who have introduced new members!

Our Annual General Membership meeting is January 28, at 3 pm. We urge you to attend, listen to the committee reports, and take the opportunity to ask questions.

The Board passed resolutions as follows:

1. Rules. "The Board may waive one or more provisions of Rule 8 for promotional or membership development purposes." This is not detrimental or a change in anything we are doing now.

Exhibit ____1____
Page ____68____

2. In order to increase the use of the tennis courts we have authorized non-members, who are renters from Ironwood/Monterra/The Summit property owners, to use the tennis facility by paying normal guest fees. We expect that this will increase exposure to our wonderful facility and attract permanent members. In addition, it helps all leasing brokers with leasing Ironwood member property.

3. The Board has voted informally to build the three-hole, par 3 course at the South end of the driving range behind the putting and chipping greens. The final decision will occur at our next Board meeting. The total cost will be less than $80,000 and the work will mostly be done by our staff this coming summer. The existing pitching area would be relocated to two locations, one at each end of the main driving range. After two years of study we have concluded that such a facility will provide another important dimension to Ironwood for new and experienced golfers alike. It will provide a great opportunity to improve the short game, provide those who wish less of a challenge an excellent venue, and be an attraction to new golfers who may be intimidated by the full course experience. We encourage all members to walk the site. You will soon receive notice as to when "tours" will be held. We encourage you to attend one of these guided tours to preview first hand this beautiful site and receive more detail. Delaying the final approval until our February meeting will allow us to conduct tours of the site, provide more detail to members, and further review our capital spending priorities. We have received many comments and the majority are in favor of this addition. Every new amenity is a key selling point to prospective members.

4. The Board has agreed to help the Ironwood Community Association (ICA) by providing interim financial assistance to fund the redevelopment of the front entrance gate at Mariposa and Portola. The assistance is in the form of prepayment of our normal share of dues and minimal contingency financing. Any funds advanced will be fully repaid with repayment protected by a promissory note. The bottom line is that the full cost of the Mariposa Gate Project, which will greatly benefit the Club, will be paid by the ICA. We all look forward to arriving back next November and celebrating this most needed improvement. Congratulations and thank you to the ICA for their hard work on this project.

5. Over the last year the Board had three major goals:

   a) Membership;
   b) Capital Reserve analysis; and
   c) Detailed forward planning.

   Items (a) and (c) are well in hand and item b), the study of Capital Reserves has come a long way.

Exhibit ___1___
Page ___69___

Our review and analysis has revealed a mistaken belief, that began in about 2003, which led to a Club practice of repaying the $25,500 Land Assessment to members who resigned from the Club, stopped paying dues, and forfeited their memberships, rather than selling the memberships through the procedures set up by the Club.

After substantial due diligence, including consultation with past Presidents, our auditor and Counsel, this Board has concluded that the practice of repaying the Land Assessment to forfeiting members, when their forfeited membership is subsequently sold by the Club as a Treasury membership, must cease effectively immediately. Of course, this does NOT apply to any member who sells his/her active membership through the club procedures. The Club will continue to repay the Assessment to all such members when they sell their membership.

A forfeiting member (one who has resigned and stopped paying dues) whose forfeited membership is subsequently sold by the Club as a Treasury membership may, if circumstances warrant it, seek repayment of the assessment and have that request considered on an individual basis.

In appreciation for the financial commitment made at the time and in order to allow current members to enjoy some financial benefit from that commitment while they are still at the Club, the Board has created an option for any current proprietary member who is willing to waive the repayment. The offer and a letter of explanation have been mailed by separate cover to those current members who participated in the program. This is a **voluntary** program only and any current member wishing to be paid in full when they sell their membership, may certainly do so.

6. We are pleased to announce that the Nominating Committee has concluded their work and has selected Russ Blomberg, Ray Coad, and Gene Grant as the regular ticket nominees for election to the Board of Directors. If you have missed this process thus far you can, with the support of 25 proprietary members, submit you name for the ballot. We want to ensure that anyone who has the interest and requisite experience and knowledge of Ironwood is not overlooked.

7. Tarbell Realtors has brought the Young Americans and more recently Annika Sorenstam to the club to sold out audiences. We thank them for their generous support. Many members have asked how they might help out the Sorenstam Foundation. If you are interested in supporting her initiative, click on www.annikafoundation.org.

We constantly strive to build on the sense of community we share, deliver the best product we can in both the short and long term interests of the Club, and continue to find ways to better the experience of being an Ironwood member. As this current board has only one more meeting as a group I would like to thank those who have served us so well and are leaving the Board after a

Exhibit _____ (
Page _____ 70

three year term, Barbara Sue Seal (served two three year terms), Al Olson and Mike Flood. Please take a moment and thank them for their tireless effort on our behalf.

See you on the course.

Sincerely,

President
Ironwood Board of Directors

Exhibit ____ 1
Page ____ 21

# EXHIBIT "9"

Exhibit       1
Page       72



# IRONWOOD

January 24, 2012

$\mathcal{I}-8$

Dear

As you know, in 1999, you, and some 300 other Ironwood members stepped up and paid the $25,500 Land Assessment to purchase the bulk of the land on which our courses sit and save the Club. We are grateful to you for that commitment. Because of the land purchase, the Club was able to grow into one of the premier clubs in the desert.

The purpose of this letter is to clarify for you the practices and procedures of the Club for repayment of the Land Assessment and outline an offer to you to allow you to enjoy some current financial benefit from your commitment while you are still at the Club.

As I'm sure you're aware, the understanding at the time the payments were made was that you would be reimbursed in full when you sold your membership through the procedures set up by the Club. In the case of Regular Proprietary members, that would be through the Sales List procedure. Charter Proprietary members can bypass the Sales List and bring to the Club a buyer who would go through the regular membership approval process. That was the clear understanding then and remains the practice today.

Our review has revealed a mistaken belief that began in about 2003 which led to a Club practice of repayment of the Land Assessment to members who resigned from the Club, stopped paying dues, and forfeited their memberships, rather than selling the memberships through the procedures outlined above. After consulting with past presidents, our auditor and counsel, the Board has concluded that this was in error and will cease. Of course, this does NOT apply to you if you ultimately sell your membership through the Club's procedures while you are still a member. This may be confusing so we have prepared the attached Q and A which should clarify for you this change in practice and what your options are.

We recognize, however, that memberships may not always sell when someone is ready to leave the Club, so in appreciation for the financial commitment you've made and in order to allow you to enjoy some financial benefit from your commitment, we have created an enticing offer to current members, like yourself, who are willing to waive repayment of the Assessment.

Ironwood Country Club * 73735 Irontree Drive * Palm Desert, CA 92260 * (760) 776-1091

In exchange for you waiving your rights to repayment, the Club offers the following four non-transferable benefits:

1. Free golf and fitness guest fees for Lineal Family Descendants for the life of your membership. Lineal Family Descendants, for the purposes of this offer, are one's children and grandchildren, no matter what age, including your spouse's children if a combined family, but shall not include your brothers, sisters and other extended family members and their relatives. Access to the facilities shall be subject to Club rules regulating the same.

2. Ten (10) free golf Guest Fee passes per fiscal year for the life of your membership. Guest passes shall be subject to the Club rules regarding guest access to the courses and shall not be transferable.

3. Six (6) complementary regular Sunday Brunch Passes per fiscal year for the life of your membership. Such passes shall not include alcoholic beverages or gratuity.

4. A ten percent (10%) discount on non-sale priced items in the Pro Shop.

For the purposes of this offer, the life of your membership extends to your spouse if the membership is transferred to your spouse, but does not include your child, if the membership is passed to a child.

Please understand that this offer is completely voluntary and you may decline and be reimbursed in full if and when you sell your membership. This offer will expire on June 30, 2012. If you accept the offer prior to that date, you will be entitled the benefits for the remainder of the 2011-2012 fiscal year, on a pro-rated basis.

Again, on behalf of the Club and its members, thank you for your financial commitment which has allowed all of us continue to enjoy this wonderful Club.

Sincerely,

Ken Delf
President

Ironwood Country Club * 73735 Irontree Drive * Palm Desert, CA 92260 * (760) 776-1091

Exhibit _____ 1
Page _____ 74



**IRONWOOD COUNTRY CLUB**

## I Paid the $25,500 Assessment, so how does this affect me?

**IF YOU ARE A CHARTER PROPRIETARY MEMBER:**

1. You may sell your membership by either finding your own buyer (who must complete the Club's membership approval process) and/or offering your membership for sale on Club's sale list.

2. Either way, when you have sold your membership
   a. The first $25,500 of the sales proceeds is paid to you as reimbursement for your Land Assessment.
   b. The next $25,000 is paid to you free from transfer fee.
   c. Any remainder is subject to a 20% transfer fee.

3. You ARE eligible for the Benefit package in lieu of the $25,500 Land Assessment reimbursement, in which case if you sell your membership, the first $25,000 of the sales proceeds is free from transfer fee and any remainder is subject to a 20% transfer fee.

4. You may resign and relinquish your rights at any time. In that instance, <u>you no longer would be eligible for the reimbursement of the Land Assessment.</u> Acceptance of the benefit package now would allow you and your family to enjoy those benefits while you remain a member of the Club.

**IF YOU ARE A REGULAR PROPRIETARY MEMBER:**

1. You may sell your membership only by putting it on the Club's sale list. When it sells, you receive reimbursement of the $25,500 Land Assessment first and any remainder will be subject to a 25% transfer fee for members who joined before October 1998 or 40% for members who joined during or after October 1998.

2. You ARE eligible for the Benefit package in lieu of the $25,500 Land Assessment reimbursement, in which case if you sell your membership the sale is subject to the transfer fee described above.

Exhibit ____1____
Page ____75____

3.  You may resign and relinquish all rights at any time. In that instance, <u>you no longer would be eligible for the reimbursement of the Land Assessment.</u> Acceptance of the benefit package now would allow you and your family to enjoy those benefits while you remain a member of the Club.

**EMERITUS MEMBERS:**

1.  You have relinquished your Proprietary membership and all rights to reimbursement thereunder in exchange for the benefits conferred upon an Emeritus member. There are Emeritus members with whom the Club "agreed" to reimburse the Land Assessment in the future. Those memberships have been tagged as treasury memberships and when sold, you will receive $25,500 assessment reimbursement, provided you keep the Club informed of your address. At the present rate of sales, that process could take 10+ years.

2.  You ARE eligible to accept the benefit package and release your future claim to the $25,500. In that event, you and your family will enjoy the benefits described as long as you remain an Emeritus Member.

3.  Going forward, the Board will adjust the terms of new Emeritus members to clarify that acceptance of the Emeritus status waives right to reimbursement of the Land Assessment.

Exhibit ____ 1
Page ____ 70

# EXHIBIT "10"

Exhibit ____
Page ____ 77



**IRONWOOD COUNTRY CLUB**

May 15, 2012

Dear Members,

The Board of Directors met again on May 7 – 8 to continue the discussions with respect to the topic of the Land Purchase Assessment (LPA). The purpose of this letter is to update you on these discussions and to provide you with our conclusions.

First, an apology is in order. It is clear to everyone on the Board that we have not done a good job of communicating the nature of the previous Board's decision regarding the repayment of the LPA or the basis for that decision, including how the Board arrived at their decision. This was a mistake and, for that, I apologize.

Next, I wish I had a good answer for why the documents issued by previous Boards, memos issued by our outside auditors, and comments made at a variety of meetings used so many different terms in discussing this issue. While it seems a popular subject among some members these days, there is no point in and nothing to be gained from looking back and criticizing and blaming former Boards. They were faced with challenging and difficult issues in very different and much better economic times. Honest, hard-working and well-intended people (your fellow members) did the best they could with the situations, options, information and projections they then had to serve the Club and guide it into a secure and successful future.

Above all, keep in mind: This is a member-owned and run Club. There is no greedy or self-serving villain. There is no corporate or government ownership entity to target. No deep pockets. When one talks of litigation, they are attacking their club and their community, their friends and their golfing pals, and their neighbors.

You may recall that at the Town Hall Meeting, I used the term 'caretakers' to describe my view of the role of the Board of Directors. By caretakers, I meant we are temporary or transitional. The institution, Ironwood Country Club; the stone and mortar holding our beautiful facilities together; the land containing our terrific golf courses; and our excellent staff that our General Manager has assembled, will all still be here when we, the Board, passes the baton to the next generation of Board members. We will move on, but the institution remains.

Therefore, our job is fairly simple to define: leave the place in better condition than it was when we took office. To address this charge within the context of the Land Purchase Assessment requires that we go back in time so that we explain why the Board of Directors decided to review the matter, what our review found and our conclusions. To help you get through all of this is going to entail a fair amount of detail and volume.

To assist in your review, several exhibits, each of which covers a different topic, were developed and are attached to this letter. I suggest that you read them in sequence.

Exhibit A – Why the Board looked into this matter
Exhibit B – What the documents say
Exhibit C – A loan attached to the Member's Membership
Exhibit D – Benefit Packages: revised and new
Exhibit E – How should resigned Members be treated
Exhibit F – Final Conclusions and Resolution

Also attached for your review is an appendix containing three items:

* Appendix A - The Statement of Information: Proposed Purchase of Leased Land and Proposed Assessment to Fund the Purchase.

* Appendix B – The ballot which was attached to the Statement of Information

* Appendix C – The letter issued by Roy Mullins (President, Board of Directors), on June 28, 1999.

The Club is in better shape now than it has been at any time since 2007. Our operational performance continues to exceed our budgets and previous years. Participation levels at our events and use of the Club's food and beverage services have been great. All departments are running at full-speed and our Staff continues to shine with outstanding service. Our continued challenge is building and sustaining a capital reserve fund and adding new members.

It is my hope that as you read this letter, you will be better informed and will continue to work with us in finding solutions that will require compromise, patience, creativity, and a desire to sustain our club as we know it into the future.

Sincerely,

Bob Manion
ICC Board President

## WHY THE BOARD LOOKED INTO THIS MATTER

After years of essentially being a back-burner issue, it became apparent to the Board in the spring of 2011 that a potential capital crisis, so long side-tracked, was now closing in quickly. A number of issues over which the Club had no control were now on a collision course:

❖ We were in the midst of a severe national/international financial crisis which significantly affected Membership sales and retention at private clubs. As a result, in November of 2009, your Board made the decision to drastically lower the Initiation Fee from $72,000, ultimately reaching $29,500, where it remains today and will likely remain in the foreseeable future. These moves, along with the development and marketing of creative membership programs, have allowed the club to bring our dues line up to a sustainable level. Since the accepted practice for financial management of country clubs like Ironwood is to run the day to day operations of the Club from dues and use Initiation Fees to fund the capital account to replace equipment and fixtures and fund long term improvements, our capital account has dwindled to an uncomfortably low level.

❖ Ironwood's situation is not unique. In order to attract new members, clubs nationwide are lowering their Initiation fees. Industry projections are that this will continue, even as the economy recovers.

❖ An increasing number of members who had contributed the $25.5k associated with the LPA would be retiring from the Club in the next few years and the return of their contributions would be timed with the sale (not resignation) of their membership.

❖ An increasing number of treasury memberships that would be sold over the next several years were "tagged" in such a way that when the club sold a treasury membership, it could be paying $25.5 to members who had resigned and surrendered all their rights of membership years earlier.

The financial model that we developed over the past two weeks clearly confirm earlier concerns that the net effect of the above facts is that the club will have insufficient funds to cover our ongoing capital needs for the future. In that event, the Board could be forced to request a member assessment or take on additional indebtedness from new bank loans.

## WHAT THE DOCUMENTS SAY

The Land Purchase Assessment of 1999 (the "LPA") has been called an assessment, a refundable assessment, an advance and a loan. A good deal of membership unrest centers around the fact that many of the associated documents indicate that the Land Purchase Assessment will be "treated as a loan" and it appears that the Board is unwilling to acknowledge this. The Board has concluded that the main issue is not whether the LPA is a Loan but rather what are its terms and conditions.

The pertinent documents describe the Land Purchase Assessment in several terms but it is clear that the members heard that the LPA would be treated as a loan. Absent a Loan Agreement and a Promissory Note outlining the terms and conditions of the loan, the board has focused on the terms and conditions outlined in the LPA documents.

The key terms and conditions for the repayment of the Land Purchase Agreement are outlined in three documents as follows:

1. Statement of Information, Proposed Purchase for Leased Land and Proposed Assessment to Fund the Purchase dated March 24, 1999. This document was approved by the membership effective April 17, 1999. (This Document is attached as Appendix A.) It contains the following terms:

   ❖ The Land Purchase Assessment will be treated as an advance.
   ❖ The Land Purchase Agreement will be accounted for as an obligation by the Club.
   ❖ When a member sells the Member's Membership, the Club shall be absolutely obligated to pay to the selling member the entire amount in that member's Land Purchase Account.
   ❖ The Club may elect to make payment of the Land Purchase Account in four equal annual installments without interest.
   ❖ The Club is not obligated to pay the Land Purchase Account before the sale of any Member's Membership.
   ❖ The Club may not charge a transfer fee with respect to payment of a Member's Land Purchase Account.

2. The ballot which was attached to the Statement of Information. (This document is attached as Appendix B.) It includes the following:

   ❖ It references the Statement of Information.
   ❖ The undersigned votes in favor (or against) the proposed purchase and the proposed assessment.

Exhibit          1
Page          81

3.  Letter from the President of the Board of Directors dated June 28, 1999. This Document was issued to announce an increase in the Initiation Fee and the Transfer Fee for new members as well as to clarify the payment process and the terms and conditions of the of the LPA. (This Document is attached as Appendix C.) It includes the following:

- ❖ The Land Purchase Assessment payments are being treated as an interest free loan.
- ❖ The repayment is to come from proceeds from the resale of the membership interest.
- ❖ The explanation addressed the process to follow when a member sells his/her membership after December 31, 1999.
- ❖ There will be no Club transfer fee applied to the amounts that represent the repayment of the assessment.
- ❖ Examples were provided based upon the new Initiation Fee of $75,000.

On November 3, 1999, the Board of Directors adopted a resolution containing the following:

- ❖ WHEREAS, the Board of Directors promised the proprietary members that if they approved the $25,500 Land Acquisition and Assessment, it would be treated as a loan and the entire amount paid on principal would be returned to them when they sold their Membership;...

- ❖ NOW THEREFORE, BE IT RESOLVED: That the $25,500 Land Purchase Assessment...shall be treated as a non-interest bearing loan to Ironwood Country Club by the Proprietary Members subject to such assessment. When those Memberships are sold, then the first $25,500 of the Initiation Fee, shall be refundable to the seller.

In about 2003, the Club began repaying the $25,500 to former Proprietary members who had resigned from the Club and ceased paying dues and other fees and whose membership, which had been tagged by the club for later sale as a treasury, was sold to a new member by the Club.

- ❖ There are no documents evidencing a Board discussion or authorization for this practice.

