John J. McLeod, Esq., State Bar No. 174169
john@mcleodlawgroup.com
Paul C. Hirst, Esq., State Bar No. 234460
pchirst@mcleodlawgroup.com
McLEOD LAW GROUP, A.P.C.
701 B Street, Suite 1570
San Diego, California 92101
Telephone:  (619) 236-9938
Facsimile:  (619) 236-9943

Attorneys for Plaintiff,
IRONWOOD COUNTRY CLUB

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| IRONWOOD COUNTRY CLUB,<br><br>Plaintiff,<br>v.<br><br>LIBERTY INSURANCE UNDERWRITERS, INC. and DOES 1 through 100,<br><br>Defendants. | CASE NO. 13-00996-VAP (DTBx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *AMENDED* MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:   February 24, 2014<br>Hearing Time:   2:00 p.m.<br>Courtroom:      Hon. Virginia A. Phillips<br><br>Date Complaint Filed: May 1, 2013<br>Trial Date: August 5, 2014<br><br>Filed concurrently with:<br>   *1. Notice of Amended Motion and Amended Motion;*<br>   *2. Statement of Undisputed Facts;*<br>   *3. Declaration of Bryan R. Gerstel;*<br>   *4. Declaration of Joshua Tanner;*<br>   *5. Declaration of Alan Lux;*<br>   *6. Declaration of Robert C. Manion;*<br>   *7. Declaration of John J. McLeod;*<br>   *8. Request for Judicial Notice; and*<br>   *9. [Proposed] Order.* |

# TABLE OF CONTENTS

I.      **INTRODUCTION**…………………………………………………………1

II.     **STATEMENT OF FACTS** ……………………………………………...1

    A.    **The Liberty Policy** ……………………………………………1

    B.    **Ironwood's Vote to Change**
        **One of Its Business Practices** ……………………………......2

    C.    **The Underlying Action (the Cobb Matter)** ……..………………3

    D.    **Liberty Agrees to Defend Ironwood** ……………………………3

    E.    **Ironwood Inadvertently Submits**
        **Pre-Tender Invoices to Liberty** ………………………………3

    F.    **Liberty Fails to Pay Any Money Toward Ironwood's Defense** ……………5

    G.    **Liberty Withdraws Coverage and Abandons Ironwood's Defense** ………..5

III.    **ARGUMENT**…………………………………………………………5

    A.    **Liberty's Duty to Defend Ironwood in the Underlying Action** ……………5

        1.    **Liberty's Bad Faith Coverage Denial** …………………………6

        2.    **Coverage Limitations Are Narrowly Construed** ……………….7

        3.    **Liberty's Coverage Position Lacks Any Legal Support** ………...10

        4.    **Liberty's Coverage Position Lacks Any Factual Support** ………..10

        5.    **Liberty Improperly Relied on Privileged Information**
           **that Ironwood Inadvertently Disclosed** ………………………12

        6.    **Liberty Cannot Justify Its Coverage Denial by Hindsight** …………12

        7.    **Liberty's Newly-Asserted Rescission Affirmative Defense**
           **Does Not Bar the Relief Sought by Ironwood in this Motion** ……..13

    B.    **Liberty Must Reimburse Ironwood for Defense Fees and Costs** …………18

    C.    **Liberty Must Return the Pre-Tender Invoices to Ironwood** ………………20

        1.    **Ironwood Has Not Waived the Attorney-Client Privilege** …………22

        2.    **The "Crime-Fraud" Exception Does Not Apply** ……………………24

IV.     **CONCLUSION**…………………………………………………………25

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**

*Allstate Ins. Co. v. Erickson*, 227 F.2d 755, 756 (9th Cir. 1955)……………………………7, 8

*Ashley v. Am. Mut. Liab. Ins. Co.* 167 F. Supp. 125, 131 (N.D. Cal. 1958)……………………8

*Atmel Corp. v. St. Paul* 416 F. Supp. 2d 802 (N.D. Cal. 2006)……………………………...14

*Brennan v. Lermer Corp.*, 626 F. Supp. 926 (N.D. Cal. 1986)………………………………...5

*Endurance American Specialty Ins. Co. v. WFP Securities Corp.*, 2012 U.S. Dist. LEXIS 153864, 9-10, 11-cv-2611 JAH (KSC) (S.D. Cal., Sept. 28, 2012)………………………13, 15

*Rocklin Park Place Condominium Owners Assoc. v. Liberty Ins. U'wtrs, Inc.*, 2013 U.S. Dist. LEXIS 127669, 2:12-cv-02247-TLN-CKD (E.D. Cal., Sept. 6, 2013)…14, 15

*Unionamerica Ins. Co. v. The Fort Miller Group. Inc.*, 590 F. Supp. 2d 1254 (N.D. Cal. 2008)…………………………………………………………8

**<u>State Cases</u>**

*Advanced Micro Devices v. Great Am. Surplus Lines Ins. Co.*, 199 Cal. App. 3d 791, 245 Cal. Rptr. 44 (1988)…………………………………………………10

*Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal. 4th 38, 70 Cal. Rptr. 2d 218 (1997)………………………………………………………………19

*Buss v. Superior Court*, 16 Cal. 4th 35, 65 Cal. Rptr. 2d 366 (1997)……………………5, 14

*City & County of San Francisco v. Superior Court*, 37 Cal. 2d 227, 231 P.2d 26 (1951)….21

*Costco Wholesale Corp. v. Superior Court*, 47 Cal. 4th 725, 732, 101 Cal. Rptr. 3d 758 (2009)…………………………………………………………20, 21

*Dickerson v. Superior Court*, 135 Cal. App. 3d 93, 185 Cal. Rptr. 97 (1982)………………24

*Glade v. Superior Court*, 76 Cal. App. 3d 738, 143 Cal. Rptr. 119 (1978)…………………24

*Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 54 Cal. Rptr. 104 (1966)………………...5, 6, 10, 14

*Grey v. Superior Court*, 62 Cal. App. 3d 698, 703-04, 133 Cal. Rprtr. 318 (1976)…………12

*Haskel, Inc. v. Superior Court*, 33 Cal. App. 4th 963, 39 Cal. Rptr. 2d 520 (1995)…………………………………………11, 13, 14, 15, 17, 18

1   *Horace Mann Ins. Co. v. Barbara B,* 4 Cal. 4th 1076, 17 Cal. Rptr. 2d 210 (1993)………..6

2   *Intergulf Develop., LLC v. Superior Court*, 183 Cal. App. 4th 16,

3   107 Cal. Rptr. 3d 162 (2010)…………………………………………………………17

4   *Janopaul + Block Cos., LLC v. Superior Court*, 200 Cal. App. 4th 1239,

5   133 Cal. Rptr. 3d 380 (2011)…………………………………………………………18

6   *Jefferson Standard Life Ins. Co. v. Anderson*, 236 Cal. App. 2d 905,

7   46 Cal. Rptr. 480 (1965)……………………………………………………………...7, 8

8   *Marie Y. v. General Star Indem. Co.*, 110 Cal. App. 4th 928,

9   2 Cal. Rptr. 3d 133 (2003)…………………………………………………………19

10  *Metropolitan Life Ins. Co. v. Devore* 66 Cal. 2d 129, 56 Cal. Rptr. 881 (1967)…………7, 8

11  *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 3 Cal. Rptr. 3d 228 (2003)………………7

12  *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287,

13  24 Cal. Rptr. 2d 467 (1993)……………………………………………...6, 10, 13, 14, 15, 16

14  *Montrose Chem. Corp. v. Superior Court*, 25 Cal. App. 4th 902,

15  31 Cal. Rptr. 2d 38 (1994)…………………………………………………………16

16  *Mullen v. Glens Falls Ins. Co.*, 73 Cal. App. 3d 163, 140 Cal. Rptr. 605 (1977)………13, 14

17  *Resure, Inc. v. Superior Court*, 42 Cal. App. 4th 156, 49 Cal. Rptr. 2d 354 (1996)……….10

18  *Roberts v. Superior Court*, 9 Cal. 3d 330, 107 Cal. Rptr. 309 (1973)……………………...22

19  *State of Calif. v. Pacific Indem. Co.,* 63 Cal. App. 4th 1535, 75 Cal. Rprtr. 2d 69 (1998)…19