Exhibit _____ 1
Page _____ 82

Exhibit C
Page 1 of 1

## A LOAN ATTACHED TO THE MEMBER'S MEMBERSHIP

It is clear from the Land Purchase Assessment (LPA) documents mentioned above and attached as Appendix A and B that the repayment of the LPA is tied to the Members resale of his Membership and the LPA is not a loan that is separate from one's membership. It is clear from the examples in the President's Letter of June 28, 1999 that the repayment comes off the top of the sales proceeds of the membership sale without a transfer fee and that the balance of the resale proceeds goes to the member after the Club deducts the appropriate transfer fee. The example used in the documents is for a Charter Proprietary member as follows:

| | As Described June 28, 1999 letter | Current Calculation |
|---|---|---|
| ❖  Charter Proprietary Member: | | |
| ➤  Initiation Fee paid by New Member | $75,000 | $29,500 |
| ➤  Payment of the LPA to Certificate Holder | $25,500 | $25,500 |
| ➤  Balance | $49,500 | $ 4,000 |
| ➤  Transfer Fee (for Charter Proprietary Member) (20% of the amount over $25,000) | ($4,900) | -0- |
| ➤  Balance | $44,600 | $ 4,000 |
| ➤  Thus the Total amount to a selling Charter Proprietary Member including the payback of the LPA is..... | $70,100 | $29,500 |

❖  **Other Membership Categories:**
The same type of calculation is made for the other membership categories with differing transfer fees and is available for your review.

❖  **Prior repayments of the LPA**
It is important to note that all prior payments made to LPA Certificate holders (approximately 270 payments) have been made under the formula outlined in the LPA documents and as shown above and each payment and the terms of it were approved and accepted by each selling Member

❖  **Club does not benefit**
It is also important to note that under the calculations outlined in the LPA documents the Club receives little or no funds from the sale of a membership sold by a LPA Certificate holder.

Exhibit ___ 1
Page ___ 83

Exhibit D
Page 1 of 5

## BENEFIT PACKAGES

❖ **Explanation**

Given the previously explained terms and conditions attached to any repayment, the difference between (a) waiving one's rights to the Land Purchase Assessment (LPA) and (b) not waiving one's rights through the sale of the member's membership per the By-Law approved Sales List is not as large as one might expect. The Board's intent was, and is, to design a Benefit Package to help bridge this difference while at the same time allowing LPA Certificate holding members to enhance their membership now while they remain at the club rather than waiting the long period of time for one to sell his/her membership and gain repayment of the LPA.

❖ **Initial Efforts**

The Board's initial effort in designing such a benefit package (announced in January, 2012) that would encourage LPA Certificate holders to waive their rights to the repayment in favor of enhancing their current membership with specific benefits was excellent for some but lacking for others without family and friends close by.

❖ **Therefore, the Board has modified the Benefit Package as follows:**

➢ A dues reduction alternative has been provided for Charter Proprietary and Regular Proprietary Members with the one exception that this alternative is not available to LPA installment payment plan members who elect to waive their rights to funds paid to date and are relieved of future payments.

➢ Clarify that all TFS Members who paid the LPA are eligible for either of benefit packages

➢ Tennis Fitness Social (TFS) Members that paid the LPA and have converted to TFS are being given the one time right to a TFS benefit package

➢ Previous Charter members are offered to reinstate their golf membership in order to sell that membership and obtain repayment of the LPA.

➢ All of this is explained in much more detail in the benefit packages outlined on the following pages

❖ **Not for Everyone**

The Benefit Package is not designed for everyone and it is only an option. Some members are high on the sales list and may have a near term need to sell their membership. For those in that situation it may not make sense to waive your rights to the repayment of the LPA in favor of a Benefit Package.

❖ **The Big Picture**

As outlined previously, the Board's intent is to create a win-win-win situation whereby:

➢ Members that paid the LPA and intend to retain their memberships for several more years are adequately compensated for the difference between waiving and not waiving their rights to any repayment of the LPA.

➢ The Club relieves itself of future liabilities by incurring expenses and providing dues abatement now, thus strengthening its ability to weather an environment of reduced Regular Proprietary membership Initiation Fees which impact capital improvement funding.

➢ The overall community is stabilized by the resolution of an issue that will become greater as the members who paid the LPA retire and leave the club, thus stabilizing housing prices.

After extensive feedback, the Board has modified the benefits in order to deliver a package that will appeal to the majority of the members wishing to waive the repayment of the LPA.

Exhibit _____1_____
Page _____84_____

## GOLFING MEMBER BENEFIT PACKAGES
### (Including Regular, Charter and Emeritus Members)

The Board of Directors has amended the Benefit Package provided to Members that hold a Land Purchase Assessment Certificate in order to allow more golf members to avail themselves of the benefit of enhancing their membership while they remain at the club rather than waiting the long period of time for one's membership to sell and collect the repayment of the $25,500 LPA in the future. In exchange for waiving your rights to repayment of the land assessment, the Club now offers one of two Benefit Packages as follows:

### Package "A"

❖ Free golf, tennis and fitness guest fee access for Lineal Family Descendants for the life of your Charter Proprietary, Regular Proprietary or Emeritus membership. Lineal Family Descendants, for the purposes of this offer, are one's children and grandchildren, no matter what age, including your spouse's children if a combined family, but shall not include your or your spouse's brothers, sisters and other extended family members and their relatives. Access to the facilities shall be subject to Club By-Laws and Rules regulating the same.

❖ Ten (10) free golf Guest Fee passes per fiscal year for the life of your Charter Proprietary, Regular Proprietary or Emeritus membership. Guest passes shall be subject to the Club rules regarding guest access to the courses and shall not be transferable.

❖ Six (6) complimentary regular Sunday Brunch Passes per fiscal year for the life of your membership. Such passes shall not include alcoholic beverages or gratuity.

❖ A ten percent (10%) discount on non-sale priced items in the Golf or Fitness Shops.

### Package "B"

❖ An abatement of regular golfing member dues of one thousand dollars ($1,000.00) per fiscal year for the life of your Charter Proprietary, Regular Proprietary or Emeritus membership. Note: as stated in the "detail" section attached, this Package B shall not be available to those members under the LPA payment installment plan.

These two packages are offered as two independent alternatives. Members may choose one or the other but not both. Members who have accepted the previously offered Benefit Package shall have the opportunity, should they so desire, to change their previous choice (Package A) and select Package B.

### (See More Details Attached)

Exhibit _____1____
Page _____85____

### Golfing Member Benefit Packages

### Details

- ❖ For the purposes of this offer, the life of your Charter Proprietary, Regular Proprietary or Emeritus membership extends to your spouse if the membership is transferred to your spouse, but does not include your child, if the membership is passed to a child.

- ❖ For Emeritus members the Benefit Package is only available to those that have converted to this membership category prior to June 30, 2012.

- ❖ Please understand that the offer to accept one of the above Benefit Packages is completely voluntary and you may elect to decline the offer and be reimbursed the Land Purchase Assessment in full if and when you sell your membership though the Sales List procedure.

- ❖ Benefit Package B shall only be available for those members who paid the LPA in full. Those members under the LPA payment installment plan shall not be eligible for dues abatement.

- ❖ This offer will expire on December 31, 2012. If you accept the offer prior to that date you shall be entitled the benefits beginning with the new fiscal year, July 1, 2012.

- ❖ If you wish to accept Benefit Package B and have already prepaid your annual dues via credit card your credit card will be credited in the amount of $1,000.00.

Should you wish to accept this Benefit Package please call Josh Tanner, the Club's General Manager, at (760) 766-1090 in order to sign the necessary documents and get you set up in the Club's accounting system.

## TENNIS FITNESS SOCIAL MEMBER BENEFIT PACKAGES

The Board will allow current TFS members, who paid the Land Purchase Assessment (LPA) and resigned their prior Proprietary memberships and have or will have converted to TFS on or before December 31, 2012, the one-time opportunity to select one of the following three (3) Benefit Packages in lieu of any repayment of the LPA that may or may not accrue to a TFS member.

### Package "A"

❖ Free tennis and fitness guest fee access for Lineal Family Descendants for the life of your Tennis Fitness Social (TFS) membership. Lineal Family Descendants, for the purposes of this offer, are one's children and grandchildren, no matter what age, including your spouse's children if a combined family, but shall not include your or your spouse's brothers, sisters and other extended family members and their relatives. Access to the facilities shall be subject to Club By-Laws and Rules regulating the same.

❖ Six (6) complimentary regular Sunday Brunch Passes per fiscal year for the life of your TFS membership. Such passes shall not include alcoholic beverages or gratuity.

❖ A ten percent (10%) discount on non-sale priced items in the Pro or Fitness Shop.

### Package "B"

❖ An abatement of regular TFS member dues of one thousand dollars ($1,000.00) per fiscal year for the life of your TFS membership.

### Package "C"

❖ The Ability to Reinstate your membership status to the status that it was prior to converting to a TFS member, without a fee, effective November 1, 2012 and begin paying golf membership dues as of that date. This may be somewhat attractive to former Charter members that had the opportunity to sell one's membership as stated in the by-laws and receive the repayment of LPA per the terms of the LPA documents.

❖ Any TFS member that selects Package C, and then sells their membership, may then rejoin the Club as a TFS member by paying the Initiation Fees and dues then being offered to members joining the TFS category of membership.

These three packages are offered as three independent alternatives. Members may choose only one.

(See More Details Attached)

Exhibit D
Page 5 of 5

## Tennis Fitness Social Member Benefit Packages

### Details

❖ For the purposes of this offer, the life of your Tennis Fitness Social membership extends to your spouse if the membership is transferred to your spouse, but does not include your child, if the membership is passed to a child.

❖ Please understand that the offer to accept one of the above Benefit Packages is completely voluntary and you may elect to decline the offer.

❖ The Board of Directors of Ironwood Country Club has made the decision to end the practice of repaying the Land Purchase Assessment (LPA) to those that have resigned from the Club and forfeited their memberships. At the time of the LPA, the ability to transfer a proprietary golf membership to a Tennis Fitness Social (TFS) membership by giving up one's proprietary rights and enrolling in TFS without a TFS Initiation Fee was not contemplated. Since the current TFS members still hold a membership in the Club the Board has modified its new policy with respect to current TFS members.

❖ If you decline the offer the Board will take the position that you no longer hold a Proprietary membership to sell and are no longer eligible for repayment of the LPA.

❖ This offer will expire on December 31, 2012. If you accept the offer prior to that date you shall be entitled the benefits beginning with the new fiscal year, July 1, 2012.

❖ If you wish to accept Benefit Package B and have already prepaid your annual dues via credit card your credit card will be credited in the amount of $1,000.00

Should you wish to accept this Benefit Package please call Josh Tanner, the Club's General Manager, at (760) 766-1090 in order to sign the necessary documents and get you set up in the Club's accounting system.

Exhibit _____1_____
Page _____68_____

## HOW SHOULD RESIGNED MEMBERS BE TREATED

One of the key provisions of the Statement of Information, which is the governing document with respect to the LPA, is that repayment occurs when a proprietary member sells his membership. If a proprietary member resigns from the Club, that member's relationship with the Club is terminated and that proprietary member no longer has a membership to sell. The membership becomes a Treasury membership, owned by the Club. Please note that the statement "When I sell my membership" is materially different from "When my membership sells".

The Statement of Information's terms clearly provide that a proprietary member must sell his membership in order to be entitled to a return of the $25,500. As such, there was no reference to a Member surrendering and forfeiting his membership and the impact of a resignation does not appear to have been addressed or discussed or considered by the board at the time of the assessment. A resigned proprietary member would not qualify under the terms of the Statement of Information for a return of the $25,500. Notwithstanding, in the early 2000's several things changed and resigned proprietary members began surrendering their memberships and seeking to be repaid the $25,500 anyway. Three of these significant changes are:

- ❖ Sales of golf memberships began to decline;

- ❖ Initiation fees dropped;

- ❖ The length of time to sell a membership through the By-law approved sales list increased dramatically;

Given the lower value of a club membership, the length of time to sell that membership and the ability to resign and surrender it without further financial obligation to the Club, it appears that many members elected to voluntarily resign and surrender their rights of membership to the Club rather than continuing to pay dues and maintain any present or future membership right or interest.

Based on these and other facts, together with a lengthy review of board minutes back to 1999 and other documentation relating to the LPA, the Board authorized an independent legal review of the question of repayment to resigned members by a well-known and respected attorney specializing in private club legal matters. Following this research and much discussion, the Board concluded that repayment to resigned members was not required by the governing Statement of Information and that continuing the practice of repayment under such circumstances would be a breach of fiduciary duty that would put the Club in an untenable capital situation in the not too distant future. Moreover, the Board believes that a failure to deal with this issue now may preclude or impact future boards from acting to change the practice.

Exhibit _____ 1
Page _____ 89

The Board has spent an enormous amount of time on this issue over the last year and we have not made this decision lightly. We recognize that many members feel very strongly about the original LPA being a loan that would be repaid under any circumstance. Unfortunately, the facts that we have to work with do not support that conclusion. We believe that we have a fiduciary duty to all members, not just those who participated in the LPA, to exhibit best business practices and that a large part of that fiduciary duty is to insure the continued viability of the Club. By continuing to repay the LPA to a Member who surrendered his membership, whether it is called a loan or an assessment, when that repayment is not specifically required, undermines rather than insures the continued viability of the Club.

### CONCLUSIONS & RESOLUTION

As it has been stated, the Board of Directors has spent an extraordinary amount of time researching and analyzing all the documents related to the Land Purchase Assessment (LPA). We recognize the LPA report provided is lengthy, but we felt is necessary to provide this information to you.

Since the last Town Hall Meeting, we have met with a large number of Members in person and have received a significant amount of correspondence regarding the LPA. During these meetings and through correspondence many Members offered guidance and insight on a resolution which is fair to all Members. We believe the conclusions and resolutions offer the best of their recommendations.

Below is a summary of the Board conclusions and resolutions related to the Land Purchase Assessment (LPA) which is detailed in more specifics in the preceding exhibits:

❖ The Board approved a change in the ratio of Sales of Treasury Memberships as described in By-law 8.4. The change in rotation of Treasury Sales to Resale Proprietary Memberships will immediately change to 1 Treasury Sale to 1 Resale Proprietary Membership, from present 3 Treasury Sales to 1 Resale Proprietary Membership. This is intended to help those members who hold an LPA Certificate sell their membership in a timelier manner.

❖ The Board approved a modification to the "Benefit Package" for those who paid the LPA in full and wish to waive their rights to repayment of the LPA. The modifications include a provision for dues abatement (see Exhibit D).

❖ The Board unanimously approved and reaffirmed the change in practice of repaying the Land Purchase Assessment to members who have resigned their memberships and no longer have a membership to sell, all as stated in section 5 of the January 24, 2012 President's Letter. There is no basis in fact or law to repay resigned members.

Again, we hope the report provided is helpful in providing you how and why the Board came to its conclusion on this matter and the information you may need to make an informed decision as to whether waiving your rights to repayment of Land Purchase Assessment in favor of the modified Benefit Package is right for you.

Exhibit ____1
Page ____91

Appendix A

IRONWOOD COUNTRY CLUB

STATEMENT OF INFORMATION

PROPOSED PURCHASE OF LEASED LAND
and
PROPOSED ASSESSMENT TO FUND THE PURCHASE

March 24, 1999

The Proposed Purchase of Leased Lands

The following discussion is a summary of the important terms of the proposed Purchase and Sale Agreement ("Purchase Agreement") and is not a complete statement of all of the terms of the Purchase Agreement.   The terms of the proposed Purchase Agreement are subject to negotiation and may change.

Property

The property ("Property") that is the subject of the Purchase is land which comprises substantially all of the South Course, a major portion of North Course and substantially all of the practice range.

Purchase Price

The proposed purchase price is $14,000,000.00.

Conditions to the Purchase

Consummation of the Purchase is subject to the following conditions: (a) the District must comply with California Government Code Section 54222 regarding the offering of the Property to other agencies; (b) the Club must obtain approval from the Proprietary Members; (c) the Club must obtain financing for the purchase price; and (d) the Club must approve the condition of the title to the Property.

Additional Terms

- District will obtain a quitclaim from the Living Desert Reserve conveying all right, title and interest in its right to reversion for the portion of the south Course lying Easterly of the Wash if the preliminary title report shows that the reversion still exists.

- The legal description of the Property to be purchased will be adjusted so that the property line of the Property to be purchased will go to the Westerly side of Hole No. 15 North.

The Proposed Land Purchase Assessment

The Proposed Land Purchase Assessment has the following features:

189212
438772218003
H43204 4:22 PM

Exhibit _____1_____
Page _____92_____

1. The amount of the Land Purchase Assessment will be $35,500 for each Proprietary Member.

2. All or any part of the Land Purchase Assessment may be paid in cash when it is levied.

3. All or any part of the Land Purchase Assessment may be paid in installments. If the installment plan is elected by a Member, the installment plan will have the following features:

   a. The unpaid principal balance of the Land Purchase Assessment will bear interest at the interest rate being charged to the Club by Lender as described below which may change from time to time. Based on preliminary discussions with potential lenders, if the interest rate is 8%, the monthly payment under the installment plan will be $215 plus or minus approximately $8.00 per month for each ½ percentage point change in interest rates.

   b. Installments of principal and interest will be paid so as to amortize the unpaid principal amount of the Land Purchase Assessment and interest thereon in monthly installments over 20 years.

   c. The amount of the monthly installments will vary as the interest rate changes.

   d. Principal may be paid in advance at any time without penalty. Advance payment will not reduce the monthly payments.

4. The Land Purchase Assessment will be treated as an advance by each Member to the Club. A separate account (called a "Land Purchase Account") will be maintained for each Proprietary Member.

5. The principal amount of the Land Purchase Assessment paid in by each Member will be accounted for as an obligation by the Club to each Member. A Member's Land Purchase Account will be increased by the principal amount of each payment received by the Club under the installment plan (but will not be increased by the interest portion thereof).

6. When a Member sells the Member's Membership, the Club shall be absolutely obligated to pay to the Selling Member the entire amount then standing in the Member's Land Purchase Account. The Club may elect to make payment of the Land Purchase Account in not more than four equal annual installments without interest.

7. The Club is not obligated to pay the Land Purchase Account before the sale of any Member's Membership.

8. The Club may elect to repay all or portions of the Land Purchase Account from extraordinary sources such as from the sale of surplus lands. In such event, those

Exhibit 1
Page 93

Members who paid their Land Purchase Assessments in cash up front will receive cash. Those Members who elected the installment plan will have their unpaid balances credited against the last installments to become due.

9. The Club may not charge a transfer fee with respect to payment of a Member's Land Purchase Account.

10. New Members who purchase Memberships after the imposition of the Land Purchase Assessment will have the following obligations:

    a. In addition to the Initiation Fee, New Members, upon admission, will be required to pay an amount equal to the principal amount which would have built up in a hypothetical member's Land Purchase Account if the hypothetical member elected to amortize the Land Purchase Assessment over the 20-year installment plan. The New Member would receive credit in the new Member's Land Purchase Account equal to that payment.

    b. The New Member would be obligated to pay the remaining unamortized portion of the Land Purchase Assessment which would be payable by a hypothetical member who elected the fully amortizing installment plan. The New Member would receive credit in the new Member's Land Purchase Account equal to the principal portions of such payments. New Members may also elect to pay principal in advance.

    c. For instance, if a New Member purchases a Membership three years after the Land Purchase Assessment goes into effect, in addition to the Initiation Fee, the New Member would pay to the Club an amount equal to the principal paydown under a fully amortizing 20 year loan ($1,756) and would assume an obligation to pay the balance over 17 years ($23,744) payable at approximately $215 per month assuming an 8% interest rate).