20  *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 109 Cal. Rptr. 811 (1973)…….7

21  *Wausau Underwriters Ins. Co. v. Unigard Sec. Ins. Co.*,

22  68 Cal. App. 4th 1030, 80 Cal. Rptr. 2d 688 (1998)……………………………………13, 14

23  *Wells Fargo Bank, N.A. v. Superior Court*, 22 Cal. 4th 201, 91 Cal. Rptr. 2d 716 (2000)…20

24  *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 221 Cal. Rptr. 509 (1985)………………...24

25  *Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.*,

26  64 Cal. App. 3d 261, 134 Cal. Rptr. 427 (1976)……………………………………………10

27  / / /

28  / / /

Points & Authorities ISO Ironwood's *Amended* Motion for Partial Summary Judgment

**Federal Statutes and Rules**

Fed. R. Civ. Proc. 56 …………………………………………………………………..1

Fed. R. Evid. 501 …………………………………………………………………..20

**State Statutes and Rules**

Cal. Civ. Code § 2860…………………………………………………...…12, 17

Cal. Evid. Code, § 911…………………………………………………………...20

Cal. Evid. Code, § 914(b)………………………………………………………..20

Cal. Evid. Code, § 917(a)………………………………………………………..21

Cal. Evid. Code, § 952 …………………………………………………………21

Cal. Evid. Code, § 953(a) ………………………………………………………23

Cal. Evid. Code, § 954 …………………………………………………20, 21

Cal. Evid. Code, § 956 …………………………………………………………24

**Other**

Hon. H. Walter Croskey, et al.,

Rutter Group Practice Guide: Ins. Lit.; Ch. 7B-A, ¶ 7:506 (2013 ed.)…………………18

Hon. H. Walter Croskey, et al.,

Rutter Group Practice Guide: Ins. Lit.; Ch. 7B-A, ¶ 7:506.2 (2013 ed.)…………………18

Hon. H. Walter Croskey, et al.,

Rutter Group Practice Guide: Ins. Lit.; Ch. 7B-H, ¶ 7:691 (2013 ed.)…………………18

Plaintiff, Ironwood Country Club ("Ironwood"), respectfully submits the following memorandum of points and authorities in support of its *amended* motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

## I.   <u>INTRODUCTION</u>

This case arises from an insurance coverage dispute between Ironwood and its insurance company, Liberty.  Ironwood submits that there is no genuine dispute as to any material fact and that Ironwood is entitled to judgment as a matter of law on the following issues: (1) that Liberty has a duty to defend Ironwood in the underlying lawsuit entitled *Cobb, et al. v. Ironwood County Club* ("Cobb Lawsuit"); (2) that Liberty must immediately reimburse Ironwood the sum of $56,569.36 for the fees and costs Ironwood incurred (at the agreed-upon hourly rate of $275 and after subtracting Ironwood's payment of the $10,000 retention under the Liberty policy) in defense of the Cobb Lawsuit from May 15, 2012 (the date that Ironwood gave notice to Liberty) to February 26, 2013 (the date that Liberty withdrew from Ironwood's defense);[2] and (3) that Liberty must immediately return to Ironwood any and all copies (digital, paper or otherwise) of Bryan R. Gerstel, APC's attorney billing statements dated June 30, 2011, September 6, 2011, October 13, 2011, December 8, 2011, March 5, 2012, April 3, 2012, and May 1, 2012 (collectively "Pre-Tender Invoices"), and Liberty is prohibited from using the Pre-Tender Invoices for any purpose in this action.  The undisputed facts that are material to these three issues are as follows.

## II.   <u>STATEMENT OF FACTS</u>

### A.   <u>The Liberty Policy</u>

In July 2011, Ironwood's General Manager and Chief Operating Officer, Joshua

---

[1] Per this Court's January 16, 2014 Order granting defendant Liberty Insurance Underwriters, Inc.'s ("Liberty") motion for leave to amend its answer in this action, Ironwood is hereby re-filing its motion for partial summary judgment to address the amended answer and to correct any clerical errors.

[2] Ironwood reserves all of its rights under California law to seek additional defense fees and costs incurred by Ironwood, including the right to seek recovery of defense fees and costs at the full hourly rate, rather than the previously agreed-to discounted rate.

Tanner, began working with Ironwood's insurance broker, Alan Lux, to purchase a policy affording directors and officers liability coverage for the period of October 2011 to October 2012.  Statement of Undisputed Facts filed concurrently herewith ("SUF"), No. 1.  To that end, on October 5, 2011, Ironwood submitted to Liberty an "Application for Nonprofit Executive Advantage Policy" ("Liberty Application").   SUF, No. 2.[3] Liberty thereafter issued a policy to Ironwood affording Directors & Officers Liability coverage for the period of October 1, 2011 to October 1, 2012 ("Policy").  SUF, No. 3.

### B.    <u>Ironwood's Vote to Change One of Its Business Practices</u>

In 1999, Ironwood's members approved an assessment of $25,500 per member ("Assessment").  SUF, No. 4.  The Assessment was to be repaid to a member when the member subsequently sold their membership.   SUF, No. 5.   Members sold their memberships by placing them on a resale list.  SUF, No. 6.  However, some members forfeited their membership to the club rather than have it sold to an incoming member. SUF, No. 7.   The forfeited memberships became club property and were called Treasury memberships.   SUF, Nos. 8-9.   Prior to 2010, Ironwood had a business practice of selling these Treasury memberships to incoming new members and repaying the Assessment to the forfeiting member when that Treasury sale occurred, which was typically years after the member forfeited it.  SUF, Nos. 10-11.

For several years before 2010, Ironwood's prior Boards had intermittently discussed the nature and terms of this business practice.  SUF, No. 12.  And, in 2010, the Board was discussing this very same topic.  SUF, No. 13.  In discussing whether or not to cease repaying the Assessment to forfeiting members, the Board consulted with many individuals, including Ironwood's counsel, Bryan Gerstel.  SUF, No. 14.  Prior to

---

[3] Liberty has since claimed that Ironwood provided a "no" response to Question No. 14 on the Liberty Application.  Ironwood does not know who, if anyone, provided a "no" response to this question.  *See* Declaration of Joshua Tanner filed concurrently herewith ("Tanner Decl."), ¶ 6; Declaration of Alan Lux filed concurrently herewith ("Lux Decl."), ¶ 8.  However, whether or not Ironwood provided a "no" response to Question No. 14 is <u>not</u> a material fact for purposes of this motion.  For the reasons set forth herein, even if, as Liberty contends, Ironwood responded "no" to Question No. 14, Ironwood is still entitled to an order in its favor on the three discrete issues that are the subject of this motion.

1   January 2012, the matter was never presented to the Board for a vote.  SUF, No. 15.

2   On January 19, 2012, nearly four months <u>after</u> Ironwood submitted the Liberty

3   Application, Ironwood's Board voted to stop the practice of repaying the Assessment to

4   forfeiting members. SUF, Nos. 18-19.  This was the first time the Board voted on

5   whether to change this business practice.  SUF, No. 18.

6   **C.   <u>The Underlying Action (the Cobb Matter)</u>**

7   On May 7, 2012, more than seven months <u>after</u> Ironwood submitted the Liberty

8   Application, Ironwood received a demand letter from William Cobb, which asserted

9   claims arising out of Ironwood's January 2012 vote.  SUF, No. 21.  Mr. Cobb's May

10  2012 letter was the first claim of which Ironwood was aware regarding the January

11  2012 vote.  SUF, No. 22.  Mr. Cobb subsequently filed a lawsuit against Ironwood,

12  which asserts claims arising out of that vote.  SUF, No. 26.

13  **D.   <u>Liberty Agrees to Defend Ironwood</u>**

14  On May 15, 2012, Ironwood provided notice of the Cobb claim to Liberty.  SUF,

15  Nos. 24-25.  On or about September 13, 2012, Liberty informed Ironwood (through Mr.

16  Lux) that it would defend Ironwood in the Cobb matter.  SUF, No. 27.  Around this

17  time, Liberty agreed to retain Ironwood's counsel, Mr. Gerstel, to defend Ironwood in

18  the Cobb matter.  SUF, Nos. 35-36.  On September 25, Mr. Gerstel sent a letter to

19  Liberty confirming that Liberty had agreed to pay him to defend Ironwood at a reduced

20  hourly rate of $275.  SUF, No. 36.  On October 25, 2012, Liberty sent Ironwood a letter

21  confirming its agreement to defend Ironwood in the Cobb matter.  SUF, No. 37.