11. Approximately one month before the expected close of escrow, Members will be billed for the Land Purchase Assessment. Those Members who wish to pay in cash will deposit their payments in a special account with the Escrow Holder. If the purchase is completed, the deposited amounts will be used in the closing (thereby reducing the amounts to be borrowed under the Loan described below). If the purchase is not completed, the deposited amounts will be returned.

## Potential Loans

Since the purchase of the Land is for cash and since many Members will probably opt for an installment plan, the Club will no doubt have to finance a large part of the purchase price through a loan obtained from a bank or other lending institution.

Several banks have expressed a willingness to lend the Club up to the full purchase price under varying arrangements and terms. The best arrangement thus far is a 20-year fully amortizing loan for which the interest rate at this writing would be in the 8% to 8.5% range. The interest rate will depend upon interest rates in effect at the time of closing the loan which may be several months from now. A key factor is that the loan would be

8

prepayable without penalty. The interest rate would be set for five years and would reset every five years thereafter.

Potential lenders will require a favorable vote of the members to purchase; an appraisal, an environmental report and representation by our attorneys that all necessary legal steps have been taken to be in a position to close.

Potential lenders have expressed willingness to loan directly to members seeking to get a tax deduction for the interest cost through use of home mortgage or home equity financing. In that case the member could borrow the amount of the Assessment ($25,000) pay it into the special account, and arrange a repayment plan with the bank that is mutually satisfactory.

### Surplus Land

Approximately 50 acres Westerly of Holes 16 and 17 South Course are surplus land. It is possible that, following the purchase, the Club will be able to realize value from the 50 acres. However, any such plan and the use of proceeds from such plan will require numerous decisions by future Boards of Directors and will also require consent of the membership as then constituted.

### Insurance Coverage

Questions have been raised at the informative sessions regarding insurance coverage for actions taken or not taken by the Club and its officers, directors and employees. An insurance policy has been issued insuring the Club and its officers, directors and employees against loss arising out of Wrongful Acts. The policy contains provisions which prohibit the Club, itself, from attempting to collect on the policy or from prejudicing defenses of the insurance company against claims made under the policy.

If claims are made under the policy or if litigation is commenced against the Club or former or present officers, directors or employees, the claims or litigation will have to be reported to the Lender.

It is probable that Lenders will decline to make the loan to the Club if such claims are made or litigation is commenced.

### Indemnity

Section 7 of Article XI of the By-Laws of the Club require the Club to indemnify present and former officers, directors and employees of the Club from expenses, judgments, fines and other obligations arising out of lawsuits (whether or not the Club is named as a party defendant) incurred while such officer, director or employee was acting on behalf of the Club if the Board determines that the officer, director or employee was acting "...in good faith within what such person reasonably believed to be the scope of such person's authority and for a purpose which such person reasonably believed to be in the best interests of the Club or its members."

4.

Exhibit 1
Page 95

### Recommendation

The Board of Directors of the Club has unanimously determined that the Purchase of the Property and proposed Assessment is in the best interests of the Club and its Proprietary Members. The Board unanimously recommends that the Proprietary Members vote "Yes" to approve the purchase and the Assessment.

Exhibit ___1___
Page ___96___

Appendix B

[Please complete the Ballot per the instructions set forth below and return the Ballot in the enclosed self-addressed envelope so that the Club will receive it on or before

2:00 PM on April 17, 1999.

You may fax your completed Ballot to the Club at 760/772-4855 and forward a completed hard copy by mail in the enclosed envelope.]

BALLOT

The undersigned is a Proprietary Member of Ironwood Country Club.   The undersigned acknowledges receipt of the Statement of Information dated March 24, 1999 describing the proposed purchase of portions of the golf course leased from Coachella Valley Water District and the proposed Assessment to fund the cost of such purchase in the amount of $25,500 for each Proprietary Member under the terms as more fully described in the Statement of Information.

The undersigned votes as follows:

[ ]     YES.  The undersigned votes in favor of the proposed purchase and the proposed Assessment.

[ ]     NO.  The undersigned votes against the proposed purchase and the proposed Assessment.

[Please check one block.  If you check neither block, this ballot will be voted "Yes", in favor of the proposed purchase and the proposed assessment.]

Signature: _____

Print Name: _____

Member No: _____

Date: _____

Please sign your name exactly as it appears on your membership certificate.   Executors, administrators, trustees and other fiduciaries should state their full title.

6

Exhibit ____ 1
Page ____ 97

Appendix C



**IRONWOOD COUNTRY CLUB**

June 28, 1999

Dear Proprietary Member:

In my recent letter to you dated June 9, 1999, I reported that the Board had voted to increase the Initiation fee to $75,000, effective January 1, 2000 with a transfer fee of 40%. In order to avoid possible confusion, Treasurer John Bama and Membership Chairman Dave Milner have composed the following clarification. This explanation addresses the new Initiation fee that will be applied to those who are members prior to December 31, 1999 and have paid or are paying the assessment for the land acquisition, if they were to sell their membership after December 31, 1999.

Now, please get some refreshment, sit down, get comfortable and read very slowly. This is not too difficult if you don't get too far ahead of us. As we have indicated in our prior correspondence on the subject, the assessment amounts paid to the Club are being treated as an interest free loan from the member with repayment to come from proceeds from the resale of the membership. There will be no transfer fee applied to amounts that represent repayment of the assessment.

On the Initiation fee of $75,000, the first $25,500 will be applied toward the assessment. If the member has paid the assessment in full, $25,500 will be returned to the member. If the member is participating in servicing the bank loan to the Club, the amount that has been credited to principal reduction at the time of sale will be returned to the member. The difference between the amount paid by the member toward principal reduction and the amount borrowed per member participating in the bank financing will be paid to the bank as prepayment on the loan. Because of loan closing costs, this amount may exceed the $25,500 amount by a few hundred dollars.

Assuming we are still together, the transfer fee applicable to the membership being sold will be applied to the amount remaining after handling the assessment amount described in the preceding paragraphs. For example, a $75,000 initiation fee with $25,500 applied to, repaying a member who paid the assessment in full would leave $49,500 subject to transfer fee. Example: For a Charter Proprietary member, the transfer would be $4,900 (20% of the amount in excess of $25,000) leaving the selling member with $44,600 in addition to the return of the amount paid toward the assessment. The transfer fee for a Proprietary member subject to 25% transfer fee, would be $12, 375 and for memberships subject to a 40% transfer fee the amount would be $19,800.

We trust that you now have a clear understanding of the subject at hand. In the off chance that you may have questions, please call John or Dave. Thank you.

Sincerely yours,

Roy E. Mullins
President
Board of Directors

cc:    Nonproprietary members

Exhibit ___1___
Page ___58___

# EXHIBIT "11"

Exhibit _____
Page _____ 99

  

**IRONWOOD**
COUNTRY CLUB

June 7, 2012

Dear Past Member,

This letter is being sent to you as a previous Club Member who paid the Club's 1999 Land Purchase Assessment (LPA) in the sum of $25,500 and thereafter resigned and terminated your relationship with the Club. As you may know, last year's Board of Directors spent a lot of time on the question of whether the Club should be paying the LPA to members who terminate their membership.

Our review and analysis has revealed a mistaken belief, that began in about 2003, which led to a Club practice of repaying the $25,500 Land Assessment to members who resigned from the Club, stopped paying dues, and forfeited their memberships, rather than selling the memberships through the procedures set up by the Club.

After substantial due diligence, including consultation with past Presidents, our auditor and Counsel, this Board has concluded that the practice of repaying the Land Assessment to forfeiting members, when their forfeited membership is subsequently sold by the Club as a Treasury membership, must cease effectively immediately.

I do not have an answer for why the documents issued by previous Boards, memos from our outside auditors and comments made at a variety of meetings used so many different terms in discussing this issue. I think there is no point in and nothing to be gained from looking back and criticizing former Boards. They did the best they could, with the situations, options, information and projections they then had, to serve the Club and guide it into a secure and successful future.

Each of you were members of the Club at varying times and some of you were most likely here when economic times were good and sales of new memberships were not an issue. Some of you will remember when the Club raised the Initiation Fee to $72,000 and there was speculation that it was on the way to $100,000. Clearly, this is not the situation that the Club finds itself in today. The Initiation Fee is currently set at $29,500 and new membership sales are not easy to get. The Board also recognized that a number of issues over which the Club had no control were now converging.

> ➤ We were in the midst of a severe national/international financial crisis which significantly affected Membership sales and retention at private clubs. As a result, in November of 2009, the Board of Directors made the decision to drastically lower the Initiation Fee, ultimately to $29,500 as noted above, and it will likely remain at that level for the foreseeable future. Those moves, along with the development and marketing of creative membership programs, have allowed the Club to bring its dues revenue up to a sustainable level. Since the accepted practice for financial management of country clubs like Ironwood is to run the day to day operations of

Exhibit ___1___
Page ___100___

the Club from dues and use Initiation Fees to fund the capital account to replace equipment and fixtures.

➢ Ironwood's situation is not unique. In order to attract new members, clubs nationwide are lowering their initiation fees. Industry projections are that this will continue, even as the economy recovers.

➢ An increasing number of members who had contributed the $25.5k associated with the LPA would be retiring from the Club in the next few years and the return of their contributions would be timed with the sale (not the resignation) of their membership.

➢ An increasing number of treasury memberships that would be sold over the next several years were "tagged" in such a way that when the club sold a treasury membership, it could be paying $25.5k to members who had resigned and surrendered all rights of membership years earlier.

The LPA has been called an assessment, a refundable assessment, an advance and a loan. I understand you may have concerns that the Club is "reneging" on (what several documents' state) the LPA being "treated as a loan." So, the Board set out to understand this situation and concluded that the main issue is not whether the LPA is a loan, but rather <u>what its terms and conditions are</u>.

The LPA documents are the Statement of Information, ballot and letter from the President of the Board of Directors dated June 28, 1999.

Statement of Information, Proposed Purchase for Leased Land and Proposed Assessment to Fund the Purchase dated March 24, 1999. This document was approved by the membership effective April 17, 1999. (This Document is attached as Appendix A.) It contains the following terms:

➢ The Land Purchase Assessment will be treated as an advance.

➢ The Land Purchase Agreement will be accounted for as an obligation by the Club.

➢ When a member sells the Member's Membership, the Club shall be absolutely obligated to pay to the selling member the entire amount in that member's Land Purchase Account.

➢ The Club may elect to make payment of the Land Purchase Account in four equal annual installments without interest.

➢ The Club is not obligated to pay the Land Purchase Account before the sale of any Member's Membership.

➢ The Club may not charge a transfer fee with respect to payment of a Member's Land Purchase Account.

The ballot which was attached to the Statement of Information. (This document is attached as Appendix B) It includes the following:

Exhibit _____ 1
Page _____ 101

- ➢ It references the Statement of Information.

- ➢ The undersigned votes in favor (or against) the proposed purchase and the proposed assessment.

Letter from the President of the Board of Directors dated June 28, 1999. This Document was issued to announce an increase in the Initiation Fee and the Transfer Fee for new members as well as to clarify the payment process and the terms and conditions of the LPA. (This Document is attached as Appendix C.) It includes the Following:

- ➢ The Land Purchase Assessment payments are being treated as an interest free loan.

- ➢ The repayment is to come from proceeds from the resale of the membership interest.

- ➢ The explanation addressed the process to follow when a member sells his/her membership after December 31, 1999.

- ➢ There will be no Club transfer fee applied to the amounts that represent the repayment of the assessment.

- ➢ Examples were provided based upon the new Initiation Fee of $75,000.

On November 3, 1999, the Board of Directors adopted a resolution containing the following:

- ➢ WHEREAS, the Board of Directors promised the proprietary members that if they approved the $25,500 Land Acquisition and Assessment, it would be treated as a loan and the entire amount paid on principal would be returned to them when they sold their Membership;....

- ➢ NOW THEREFORE, BE IT RESOLVED: That the $25,500 Land Purchase Assessment...shall be treated as a non-interest bearing loan to Ironwood Country Club by the Proprietary Members subject to such assessment.   When those Memberships are sold, then the first $25,500 of the initiation fee...shall be refundable to the seller.

In about 2003, the Club began repaying the $25,500 to former Proprietary members who had resigned from the Club and ceased paying dues and other fees and whose membership, which had been tagged by the club for later sale as a treasury, was sold to a new member by the Club.

- ➢ There are no documents evidencing a Board discussion of or authorization for this practice.

As I indicated at the beginning of this letter, the Club has now ceased the above practice.  When a Member resigns and forfeits his membership and all current and future obligations to the Club, the membership becomes a Treasury Membership owned by the Club. The membership becomes the sole property of the Club.  A forfeiting member (one who has resigned and stopped paying dues) whose forfeited membership is subsequently sold by the Club as a Treasury membership may, if circumstances warrant it, seek repayment of the assessment and have that request considered on an individual basis.

Exhibit    1
Page    102

*******************************************************************

Based on these and other facts, together with a lengthy review of board minutes back to 1999 and other documentation relating to the LPA, the Board authorized an independent legal review of the question of repayment to resigned members by a well-known and respected attorney specializing in private club matters. Following this research and much discussion, the Board concluded that repayment to resigned members was not required by the governing Statement of Information and that continuing the practice of repayment under such circumstances would be a breach of its fiduciary duty to the Club.  We recognize that you may feel very strongly about the original LPA being a loan that would be repaid under any circumstance. Unfortunately, the facts that we have to work with do not support that conclusion. By continuing to repay the LPA to a Member who surrendered his membership, whether it is called a loan or an assessment, when that repayment is not specifically required, undermines rather than insures the continued viability of the Club. I hope your time as a Member was enjoyable and fulfilling and that you understand and appreciate the situation in which the Club finds itself.


Sincerely,

Robert C. Manion

**Bob Manion**
**ICC Board President**

EXHIBIT ___1___
Page ___103___

# EXHIBIT "12"

Exhibit ___1___
Page ___104___

Subject: Pam Carlson's note to Ironwood Board

From:

To:

Cc:

Date:

-----Original Message-----

**From:**
PAMELA C CARLSON <pam_carlson@mac.com>
**Subject: $25,500 loan repayment policy decision**
**Date:**
February 21, 2012 7:27:13 AM PST
**To:**
bod@ironwoodcountryclub.com, Joshua Tanner <jtanner@ironwoodcountryclub.com>
**Cc:**
Don Carlin <doncarlin@aol.com>, Roy Mullins <ZCHEEF@GMAIL.COM>, Ron Doll <rondoll@earthlink.net>, John Godfrey <jgodfrey@dc.rr.com>, Don Black <dkblk1@dc.rr.com>, Richard Turner <rturner@eisenhowerlaw.com>, Rob Reifschneider <rob@lovetheview.com>
**Bcc:**
Rick & Pam Carlson <golfer824@yahoo.com>, PAM CARLSON <pam_carlson@mac.com>

I believe the letter written on January 24, 2012 gave the impression that all of the past presidents of the club were supportive of the new policy adopted by the Board regarding the $25,500 loan to the Club. I for one was informed of the change only days before the letter was sent and clearly after the decision had been made. I told Ken I was troubled by the decision of the Board during our phone call. I also advised him that my recollection was that the loan documents were so poorly written it was highly likely a lawsuit would result if the repayment policy was changed in the manner he described.

If I had been consulted about the proposal earlier, I would have argued against it's adoption. There is now a perception among most members that not only were past

Exhibit 1
Page 105

practices in error, but that the past presidents agree with that conclusion and approve of the new policy. I personally don't believe our practices were in error; I don't support the new policy and I would like the Board to either reconsider their actions or send a letter to the members explaining that all the past presidents are not in agreement with the Board's decision.

In my opinion, it would be in the best interest of the Club to reconsider the repayment policy as adopted. There are tremendous divisions developing over this issue and I believe it is an entirely avoidable situation. Ironwood has suffered through the years over divisions like this. This one is self inflicted and should be corrected quickly before more damage is done.

I commend your action in offering the current members something of value in return for forgiveness of the loan. My only suggestion there is that an alternative to the current offer be made for members who see no value in guest passes or dining.

I am only in disagreement with you over the decision to take away an asset of value from the members who leave the club and whose memberships are held by the Club for resale. In particular, I don't know how you can take away an asset from the 100 or so members who have already left the club when they had the clear understanding they would receive the $25,500 upon eventual resale of their membership.

Because of the economic environment and the change in market conditions, the regular proprietary members will never be able to sell their memberships on a timely basis through the club. They not only have to walk away from any equity they might have in their membership, but also a $25,500 asset that was clearly loaned to the Club during a time of severe distress.

That to me is morally wrong and not in the spirit of the transaction when it was initially contemplated and explained to the membership.