22  **E.   <u>Ironwood Inadvertently Submits Pre-Tender Invoices to Liberty</u>**

23  Upon agreeing to defend Ironwood, Liberty asked Ironwood (through Mr. Lux)

24  to submit copies of any bills that Ironwood had received for legal fees and costs in

25  connection with the Cobb matter.  SUF, No. 28.  Accordingly, on September 13, 2012,

26  Mr. Lux asked Mr. Tanner to send him copies of all bills that Ironwood had received.

27  SUF, No. 29.  Mr. Lux did not tell Mr. Tanner to limit the scope of the invoices to only

28  those that post-dated the May 15, 2012 notice to Liberty.  SUF, No. 30.  That same day,

3

Mr. Lux received several invoices from Ironwood, which he then forwarded to Liberty without reviewing.  (SUF, Nos. 33-34.)

The bills that Ironwood sent to Mr. Lux included invoices dating back to June 2011 – almost a year prior to Mr. Cobb's May 2012 demand letter.  SUF, Nos. 32-33 & 38.  Mr. Tanner, who is not an attorney and does not have any formal legal training, did not understand that Liberty was only asking for the bills reflecting legal fees incurred in defense of the Cobb matter.  SUF, No. 31.  Thus, by innocent mistake, invoices pre-dating the May 2012 Cobb demand letter were disclosed to Liberty.  SUF, Nos. 32 & 42.  Indeed, the invoices submitted to Liberty inadvertently included invoices that Mr. Gerstel had previously issued to Ironwood for work performed between June 2011 and April 2012 (i.e., the Pre-Tender Invoices). SUF, No. 38.

These Pre-Tender Invoices do not include any billing entries related to the defense of the Cobb matter.  SUF, No. 39.  Instead, they contain attorney-client communications describing legal services performed by Mr. Gerstel for Ironwood on various matters unrelated to the defense of the Cobb claim.  SUF, No. 40.  Ironwood and Mr. Gerstel have always kept the Pre-Tender Invoices and their contents confidential.  SUF, No. 41.  As such, the Pre-Tender Invoices were mistakenly and inadvertently disclosed to Liberty and were not provided to Liberty with any intention of waiving the attorney-client privilege.  SUF, No. 42.  In fact, Mr. Tanner does not have authority to waive any privileges on behalf of Ironwood, as any such waiver would require authorization from Ironwood's Board, which Mr. Tanner neither asked for nor received.  SUF, Nos. 43-46.

Furthermore, the Pre-Tender Invoices were sent to Liberty without Mr. Gerstel's knowledge or authorization.  SUF, Nos. 47-48.  If Mr. Gerstel had been asked to send Liberty the Pre-Tender Invoices, he would have refused to do so.  SUF, No. 49.

Upon learning that the Pre-Tender Invoices had been mistakenly sent to Liberty, Ironwood, through its counsel in this action, McLeod Law Group, made no less than six written requests for the immediate return of the Pre-Tender Invoices.  SUF, Nos. 56-57.

1    To date, Liberty has not returned the Pre-Tender Invoices.  SUF, Nos. 58-59.

2                    **F.    Liberty Fails to Pay Any Money Toward Ironwood's Defense**

3            After Liberty acknowledged its duty to defend Ironwood in the Cobb Action and

4    agreed to retain Bryan Gertsel to defend it, Ironwood made several written demands on

5    Liberty to pay all defense fees and costs incurred after the date of notice of the Cobb

6    claim (i.e., after May 15, 2012).   SUF, No. 72.   On or about February 21, 2013,

7    Ironwood paid its defense counsel, Mr. Gerstel, $10,000.00 to satisfy the $10,000.00

8    retention under the Liberty Policy.  SUF, No. 60.   Using the $275 hourly rate that

9    Liberty agreed to pay for Ironwood's defense, the amount of defense fees and costs

10   unpaid by Liberty from May 15, 2012 through February 26, 2013 totals $56,569.36

11   after subtracting the $10,000 retention payment made by Ironwood.  SUF, Nos. 62-71.

12   To date, Liberty has not paid any money toward Ironwood's defense.  SUF, No. 73.

13                   **G.    Liberty Withdraws Coverage and Abandons Ironwood's Defense**

14           On February 26, 2013, Liberty (through its new claims adjuster Seon Choi)

15   informed Ironwood that it was withdrawing coverage in connection with the Cobb

16   matter based solely on Ironwood's "no" response to Question No.14 on the Liberty

17   application.  SUF, No. 61.

18   **III.   ARGUMENT**

19           In diversity cases such as this, courts must apply the substantive law of the state

20   in which it sits.  *Brennan v. Lermer Corp.,* 626 F. Supp. 926, 929 (N.D. Cal. 1986).

21   Accordingly, California law applies to the issues that are the subject of this motion.

22                   **A.    Liberty's Duty to Defend Ironwood in the Underlying Action**

23           Under California law, an insurer's duty to defend arises <u>immediately</u> upon notice

24   of a covered claim against its insured.  *Buss v. Superior Court*, 16 Cal. 4th 35, 49, 65

25   Cal. Rptr. 2d 366, 375 (1997).   An insurer must defend any suit that potentially seeks

26   damages within the coverage of the policy.  *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263,

27   275, 54 Cal. Rptr. 104, 112 (1966).  The duty to defend arises whenever the lawsuit

28   against the insured seeks damages on any theory that, if proved, would be covered by

1  the policy.  Thus, a defense is excused only when a complaint can, by <u>no</u> conceivable

2  theory, raise a single issue that could bring it within the policy coverage.  *Montrose*

3  *Chem. Corp. v. Superior Court* ("*Montrose I*"), 6 Cal. 4th 287, 295, 24 Cal. Rptr. 2d

4  467, 471 (1993); *Gray*, 65 Cal. 2d at 275, fn. 15.  The insured need only show that the

5  underlying claim may fall within policy coverage, while the insurer must prove it

6  cannot.  *Montrose I*, 6 Cal. 4th at 300.  A bare 'potential' or 'possibility' of coverage is

7  the trigger of a defense duty.  *Id.*  Accordingly, any doubt as to whether a potential for

8  coverage exists is resolved in the insured's favor.  *Id.* at 299-300; *Horace Mann Ins.*

9  *Co. v. Barbara B.* 4 Cal. 4th 1076, 1081, 17 Cal. Rptr. 2d 210, 214 (1993).

10       Here, Ironwood tendered the Cobb claim to Liberty on May 15, 2012.  SUF, Nos.

11  24-25.   Liberty has already acknowledged that the claims being asserted against

12  Ironwood in the underlying Cobb matter are potentially covered.  SUF, No. 37; *See*

13  Tanner Decl., ¶ 27, Ex. 5, p. 2; Lux Decl. ¶ 21, Ex. 8, p. 6.)  Thus, it is undisputed that

14  Liberty's duty to defend Ironwood was triggered as of May 15, 2012.

15       ### 1.     <u>Liberty's Bad Faith Coverage Denial</u>

16       Liberty's sole basis for withdrawing coverage and abandoning Ironwood's

17  defense is the alleged "no" response to Question No.14 on the Liberty Application,

18  which asked whether Ironwood was aware of an "act, error, omission, fact, or

19  circumstance" that could give rise to a later claim.  SUF, No. 61; *See* Declaration of

20  John J. McLeod filed concurrently herewith ("McLeod Decl."), ¶ 9, Ex. 7, pp. 2-4.

21  Liberty contends that the billing entries set forth in the Pre-Tender Invoices show that

22  prior to the October 2011 application for the Liberty policy, Ironwood was aware of

23  facts and circumstances which might give rise to a claim.  *Id.*  Liberty thus concludes

24  that Ironwood lied on its application and that the Question No. 14 Exclusion applies

25  and bars all coverage for the underlying Cobb action.  McLeod Decl., ¶ 9, Ex. 7, pp. 2-

26  4.  As follows, Liberty's position lacks legal and factual support.  Liberty cannot cite

27  any authority in support of its position and has absolutely no evidence – let alone

28  unequivocal evidence – that would conclusively show that Ironwood was aware of an

6

1  "act, error, omission, fact, or circumstance" that could give rise to a later claim when it

2  submitted Liberty Application.  So, Liberty's coverage position necessarily fails.