Pam Carlson
Board of Directors President 2003 - 2005

# EXHIBIT "13"

Exhibit _____ 1
Page _____ 107



# IRONWOOD
## COUNTRY CLUB

## BY LAWS

B-1

Exhibit ____ 1
Page ____ 108

# BY LAWS OF IRONWOOD COUNTRY CLUB

## TABLE OF CONTENTS

ARTICLE 1 ORGANIZATION ............................................................. B-6
1.1 NAME AND PURPOSE ............................................................. B-6
1.2 PLACE OF BUSINESS ............................................................. B-6
1.3 MEMBERSHIP ACCEPTANCE OF BY-LAWS AND RULES ...... B-6
1.4 PURCHASE FROM SILVER SPUR ............................................. B-6
1.5 PERSONAL PROPERTY OF MEMBERS AND GUESTS .............. B-7

ARTICLE 2 MEMBERSHIP CLASSIFICATIONS .................................. B-7
2.1 PROPRIETARY MEMBERSHIP ................................................. B-7
2.2 CHARTER PROPRIETARY MEMBERSHIP ................................. B-7
2.3 TRUST PROPRIETARY MEMBERSHIP ...................................... B-7
2.4 TENNIS/FITNESS/SOCIAL MEMBERSHIP ................................ B-8
2.5 TENNIS/SOCIAL MEMBERSHIP ................................................ B-8
2.6 DINING/SOCIAL MEMBERSHIP ................................................ B-8
2.7 NON-PROPRIETARY MEMBER ................................................ B-8
2.8 HONORARY MEMBERSHIP ...................................................... B-8
2.9 EMERITUS MEMBERSHIP ........................................................ B-9
2.10 MEMBERSHIP LIMITATION .................................................... B-10
2.11 OTHER CLASSES OF MEMBERSHIP ....................................... B-10
2.12 INTERMEDIATE MEMBERS .................................................... B-10
2.13 MEMBERSHIP CERTIFICATES ................................................ B-11
2.14 DEFINITION OF "FAMILY" ...................................................... B-11

ARTICLE 3 ADMISSION OF MEMBERS ............................................. B-11
3.1 OPEN MEMBERSHIP .............................................................. B-11
3.2 MEMBERSHIP APPLICATIONS .............................................. B-11
3.3 POSTING ................................................................................. B-11
3.4 OBJECTIONS ........................................................................... B-11
3.5 APPROVAL .............................................................................. B-11

ARTICLE 4 SUSPENSION, EXPULSION AND TERMINATION ............ B-12
4.1 GROUNDS FOR SUSPENSION OR EXPULSION ..................... B-12
4.2 NOTICE AND RIGHT TO BE HEARD ....................................... B-12
4.3 SUSPENSION .......................................................................... B-12
4.4 ENFORCEMENT ...................................................................... B-12
4.5 REINSTATEMENT ................................................................... B-13
4.6 EXPULSION ............................................................................ B-13
4.7 RESIGNATION ........................................................................ B-13
4.8 DEATH .................................................................................... B-14
4.9 LIABILITY ............................................................................... B-14

ARTICLE 5 INITIATION FEES AND DUES ........................................ B-15
5.1 INITIATION FEE ..................................................................... B-15
5.2 DUES ...................................................................................... B-15



ARTICLE 6 ASSESSMENTS .............................................................. B-15
6.1 LIABILITY FOR ASSESSMENTS ............................................. B-15
6.2 PROCEDURE FOR ASSESSMENT ........................................... B-15
6.3 VOTING PROCEDURE ............................................................ B-15

ARTICLE 7 TRANSFER AND SALE OF MEMBERSHIPS ................... B-16
7.1 TRANSFER FEE ...................................................................... B-16
7.2 TRANSFER OF PROPRIETARY MEMBERSHIP TO CERTAIN FAMILY MEMBERS ........................................................... B-16
7.3 SALE OF PROPRIETARY MEMBERSHIPS ............................... B-16
7.4 SALE OF TREASURY MEMBERSHIPS ..................................... B-16
7.5 MEMBERSHIP SALE PROCESS ............................................... B-16
7.6 SALE OF CHARTER PROPRIETARY MEMBERSHIP .............. B-17
7.7 ALLOCATION AND DISTRIBUTION OF INITIATION FEES ... B-17

ARTICLE 8 CONVERSION PRIVILEGES ........................................... B-18
8.1 CONVERSION OF A NON-PROPRIETARY MEMBERSHIP TO A PROPRIETARY MEMBERSHIP ............................................... B-18

ARTICLE 9 CHANGE OF MARITAL STATUS OF A MEMBER BY DIVORCE, ANNULMENT OR MARRIAGE ........................................ B-18
9.1 DESIGNATED OWNER OF CLUB MEMBERSHIP ................... B-18
9.2 NOTICE OF CHANGE IN MARITAL STATUS ......................... B-18

ARTICLE 10 VOTING RIGHTS, ELECTIONS & VOTING PROCEDURES ... B-18
10.1 VOTING PRIVILEGES .......................................................... B-18
10.2 INSPECTORS ....................................................................... B-19
10.3 BALLOT RETURN DATE ..................................................... B-19
10.4 BALLOT ENVELOPES ......................................................... B-19
10.5 BALLOT COUNT AND CERTIFICATION OF ELECTION ...... B-19
10.6 INSPECTION OF THE BALLOTS .......................................... B-19

ARTICLE 11 VOTE BY WRITTEN BALLOT ...................................... B-20
11.1 ........................................................................................... B-20

ARTICLE 12 MEETINGS OF THE MEMBERSHIP .............................. B-20
12.1 ANNUAL MEMBERSHIP MEETING ..................................... B-20
12.2 SPECIAL MEETINGS ........................................................... B-20
12.3 NOTICE OF MEETINGS ....................................................... B-20
12.4 QUORUM .............................................................................. B-20
12.5 PROXIES .............................................................................. B-20
12.6 APPROVAL OF ACTION TAKEN .......................................... B-21
12.7 ROBERTS RULES OF ORDER .............................................. B-21
12.8 LOCATION OF MEETINGS ................................................... B-21
12.9 MINUTES .............................................................................. B-21

Exhibit 1
Page 109

ARTICLE 13  BOARD OF DIRECTORS ....................................................................... B-21
13.1  COMPOSITION ................................................................................................... B-21
13.2  FUNCTION AND AUTHORITY ......................................................................... B-21
13.3  TERM OF OFFICE ............................................................................................. B-21
13.4  VACANCY DURING THE TERM OF A DIRECTOR ........................................ B-22
13.5  COMPENSATION ............................................................................................... B-22
13.6  REMOVAL OF DIRECTORS ............................................................................. B-22

ARTICLE 14  NOMINATION AND ELECTION OF DIRECTORS ................................ B-22
14.1  NOMINATING COMMITTEE ............................................................................ B-22
14.2  NOMINATION OF THE REGULAR TICKET .................................................... B-22
14.3  NOMINATION BY PETITION ........................................................................... B-23
14.4  VOTING PROCEDURE ...................................................................................... B-23

ARTICLE 15  MEETINGS OF THE BOARD ................................................................. B-23
15.1  ORGANIZATIONAL MEETING ........................................................................ B-23
15.2  OTHER MEETINGS ........................................................................................... B-23
15.3  NOTICES ............................................................................................................ B-24
15.4  QUORUM OF THE BOARD ............................................................................... B-24
15.5  ACTION OF THE BOARD .................................................................................. B-24
15.6  ACTION BY UNANIMOUS WRITTEN CONSENT .......................................... B-24

ARTICLE 16  COMMITTEES ........................................................................................ B-24
16.1  STANDING COMMITTEES AND DUTIES ........................................................ B-24
16.2  APPOINTMENT OF COMMITTEE CHAIRS ..................................................... B-26
16.3  APPOINTMENT OF COMMITTEE MEMBERS ................................................ B-26
16.4  MINUTES ........................................................................................................... B-27

ARTICLE 17  OFFICERS OF THE CLUB ..................................................................... B-27
17.1  OFFICERS .......................................................................................................... B-27
17.2  ELECTION .......................................................................................................... B-27
17.3  DUTIES OF THE OFFICERS ............................................................................. B-27
17.4  VACANCIES OF OFFICERS ............................................................................. B-28
17.5  ADDITIONAL DUTIES ...................................................................................... B-28
17.6  COMPENSATION ............................................................................................... B-28
17.7  THE GENERAL MANAGER ............................................................................. B-28
17.8  MANAGEMENT REVIEW ................................................................................. B-28

ARTICLE 18  FINANCIAL ............................................................................................ B-29
18.1  ADOPTION OF THE ANNUAL CAPITAL EXPENDITURES BUDGET ........... B-29
18.2  CAPITAL EXPENDITURES ............................................................................... B-29

ARTICLE 19  DISSOLUTION, LIQUIDATION OR SALE OF ASSETS ......................... B-29
19.1  AUTHORITY TO DISSOLVE, LIQUIDATE OR SELL ASSETS ...................... B-29
19.2  RIGHTS OF MEMBERS TO PROCEEDS FROM A SALE OF CLUB ASSETS ................................................................................................................ B-29

ARTICLE 20  INSPECTION OF RECORDS ................................................................. B-30

ARTICLE 21  AMENDMENTS TO THE BY-LAWS ...................................................... B-30
21.1  BOARD OF DIRECTORS ACTION .................................................................... B-30
21.2  BOARD APPROVAL OF PROPOSED AMENDMENTS .................................... B-30

ARTICLE 22  INDEMNIFICATION OF DIRECTORS, OFFICERS, COMMITTEE MEMBERS, VOLUNTEERS AND EMPLOYEES .......... B-30
22.1  INDEMNITY IN AN ACTION OR PROCEEDING OTHER THAN BY OR IN THE RIGHT OF THE CLUB ................................. B-30
22.2  INDEMNITY IN ACTION OR PROCEEDING BY OR IN THE RIGHT OF THE CLUB ................................................................ B-30
22.3  INDEMNITY INAPPLICABLE ........................................................................... B-31
22.4  INDEMNITY WHERE SUCCESSFUL ON THE MERITS ................................. B-32
22.5  INDEMNITY IN A SPECIFIC CASE .................................................................. B-32
22.6  ADVANCE PAYMENT OF EXPENSES .............................................................. B-32
22.7  INDEMNITY NOT EXCLUSIVE ....................................................................... B-32
22.8  LIMITATION ON INDEMNITY ......................................................................... B-33

ARTICLE 23  FISCAL YEAR ........................................................................................ B-33
ARTICLE 24  CONSTRUCTION .................................................................................... B-33
ARTICLE 25  NOTICES ................................................................................................. B-33
ARTICLE 26  TEMPORARY AUTHORITY TO NUMBER THE BY-LAWS ................. B-34

Exhibit _____
Page _____

# Amended and Completely Restated
# BY-LAWS OF IRONWOOD COUNTRY CLUB

## ARTICLE 1
## ORGANIZATION

### 1.1   NAME AND PURPOSE

Ironwood Country Club (Club) is incorporated as a nonprofit mutual benefit corporation under the laws of the State of California.

The Club is organized primarily for social and recreational purposes, providing golf, tennis and other activities and facilities for its members. The Club shall have authority to engage in all activities within the limitations imposed in these By-laws and the California Corporation Code (Code).

### 1.2   PLACE OF BUSINESS

The administrative offices of the Club are located at 73-735 Irontree Drive, Palm Desert, California 92260.

### 1.3   MEMBERSHIP ACCEPTANCE OF BY-LAWS AND RULES

Members of the Club accept and agree to be bound by the terms of these By-laws and all Rules adopted and promulgated by the Board of Directors (Board) of the Club.

### 1.4   PURCHASE FROM SILVER SPUR

The initial equity memberships in the present Club were purchased by the Charter Proprietary Members prior to May 1, 1989, and on August 31, 1989 (the "Date of Purchase"), the Club purchased (the "Purchase") from Silver Spur Associates ("Silver Spur"), certain of the assets and assumed certain of the liabilities comprising the facility then known as Ironwood Country Club. On the Date of Purchase, the Club was changed to Ironwood Country Club. Subsequently, the name of the Club was changed to Ironwood Country Club. The "Silver Spur By-laws" are the Membership By-laws of Ironwood Country Club adopted and issued as of October 1, 1984 by the Board of Governors of Silver Spur. All Members governed by the Silver Spur By-laws were given the opportunity to purchase Proprietary Memberships in these By-laws. "Silver Spur Lifetime Members" shall mean those persons who chose not to purchase use of Club facilities pursuant to the documents (the "Purchase Documents") executed by the Club in connection with the Purchase. The Club shall honor the rights, preferences and privileges of Silver Spur Lifetime Members (sometimes also referred to as "Non-Proprietary Golf Members" in these By-laws) as set forth in the Silver Spur By-laws to the extent that the Club is obligated to do so pursuant to the Purchase Documents. All Non-Proprietary Golf Members accepted into membership on or after April 4, 2000 shall not be governed by the foregoing provisions but shall be governed by the provisions of these By-Laws, as amended.

### 1.5 PERSONAL PROPERTY OF MEMBERS AND GUESTS

The Club shall not be responsible for personal property of members, family of members, visitors, guests or other persons brought into the Club for any purpose whatsoever.

## ARTICLE 2
## MEMBERSHIP CLASSIFICATIONS

### 2.1   PROPRIETARY MEMBERSHIP

Each owner of a Proprietary Membership shall be referred to as a Proprietary Member. A Proprietary Member and the family of each Proprietary Member shall be entitled to use all Club facilities. Proprietary Members are the equitable owners of the assets of the Club, including but not limited to real and personal property owned by the Club, and are entitled to share equally in the proceeds from sale of those assets in the event of a liquidation or dissolution of the Club. Each Proprietary Member has one vote in the affairs of the Club upon which members are entitled to vote. No other class of membership shall have a vote in the affairs of the Club, or hold office, or have ownership interest in the Club or its assets.

Proprietary Members shall have the right to hold office. Proprietary Members and their spouses may attend membership meetings and shall have the right to serve on Committees of the Club regardless of which spouse is designated as owner of the Proprietary Membership.

### 2.2   CHARTER PROPRIETARY MEMBERSHIP

Charter Proprietary Members are those Proprietary Members who were designated as Charter Proprietary Members in the records of the Club as of August 31, 1989 pursuant to the Offering Circular dated April 17, 1989. Charter Proprietary Members shall have the same rights and privileges as Proprietary Members except that, in the event a Charter Proprietary Member sells his membership, he shall have the right to name the buyer of the membership pursuant to the provisions of Article 7.6 and the Transfer Fee shall be calculated in accordance with the provisions of Article 7.7.

When a Charter Proprietary Membership is sold, such membership shall be converted to a Proprietary Membership.

### 2.3   TRUST PROPRIETARY MEMBERSHIP

A Proprietary Membership, for the convenience of the member, may be owned by a Trust, and may be referred to herein from time to time, as a Trust Membership. Each owner of a Trust Membership shall designate a person, as Designee, who must otherwise qualify for Membership. Such Designee shall be entitled to all of the rights and privileges of a Proprietary member. The Designee's spouse and the Designee's unmarried dependent children under the age of 23 shall have the rights and privileges to which the family of a Proprietary Member are entitled. Without limiting the generality of the foregoing, (a) the surviving spouse of a Designee shall be entitled to all of the rights of a surviving spouse of a member as set forth in these By-laws and (c) the owner of a Trust Membership shall have the right to designate the spouse of a Designee as a

Exhibit _____
Page _____

from the date of the mailing of the ballot. The ballots shall be prepared, mailed, returned and tabulated in accordance with the provisions of Article 10.

## ARTICLE 7
## TRANSFER AND SALE OF MEMBERSHIPS

### 7.1   TRANSFER FEE

A Transfer Fee is a fee paid to the Club in consideration for the Club's efforts and involvement in approving an Applicant for membership and in procuring the sale and purchase of a new membership. The Club shall be entitled to a Transfer Fee upon certain transfers of a membership. The Transfer Fee, if applicable, shall be deducted from the Initiation Fee paid by an incoming Member and retained by the Club. The remaining balance of the Initiation Fee shall be remitted to the Member selling his membership in accordance with the terms and provisions of this Article.

### 7.2   TRANSFER OF PROPRIETARY MEMBERSHIP TO CERTAIN FAMILY MEMBERS

A Proprietary Membership may be transferred to a spouse and such transfer is not subject to a Transfer Fee. Proprietary Memberships may be transferred to a Member's child or to the child of a Member's spouse without payment of a transfer fee. The term "child" shall include an adopted child, stepchild, or grandchild. The transfer is subject to the provisions these By-laws and conditioned upon the new Member meeting all of the membership requirements of the Club. Written notice of intent to transfer a membership to a spouse, a Member's child or to a child of a Member's spouse shall be delivered to the General Manager. When a membership is ultimately sold, the transfer fee shall be determined in accordance with the provisions of Article 7.7.2 of these By-laws.

### 7.3   SALE OF PROPRIETARY MEMBERSHIPS

Proprietary Memberships shall be sold pursuant to procedures, terms and conditions determined by the Board from time to time. A Proprietary Member who wishes to sell his or her Proprietary Membership shall list his or her membership for sale with the Club on its list of memberships available for sale ("Sale List"). Such memberships shall be called "Resale Proprietary Memberships."

### 7.4   SALE OF TREASURY MEMBERSHIPS

"Treasury Memberships" are Memberships held by the Club for sale as Proprietary Memberships. The Club has the right to sell Treasury Memberships on an alternating basis with Resale Proprietary Memberships, except that all Intermediate membership sales must be made from Treasury Memberships unless the first on the Sale List accepts the terms of payment from the Intermediate Membership.

### 7.4.1   TEMPORARY AUTHORITY TO SELL TREASURY MEMBERSHIPS ON AN ALTERNATING BASIS OR UP TO THREE TREASURY MEMBERSHIPS FOR EVERY ONE RESALE PROPRIETARY MEMBERSHIP.

Notwithstanding anything in Article 7.4 to the contrary, the Board may authorize the Club to sell Treasury Memberships on an alternating basis of up to three Treasury Memberships for every one Resale Proprietary Membership. This authority shall expire on June 30, 2015, at which time this Article 7.4.1 shall be deleted from these By-laws.

### 7.5   MEMBERSHIP SALE PROCESS The sale of all Club memberships shall be processed through the General Manager of the Club with the assistance of the Membership Committee. Except as specifically provided elsewhere herein, no Proprietary Member shall have the right to sell or transfer his Proprietary Membership.

### 7.6   SALE OF A CHARTER PROPRIETARY MEMBERSHIP

The foregoing notwithstanding, a Charter Proprietary Member shall have the right once and only once to sell his membership to a buyer of the Member's choice subject to the processing of the application for membership as set forth in the By-laws, provided that the prospective buyer is procured by the selling Charter Proprietary Member. The question of whether or not the prospective buyer was procured by the selling Charter Proprietary Member shall be determined in the sole discretion of the Board. The price of the membership sold shall be the price determined by the Board.

### 7.7   ALLOCATION AND DISTRIBUTION OF INITIATION FEES

The amount of the Initiation Fee received by the Club incident to the sale of a Proprietary or Charter Proprietary Membership shall be allocated between the Club and the selling Member as follows:

### 7.7.1   The Club shall retain an amount equal to all unpaid obligations of the selling Member, plus interest thereon, and all costs and expenses that the Club incurred in attempting to collect the indebtedness.

### 7.7.2   From the amount remaining the Club shall deduct and retain a Transfer Fee. There shall be no Transfer Fee on the first $25,000 of proceeds realized from the sale of a Charter Proprietary Membership. In the case of Charter Proprietary Members, the Transfer Fee shall be 20% of an amount equal to the Initiation Fee less $25,000. The Transfer Fee for Proprietary Members who are not Charter Proprietary Members shall be a percentage of the Initiation Fee. The Transfer Fee percentage used for each such Proprietary Member shall be the Transfer Fee percentage in effect when the Proprietary Member joined the Club. The Board shall have the right to increase the Transfer Fee percentage on Proprietary Memberships issued after the effective date of such Board action, or decrease or suspend the Transfer Fee percentage on any existing membership category.

### 7.7.3   The amount of the Initiation Fee remaining after taking into account the deductions set forth in Articles 7.7.1 and 7.7.2 shall be paid to the selling Member. Any sums payable ** to the Club or the

Exhibit ___
Page 112

selling Member under the terms of this Article shall be payable only after final approval of the prospective Member by the Board. Members are not guaranteed that their memberships can be sold or that they will receive any specific amount of proceeds from the sale of their membership.

## ARTICLE 8
## CONVERSION PRIVILEGES

**8.1   CONVERSION OF A NON-PROPRIETARY MEMBERSHIP TO A PROPRIETARY MEMBERSHIP**

A Non-Proprietary Member desiring to become a Proprietary Member shall advise the General Manager in writing if a Proprietary Membership is available, the Non-Proprietary Member shall be issued a Proprietary Membership upon payment of the initiation Fee. In the event a Proprietary Membership is not available, the name of the Member desiring to convert a Non-Proprietary Membership to a Proprietary Membership shall be placed on a waiting list that shall have priority over all non-member applications.