3        2.    **Coverage Limitations Are Narrowly Construed**

4        Under California law, Liberty must apply and construe exclusions and limitations

5  on coverage narrowly in favor of Ironwood.  *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v.*

6  *Partridge*, 10 Cal. 3d 94, 101-02, 109 Cal. Rptr. 811, 816 (1973).  If there is any doubt

7  with respect to coverage, it must be resolved in the insured's favor.  *MacKinnon v.*

8  *Truck Ins. Exch.*, 31 Cal. 4th 635, 656, 3 Cal. Rptr. 3d 228, 245 (2003).  These rules

9  interpreting policy language against the insurer apply equally to questions in

10  applications for insurance.  *See, e.g., Metropolitan Life Ins. Co. v. Devore* 66 Cal. 2d

11  129, 136, 56 Cal. Rptr. 881, 885-86 (1967); *Jefferson Standard Life Ins. Co. v.*

12  *Anderson*, 236 Cal. App. 2d 905, 912, 46 Cal. Rptr. 480, 485 (1965); *see also Allstate*

13  *Ins. Co. v. Erickson*, 227 F.2d 755, 756 (9th Cir. 1955).  Because Question No. 14 and

14  the purported "exclusion" in the application must be narrowly construed and applied,

15  Question No. 14 can only be read as requiring Ironwood to provide information about

16  an actual "act, error, omission, fact, or circumstance," that has already taken place and

17  that actually may give rise to a later claim.

18        Here, it is undisputed that at the time Ironwood submitted the Liberty

19  Application (October 2011), the Board had not voted on the issue.  SUF, Nos. 2 & 15-

20  19.  Indeed, as of October 2011, the only thing the Board had done was to talk about

21  the nature and terms of an on-going business practice.  *See* Declaration of Robert C.

22  Manion filed concurrently herewith ("Manion Decl."), ¶ 6; Tanner Decl., ¶ 10.   The

23  fact that such discussions were taking place when Ironwood submitted the Liberty

24  Application does not come close to constituting something that might give rise to a

25  claim.   After all, talking does not give rise to claims; only decisions do.   And no

26  decision was made (or vote even held) until January 2012, more than three months after

27  the Liberty Application was submitted.   SUF, Nos. 18-19; *See* Manion Decl., ¶ 5;

28  Tanner Decl., ¶ 9.  Merely talking about possibly taking some action in the future did

7

1  not give rise to the underlying Cobb matter.   Nor could it give rise to any future

2  lawsuit.   What gave rise to the Cobb action was Ironwood's January 19, 2012 vote to

3  stop re-paying the Assessment.   And that decision was made months _after_ the Liberty

4  Application was submitted in October 2011.

5       Nevertheless, contrary to California law, Liberty abandoned Ironwood's defense

6  based solely on the notion that Ironwood was required to disclose more than what the

7  application sought and more than what Ironwood could have reasonably understood

8  was purportedly being sought.   If Liberty wanted to know what Ironwood was talking

9  about possibly doing, California law required it to actually ask that question.   Having

10  not done so, it cannot deny coverage based on information for which it did not ask.   *See*

11  *Ashley v. Am. Mut. Liab. Ins. Co.* 167 F. Supp. 125, 131 (N.D. Cal. 1958) (insurers

12  must use language as to make questions in an application clear to the ordinary mind);

13  *Metropolitan*, 66 Cal. 2d at 136; *Jefferson*, 236 Cal. App. 2d at 912; *Allstate*, 227 F.2d

14  at 756; and *Unionamerica Ins. Co. v. The Fort Miller Group. Inc.* 590 F. Supp. 2d

15  1254, 1260 (N.D. Cal. 2008) (insured not required to disclose information not asked for

16  in application).

17       Furthermore, if, in fact, a prospective insured is required to disclose that it is

18  considering a new or different business practice or procedure (it is not), at what point in

19  the decision making process does it have to answer "Yes" to a question like Question

20  No. 14?   Question No. 14 certainly does not give any clue as to when in the spectrum of

21  the decision-making process such contemplations would have to be disclosed.   If a

22  board member informally suggests a new or different business practice, does that

23  trigger a "Yes" response to Question No. 14?   If one or more board members are, or a

24  committee is, tasked with evaluating a contemplated change in procedure, does that

25  trigger a "Yes" response to Question No. 14?   If the contemplated change in procedure

26  is put up for a vote by the board, but has not yet been voted on, does that trigger a

27  "Yes" response to Question No. 14?   What if the board seeks the advice of counsel

28  regarding the contemplated change in procedure, does that trigger a "Yes" response to

8

Question No. 14?   Whatever answers Liberty may suggest in response to these questions, there is nothing in the language of Question No. 14 that makes those parameters clear.  Whatever Liberty's intentions, Liberty's failure to clearly phrase the question to get that information precludes it from trying to impose that unexpressed intent on its insured after the fact.  There is nothing in the language of Question No. 14 that put Ironwood on notice that Liberty was seeking the disclosure of such information.

Furthermore, no purpose would be served by requiring a prospective insured to disclose that it was merely contemplating taking some action in the future.   It is undisputed that the Board's vote to stop re-paying the Assessment, which later gave rise to the Cobb claim, did not occur until months <u>after</u> the Liberty application was submitted by Ironwood.  SUF, Nos. 2 & 15-19.  Accordingly, there was nothing that Ironwood was required to or could disclose on the Liberty Application.   Indeed, Ironwood's mere discussion of doing something in the future is not responsive to Question No. 14.   After all, when Ironwood completed the application, there was no "act, error, omission, fact, or circumstance,[4] which may give rise to a Claim, which may fall within the scope of the proposed insurance."   Ironwood was not sued by Mr. Cobb because it was <u>discussing</u> changing its practice of re-paying the Assessment. Instead, as Liberty knows, Ironwood was sued because it voted on January 19, 2012 to actually stop re-paying the Assessment.  That was the only "act, error, omission, fact or circumstance" that gave rise to the Cobb claim and it occurred months <u>after</u> submission of the Liberty Application.   Accordingly, when Ironwood submitted the application, there was nothing it was required to disclose that was responsive to Question No. 14.

---

[4] The word "circumstance" is not defined in the Liberty application.   Merriam-Webster defines "circumstance" as "a condition, fact, or event accompanying, conditioning, or determining another." Under this definition, there was no "circumstance" that would have required Ironwood to answer Question No. 14 with a "Yes," because there had not yet been any " condition, fact, or event" that "may give rise to a Claim."   Indeed, the "condition, fact, or event" giving rise to the Cobb Lawsuit (i.e., the January 2012 vote) did not happen until months after Ironwood submitted the Application.

Points & Authorities ISO Ironwood's *Amended* Motion for Partial Summary Judgment

### 3.   Liberty's Coverage Position Lacks Any Legal Support

No California court has held that a prospective insured is required to disclose the fact that it is thinking about doing something or thinking about changing a business practice that, if done, might lead to a later claim.  Indeed, no California court has ever construed a question like Question No. 14 to require a prospective insured to disclose what the insured was merely discussing doing, if at all, in the future.  The cases that that have addressed the failure to disclose facts or circumstances on an application (or the insured's prior knowledge of such facts or circumstances) that could later give rise to a claim concern situations where a wrongful act or accident had <u>already</u> occurred or a demand letter and threat of future litigation had <u>already</u> been received.  *See, e.g.*, *Advanced Micro Devices v. Great Am. Surplus Lines Ins. Co.*, 199 Cal. App. 3d 791, 245 Cal. Rptr. 44 (1988); *Resure, Inc. v. Superior Court*, 42 Cal. App. 4th 156, 159, 49 Cal. Rptr. 2d 354, 355 (1996); *Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.*, 64 Cal. App. 3d 261, 269-70, 134 Cal. Rptr. 427, 431 (1976).  That is not the situation in this case.  Here, when Ironwood submitted the application to Liberty in October 2011, Ironwood had not voted to change its business practices or policies.  Therefore, there was no claim that had <u>already</u> been made against Ironwood or evidence of a problem of which Ironwood was <u>already</u> aware and that would lead it to believe that a claim would be asserted.