## ARTICLE 9
## CHANGE OF MARITAL STATUS OF A MEMBER BY DIVORCE, ANNULMENT OR MARRIAGE

**9.1   DESIGNATED OWNER OF CLUB MEMBERSHIP**

In the event of the dissolution of the marriage of a Member and the spouse of the Member is designated as the successor to the membership in a property settlement agreement, a written direction signed by both parties to the marriage, or a court order or decree, the Club will recognize the former spouse as the successor Member as of the effective date of the dissolution of marriage. The successor Member shall be responsible for all dues, assessments, charges and other obligations of the membership. No Transfer Fee shall be assessed in connection with the designation of the spouse of a Member as a successor Member pursuant to this Article.

**9.2   NOTICE OF CHANGE IN MARITAL STATUS**

It is the responsibility of every Member to promptly notify the Club in writing of a change of marital status as a result of divorce, annulment or remarriage. In the event of marriage, the Member shall provide the General Manager with a copy of the certificate of marriage or a letter signed by both parties attesting to the marriage.

## ARTICLE 10
## VOTING RIGHTS, ELECTIONS AND VOTING PROCEDURES

**10.1   VOTING PRIVILEGES**

Each Proprietary Member shall be entitled to one vote on matters on which Members are entitled to vote. Cumulative voting is not permitted.

**10.2   INSPECTORS**

The Board shall appoint three Proprietary Members as inspectors for each vote by written ballot. The inspectors may not be current members of the Board and, in the case of elections to the Board, inspectors may not be members of the Nominating Committee or candidates for election to the Board.

**10.3   BALLOT RETURN DATE**

The Board shall mail ballots to each Proprietary Member at least 30 days, and not more than 40 days, prior to the date the ballot is to be returned. The specific date for return of the ballots shall be determined by the Board, referred to as the Ballot Return Date and shall be printed on the Ballot.

**10.4   BALLOT ENVELOPES**

Included with the ballot shall be one envelope marked "Ballot" and a second envelope addressed to the inspectors at the address of the administrative office of the Club. The envelope addressed to the inspectors shall provide a printed box or space within which the Member shall be required to print his name and membership number. Ballots must be enclosed and sealed in the envelope marked "Ballot". Neither the ballot nor the ballot envelope shall be signed nor shall the name or membership number appear on the ballot or the Ballot envelope. The ballot envelope containing the marked ballot shall then be placed in the envelope addressed to the inspectors and sealed. Ballots may be delivered by mail, commercial delivery service or personally to the Club's administrative office. Ballots must be received by the administrative office no later than 5:00 PM on the Ballot Return Date. Ballots that do not comply with the provisions of this Article shall be disqualified and not counted.

**10.5   BALLOT COUNT AND CERTIFICATION OF ELECTION**

At any time after 5:00 PM on the Ballot Return Date, but not later than 48 hours thereafter, the inspectors, with the assistance of the Secretary of the Board and the administrative staff of the Club, shall record the names of the Members who have cast ballots and shall certify that each ballot was cast by a Proprietary Member of the Club on or before the Ballot Return Date. The inspectors shall then count the ballots cast, announce the results and certify the ballot count to the President of the Board who shall promptly notify the candidates and thereafter the membership.

**10.6   INSPECTION OF THE BALLOTS**

All ballots shall be retained for ninety days after the Ballot Return Date, during which time any Proprietary Member of the Club may inspect the ballots during regular office hours in the presence of the General Manager or his designee. Inspection shall be permitted only upon written request to the General Manager and shall be conducted at an appointed time convenient to the General Manager.

Exhibit ___1___
Page ___113___

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| THOMAS S. SLOVAK, ESQ. (SBN 62815)<br>SLOVAK BARON & EMPEY LLP<br>1800 East Tahquitz Canyon Way<br>Palm Springs, CA 99262<br><br>TELEPHONE NO.: 760/322-2275   FAX NO.: 760-322-2107<br>ATTORNEY FOR (Name): | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
STREET ADDRESS: 46-200 Oasis Street
MAILING ADDRESS: same
CITY AND ZIP CODE: Indio, CA  92201
BRANCH NAME: Indio

CASE NAME: COBB, ET AL. V. IRONWOOD COUNTRY CLUB

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [x] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: | INC 1205888 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [x] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (*not specified above*) (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (*check all that apply*): a. [ ] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action (*specify*):
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)
Date: August 21, 2012

THOMAS S. SLOVAK, ESQ. (SBN 62815)
(TYPE OR PRINT NAME)                                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |

Exhibit
Page 114

INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach—Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

CIVIL CASE COVER SHEET

Exhibit ____
Page ____ 115

This must be in red to be a
CERTIFIED COPY

Each document to which this certificate is attached
is certified to be a full, true and correct copy of the
original on file and of record in my office.

Superior Court of California
County of Riverside

By _Olegalado_

DEPUTY

Dated: _Aug 19, 2013_

Certification must be in red to be a
CERTIFIED COPY

Exhibit ____ l
Page ____ llo

# EXHIBIT 2

1  John J. McLeod, Esq., State Bar No. 174169
   john@mcleodlawgroup.com
2  Daniel H. Rylaarsdam, Esq., State Bar No. 216805
   drylaarsdam@mcleodlawgroup.com
3  McLEOD LAW GROUP, A.P.C.
   701 B Street, Suite 1570
4  San Diego, California 92101
   Telephone: (619) 236-9938
5  Facsimile: (619) 236-9943

6  Attorneys for Plaintiff
   IRONWOOD COUNTRY CLUB
7

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

MAY 01 2013

Y. REEVES

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF RIVERSIDE, INDIO BRANCH

10  IRONWOOD COUNTY CLUB,              CASE NO. **INC** 1302832

11                Plaintiff,           COMPLAINT FOR:

12        v.                           1.   Declaratory Relief;   **FILE BY FAX**
                                        2.   Breach of Contract – Failure to
13  LIBERTY INSURANCE                        Defend; and
    UNDERWRITERS, INC. and DOES 1      3.   Breach of the Implied Covenant
14  through 100,                            of Good Faith and Fair Dealing
15
                                        **DEMAND FOR JURY TRIAL**
16                Defendants.

17

18       COMES NOW, Plaintiff IRONWOOD COUNTY CLUB ("IRONWOOD"), and for

19  causes of action against Defendants, and each of them, alleges as follows:

20                              **THE PARTIES**

21       1.    IRONWOOD is a California corporation and was at all relevant times herein

22  mentioned admitted to do business in the State of California, including the County of Riverside.

23       2.    IRONWOOD is informed and believes and thereon alleges that Defendant

24  LIBERTY INSURANCE UNDERWRITERS, INC. ("LIBERTY") is domiciled in the State of

25  Illinois and was at all relevant times either admitted to do business as an insurer under the

26  laws of the State of California or authorized to sell insurance in the State of California through

27  a licensed surplus lines broker or other permissible means.

28       3.    IRONWOOD is informed and believes and thereon alleges that DOES 1 through

                                      1
                          IRONWOOD'S COMPLAINT

COPY

Exhibit ___2___
Page _____1_____

1   50 are persons, corporations or other entities which reside or are authorized to do and are

2   doing business in the State of California.  The true identities of DOES 1 through 50 are

3   currently unknown to IRONWOOD and IRONWOOD therefore prays for leave to amend this

4   Complaint to assert the proper names of each DOE when its identity is discovered.

5       4.    IRONWOOD is informed and believes and thereon alleges that DOES 51

6   through 100 are persons, corporations or other entities which reside or are authorized to do

7   and are doing business in the State of California. The true identities of DOES 51 through 100

8   are currently unknown to IRONWOOD and IRONWOOD therefore prays for leave to amend

9   this Complaint to assert the proper names of each DOE when its identity is discovered. Each

10  of DOES 51 through 100 was the managerial agent, employee, predecessor, successor, joint

11  venturer, co-conspirator, alter-ego, and/or representative of one or more of the other

12  Defendants named herein or identified as DOES 1 through 50, and acted with the permission,

13  authorization and/or ratification and consent of the other Defendants.

14      5.    IRONWOOD is informed and believes, and thereon alleges, that each

15  fictitiously named Defendant is in some way responsible for, participated in, or contributed to

16  the matters of which IRONWOOD complains and has legal responsibility for those matters.

17      6.    LIBERTY and DOES 1-100, inclusive, are collectively referred to as

18  "CARRIERS."

19      7.    This court has personal jurisdiction over CARRIERS, and each of them, as they

20  are at all relevant times hereinafter mentioned insurers, agents or brokers, incorporated,

21  headquartered and/or engaged in the business of selling and/or placing insurance in the State

22  of California.

23      8.    IRONWOOD is informed and believe and thereon alleges that at all times

24  relevant to the allegations contained in this Complaint, there exists and existed such a unity of

25  interest, ownership and control between CARRIERS, and any of them, such that there was no

26  separateness or individuality of these CARRIERS, and each of them. As a result of this unity

27  of ownership, control or interest between and among CARRIERS, and any of them, adherence

28  to the fiction of any of their separate existences would, under the circumstances in this case,

Exhibit    2
Page       2

1  sanction fraud and promote injustice, unfairness and inequity.   As such, IRONWOOD is
2  informed and believes and thereon alleges that CARRIERS are the alter egos of the other.

3      9.      IRONWOOD is informed and believes and thereon alleges that venue lies in
4  the Riverside County Superior Court as the policy of insurance that is the subject of this
5  Complaint was negotiated in, sold in, entered into and/or delivered to IRONWOOD and/or the
6  liability and breach occurred in the County of Riverside, State of California.

7                              **THE LIBERTY POLICY**

8      10.     CARRIERS made, executed and delivered a policy of insurance to
9  IRONWOOD: Nonprofit Executive Advantage Policy number DOCH216747-211 (policy
10 period October 1, 2011 to October 1, 2012) (the "Policy").   Attached hereto as Exhibit "A"
11 and incorporated herein by this reference as if set forth in full is, IRONWOOD is informed and
12 believes and thereon alleges, a true and correct copy of the Policy (redacted).

13     11.     Under the Policy, CARRIERS promised to "pay on behalf of . . . the **Insureds**
14 all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made
15 during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a
16 **Wrongful Act** which takes place before or during the **Policy Period**."   (Policy, Section 1, p.
17 1.)

18     12.     Under the Policy, CARRIERS also promised that they have the "right and duty
19 . . . to defend any **Claim**." (Policy, Section 1, p. 1.)

20     13.     The Policy defines **"Loss"** as "sums which the **Insureds** are legally obligated to
21 pay solely as a result of any **Claim** insured by this Policy, including **Defense Costs**, damages,
22 judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive
23 or exemplary damages, and the multiple portion of any multiplied damage award . . . ."
24 (Policy, Section 23 (Definitions), subsection 23.14 (as modified by Endorsement No. 1).)

25     14.     The Policy defines "**Claim**" as "a written demand for monetary or nonmonetary
26 relief against an **Insured**; the commencement of a civil . . . judicial proceeding . . . against an
27 **Insured** . . . ." (Policy, Section 23 (Definitions), subsection 23.3, p. 7.)

28     15.     The Policy defines "**Defense Costs**" as "reasonable and necessary fees

1  (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim**

2  . . ." (Policy, Section 23 (Definitions), subsection 23.4, pp. 7-8.)

3       16.    The Policy defines **"Wrongful Act"** as "any actual or alleged error,

4  misstatement, misleading statements, act, omission, neglect, or breach of duty . . . committed .

5  . . by the **Insured Organization**." (Policy, Section 23 (Definitions), subsection 23.22, p. 10.)

6       17.    The Policy defines **"Insured Organization"** as "any entity named in Item I of

7  the Declarations . . . .") (Policy, Section 23 (Definitions), subsection 23.11, p. 9.)

8       18.    IRONWOOD is the entity named in Item I of the Declarations. (Policy,

9  Declarations, Item I.)

10       19.    The Policy also provides as follows: **"Retention.** The Insurer shall be liable to

11  pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in

12  Item IV of the Declarations. Such applicable Retention shall be uninsured, shall be applicable

13  to Defense Costs and shall be borne by the **Insured Organization**." (Policy, Section 23

14  (Definitions), subsection 10 (as modified by Endorsement No. 1).)

15       20.    Item IV of the Declarations states that the Retention is "$10,000 – **Directors &**

16  **Officers** in the aggregate each **Claim**." (Policy, Declarations, Item IV.) IRONWOOD is

17  informed and believe and thereon alleges that it has satisfied the Retention.

18  **THE UNDERLYING CLAIM AND LAWSUIT**

19       21.    During the period of the Policy, by letter dated May 7, 2012, a member of

20  IRONWOOD sent a letter to IRONWOOD making demands upon IRONWOOD with respect

21  to IRONWOOD'S January 2012 decision to cease re-paying certain assessments collected by

22  IRONWOOD for the purpose of acquiring certain land in 1999 (the "Assessments").

23       22.    Thereafter, on or about August 21, 2012, IRONWOOD was served with the

24  complaint in an action entitled Cobb, et al. v. IRONWOOD, et al. (Riverside Superior Court

25  Case No. 1205888), in which the plaintiffs in that action (collectively, "Cobb") asserted a

26  cause of action for declaratory relief against IRONWOOD (the "Cobb Lawsuit"). Attached

27  hereto as Exhibit "B" and incorporated herein by this reference as if set forth in full is,

28  IRONWOOD is informed and believes and thereon alleges, a true and correct copy of the

4
IRONWOOD'S COMPLAINT

Exhibit _____ 2
Page _____ 4

1    complaint in the Cobb Lawsuit.  By this incorporation, IRONWOOD is not admitting any of

2    the allegations in the Cobb Lawsuit, all of which are expressly denied as set for the pleadings

3    in the Cobb Lawsuit.

4         23.    Like the May 7 letter, the Cobb Lawsuit alleges, among other things, that

5    IRONWOOD has an obligation to repay the Assessments.  The Cobb Lawsuit also alleges that

6    "sometime in January 2012," IRONWOOD "made the decision to breach the March 24, 1999

7    Loan Agreement by unilaterally restructuring and or [SIC] redefining the terms and conditions

8    of its loan repayment obligations which directly affected all members of Ironwood County

9    Club, both past and present."  (Cobb Lawsuit, p. 10, lines 13-16.)  In essence, the Cobb

10   Lawsuit alleges that IRONWOOD committed the following: errors, misstatements, misleading

11   statements, acts, omissions, neglect, or breaches of duties with respect to its alleged obligation

12   to repay the Assessments.

13        24.    Plaintiffs in the Cobb Lawsuit have, in fact, made allegations and claims that

14   IRONWOOD committed "Wrongful Act[s]" that are at least potentially covered under the

15   Policy.

16        25.    IRONWOOD timely tendered the claims and allegations in the Cobb Lawsuit

17   to LIBERTY, demanding that LIBERTY provide IRONWOOD an immediate defense of the

18   entire Cobb Lawsuit pursuant to the provisions of the Policy and pursuant to California law.

19   Alternatively, IRONWOOD'S claim for a defense in the Cobb Lawsuit was tendered to

20   CARRIERS, and each of them, on behalf of IRONWOOD by others, thereby providing

21   CARRIERS, and each of them, with actual and/or constructive notice of the claims asserted

22   against IRONWOOD and of IRONWOOD'S right to defense with respect to those claims,

23   thereby triggering each of CARRIERS' obligations to IRONWOOD under the Policy and

24   pursuant to California law.

25        26.    IRONWOOD is informed and believes and thereon alleges that on or before

26   October 25, 2012, CARRIERS agreed to provide a defense for IRONWOOD.  In fact, LIBERTY

27   appointed Bryan R. Gerstel of Green Bryant & French LLP ("Gerstel") as defense counsel to

28   defend against the Cobb Lawsuit and agreed to pay a portion, but not all, of Gerstel's fees and

Exhibit _____ 2

Page _____ 5

1   costs. In a letter dated October 25, 2012, LIBERTY confirmed that Gerstel "was appointed to

2   defend [IRONWOOD] in connection with the [Cobb Lawsuit]." In that same letter, Liberty also

3   "confirm[ed] the defense that Liberty has agreed to provide to [IRONWOOD] and that coverage

4   is triggered for the [Cobb Lawsuit] . . . ."

5       27.    As a result of the Cobb Lawsuit, IRONWOOD has been compelled to incur fees

6   and costs (and will continue to incur fees and costs) to defend itself against the Cobb Lawsuit.

7   At this time, the fees and costs incurred by IRONWOOD are roughly $55,000, which is well in

8   excess of the Policy's $10,000 Retention, which IRONWOOD has already satisfied, triggering

9   CARRIERS' duties to, among other things, defend IRONWOOD in the Cobb Lawsuit. (The

10   defense fees and costs are ongoing and will increase over time.)

11       28.    IRONWOOD is informed and believes that certain pre-tender invoices were

12   inadvertently submitted to LIBERTY and that such invoices and their contents were and are

13   protected by, among potentially other things, the attorney-client privilege and the attorney

14   work product doctrine. Despite IRONWOOD'S repeated requests for their return, LIBERTY

15   refused and continues to refuse to return them to IRONWOOD even though it admits that it

16   will not reimburse IRONWOOD for the amounts stated therein.

17       29.    IRONWOOD is informed and believes and thereon alleges that IRONWOOD

18   timely submitted invoices showing the defense fees and costs incurred in the Cobb Lawsuit to

19   LIBERTY. Those defense fees and costs, however, were not paid by LIBERTY. Accordingly,

20   by letters dated January 29, February 7 and March 1, 2013, IRONWOOD demanded that

21   LIBERTY pay the outstanding fees and costs incurred in the defense of the Cobb Lawsuit so as

22   to, among other things, not prejudice IRONWOOD'S defense in the Cobb Lawsuit. LIBERTY

23   did not respond to those letters or pay any amount towards IRONWOOD'S defense in the Cobb

24   Lawsuit.

25       30.    By letter dated February 26, 2013, LIBERTY, despite its earlier promise to

26   provide a defense for IRONWOOD and its acknowledgement that the allegations in the Cobb

27   Lawsuit triggered coverage under the Policy, denied all coverage for the Cobb Lawsuit.

28   Thereafter, by e-mail dated March 13, 2013, LIBERTY confirmed that its February 26, 2013,

IRONWOOD'S COMPLAINT

Exhibit _____ 2 _____
Page _____ 6 _____

1  letter was a complete denial of coverage for the Cobb Lawsuit and that LIBERTY would not pay

2  for any fees and costs IRONWOOD incurred in the defense of the Cobb Lawsuit.

3        31.    As a result of LIBERTY'S conduct prior to February 26, 2013, and its February

4  26, 2013, letter in which it reneged on its agreement to defend LIBERTY in the Cobb Lawsuit

5  and pay, at least in part, the fees and costs incurred in IRONWOOD'S defense of the Cobb

6  Lawsuit, IRONWOOD retained coverage counsel in an effort to obtain the benefits owed

7  under the Policy.