### 4.   Liberty's Coverage Position Lacks Any Factual Support

Liberty cannot properly withdraw from Ironwood's defense based solely on Ironwood's supposed omission in the Liberty Application.  As discussed above, Liberty has a duty to defend against any claims where there exists a potential for coverage.  *Gray*, 65 Cal. 2d at 275.  Liberty can avoid its duty to defend only if "the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage."  *Montrose I*, 6 Cal. 4th at 300.  Indeed, insureds like Ironwood are entitled to a defense if there is "(1) a showing of a potential for coverage …, and (2) the insurers do not produce undisputed evidence which conclusively eliminates any

possibility of coverage." *Haskel, Inc. v. Superior Court*, 33 Cal. App. 4th 963, 969, 39 Cal. Rptr. 2d 520, 522 (1995). Here, Liberty does not have and cannot produce "undisputed evidence which conclusively eliminates any possibility of coverage." Instead, and rather glaringly, Liberty can only speculate as to what Ironwood may or may not have been aware as of October 5, 2011, when the application was submitted, and is relying exclusively on that speculation to justify its abandonment of Ironwood's defense.

Indeed, the language used in Liberty's February 2012 letter withdrawing coverage is telling. Nowhere does Liberty state that the facts unequivocally show that there is no potential for coverage (i.e., that there is uncontroverted evidence that Ironwood was aware of an "act, error, omission, fact, or circumstance" that could give rise to a later claim). Instead, Liberty repeatedly makes the following concessions: "there <u>appears</u> to be no coverage," "it <u>appears</u> that [Ironwood] and its counsel were considering 'Insurance issues re potential claims and coverage,'" "the response in the Application to question [SIC] <u>appeared</u> to have been inaccurate" and "[Ironwood] and its board members <u>appear</u> to have been aware of facts and circumstances which gave rise to the Complaint." SUF, No. 61; *See* McLeod Decl., ¶ 9, Ex. 7, pp. 1-4.) Liberty surmising that there "appears" to be no coverage is not a sufficient basis to deny a duty to defend. Instead, California law requires an insurer to have uncontroverted evidence showing that the claim is excluded. Liberty does not have that. The Pre-Tender Invoices do not constitute such uncontroverted evidence, even assuming *arguendo* that they are not privileged. For all the reasons set forth above, California law requires a much higher showing. Liberty's position is based solely on speculation and such speculation does not rise to the level of uncontroverted evidence, which is what California law requires an insurer, like Liberty, to possess in order to avoid its duty to defend.

/ / /

/ / /

5. **Liberty Improperly Relied on Privileged Information that Ironwood Inadvertently Disclosed**

Liberty's refusal to defend is based on speculation derived from privileged and protected information that was inadvertently disclosed to Liberty (i.e., the Pre-Tender Invoices). For the reasons discussed in more detail below, it is undisputed that the Pre-Tender Invoices are protected by the attorney-client privilege. Liberty's reliance on this privileged information in denying coverage is wrong, unreasonable and not supported by California law. Indeed, because California law precludes an insurer from receiving privileged/protected information from its insured, it logically follows that an insurer cannot rely on that privileged/protected information as a basis to refuse to defend its insured. *See, e.g., Grey v. Superior Court*, 62 Cal. App. 3d 698, 703-04, 133 Cal. Rprtr. 318, 320-21 (1976); Cal. Civ. Code § 2860(d).

The *Grey* case is instructive here. In *Grey*, the insurer sought to avoid having to provide policy benefits under a life insurance policy. 62 Cal. App. 3d at 702. The only way it could prove that a suicide exclusion was applicable (and thus avoid having to pay out under the policy) was to invade the patient-psychiatrist privilege and question the insured's former psychiatrist about his treatment of the deceased. *Id*. The court denied the insurer's attempt to invade this privilege even though it meant that insurer was left without any evidence to support its denial of policy benefits. *Id.* at 704. Like the insurer attempted to do in *Grey*, Liberty is relying on Ironwood's privileged/protected information as the sole basis to abdicate its duty to defend Ironwood in the Cobb matter. California law does not permit such conduct.

6. **Liberty Cannot Justify Its Coverage Denial by Hindsight**

Even if the attorney-client privilege does not apply to the Pre-Tender Invoices (for all the reasons discussed below, it does), any other information or documents Liberty might seek through discovery is simply not relevant in this coverage action. As a matter of law, the only relevant matters that are considered in determining whether Liberty owes a defense are: (1) the terms of the policy; (2) the allegations of the third

12

party's complaint against Ironwood; and (3) the extrinsic facts known to Liberty from any source. *Montrose I*, 6 Cal. 4th at 295.  Furthermore, and more to the point, determining the existence of a duty to defend turns upon the facts known by the insurer <u>at the time of the inception of a third party lawsuit</u>.  *Haskel*, 33 Cal. App. 4th at 974.  Liberty, therefore, cannot use subsequently discovered facts to justify by hindsight its earlier refusal to defend. *See, e.g.*, *Mullen v. Glens Falls Ins. Co.*, 73 Cal. App. 3d 163, 173-74, 140 Cal. Rptr. 605, 611-12 (1977); *Wausau Underwriters Ins. Co. v. Unigard Sec. Ins. Co.*, 68 Cal. App. 4th 1030, 1044, 80 Cal. Rptr. 2d 688, 696-97  (1998).  And subsequently discovered facts do not retrospectively apply to justify Liberty's earlier refusal to defend.  *Wausau*, 68 Cal. App. 4th at 1047.  Consequently, in determining Liberty's duty to defend Ironwood in the underlying Cobb action, the only potentially relevant information, documents and/or materials are those on which Liberty relied at the time it withdrew coverage and refused to defend Ironwood.  Accordingly, Liberty cannot rely on any other newly-discovered facts to justify its prior refusal to defend Ironwood in the Cobb matter.

### 7.   <u>Liberty's Newly-Asserted Rescission Affirmative Defense Does Not Bar the Relief Sought by Ironwood in this Motion</u>

Liberty claims its rescission defense makes this motion is premature.  Liberty is wrong.  First, California law is clear that insurers cannot avoid a determination of their duty to defend by claiming that they need more discovery.  California courts have already rejected that argument.   *See, e.g.*, *Haskel*, 33 Cal. App. 4th at 974 ("[i]imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf.").  And U.S. District courts applying California law have rejected this very same argument.  (*See, e.g.*, *Endurance American Specialty Ins. Co. v. WFP Securities Corp.*, 2012 U.S. Dist. LEXIS 153864, 9-10, 11-cv-2611 JAH (KSC) (S.D. Cal., Sept. 28, 2012) (explaining that the duty to defend is not analyzed after discovery).  Liberty does not need to conduct any discovery on the three discrete issues that are the subject of the instant motion, as

1    determining the existence of a duty to defend turns upon the facts known by Liberty <u>at</u>
2    <u>the time of the inception of the Cobb Lawsuit</u>.  *Haskel*, 33 Cal. App. 4th at 974.
3    Liberty simply cannot use subsequently discovered facts to justify by hindsight its
4    earlier refusal to defend. *See, e.g.*, *Mullen*, 73 Cal. App. 3d at 173-74; *Wausau*, 68 Cal.
5    App. 4th at 1044.  Accordingly, any argument that a ruling on this motion must be put
6    off until after discovery has been conducted should be rejected.

7         Second, Liberty's affirmative defense of rescission does not preclude this Court
8    from deciding Liberty's duty to defend Ironwood.  Liberty cites two cases for the
9    proposition that an insured cannot obtain summary judgment on the duty to defend until
10   after the insurer's rescission defense is resolved – *Rocklin Park Place Condominium*
11   *Owners Assoc. v. Liberty Ins. U'wtrs, Inc.*, 2013 U.S. Dist. LEXIS 127669, 2:12-cv-
12   02247-TLN-CKD (E.D. Cal., Sept. 6, 2013) and *Atmel Corp. v. St. Paul* 416 F. Supp.
13   2d 802 (N.D. Cal. 2006).  Liberty's reliance on these two cases is misplaced.  The
14   *Rocklin Park Place* case completely ignored well-established California law on the
15   immediate duty to defend, including without limitation *Haskel*, and relied almost
16   exclusively on the *Atmel* decision.  However, the *Amtel* decision is factually
17   distinguishable, because, unlike here, the insured sought partial summary judgment on
18   the insurer's rescission claim and <u>not</u> on the duty to defend.  Thus, neither of these
19   cases supports Liberty's position.