8        32.    By letter dated March 25, 2013, IRONWOOD wrote to LIBERTY demanding

9  that LIBERTY withdraw its February 26 denial of coverage and agree to pay (and pay) the

10  fees and costs IRONWOOD incurred (and will continue to incur) in the defense of the Cobb

11  Lawsuit.   By e-mail dated April 19, 2013, LIBERTY refused to withdraw its denial of

12  coverage and refused to pay any fees and costs incurred in the defense of the Cobb Lawsuit.

13        33.    As a direct and proximate result of the CARRIERS', and each of their, failure to

14  immediately defend IRONWOOD in the Cobb Lawsuit and/or failure to timely pay for the fees

15  and costs incurred in the defense of the Cobb Lawsuit as promised and/or as required under the

16  Policy and under California law, IRONWOOD has been forced to pay and incur fees, costs and

17  expenses in an amount to be proved at time of trial in the defense, investigation, evaluation,

18  mitigation and/or other efforts to defeat the claims asserted against IRONWOOD in the Cobb

19  Lawsuit and in efforts to obtain the benefits owed under the Policy, which fees, costs and

20  expenses exceed the amount of any the Retention of the Policy.

21                          **FIRST CAUSE OF ACTIONS**

22                              For Declaratory Relief

23                             (Against the CARRIERS)

24        34.    IRONWOOD repeats, re-alleges and incorporates by this reference each and all

25  of the allegations contained in paragraphs 1 through 33 of this Complaint.

26        35.    As set forth above, the CARRIERS, and each of them, agreed, among other

27  things, to investigate, adjust, and/or defend IRONWOOD'S interests against any and all

28  "Claims" against IRONWOOD for a "Wrongful Act."   In the Cobb Lawsuit, the plaintiffs

Exhibit ___2___
Page ___7___

have in fact made a "Claim" (which was first made during the period of the Policy) and has alleged "Wrongful Acts" that are covered and/or potentially covered by the Policy. IRONWOOD disputes the allegations against it in the Cobb Lawsuit.

36.     IRONWOOD has been forced to incur defense fees and costs because of a "Claim" for "Wrongful Acts" falling within and/or potentially falling within the coverage of the Policy, which fees and costs exceed the Retention of the Policy, which has been satisfied by IRONWOOD.

37.     IRONWOOD timely provided notice of the Cobb Lawsuit to the CARRIERS, and each of them. Alternatively, notice of the Cobb Lawsuit was timely provided to the CARRIERS, and each of them, by others, thereby giving the CARRIERS actual or constructive notice of the Cobb Lawsuit.

38.     IRONWOOD has performed each covenant and/or condition which on its part must be performed in order to obtain a defense under the Policy, or has been excused from so performing as a result of the CARRIERS', and each of their, breaches of their respective insurance agreements, including refusals to and/or delays in and/or failures to defend IRONWOOD, among other matters.

39.     A dispute has arisen between IRONWOOD and the CARRIERS in that IRONWOOD contends that it was and is entitled to be defended in the Cobb Lawsuit in order to mitigate and/or avoid IRONWOOD'S liability by each and all of the CARRIERS, inclusive, pursuant to the Policy and pursuant to California law, and is entitled to be reimbursed for the attorney's fees and costs, experts' fees and costs and other costs and expenses in the defense, mitigation and/or investigation and/or other costs and expenses incurred as a result of the Cobb Lawsuit, and which exceed the Retention of the Policy. IRONWOOD is informed and believes and thereon alleges that the CARRIERS, and each of them, unreasonably contend otherwise.

40.     IRONWOOD is informed and believes and thereon alleges that the CARRIERS, and each of them, failed and/or refused to provide a defense to IRONWOOD in the Cobb Lawsuit without performing a diligent, timely, adequate and thorough investigation

Exhibit  2
Page  8

1    of the claims against IRONWOOD in the Cobb Lawsuit and failed and/or refused to timely

2    pay for the fees and costs incurred in the defense of the Cobb Lawsuit.

3        41.     A dispute has also arisen between IRONWOOD and the CARRIERS in that

4    IRONWOOD contends that the inadvertently produced pre-tender invoices and their contents

5    are privileged and/or protected under California law. IRONWOOD also contends that these

6    invoices must be returned to IRONWOOD and neither the invoices nor their contents can be

7    used as a basis to deny coverage for the Cobb Lawsuit. IRONWOOD is informed and

8    believes and thereon alleges that the CARRIERS, and each of them, unreasonably contend

9    otherwise.

10       42.     IRONWOOD is informed and believes and thereon alleges that the

11    CARRIERS, and each of them, failed and/or refused to return the inadvertently produced pre-

12    tender invoices and have and are continuing to rely on these invoices and their contents to

13    deny coverage for the Cobb Lawsuit.

14       43.     IRONWOOD is informed and believes and thereon alleges that an actual

15    controversy exists between IRONWOOD and the CARRIERS, and each of them, regarding

16    the duties of each of the CARRIERS to defend IRONWOOD pursuant to the Policy and

17    pursuant to California law as to the Cobb Lawsuit and to pay for fees and costs incurred in the

18    Cobb Lawsuit. IRONWOOD is also informed and believes and thereon alleges that an actual

19    controversy exists between IRONWOOD and the CARRIERS, and each of them, regarding

20    the inadvertently produced pre-tender invoices and the use of them and/or their contents as a

21    basis to deny coverage for the Cobb Lawsuit. A declaratory judgment is therefore necessary

22    and appropriate to determine the rights and duties of the parties.

23                             **SECOND CAUSE OF ACTIONS**

24                   Breach of Written Contract – Failure to Defend

25                            (Against the CARRIERS)

26       44.     IRONWOOD repeats, re-alleges and incorporates by this reference each and all

27    of the allegations contained in paragraphs 1 through 43 of this Complaint.

28       45.     As set forth above, the CARRIERS, and each of them, agreed, among other

Exhibit _____2_____
Page _____9_____

things, to investigate, adjust, and/or defend IRONWOOD'S interests against any and all "Claims" against IRONWOOD for a "Wrongful Act." In the Cobb Lawsuit, the plaintiffs have in fact made a "Claim" first made during the policy period of the policy and alleged "Wrongful Acts" that are covered and/or potentially covered by the Policy. IRONWOOD disputes the allegations against it in the Cobb Lawsuit.

46. IRONWOOD is informed and believes and thereon alleges that the CARRIERS issued the Policy to IRONWOOD as indicated herein. The Policy does in fact, at a minimum, potentially cover the Cobb Lawsuit and requires the CARRIERS, and each of them, to fully defend IRONWOOD in THE Cobb Lawsuit.

47. IRONWOOD (or others) has duly tendered the defense of the Cobb Lawsuit to the CARRIERS, such that the CARRIERS, and each of them, have actual or constructive notice of the Cobb Lawsuit; but, the CARRIERS, and each of them, have refused to and/or delayed in and/or failed to fully defend IRONWOOD for the Cobb Lawsuit.

48. IRONWOOD has performed all conditions, covenants and promises required to be performed in accordance with the terms and conditions of the Policy, except to the extent that IRONWOOD was prevented by the CARRIERS, or any of them, or excused from such performance, or said conditions, covenants and promises have accrued or have been waived.

49. As a result of the Cobb Lawsuit, IRONWOOD has been forced to incur fees and costs and other expenses, because of claims falling within, or potentially falling within, the coverage of, or as defined in, the Policy referred to hereinabove. In breach of the Policy, the CARRIERS, and each of them, through their respective officers and/or managerial agents, have, *inter alia*, failed and/or refused and continue to fail and/or refuse to fully pay and/or reimburse IRONWOOD for the fees and costs of defense, mitigation and/or investigation and other costs and expenses as a result of the Cobb Lawsuit.

50. IRONWOOD is informed and believes and thereon alleges that the CARRIERS, and each of them, did not reasonably or diligently investigate the claims asserted in the Cobb Lawsuit against IRONWOOD or timely acknowledge and/or accept and/or fully fund IRONWOOD'S defense in the Cobb Lawsuit. Additionally, IRONWOOD is informed

Exhibit 2
Page 10

1    and believes, and thereon alleges, that the CARRIERS, and each of them, failed to properly

2    respond to IRONWOOD'S requests to such CARRIERS for defense and/or coverage.

3        51.    The failure and/or refusal of the CARRIERS to adequately investigate the

4    claims made against IRONWOOD in the Cobb Lawsuit; the failure and/or refusal to timely

5    provide an appropriate defense to IRONWOOD without such an adequate investigation; and

6    the failure and/or refusal of the CARRIERS to adequately respond to the tenders of defense

7    and/or coverage and other correspondence from IRONWOOD also constitute breaches of the

8    terms and conditions of the Policy.

9        52.    By reason of the CARRIERS' failure and/or refusal to timely and fully defend

10    IRONWOOD pursuant to the Policy and California law, the CARRIERS, and each of them,

11    have breached their written contracts of insurance under which Policy IRONWOOD is entitled

12    to coverage as an insured as required under the provisions of the Policy and under California

13    law.

14        53.    As a direct and proximate result of the foregoing breaches by the CARRIERS,

15    IRONWOOD has incurred substantial attorneys' fees and costs in defense, mitigation and

16    investigation and other costs and expenses in an amount within the jurisdictional limits of this

17    Court, according to proof. IRONWOOD has been damaged in an amount presently unknown,

18    but in excess of the jurisdictional minimum of this court, to be established at the time of trial,

19    according to proof.

20                 **THIRD CAUSE OF ACTIONS**

21           For Breach of the Implied Covenant of Good Faith and Fair Dealing

22                  (Against the CARRIERS)

23        54.    IRONWOOD repeats, re-alleges and incorporates by this reference each and all

24    allegations contained in paragraphs 1 through 53 of this Complaint.

25        55.    The CARRIERS, and each of them, at all material times had the duty to act

26    fairly and in good faith to IRONWOOD in carrying out their responsibilities under the Policy.

27        56.    Pursuant to the Policy and California law, the CARRIERS, and each of them,

28    have implicit obligations to act fairly and in good faith to IRONWOOD, to promptly,

Exhibit _____ 2

Page _____ 11

1  thoroughly and reasonably investigate claims against IRONWOOD, and to make timely and

2  reasonable coverage decisions.   The Policy identified in this Complaint is subject to an

3  implied covenant of good faith and fair dealing such that no party will disturb the rights of the

4  other to obtain the full benefits of the contract.  The CARRIERS, and each of them, have

5  breached the implied covenant of good faith and fair dealing when failing to and/or delaying

6  in and/or refusing to defend IRONWOOD in the Cobb Lawsuit, and/or to provide necessary

7  coverages owed under the Policy when tendered, and at all material times thereafter,

8  notwithstanding repeated requests to do so.

9        57.     IRONWOOD is informed and believes, and on such basis alleges, that the

10  CARRIERS, and each of them, breached their respective obligations to act fairly and in good

11  faith towards IRONWOOD by committing, among other things, the following acts and

12  omissions:

13             (a.)    Unreasonably delaying, failing, refusing and/or denying the provision of

14  policy benefits to IRONWOOD;

15             (b.)    Unreasonably delaying and/or failing and/or refusing to fully defend

16  IRONWOOD in the Cobb Lawsuit after receipt of tender thereof;

17             (c.)    Failing to conduct a prompt, reasonable and thorough investigation and

18  unreasonably withholding monetary payment of the defense;

19             (d.)    Causing IRONWOOD severe financial hardship by delaying, failing and/or

20  refusing to immediately and fully defend IRONWOOD in the Cobb Lawsuit;

21             (e.)    Failing to give a reasonable interpretation to the provisions of the Policy,

22  failing to reasonably apply provisions of the Policy to the claims in the Cobb Lawsuit, and

23  unreasonably refusing to acknowledge that the claims asserted against IRONWOOD in the Cobb

24  Lawsuit were and are potentially covered, and failing to timely, promptly and without delay, pay

25  for the reasonable and necessary defense incurred after the tender;

26             (f.)    Failing to interpret limitations in the Policy narrowly and in favor of

27  coverage for IRONWOOD in contravention of California law;

28             (g.)    Interpreting the provisions of the Policy and the factual circumstances so as

                                    12
                            IRONWOOD'S COMPLAINT

Exhibit _____2_____
Page _____12_____

1 to resolve ambiguities and uncertainties against IRONWOOD and to favor their own economic
2 interests;

3         (h.)    Misrepresenting the provisions of the Policy;

4         (i.)    Failing to provide IRONWOOD with any reasonable or justifiable basis for
5 the decision to deny and/or delay the actual participation of the defense in the Cobb Lawsuit;

6         (j.)    Embarking on a course of conduct and pattern and practice, whereby the
7 CARRIERS would fail and/or refuse to participate in the mounting and funding of the defense of
8 IRONWOOD;

9         (k.)    Pursuing such a course of conduct and pattern and practice, notwithstanding
10 the terms of the Policy imposing a duty to immediately defend potentially covered claims
11 asserted against IRONWOOD and notwithstanding repeated advisements of the California
12 Supreme Court over the last forty years of the breadth of the defense obligation, the immediacy
13 of the defense obligation upon tender and the need to defend by funding of the defense;

14         (l.)    Pursuing such a course of conduct and pattern and practice in violation of
15 the terms of the Policy and California law with the knowledge, understanding, consent and
16 approval of the CARRIERS' respective managing officers, directors, agents and employees;

17         (m.)    Refusing to return privileged/protected documents inadvertently provided
18 to LIBERTY despite repeated requests to do so; and

19         (n.)    Utilizing and relying on the inadvertently produced pre-tender invoices
20 and their contents to deny coverage for the Cobb Lawsuit and/or as the basis to refuse to pay
21 fees and costs incurred in the defense of the Cobb Lawsuit.

22     58.    IRONWOOD is informed and believes and thereon alleges that the foregoing
23 acts and omissions, among others, were unreasonable, malicious, fraudulent, oppressive and
24 despicable.

25     59.    IRONWOOD is informed and believes and thereon alleges that the respective
26 officers, directors and/or managing agents and/or employees of the CARRIERS, and each of
27 them, participated in, authorized and/or ratified the wrongful conduct of said CARRIERS as
28 alleged above.

Exhibit _____ 2
Page _____ 13

60.    As a result of the bad faith conduct of the CARRIERS, and each of them, IRONWOOD has incurred substantial attorneys' fees, costs and expenses in defense, mitigation and/or investigation and other costs and expenses in response to the Cobb Lawsuit and has been required to bring this Complaint to enforce its rights as a named insured under the Policy mentioned herein. IRONWOOD is entitled to recover as damages against each of the CARRIERS, all the aforementioned fees, costs and expenses which it has incurred as a result of the Cobb Lawsuit together with interest thereon. IRONWOOD has suffered damages and will continue to suffer damages within the jurisdiction of this Court, according to proof.

61.    IRONWOOD is further entitled to recover as damages against each of the CARRIERS all fees, expenses and costs incurred in this action to enforce its rights under the Policy, plus interest thereon, according to proof.

62.    The above-described conduct of the CARRIERS, and each of them, have been and continue to be unreasonable, capricious and arbitrary, and constitute a breach of the covenant of good faith and fair dealing contained in the Policy referred to above in this Complaint.    The above-described conduct further constitutes malicious, oppressive and despicable conduct and conscious disregard of IRONWOOD'S rights, and stems from improper and evil motives, including the CARRIERS', and each of their, desire to reduce or avoid their obligations to IRONWOOD, so as to justify an award of punitive and exemplary damages.

## PRAYER

WHEREFORE, IRONWOOD prays for judgment against each and all of the Defendants as follows:

## FIRST CAUSE OF ACTION

1.    For a declaratory judgment that the CARRIERS must defend IRONWOOD from and against the claims being asserted against IRONWOOD in the Cobb Lawsuit;

2.    For a declaratory judgment that the CARRIERS must fully reimburse IRONWOOD for all of the defense fees and costs already incurred (or to be incurred) in Cobb Lawsuit notwithstanding any limitations set forth in Civil Code section 2860;

Exhibit____2
Page____14

3.      For a declaratory judgment that the CARRIERS must return the inadvertently produced pre-tender invoices, that their contents are privileged and/or protected under California law and that neither these invoices nor their contents can be used as a basis to deny coverage for the Cobb Lawsuit.

## SECOND CAUSE OF ACTION

4.      For compensatory damages according to proof, but in an amount within the jurisdiction of this Court;

## THIRD CAUSE OF ACTION

5.      For compensatory damages according to proof, but in an amount within the jurisdiction of this Court;

6.      For attorney's fees and costs of suit in obtaining the benefits owed under the Policy, pursuant to Brandt v. Superior Court (1985) 37 Cal.3d 813, according to proof;

7.      For punitive and exemplary damages according to proof;

## ON ALL CAUSES OF ACTION

8.      For costs of suit herein;

9.      For prejudgment interest; and

10.     For all such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby request a trial by jury on all issues so triable.

Dated: April 19, 2013                       McLEOD LAW GROUP, A.P.C.

                                            By: _____
                                                John J. McLeod, Esq.
                                                Daniel H. Rylaarsdam, Esq.
                                                Attorneys for Plaintiff IRONWOOD
                                                COUNTRY CLUB

Exhibit ___2___
Page ___15___

# EXHIBIT 3

Jeffrey S. Whittington, Esq./SBN 236028
Email: jwhittington@KBRlaw.com
Nicholas W. Sarris, Esq./SBN 242011
Email: nsarris@KBRlaw.com
KAUFMAN BORGEEST & RYAN LLP
23975 Park Sorrento, Suite 370
Calabasas, CA 91302
Telephone: (818) 880-0992
Facsimile: (818) 880-0993

Attorneys for Defendant Liberty
Insurance Underwriters, Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| IRONWOOD COUNTRY CLUB,<br><br>          Plaintiffs,<br><br>     vs.<br><br>LIBERTY INSURANCE<br>UNDERWRITERS, INC. and DOES 1<br>through 100,<br><br>          Defendants. | Case No. 13-00996-VAP (DTBx)<br><br>**DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

        COMES NOW defendant, LIBERTY INSURANCE UNDERWRITERS, INC. (hereinafter "defendant"), and answers plaintiff's complaint (hereinafter "complaint") on file herein as follows:

Printed on Recycled Paper

Exhibit ___3___
Page ___1___

## PARTIES

1.    Answering paragraph 1, defendant admits the allegations thereof.

2.    Answering paragraph 2, defendant admits that it is domiciled in the State of Illinois and is authorized to do business in the State of California. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph with respect to plaintiff's knowledge regarding defendant's business operation, and on that basis denies the remainder of the allegations contained therein, generally and specifically.

3.    Answering paragraph 3, defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein, generally and specifically, and each and every part thereof. Defendant further contends that to the extent paragraph 3 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

4.    Answering paragraph 4, defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein, generally and specifically, and each and every part thereof. Defendant further contends that to the extent paragraph 4 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

5.    Answering paragraph 5, defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein, generally and specifically, and each and every part thereof. Defendant further contends that to the extent paragraph 5 constitutes questions

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

Printed on Recycled Paper

Exhibit 69629     3

Page     2

of law and/or fact for this court, defendant is not required to admit or deny the same.

6.    Answering paragraph 6, defendant contends that to the extent paragraph 6 constitutes questions of law and/or fact for this court, defendant is not required to admit or denies the same.  Defendant further contends that to the extent paragraph 6 does not constitute an allegation, defendant is not required to admit or deny the same.