20        Furthermore, both *Rocklin Park Place* and *Amtel* turn California law regarding
21   the duty to defend on its head.  As discussed above, the duty to defend arises
22   <u>immediately</u> upon notice of a potentially covered claim against its insured.  *Buss*, 16
23   Cal. 4th at 49.  A defense is excused only when a complaint can, by <u>no</u> conceivable
24   theory, raise a single issue that could bring it within the policy coverage.  *Montrose I*, 6
25   Cal. 4th at 295; *Gray*, 65 Cal. 2d at 275, fn. 15.  Thus, the *Rocklin Park Place* and
26   *Amtel* decisions are contrary to California's well-established law on the <u>immediacy</u> of
27   the duty to defend.
28   / / /

1      Indeed, U.S. District court's that have actually considered and applied California

2   law on the duty to defend have rejected the wait-and-see argument that Liberty is

3   promoting here.   For example, in *Endurance*, the insured sought partial summary

4   judgment on the duty to defend.  2012 U.S. Dist. LEXIS 153864, 17-21.  The insurer –

5   just like Liberty – argued that its rescission claim precluded judgment on the duty to

6   defend claim.  *Id.*  The court rejected this argument, citing *Haskel* and explaining that

7   the duty to defend turns on the facts known to the insurer at the inception of the third

8   party lawsuit and not on the ultimate issue of coverage.  *Id.*  The *Endurance* court held

9   that the insured was entitled to summary judgment on their duty to defend claim,

10  notwithstanding the insurer's rescission claim.   *Id.* at 32.   Accordingly, Liberty's

11  argument has been rejected by court's that, unlike *Rocklin Park Place*, actually base

12  their decisions on California law.

13     In addition, the practical consequences of the wait and see approach that Liberty

14  wishes for would result in a windfall for insurance companies and a disaster for their

15  insureds.  It would allow an insurer like Liberty to assert a claim for rescission, refuse

16  to defend, and thereafter unilaterally impose a substantial delay and litigation costs on

17  the insured.  By asserting rescission and refusing to defend, insurers like Liberty could

18  employ this tactic in an effort to avoid claims altogether, which would directly

19  contradict the entire purpose of the <u>immediate</u> duty to defend.  *See, e.g.*, *Montrose I*, 6

20  Cal. 4th at 295-96.  Accordingly, Liberty's wait-and-see approach should be rejected.

21     Ironwood anticipates that Liberty will also argue that this motion is premature

22  because it plans to file a motion to stay this coverage action pending resolution of the

23  underlying Cobb action.  For several reasons, Liberty has no right or standing to seek a

24  stay of this coverage case.   In this case, Liberty is not providing (and has never

25  provided) a defense to Ironwood.  As such, a stay would have the highly prejudicial

26  effect of compelling the insured, Ironwood, to defend the Cobb action through trial,

27  using only its own resources.  That would directly contradict the entire purpose of the

28  duty to defend under an insurance policy.  *See, e.g.*, *Montrose I*, 6 Cal. 4th at 295-96.

After all, the fact that Ironwood filed this action now, rather than waiting until conclusion of the Cobb action, evidences the concern that Ironwood has about having to fund its own defense without the assistance of the superior resources of Liberty.

Moreover, Ironwood is not aware of any legal authority (and Liberty has not provided any) that stands for the proposition that a motion to stay can be used to compel an insured, like Ironwood, to face and defend a third party claim on its own and without resort to insurance resources for which Ironwood paid a substantial premium. Indeed, California courts have seemingly held the very opposite:

> In a case where there is no potential conflict between the coverage issues and the issues in the third party action, the carrier may obtain an early trial date in the coverage action… Where that cannot be done, however, the carrier gets to keep paying and paying and paying. *Montrose Chemical Corp. of Calif. v. Superior Court*, 25 Cal. App. 4th 902, 910, 31 Cal. Rptr. 2d 38, 43 (1994).

Here, Liberty contends that there is a conflict between the coverage issues in this case and the issues in the underlying Cobb action.  The difference is that Liberty is <u>not</u> paying for Ironwood's defense.  Liberty acknowledged its duty to pay. SUF, Nos. 27 & 35-37.  Liberty subsequently agreed to pay for Ironwood's defense counsel.  SUF, Nos. 35-37.  But, it later refused to do so and reneged on its agreement to defend Ironwood. SUF, No. 61 & 73.  Thus, Ironwood has had to pay for its entire defense.  By doing so, Liberty has created the problem in which it now finds itself.  It cannot justify (much less carry its burden of proof) on its coverage defenses without discovery in this case; but, Liberty has now apparently realized that it cannot obtain that discovery without subjecting Ironwood to potentially significant prejudice in the Cobb action.  It is therefore with no degree of irony that Liberty would suggest that the coverage case be stayed (to the sole prejudice of its insured, Ironwood), because Liberty cannot now prove its coverage arguments.  Unfortunately for Liberty, that is not the law.  At best, Liberty's arguments (if established) would only support a stay of the litigation (and any permissible discovery) as to only Liberty's coverage arguments, but not a stay of

Ironwood's claims for a defense and for damages arising out of Liberty's failure to afford Ironwood an immediate and entire defense in the Cobb Action, including *Brandt* fees and punitive damages.

Directly on point to this very circumstance is *Haskel*, 33 Cal. App. 4th 963, which summarized the issue as follows:

> This case raises the question of just how that rule [requiring an insurer provide an immediate defense upon tender] impacts upon the right of an insurer, who has denied any defense obligation, to conduct discovery on an insured's motion for summary adjudication of the defense issue…. We conclude that Haskel was entitled to have its summary adjudication motion considered and, if (1) a showing of a potential for coverage under the several policies is made, and (2) the insurers do not produce undisputed evidence which conclusively eliminates any possibility of coverage, the motion should be granted. We also conclude that Haskel is entitled to a stay of prejudicial discovery. *Id.* at 968-69.

In this case, Liberty has already acknowledged that the claims asserted against Ironwood in the Cobb action are potentially covered. SUF, ¶ 37. Liberty's sole basis for withdrawing from the defense is a coverage argument that Liberty now acknowledges it cannot prove without conducting discovery (to which it is not entitled). Thus, by suggesting that this case needs to be stayed, Liberty has effectively admitted that it has no evidence (or at least uncontroverted evidence that conclusively eliminates any possibility of coverage, as required under California law) to support its current coverage position and, thus, no evidence to support its abandonment of Ironwood's defense in this case.

In any event, it is clear that Liberty must defend Ironwood in the Cobb action, that it must do so immediately and entirely and, because of its wrongful refusal to defend Ironwood up to this point in time, Liberty has waived its right to control the defense. Indeed, by wrongfully failing to fund any portion of Ironwood's defense and wrongfully and unreasonably abandoning the defense of Ironwood in the Cobb action, Liberty is precluded from relying on California Civil Code section 2860 and the hourly rate limitations set forth therein. *Intergulf Develop., LLC v. Superior Court*, 183 Cal.

1   App. 4th 16, 20, 107 Cal. Rptr. 3d 162, 165 (2010); *Janopaul + Block Cos., LLC v.*

2   *Superior Court*, 200 Cal. App. 4th 1239, 1249, 133 Cal. Rptr. 3d 380, 386 (2011).

3   Instead, Liberty is obligated to fund the entire defense of the Cobb action and is liable

4   for, among other things, the fees and costs incurred by Ironwood in this case in order to

5   obtain coverage that was unreasonably withheld (i.e., *Brandt* fees).

6        Indeed, in suggesting that it needs discovery in order to defeat Ironwood's claim

7   for a defense, Liberty places itself in exactly the same position as the carriers in *Haskel*,

8   which, in turn, makes the following observation by the *Haskel* court particularly apt:

9        The insurers were either aware of such [undisputed extrinsic
10   evidence which conclusively establishes that there is no
     potential for coverage] or they were not; they did not need
11   discovery from Haskel to determine the existence of that
     evidence.… If, on the other hand, they did not have such
     conclusive evidence, then they could not successfully oppose
12   Haskel's claim for an immediate judicial recognition of the fact
     that a defense obligation then existed. *Id.* at 977.
13

14       Here, Liberty is either aware of evidence to support its denial or it is not.  And, if

15   it does not have that evidence now (without additional discovery), then Liberty acted

16   wrongfully in refusing to defend Ironwood and in abandoning Ironwood's defense in

17   the Cobb action.  And, for all the reasons set forth above, Liberty cannot seek discovery

18   to try to justify, after-the-fact, its denial of coverage and abandonment of Ironwood. In

19   short, none of the issues raised by Liberty support a stay of the action.