7.    Answering paragraph 7, defendant contends that to the extent paragraph 7 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

8.    Answering paragraph 8, defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein, generally and specifically, and each and every part thereof. Defendant further contends that to the extent paragraph 8 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

9.    Answering paragraph 9, defendant contends that to the extent paragraph 9 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

## THE LIBERTY POLICY

10.    Answering paragraph 10, defendant admits that it issued a Nonprofit Executive Advantage Policy to Ironwood Country Club, Policy no. DOCH216747-211, with a policy period of October 1, 2011 to October 1, 2012.  Defendant denies that the document attached as Exhibit A is a complete copy of the Policy.

11.    Answering paragraph 11, defendant admits that section 1 of the Policy contains the quoted language.  Defendant denies the remainder of the

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

Printed on Recycled Paper

1569629

Exhibit _____ 3

Page _____ 3

allegations as they disregard the other provisions of the Policy.  Defendant further contends that to the extent paragraph 11 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

12.    Answering paragraph 12, defendant admits that section 2.1 of the Policy contains the quoted language.  Defendant denies the remainder of the allegations as they disregard other provisions of the Policy.  Defendant further contends that to the extent paragraph 12 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

13.    Answering paragraph 12, defendant admits that section 23.14 as modified by Endorsement No. 1 of the Policy contains the quoted language. Defendant denies the remainder of the allegations as they disregard other provisions of the Policy.   Defendant further contends that to the extent paragraph 13 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

14.    Answering paragraph 14, defendant admits that section 23.3 of the Policy contains the quoted language.  Defendant denies the remainder of the allegations as they disregard other provisions of the Policy.  Defendant further contends that to the extent paragraph 14 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

15.    Answering paragraph 15, defendant admits that section 23.4 of the Policy contains the quoted language.  Defendant denies the remainder of the allegations as they disregard other provisions of the Policy.  Defendant further contends that to the extent paragraph 15 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

16.    Answering paragraph 16, defendant admits that section 23.22 of the Policy contains the quoted language.  Defendant denies the remainder of the allegations as they disregard other provisions of the Policy.  Defendant further contends that to the extent paragraph 16 constitutes questions of law

Printed on Recycled Paper
1569629

Exhibit _____ 3
Page _____ 4

1 and/or fact for this court, defendant is not required to admit or deny the same.

2      17.    Answering paragraph 17, defendant admits that section 23.11 of
3 the Policy contains the quoted language.  Defendant denies the remainder of
4 the allegations as they disregard other provisions of the Policy.  Defendant
5 further contends that to the extent paragraph 17 constitutes questions of law
6 and/or fact for this court, defendant is not required to admit or deny the same.

7      18.    Answering paragraph 18, defendant admits the allegations thereof.

8      19.    Answering paragraph 19, defendant admits that section 10 as
9 modified by Endorsement No. 1 of the Policy contains the quoted language.
10 Defendant denies the remainder of the allegations as they disregard other
11 provisions of the Policy.  Defendant further contends that to the extent
12 paragraph 19 constitutes questions of law and/or fact for this court, defendant
13 is not required to admit or deny the same.

14      20.    Answering paragraph 20, defendant admits that Item IV of the
15 Declarations contains the quoted language.  Defendants is without knowledge
16 or information sufficient to form a belief as to the truth of the remainder of the
17 allegations contained in said paragraph, and on that basis denies the remainder
18 of the allegations contained therein, general and specifically.   Defendant
19 further contends that to the extent paragraph 20 constitutes questions of law
20 and/or fact for this court, defendant is not required to admit or deny the same.

21 **THE UNDERLYING CLAIM AND LAWSUIT**

22      21.    Answering paragraph 21, defendant admits that William S. Coob,
23 Jr. issued a letter to Bob Manion, Board President of Ironwood, dated May 7,
24 2012, which was reported to Defendant as "notice only" on May 16, 2012.

25      22.    Answering paragraph 22, defendant admits the allegations thereof.

26      23.    Answering paragraph 23, defendant admits that the Cobb lawsuit
27 contains the quoted language.  Defendant further contends that to the extent the
28 remainder of paragraph 23 constitutes questions of law and/or fact for this

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S
COMPLAINT

Printed on Recycled Paper
1569629

Exhibit _____ 3
Page _____ 5

1   court, defendant is not required to admit or deny the same.

2       24.    Answering paragraph 24, defendant contends that to the extent

3   paragraph 24 constitutes questions of law and/or fact for this court, defendant

4   is not required to admit or deny the same.

5       25.    Answering paragraph 25, defendant admits that Ironwood

6   tendered to the Cobb lawsuit to defendant.  Defendant further contends that to

7   the extent the remainder of paragraph 25 constitutes questions of law and/or

8   fact for this court, defendant is not required to admit or deny the same.

9       26.    Answering paragraph 26, defendant admits that the quoted

10  language is contained in defendant's correspondence to plaintiff dated October

11  25, 2012.  Defendant denies the remainder of the allegations as they disregard

12  the remainder of the October 25, 2012.  Defendant further contends that to the

13  extent paragraph 26 constitutes questions of law and/or fact for this court,

14  defendant is not required to admit or deny the same.

15      27.    Answering paragraph 27, defendant is without knowledge or

16  information sufficient to form a belief as to the truth of the allegations

17  contained in said paragraph, and on that basis denies each and every allegation

18  contained therein, generally and specifically, and each and every part thereof.

19  Defendant further contends that to the extent paragraph 27 constitutes

20  questions of law and/or fact for this court, defendant is not required to admit or

21  deny the same.

22      28.    Answering paragraph 28, defendant denies that the submission of

23  pre-tender invoices was inadvertent and that the contents of the pre-tender

24  invoices were and are protected by the attorney-client privilege and the

25  attorney work product doctrine.  Defendant admits plaintiff has requested that

26  the invoices be returned and that defendant has not returned the invoices.

27      29.    Answering paragraph 29, defendant admits that it has not paid

28  defense fees and costs incurred in the Cobb lawsuit.

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S
COMPLAINT

Printed on Recycled Paper
1569629

Exhibit _____ 3

Page _____ 6

30.    Answering paragraph 30, defendant admits that it issued a denial of coverage on February 26, 2013, which was reaffirmed in correspondence dated March 13, 2013.

31.    Answering paragraph 31, defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein, generally and specifically, and each and every part thereof. Defendant further contends that to the extent paragraph 31 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

32.    Answering paragraph 32, defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in said paragraph, and on that basis denies each and every allegation contained therein, generally and specifically, and each and every part thereof. Defendant further contends that to the extent paragraph 32 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

33.    Answering paragraph 33, defendant contends that paragraph 33 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

## FIRST CAUSE OF ACTIONS

For Declaratory Relief

(Against the Carriers)

34.    Answering paragraph 34, defendant contends that paragraph 34 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

35.    Answering paragraph 35, defendant denies that defendant failed to investigate or adjust the claim submitted by plaintiff. Defendant denies that the

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

Printed on Recycled Paper
1569629

Exhibit _____ 3
Page _____ 7

Cobb lawsuit is covered under the Policy.  Defendant further contends that to the extent paragraph 35 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

36.    Answering paragraph 36, defendant denies that the Cobb lawsuit is covered under the Policy.  Defendant further contends that to the extent paragraph 36 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

37.    Answering paragraph 37, defendant admits that the Cobb lawsuit was timely submitted to defendant.  Defendant further contends that to the extent paragraph 37 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

38.    Answering paragraph 38, defendant contends that paragraph 38 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

39.    Answering paragraph 39, defendant contends that paragraph 39 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

40.    Answering paragraph 40, defendant denies that defendant failed to perform a diligent, timely, adequate and thorough coverage investigation with respect to the Cobb lawsuit. Defendant denies that the Cobb lawsuit is covered under the Policy.  Defendant further contends that to the extent paragraph 40 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

41.    Answering paragraph 41, defendant denies that the submission of pre-tender invoices was inadvertent and that the contents of the pre-tender invoices were and are protected by the attorney-client privilege and the attorney work product doctrine.  Defendant further denies that the invoices cannot form a basis for the denial of coverage.  Defendant further contends that

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S
COMPLAINT

Printed on Recycled Paper
1569629

Exhibit _____ 3
Page _____ 8

to the extent paragraph 41 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

42.     Answering paragraph 42, defendant admits plaintiff has requested that the invoices be returned and that defendant has not returned the invoices. Defendant further denies that the submission of pre-tender invoices was inadvertent and that the contents of the pre-tender invoices were and are protected by the attorney-client privilege and the attorney work product doctrine.

43.     Answering paragraph 43, defendant contends that paragraph 39 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

### SECOND CAUSE OF ACTIONS

Breach of Written Contract – Failure to Defend

(Against the Carriers)

44.     Answering paragraph 44, defendant contends that paragraph 34 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

45.     Answering paragraph 45, defendant admits that it has a duty to investigate claims submitted for coverage.  Defendant denies that the Cobb lawsuit is covered under the Policy.

46.     Answering paragraph 46, defendant denies that the Cobb lawsuit is covered under the Policy.

47.     Answering paragraph 47, defendant admits that the Cobb lawsuit was tendered to defendant and that defendant denied coverage for the Cobb lawsuit.

48.     Answering paragraph 48, defendant contends that paragraph 48 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

Printed on Recycled Paper
1569629

Exhibit _____ 3

Page _____ 9

49.    Answering paragraph 49, defendant denies that the Cobb lawsuit was covered or potentially covered under the Policy and that defendant is in breach of the Policy.   Defendant admits that it has refused to pay and/or reimburse plaintiff for the fees and costs incurred in defense of the Cobb lawsuit.  Defendant further contends that to the extent paragraph 49 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

50.    Answering paragraph 50, defendant denies that defendant failed to perform a diligent, timely, adequate and thorough coverage investigation with respect to the Cobb lawsuit.  Defendant denies that it failed to properly respond to plaintiff's requests for defense and/or coverage.  Defendant further contends that to the extent paragraph 50 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

51.    Answering paragraph 51, defendant denies that defendant failed to perform a diligent, timely, adequate and thorough coverage investigation with respect to the Cobb lawsuit.  Defendant denies that it failed to properly respond to plaintiff's requests for defense and/or coverage.  Defendant denies that it breached the Policy.  Defendant further contends that to the extent paragraph 51 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

52.    Answering paragraph 52, defendant denies that denies that it breached the Policy.  Defendant further contends that to the extent paragraph 52 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

53.    Answering paragraph 53, defendant contends that paragraph 53 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

Printed on Recycled Paper
1569629

Exhibit _____ 3

Page _____

## THIRD CAUSE OF ACTIONS

For Breach of the Implied Covenant of Good Faith and Fair Dealing

(Against the CARRIERS)

54.    Answering paragraph 54, defendant contends that paragraph 34 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

55.    Answering paragraph 55, defendant contends that paragraph 35 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

56.    Answering paragraph 56, defendant contends that paragraph 56 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

57.    Answering paragraph 57, defendant denies the allegations contained therein.  Defendant further contends that paragraph 57 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

58.    Answering paragraph 58, defendant denies the allegations contained therein.  Defendant further contends that paragraph 58 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

59.    Answering paragraph 59, defendant denies that it engaged in any wrongful conduct.  Defendant further contends that paragraph 58 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

60.    Answering paragraph 60, defendant denies the allegations contained therein.  Defendant further contends that paragraph 60 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

Printed on Recycled Paper
1569629

Exhibit ____3____
Page ____11____

61.    Answering paragraph 61, defendant denies the allegations contained therein.  Defendant further contends that paragraph 61 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

62.    Answering paragraph 62, defendant denies the allegations contained therein.  Defendant further contends that paragraph 62 constitutes questions of law and/or fact for this court, defendant is not required to admit or deny the same.

## PRAYER FOR RELIEF

63.    Defendants denies that plaintiffs are entitled to any relief whatsoever under any cause of action against defendant and on that basis denies the prayer for relief including, but not limited to, paragraph 1 though 10.

## AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

64.    Defendants set forth its separate and distinct defenses to apprise plaintiffs of certain potentially applicable defenses to any and all claims. Defendants reserve the right to add or remove any affirmative defenses to plaintiffs' complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

65.    Plaintiff's claims should be dismissed because plaintiff has failed to perform all of the obligations of the Insured under the insurance policy or policies, and the terms and conditions precedent to coverage expressed therein, and/or to fully comply with insurance policy or policies, including but not limited to the Insured's obligations as to notice, assistance, consent and cooperation.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

66.    Plaintiff's complaint fails to state a claim upon which relief can be granted.

---

12

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

Printed on Recycled Paper
1569629

Exhibit _____ 3
Page _____ 12

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

67.    Plaintiff is equitably estopped from obtaining coverage, claiming any right for damages or any relief against defendants based on plaintiff's own conduct which defendant relied on to its detriment.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

68.    All claims made by plaintiff are barred in whole or in part by the applicable statute of limitations.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

69.    All claims made by plaintiff are barred in whole or in part by the equitable doctrine of laches.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

70.    All claims made by plaintiff are barred in whole or in part by the equitable doctrine of unclean hands.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

71.    By its acts and omissions, plaintiff has waived any and all rights at issue in the complaint.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

72.    All claims in whole or in part, are barred by the doctrine of res judicata.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

73.    Plaintiff's conduct materially increased defendant's risk in violation of the terms, conditions, limitations and exclusions in the insurance policy and/or policies.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

74.    Plaintiff made material misrepresentations in its application for insurance that defendant relied upon to its detriment.

Printed on Recycled Paper
1569629

Exhibit _____ 3
Page _____ 13

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

75.     The plaintiff's claims are barred, in whole or in part, by the applicable limits of liability, endorsements and other terms, conditions, limitations and exclusions in the policy including, but not limited to, the following:

     a.   The insuring agreements contained in the policy were not triggered;

     b.   Plaintiffs had prior knowledge of an act or omission that might reasonably be expected to be the basis of the subject claim;

     c.   Claim was first made prior to the inception of the Policy;

     d.   Exclusion 4.3, precludes coverage under the Policy;

     e.   Exclusion 4.9, precludes coverage under the Policy;

     f.   Exclusion 5.2, precludes coverage under the Policy;

     g.   Sections 6.1 and 6.2, precludes coverage under the policy; and

     h.   The damages sought in the cross-complaint are not covered under the policy.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

76.     In the event that liability is entered against defendant, defendant is entitled to set off for any uncovered claims.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

77.     Defendant reserves the right to plead additional affirmative defenses which may arise upon receiving additional information regarding the matters alleged in the complaint, through discovery or otherwise.

///
///
///
///
///

14

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

Printed on Recycled Paper
1569629

Exhibit ___3___
Page ___14___

1    **WHEREFORE**, defendants respectfully request that this Court enter

2    judgment as follows:

3        1.        Dismissing plaintiffs' complaint;

4        2.        Granting to the defendants all costs, expenses, and disbursements

5                  resulting from this litigation, including attorneys' fees; and

6        1.        Awarding such other and further relief as this Court deems just,

7    necessary, and proper.

8                                  Respectfully submitted,

9    Dated:  June 10, 2013        KAUFMAN BORGEEST & RYAN LLP

10

11

12                        By:        /s/ Jeffrey S. Whittington
                                   Jeffrey S. Whittington, Esq.
13                                 Nicholas W. Sarris, Esq.
                                   Attorneys for Defendant
14                                 Liberty Insurance Underwriters, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

15

DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S
COMPLAINT

Exhibit _____ 3
Page _____ 15

## DEMAND FOR JURY TRIAL

Defendants reserve the right to a trial by jury.

Respectfully submitted,

Dated:  June 10, 2013        KAUFMAN BORGEEST & RYAN LLP

By:        /s/Jeffrey S. Whittington
                Jeffrey S. Whittington, Esq.
                Nicholas W. Sarris, Esq.
                Attorneys for Defendant
                Liberty Insurance Underwriters, Inc.

16
<u>DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT</u>

Printed on Recycled Paper
1569629

Exhibit ___3___
Page ___16___

**PROOF OF SERVICE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

I declare as follows:

     I am employed in the County of Los Angeles, California.  I am over the age of 18 years, and not a party to the within action; my business address is 23975 Park Sorrento, Suite 370, Calabasas, California 91302.  I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

     On June 10, 2013, I served a true and correct copy, with all exhibits, of the following document(s) described as follows:

**DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT**

[x]    On the party or parties named below, by following ordinary business practice, placing a true copy thereof enclosed in a sealed envelope, for collection and mailing with a United States Postal Service, where it would be deposited for first class delivery, postage fully prepaid, in Calabasas, CA the United States Postal Service, that same day in the ordinary course of business, addressed as set forth below. *(Regular Office Deposit)*

[x]    via service through the CM/ECF system. *(eService)*

    John J. McLeod
    McLEOD LAW GROUP
    701 B Street, Suite 1570
    San Diego, California 92101
    Attorneys for Plaintiff Ironwood Country Club

     I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on June 10, 2013, at Calabasas, California.

By:   __/s/ Sharyn Waldrop_____    By:   _____Sharyn Waldrop_____
     Signature of Declarant             Name of Declarant

Printed on Recycled Paper
1569629

Exhibit ____ ₅

# EXHIBIT 4

1 | John J. McLeod, Esq., State Bar No. 174169
john@mcleodlawgroup.com
2 | Paul C. Hirst, Esq., State Bar No. 234460
pchirst@mcleodlawgroup.com
3 | McLEOD LAW GROUP, A.P.C.
701 B Street, Suite 1570
4 | San Diego, California 92101
Telephone: (619) 236-9938
5 | Facsimile: (619) 236-9943

6 | Attorneys for Plaintiff,
IRONWOOD COUNTRY CLUB
7

8 | ### UNITED STATES DISTRICT COURT

9 | ### CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| IRONWOOD COUNTRY CLUB,<br><br>  Plaintiff,<br><br>  v.<br><br>LIBERTY INSURANCE UNDERWRITERS, INC. and DOES 1 through 100,<br><br>  Defendants. | CASE NO. 13-00996-VAP (DTBx)<br><br>**JOINT DISCOVERY PLAN REPORT PURSUANT TO FED. R. CIV. P. 26(f) AND L.R. 26-1**<br><br>Scheduling Conference<br>Date:　　　September 9, 2013<br>Time:　　　1:30 p.m.<br>Location:　　U.S. District Court<br>　　　　　　3470 Twelfth Street<br>　　　　　　Riverside, California<br>　　　　　　Courtroom 2<br><br>Date Complaint Filed: May 1, 2013<br>Trial Date: None |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joint Discovery Plan Report

Exhibit ___4___
Page ___1___

Pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, Local Rule 26-1 and the Court's June 11, 2013, Order Setting Scheduling Conference, Plaintiff, Ironwood Country Club ("Ironwood"), and Defendant, Liberty Insurance Underwriters, Inc. ("Liberty") (collectively the "Parties"), respectfully submit the following Joint Discovery Plan Report.

**I.    CONFERENCE REPORT OUTLING DISCOVERY PLAN, AS REQUIRED BY RULE 26(f)(3)**

Counsel for the Parties met and conferred telephonically on August 16, 2013, to discuss the issues required by Rule 26(f).  The results of counsel's discussion are set forth below.