20       **B.    Liberty Must Reimburse Ironwood for Defense Fees and Costs**

21       An insurer such as Liberty waives its right to control the defense of an action by

22   refusing to defend.  Hon. H. Walter Croskey, et al., Rutter Group Practice Guide: Ins.

23   Lit.; Ch. 7B-A, ¶ 7:506 (2013 ed.).  Where an insurer refuses to defend, and coverage is

24   ultimately established, the insurer is required to pay all of the defense costs reasonably

25   incurred by the insured, including attorney fees allocable to non-covered claims.  (*Id.* at

26   ¶ 7:506.2.)  Indeed, where an insurer has breached its duty to defend, and where the

27   insured retains counsel to defend the claim, the insured is entitled to recover the costs

28   incurred in the defense of the action.  Hon. H. Walter Croskey, et al., Rutter Group

Practice Guide: Ins. Lit.; Ch. 7B-H, ¶ 7:691 (2013 ed.); *Marie Y. v. General Star Indem. Co.*, 110 Cal. App. 4th 928, 960-61, 2 Cal. Rptr. 3d 135, 159 (2003). This includes 'reasonable and necessary' investigative costs to minimize or avoid liability. *Aerojet-General Corp. v. Transport Indem. Co.*, 17 Cal. 4th 38, 64, 70 Cal. Rptr. 2d 118, 133 (1997). This also includes defense costs allocable to non-covered claims. *State of Calif. v. Pacific Indem. Co.,* 63 Cal. App. 4th 1535, 1556, 75 Cal. Rptr. 2d 69, 83 (1998).

Here, it is undisputed that Ironwood tendered the defense to Liberty on May 15, 2012. SUF, Nos. 24-25. While it initially agreed to defend Ironwood at a discounted hourly rate of $275, when Liberty subsequently withdrew coverage and abandoned Ironwood's defense without paying any defense costs, Liberty waived its right to control the defense and must now reimburse Ironwood for all of the defense fees and costs incurred in defending the Cobb matter at Mr. Gerstel's full hourly rate ($425).

That said (and while reserving all of its rights under California law to seek additional defense fees and costs incurred by Ironwood), for purposes of the instant motion, Ironwood is seeking an order that Liberty must immediately reimburse Ironwood for the fees and costs Ironwood incurred (at the discounted hourly rate of $275 and after subtracting Ironwood's payment of the $10,000 retention under the Liberty policy) in defense of the Cobb Lawsuit from May 15, 2012 (the date that Ironwood gave notice to Liberty) to February 26, 2013 (the date that Liberty withdrew from Ironwood's defense in the Cobb Lawsuit).

To that end, it is undisputed that on or about February 21, 2013, Ironwood paid its defense counsel, Mr. Gerstel, $10,000.00 to satisfy the $10,000.00 retention under the Liberty Policy. SUF, No. 60. It is also undisputed that, using the discounted $275 hourly rate that Liberty agreed to pay for Ironwood's defense, the amount of defense fees and costs unpaid by Liberty from May 15, 2012 through February 26, 2013 totals $56,569.36 after subtracting the $10,000 retention payment made by Ironwood. SUF, Nos. 62-71. Accordingly, Ironwood hereby respectfully submits that the Court should

19

1   order Liberty to immediately reimburse Ironwood the sum of $56,569.36.

2   ### C.   Liberty Must Return the Pre-Tender Invoices to Ironwood

3   Ironwood has repeatedly demanded that Liberty return the Pre-Tender Invoices.

4   SUF, No. 57.  Liberty has refused and has now stated in its initial disclosures that it

5   intends to use the Pre-Tender Invoices to support its defenses in this coverage action.

6   SUF, Nos. 58-59; McLeod Decl., ¶ 31, Ex. 28, p. 9.   As follows, the Pre-Tender

7   Invoices are subject to a properly asserted claim of privilege and, thus, good cause

8   exists for an order directing Liberty to immediately return to Ironwood any and all

9   copies (digital, paper or otherwise) of the Pre-Tender Invoices and prohibiting Liberty

10   from using said invoices in any way and for any purpose in this action.

11   In diversity cases such as this, privilege issues must be determined in accordance

12   with state law.  Fed. R. Evid. 501.  Under California law, a timely claim of privilege

13   furnishes an automatic ground for exclusion or nondisclosure of the privileged

14   information unless and until the court overrules the privilege claim and orders

15   disclosure.   Cal. Evid. Code, § 914(b).   Statutorily-created privileges such as the

16   attorney-client privilege are strictly construed and courts may not create exceptions to

17   such privileges.  Cal. Evid. Code, § 911, Comment; *see e.g.*, *Wells Fargo Bank, N.A. v.*

18   *Superior Court*, 22 Cal. 4th 201, 209, 91 Cal. Rptr. 2d 716, 722 (2000).

19   To that end, a client may refuse to disclose, and prevent another from disclosing,

20   a confidential communication between the client and their lawyer.  Cal. Evid. Code, §

21   954.  This privilege has been "a hallmark of Anglo-American jurisprudence for almost

22   400 years."  *Costco Wholesale Corp. v. Superior Court*, 47 Cal. 4th 725, 732, 101 Cal.

23   Rptr. 3d 758, 763 (2009) (internal quotations omitted).  Its fundamental purpose is to

24   preserve the confidentiality of communications between clients and their attorneys "so

25   as to promote full and open discussion of the facts and tactics surrounding individual

26   legal matters."  *Id.*   And, while the application of the privilege may result in the

27   suppression of relevant evidence, the California legislature has determined that such

28   concerns are outweighed by the importance of preserving the attorney-client

20

1  relationship.  *Id.*   Thus, the privilege "is absolute and disclosure may not be ordered

2  without regard to relevance, necessity or any particular circumstances peculiar to the

3  case." *Id.*

4        For example, in the *Costco* case, the California Supreme Court held that an

5  attorney's opinion letter was entirely protected from disclosure, despite the fact that

6  some information in the letter may have been discoverable through other means.  47

7  Cal. 4th at 741.  The Court concluded that the party seeking to uphold the privilege

8  need only establish the confidential nature of the communication and not that "its case

9  would be prejudiced by the discovery of the [privileged] letter." *Id.*  Thus, the attorney-

10  client privilege applies even when the information sought is relevant and even when it

11  prevents disclosure of information prejudicial to the party asserting the privilege.

12        The broad scope of the attorney-client privilege protects confidential

13  communications between the attorney and client.  Cal. Evid. Code, § 954.  A

14  "confidential communication" means information transmitted between the attorney and

15  their client in the course of the attorney-client relationship and in confidence.  Cal.

16  Evid. Code, § 952. A "communication" is broadly construed to refer to *any* means of

17  conveying information.  *City & County of San Francisco v. Superior Court*, 37 Cal. 2d

18  227, 235-36, 231 P.2d 26, 30 (1951).  And, any and all communications between an

19  attorney and their client are presumed to have been made in confidence, thereby

20  shifting the burden to the opposing party to establish the communication was somehow

21  not confidential.  Cal. Evid. Code, § 917(a).  Thus, Liberty has the burden to establish

22  that the Pre-Tender Invoices are not subject to the attorney-client privilege.

23        Here, it is undisputed that the Pre-Tender Invoices constitute information

24  transmitted between an attorney (Mr. Gerstel) and his client (Ironwood).  SUF, Nos.

25  40-49.  It is also undisputed that the Pre-Tender Invoices contain attorney-client

26  communications describing legal services performed by Mr. Gerstel for Ironwood on

27  various matters unrelated to the defense of the Cobb matter.   SUF, No. 40.