**A.    Changes to Timing, Form or Requirement for Disclosures under Rule 26(a) (FED. R. CIV. P.  26(f)(3)(A))**

The Parties have stipulated to make the initial disclosures required by Federal Rule of Civil Procedure 26(a)(1)(A) on September 30, 2013.    The Parties do not propose any other changes to the requirements for disclosures under Rule 26(a).

**B.    The Subjects on Which Discovery May Be Needed, When Discovery Should Be Completed, and Whether Discovery Should Be Conducted in Phases or Be Limited to or Focused on Particular Issues (FED. R. CIV. P. 26(f)(3)(B))**

**1.    Subjects of Which Discovery May be Needed**

**a.    Ironwood's Statement of the Discovery It Expects to Take during This Action:**

Ironwood expects to propound written discovery upon Liberty, including interrogatories, requests for admissions, and requests for production of documents. Ironwood anticipates that its written discovery will seek information and documents pertaining to the subject insurance policy, including without limitation: (1) the negotiation and purchase of the policy at issue in this case; (2) Liberty's underwriting files; (3) Liberty's underwriting manuals that pertain to the type of policy at issue in

Exhibit ____ 4
Page ____ 2

1    this case, including applications for such policies; (4) Liberty's claims manuals that

2    pertain to the type of policy at issue in this case, including applications for such

3    policies.

4        Ironwood also anticipates that its written discovery will seek information and

5    documents pertaining to the underlying action, including without limitation: (1) the

6    claims asserted against Ironwood in the underlying action; (2) the tender of those

7    claims to Liberty; (3) Liberty's investigation and handling of the claims upon tender;

8    and (4) Liberty's coverage determinations.

9        Ironwood expects to take the deposition of the following witnesses: (1) Liberty's

10    adjusters that handled this matter, Christine J. Testaverde and Seon Choi; (2) Liberty's

11    Head of Claims, John Patterson; (3) Liberty's custodian of records; (4) Liberty's person

12    most knowledgeable; and (5) Liberty's managing agent. *See* FED. R. CIV. P. 30(b)(6).

13    Plaintiff anticipates that these depositions will seek information and documents

14    pertaining to Liberty's policy specified in this case, the underlying action and Liberty's

15    investigation and claims handling regarding the underlying action, including without

16    limitation the information and documents identified above with respect to written

17    discovery.   Ironwood may need to take additional depositions based upon the

18    information and/or documents that are disclosed during these depositions, the

19    information and documents that are disclosed pursuant to the initial disclosures

20    required by Federal Rule of Civil Procedure 26(a)(1)(A), as well as the information

21    and/or documents responsive to Ironwood's written discovery.

22             **b.**     **Liberty's Statement of the Discovery It Expects to Take**

23                 **during This Action:**

24        Liberty expects to propound written discovery upon Ironwood, including

25    interrogatories, requests for admissions, and requests for production of documents.

26    Ironwood anticipates that its written discovery will seek information and documents

27    pertaining to the suit tendered by Ironwood for defense and coverage, styled *Cobb, et*

28    *al. v. Ironwood Country Club*, Riverside County Superior Court-Indio Branch, Case

Exhibit _____ 4
Page _____ 3

No. INC 1205888 ("Cobb suit"). Liberty will seek information specifically concerning, but not limited to: (1) Ironwood's communication with club members prior to the commencement of the Cobb suit; (2) Ironwood's communication with club members prior to its application for an insurance policy with Liberty; (3) Ironwood's files/documents related to the decision-making process in regard to the loan repayment agreement; (4) facts and circumstances related to Ironwood's determination to purchase an insurance policy with Liberty; (5) facts and circumstances relating to Ironwood's submission of legal invoices to Liberty for reimbursement; and (6) Ironwood's position and rational regarding the availability of a defense and coverage for the Cobb suit.

Additionally, Liberty will seek documents concerning: (1) the pre-tender invoices that Ironwood submitted to Liberty for reimbursement; (2) the memorandum referenced in a pre-tender invoice that Ironwood submitted to Liberty for reimbursement; and (3) the Board of Director meeting notes on the issues outlined in the memorandum referenced in the pre-tender invoice that Ironwood submitted to Liberty for reimbursement.

Liberty expects to take the deposition of the following witnesses: (1) Ironwood's retail broker, Alan Lux; (2) Ironwood's counsel, Bryan Gerstel; (3) Ironwood's General Manager/COO and signatory to the application for insurance with Liberty, Joshua Tanner; (4) President of the Board of Directors when the memorandum at issue was prepared, Ken Delf; (5) President of the Board of Directors when the Cobb suit was filed, Robert Manson; (6) Former club member and Plaintiff in the Cobb suit, William Cobb; and (7) Ironwood's CFO, Lydia Magal. *See* Fed. R. Civ. P. 30(b)(6). Liberty anticipates that these depositions will seek information and documents pertaining to the facts and circumstances relating to Ironwood's application for insurance, including without limitation, the information and documents identified above with respect to written discovery. Liberty may need to take additional depositions based upon the information and/or documents that are disclosed during these depositions, the information and documents that are disclosed pursuant to the initial disclosures

3

Exhibit _4_
Page _4_

required by Federal Rule of Civil Procedure 26(a)(1)(A), as well as the information and/or documents responsive to Liberty's written discovery.

### c. Issues with Proposed Discovery:

To the extent the Parties believe there are issues with respect to each other's proposed discovery, they will address them at the Scheduling Conference.

### 2. When Discovery Should Be Completed

As set forth in the attached "Exhibit A: Schedule of Pretrial and Trial Dates," the Parties mutually agree that the discovery cutoff, including hearing all discovery motions, should be May 26, 2014.

### 3. Whether Discovery Should Be Conducted in Phases or Be Limited to or Focused on Particular Issues

The Parties do not believe that discovery should be conducted in phases or be limited to or focused on particular issues.

### C. Issues about Disclosure or Discovery of Electronically Stored Information, Including the Form or Forms in Which It Should Be Produced (FED. R. CIV. P. 26(f)(3)(C))

The Parties mutually agree that electronically stored information responsive to discovery requests may be produced in its native format (i.e., the form in which it currently exists). To the extent the Parties believe there are issues with respect to each other's proposed discovery of electronically stored information, they will address them at the Scheduling Conference.

### D. Issues About Claims of Privilege or of Protection as Trial-Preparation Materials, Including--if the Parties Agree on a Procedure to Assert These Claims After Production --Whether to Ask the Court to Include Their Agreement in an Order (FED. R. CIV. P. 26(f)(3)(D))

Liberty has confirmed that it is not relying on the advice of counsel as a defense in this case.

As for any documents, communications, or tangible things not produced or

Exhibit _____ 4
Page _____ 5

1  disclosed based on a claim of privilege or protection, the Parties agree that the

2  withholding Party should produce a privilege log that contains the following

3  information: (1) the bates number range of the document(s); (2) the identity of the

4  author(s); (3) the identity of the recipient(s); (4) the date of the document(s); (5) a

5  description of the document (i.e., letter, email, etc.); (6) the document's present

6  location; and (7) the specific privilege or other reason it is being withheld. *See* Fed. R.

7  Civ. P. 26(b)(5).

8        As for the procedure for asserting privilege claims after production, whether said

9  production took place before or after the commencement of this action, the Parties

10  agree that either party may bring a motion to the Court for a determination on the

11  privilege claim, including without limitation a motion for a protective order. *See* Fed.

12  R. Civ. P. 26(b)(5)(B) and Fed. R. Civ. P. 26(c).

13        **E.   Proposed Changes in the Limitations on Discovery Imposed under the**

14             **Federal Rules of Civil Procedure or by Local Rule, and Other**

15             **Limitations that Should Be Imposed (FED. R. CIV. P. 26(f)(3)(E))**

16        Except as stated above, the Parties do not presently propose any changes to the

17  limitations on discovery imposed under the Federal Rules of Civil Procedure or the

18  Local Rules.

19        **F.   Other Orders that the Court Should Issue under Rule 26(c) or under**

20             **Rule 16(b) and (c) (FED. R. CIV. P. 26(f)(3)(F))**

21        The Parties jointly request that the Court issue a Scheduling Order reflecting the

22  dates set forth in the attached "Exhibit A: Schedule of Pretrial and Trial Dates."

23        The Parties have discussed the possibility that some information that has already

24  been disclosed or produced prior to commencement of this action, or may be sought to

25  be disclosed or produced during this action, might include confidential information,

26  such as a party's confidential financial or proprietary business information,  or that is

27  privileged or otherwise protected information, including without limitation, under the

28  attorney-client privilege or the attorney work product doctrine. The Parties agree that if

Joint Discovery Plan Report

Exhibit ____ 4
Page ____ 6

1  such information has been or is disclosed or produced, either party may bring a motion

2  to the Court for a determination on the privilege claim, including without limitation a

3  motion for a protective order.

4  **II.**   **MATTERS REQUIRED BY LOCAL RULE 26-1**

5      Counsel for the Parties met and conferred telephonically on August 16, 2013 to

6  discuss the issues required by L.R. 26-1.  The results of counsel's discussion are set

7  forth below.

8      **A.**   **Complex-Case Designation (L.R. 26-1(a))**

9      The Parties agree that this case is not a proper candidate for designation as a

10  complex case.

11      **B.**   **Motion Schedule (L.R. 26-1(b))**

12      Both Parties presently anticipate filing a single dispositive motion or partially

13  dispositive motion in accordance with Section 4 of the Court's Standing Order dated

14  June 4, 2013, regarding Liberty's coverage obligations in connection with the

15  underlying case.  However, both Parties reserve the right to seek leave of the Court to

16  file more than one dispositive or partially dispositive motion, if necessary.  As set forth

17  in the attached "Exhibit A: Schedule of Pretrial and Trial Dates," the Parties agree that

18  the last day for hearing non-discovery motions should be <u>June 30, 2014</u>.  However, the

19  Parties anticipate that dispositive or partially dispositive motions will likely be filed

20  well before that date.

21      **C.**   **ADR (L.R. 26-1(c))**

22      The Parties have mutually agreed to participate in a settlement conference and/or

23  private mediation sometime between October 14, 2013 and November 18, 2013.  To

24  that end, and as set forth in the attached "Exhibit A: Schedule of Pretrial and Trial

25  Dates" and "Form ADR 1," the Parties' first choice is to appear before the U.S.

26  Magistrate Judge assigned to this case for a settlement conference.  If, however, the

27  U.S. Magistrate Judge assigned to this case is not available between October 14, 2013

28  and November 18, 2013, the Parties will work together to schedule a private mediation.

Joint Discovery Plan Report

Exhibit ___ 4
Page ___ 7

1    **D.    Trial Estimate (L.R. 26-1(d))**

2    The Parties presently estimate a jury trial of 6-10 days.  The Parties request that

3    trial be set to begin on <u>September 16, 2014</u>.

4    **E.    Additional Parties (L.R. 26-1(e))**

5    The Parties do not presently anticipate the appearance of any additional parties.

6    **F.    Expert Witnesses (L.R. 26-1(f))**

7    As set forth in the attached "Exhibit A: Schedule of Pretrial and Trial Dates," the

8    Parties agree that the initial expert disclosure should be made by <u>March 7, 2014</u> and the

9    rebuttal expert disclosure should be made by <u>March 28, 2014</u>.

10   **III.   ADDITIONAL MATTERS REQUIRED BY THE COURT'S JUNE 11,**

11   **2013 ORDER SETTING SCHEDULING CONFERENCE**

12   **A.    Exhibit A**

13   A completed "Exhibit A: Schedule of Pretrial and Trial Dates" is attached hereto.

14   **B.    Form ADR 1**

15   A completed "Form ADR 1" is attached hereto.

16                          Respectfully submitted,

17   DATED: August 30, 2013        McLEOD LAW GROUP, A.P.C.

18
                                  By:  /s/ John J. McLeod
19                                     John J. McLeod, Esq.
20                                     Paul C. Hirst, Esq.
                                       Attorneys for Plaintiff, Ironwood Country
21                                     Club

22
23   DATED: August 30, 2013        KAUFMAN BORGEEST & RYAN LLP

24
25                                 By:  /s/ Jeffrey S. Whittington
                                       Jeffrey S. Whittington, Esq.
26                                     Miriam Gregory, Esq.
27                                     Attorneys for Defendant, Liberty Insurance
                                       Underwriters, Inc.
28

                                       7

Exhibit ___4___
Page ___8___

1
2

**PROOF OF SERVICE**

*Ironwood County Club v. Liberty Insurance Underwriters, Inc., et al.*
Case No. 13-00996-VAP (DTBx)

STATE OF CALIFORNIA      )
                         ) ss:
COUNTY OF SAN DIEGO      )

3
4
5
6

I am employed in the County of San Diego, State of California.  I am over the age of eighteen years and not a party to the action.  My business address is 701 B Street, Suite 1570, San Diego, CA 92010.  On August 30, 2013, I served the document(s) on the interested parties in this action as follows:

7
8

1. **JOINT DISCOVERY PLAN REPORT PURSUANT TO FED. R. CIV. P. 26(f) AND L.R. 26-1;**

9
10

2. **EXHIBIT A: SCHEDULE OF PRETRIAL AND TRIAL DATES; AND**

3. **FORM ADR-1**

11
12

By placing ☐ the original ☒ a true copy thereof enclosed in a sealed envelope addressed as follows:      SEE ATTACHED SERVICE LIST

13

☒   **BY ECF:**  By electronically filing the foregoing document(s) according to the procedures set forth in the Local Rule 5-3.3 of the United States District Court for the Central District, which provides as follows:

14
15
16
17
18

"Upon the electronic filing of a document, a "Notice of Electronic Filing" ("NEF") is automatically generated by the CM/ECF System and sent by e-mail to all attorneys in the case who are registered as CM/ECF Users and have consented to electronic service. (See L.R. 5-4.1.3.) Service by this electronic NEF constitutes service pursuant to the Federal Rules of Civil and Criminal Procedure for all attorneys who have consented to electronic service."

19
20
21
22
23

☐   **BY MAIL:**  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at San Diego, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after service of deposit for mailing in affidavit.

24
25

☐   **BY E-MAIL SERVICE:**   By agreement of the parties, transmission of documents by e-mail shall equal service by U.S. Mail.  I caused the above-listed documents to be served via e-mail as indicated below.

26
27
28

☐   **BY OVERNIGHT DELIVERY**:  By causing such envelope to be deposited or delivered in a box or other facility regularly maintained by Federal Express authorized to receive documents, or delivering to a courier or driver authorized by said express service carrier to receive documents, the copy of the foregoing document in a sealed envelope designated by the express service carrier,

Exhibit ____4____
Page ____9____

addressed as stated above, with fees for overnight (next business day) delivery paid or provided for and causing such envelope to be delivered by said express service carrier on [Insert Date] .

☐  **BY FACSIMILE MACHINE:**  The foregoing document was transmitted to the above-named persons by facsimile transmission from (619) 236-9943 before 5:00 p.m. on said date and the transmission was reported as complete and without error.

☐  **BY PERSONAL SERVICE:**  I caused to be delivered the foregoing document(s) to the addressee(s) specified.

☐  [State]    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☒  [Federal]    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 30, 2013, at San Diego, California.

_____/s/ Paul C. Hirst_____
Paul C. Hirst

1

Proof of Service

Exhibit ____4____
Page ____10____

**SERVICE LIST**

*Ironwood County Club v. Liberty Insurance Underwriters, Inc., et al.*
Case No. 13-00996-VAP (DTBx)

| | |
|---|---|
| Jeffrey S. Whittington, Esq.<br>KAUFMAN BORGEEST & RYAN LLP<br>23975 Park Sorrento, Suite 370<br>Calabasas, CA 91302<br>Tel: 818-880-0992<br>Fax: 818-880-0993<br>E-mail: jwhittington@kbrlaw.com | Attorneys for Defendant,<br>LIBERTY INSURANCE<br>UNDERWRITERS, INC. |

2

Proof of Service

Exhibit _____ 4

Page _____ 11

# Miscellaneous Filings (Other Documents)

5:13-cv-00996-VAP-DTB Ironwood Country Club v. Liberty Insurance Underwriters Inc et al

(DTBx),DISCOVERY,MANADR

## UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA

### Notice of Electronic Filing

The following transaction was entered by Hirst, Paul on 8/30/2013 at 6:16 PM PDT and filed on
8/30/2013

| | |
|---|---|
| **Case Name:** | Ironwood Country Club v. Liberty Insurance Underwriters Inc et al |
| **Case Number:** | 5:13-cv-00996-VAP-DTB |
| **Filer:** | Ironwood County Club |
| **Document Number:** | 18 |

**Docket Text:**
**REPORT of Joint Discovery Plan Pursuant to Fed.R.Civ.P. 26(f) and LR 26-1 filed by
Plaintiff Ironwood County Club. (Attachments: # (1) Exhibit Schedule of Pretrial and Trial
Dates, # (2) Exhibit Form ADR-1)(Hirst, Paul)**


**5:13-cv-00996-VAP-DTB Notice has been electronically mailed to:**

Jeffrey Stewart Whittington    jwhittington@kbrlaw.com

John James McLeod    john@mcleodlawgroup.com

Paul C Hirst    phirst@mcleodlawgroup.com

**5:13-cv-00996-VAP-DTB Notice has been delivered by First Class U. S. Mail or by other means
BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**M:\Ironwood Country Club - Ins\Pleadings\Ironwood v Liberty\District Court\Joint
Discovery Plan Report\Joint Discovery Plan Report - 083013.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=8/30/2013] [FileNumber=16177583-0
] [58691ca34a3cf8d803abe236dda41139601c38b2568e58a083e23dd9608ea332671
a3c38d54db1ac932a60327faa280c60c79264acd1a26702aeed9742fbd1b3]]
**Document description:**Exhibit Schedule of Pretrial and Trial Dates
**Original filename:**M:\Ironwood Country Club - Ins\Pleadings\Ironwood v Liberty\District Court\Joint
Discovery Plan Report\Exhibit A Schedule of Pretrial and Trial Dates - 083013.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=8/30/2013] [FileNumber=16177583-1
] [59dca5ce87bc63abe6fafbf4b800ec697734db3649bc2376fe0ed1ef1e71748836b

Exhibit _____ 4
Page _____ 12

aadcd5412083876d3e6d721dd10c91a838d45a483957ef0b8a7939a5d68b2]]

**Document description:**Exhibit Form ADR-1

**Original filename:**M:\Ironwood Country Club - Ins\Pleadings\Ironwood v Liberty\District Court\Joint Discovery Plan Report\Form ADR-1 - 083013.pdf

**Electronic document Stamp:**

[STAMP cacdStamp_ID=1020290914 [Date=8/30/2013] [FileNumber=16177583-2
] [37f41d57d8d83ada2a77f370f9da41edcefc3c4c072a7fc37e70b46e25af3617360
1d9524602aa9f180be73218bc43fce8de6335bfebb9980dafb0efaeb672ff]]

Exhibit ___4___
Page ___13___