28  Furthermore, it is undisputed that Ironwood and Mr. Gerstel have always kept the Pre-

Tender Invoices and their contents confidential in the normal course of their attorney-client relationship.  SUF, No. 41.  As such, it is undisputed that the Pre-Tender Invoices constitute information transmitted between an attorney (Mr. Gerstel) and his client (Ironwood) in the course of the attorney-client relationship and in confidence.  The Pre-Tender Invoices therefore constitute confidential communications between the attorney and client and are absolutely protected by the attorney-client privilege.  The same is true for the Lavely & Singer invoices.  *See* Tanner Decl., ¶ 24; Gerstel Decl., ¶ 17.

### 1.   <u>Ironwood Has Not Waived the Attorney-Client Privilege</u>

In response to Ironwood's repeated demands that Liberty return the Pre-Tender Invoices, Liberty has argued that Ironwood waived the attorney-client privilege by submitting them to Ironwood for reimbursement.  However, under California law, waiver of a statutory privilege is <u>narrowly construed</u>.  *See, e.g., Roberts v. Superior Court*, 9 Cal. 3d 330, 343, 107 Cal. Rptr. 309 (1973). The waiver must be a voluntary and knowing act that is <u>done with sufficient awareness of the relevant circumstances and likely consequences</u>.  *Id.*  Thus, any waiver of the attorney-client privilege must be intentional and the privilege cannot be waived by inadvertent disclosure.

Here, there was no voluntary and knowing waiver that was done with sufficient awareness of the relevant circumstances and likely consequences.  Instead, the Pre-Tender Invoices were inadvertently disclosed to Liberty.  Ironwood's insurance broker, Mr. Lux, who was Ironwood's primary point of contact with Liberty and served as the conduit for the exchange of information between Ironwood and Liberty, asked Mr. Tanner to send all invoices that Ironwood had received in the Cobb matter.  SUF, No. 29.  Mr. Lux did not advise Mr. Tanner to limit the scope of the invoices to only those that post-dated the May 15, 2012 notice to Liberty.  SUF, No. 30.  And, Ironwood did not understand that Liberty was only asking for the post-tender bills reflecting the legal fees incurred in defense of the Cobb matter.  SUF, No. 31.  Consequently, it was by innocent mistake that invoices pre-dating May 2012 were disclosed to Liberty.

/ / /

Points & Authorities ISO Ironwood's *Amended* Motion for Partial Summary Judgment

Furthermore, even if Mr. Tanner was sufficiently aware of the relevant circumstances and likely consequences of disclosing the Pre-Tender Invoices to Liberty (he was not) so as to arguably constitute a "voluntary and knowing waiver," the fact of the matter is that Ironwood (and not Mr. Tanner) is the holder of the privilege.  Cal. Evid. Code, § 953(a).  Mr. Tanner does not have authority to waive any privileges on behalf of Ironwood.  SUF, No. 43.  Any such waiver would require authorization from Ironwood's Board, which Mr. Tanner neither asked for nor received.  SUF, Nos. 44-46. In addition, the Pre-Tender Invoices were sent to Liberty without Mr. Gerstel's knowledge or authorization.  SUF, Nos. 47-48.  If he had been asked to send Liberty the Pre-Tender Invoices, Mr. Gerstel would have refused to do so.  SUF, No. 49.

Moreover, as discussed above, Ironwood and Mr. Gerstel always kept Mr. Gerstel's invoices and their contents confidential in the normal course of its attorney-client relationship.  SUF, No. 41.  Consequently, the Pre-Tender Invoices, which were sent to Liberty without Mr. Gerstel's or the Board's approval or authorization, were not provided to Liberty with any intention of waiving the attorney-client privilege.  SUF, No. 42.  Thus, Liberty's waiver argument fails as a matter of law.

Furthermore, when Ironwood realized that the Pre-Tender Invoices had been inadvertently disclosed to Liberty, Ironwood took immediate steps to have Liberty return the invoices and destroy any and all copies in their possession.   Indeed, Ironwood's counsel in this matter has made no less than six written requests for the return of the Pre-Tender Invoices.  SUF, No. 57.  Thus, Ironwood took immediate steps to assert and preserve the attorney-client privilege once it became aware that the Pre-Tender Invoices had been inadvertently disclosed.  In short, given the circumstances of this case, Liberty cannot reasonably maintain that Ironwood intentionally waived the privilege – especially when the scope of the privilege is so broadly applied and the waiver doctrine so narrowly construed.

/ / /

/ / /

Ironwood anticipates that Liberty will argue that the delay in bringing this motion somehow waived Ironwood's privilege claims.  However, any delay in bringing this motion was a direct result of Liberty's actions in this case.  In advance of the mediation (which took place on November 20, 2013), the parties were preparing to file a joint stipulation/discovery motion on the privilege issues surrounding the Pre-Tender Invoices.  McLeod Decl. ¶¶ 32-36 & 40.  The idea was to have the hearing date on the joint motion shortly after this mediation so that both sides would have a greater incentive to resolve the case with a decision on the privilege issue looming.  *Id.*

On the eve of filing the joint stipulation/discovery motion (literally), things went sideways.  Liberty insisted on including verbatim quotations from the very billing entries in dispute (i.e., the billing entries that Ironwood contends are privileged).  McLeod Decl. ¶¶ 35-36, Ex. 30.  For obvious reasons, Ironwood could not agree to a public filing of the privileged billing entries and, so, requested that Liberty either agree to file a redacted version or seek leave to file the joint stipulation/discovery motion under seal.  *Id.*  Liberty declined and the joint stipulation was never filed.  *Id.*  Thus, Liberty cannot reasonably use the delay caused by its own conduct to support a claim of waiver.

### 2.    The "Crime-Fraud" Exception Does Not Apply

Liberty has argued that the "crime-fraud" exception to the attorney-client privilege applies in this case.  This specious argument does little more than underscore Liberty's bad faith claims handling, which continues to apply during litigation.  *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 886, 221 Cal. Rptr. 509, 517 (1985) (superseded by statute on unrelated grounds).  Under California law, the applicability of the "crime-fraud" exception is extremely limited.  Cal. Evid. Code, § 956.  This narrow exception applies only when the client seeks legal assistance to plan or perpetrate a crime or fraud.  *Glade v. Superior Court*, 76 Cal. App. 3d 738, 746, 143 Cal. Rptr. 119, 124 (1978).  And, a mere allegation of fraud is insufficient to make the exception applicable.  *Dickerson v. Superior Court*, 135 Cal. App. 3d 93, 100, 185 Cal. Rptr. 97,

24

100-01 (1982).  Here, Liberty cannot offer any evidence (let alone admissible evidence) to support a finding that Ironwood sought Mr. Gerstel's legal assistance to plan or perpetrate a fraud.  Such an exception to the rules of privilege cannot be established by mere allegations.  Liberty's unsubstantiated claim that Ironwood and Mr. Gerstel were working together to plan or perpetrate a fraud constitutes bad faith *per se*.

For all the foregoing reasons, Ironwood respectfully submits that the Pre-Tender Invoices are protected by the attorney-client privilege.  Good cause therefore exists for this Court to order Liberty to return the Pre-Tender Invoices to Ironwood and prohibit Liberty from using them in any manner and for any purpose in this litigation.

## IV.   <u>CONCLUSION</u>

Based upon the foregoing facts and authorities, Ironwood respectfully requests that the Court grant Ironwood's motion for partial summary judgment and order as follows: (1) Liberty has a duty to defend Ironwood in the underlying Cobb Lawsuit; (2) Liberty must immediately reimburse Ironwood the sum of $56,569.36 for the fees and costs Ironwood incurred (at the agreed-upon hourly rate of $275 and after subtracting Ironwood's payment of the $10,000 retention under the Liberty policy) in defense of the Cobb Lawsuit from May 15, 2012 (the date that Ironwood gave notice to Liberty) to February 26, 2013 (the date that Liberty withdrew from Ironwood's defense in the Cobb Lawsuit); and (3) Liberty must immediately return to Ironwood any and all copies (digital, paper or otherwise) of the Pre-Tender Invoices and Liberty is prohibited from using said invoices in any way and for any purpose in this action.

DATED: January 27, 2014                McLEOD LAW GROUP, A.P.C.


By:   /s/ Paul C. Hirst
        John J. McLeod, Esq.
        Paul C. Hirst, Esq.
         Attorneys for Plaintiff, Ironwood Country
        Club