1  John J. McLeod, Esq., State Bar No. 174169
   john@mcleodlawgroup.com
2  Paul C. Hirst, Esq., State Bar No. 234460
   pchirst@mcleodlawgroup.com
3  McLEOD LAW GROUP, A.P.C.
   701 B Street, Suite 1570
4  San Diego, California 92101
   Telephone:  (619) 236-9938
5  Facsimile:  (619) 236-9943

6  Attorneys for Plaintiff,
   IRONWOOD COUNTRY CLUB
7

8           **UNITED STATES DISTRICT COURT**

9    **CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

10

11 | IRONWOOD COUNTRY CLUB, | CASE NO. 13-00996-VAP (DTBx) |
|---|---|
| Plaintiff, | **DECLARATION OF JOSHUA TANNER IN SUPPORT OF PLAINTIFF'S *AMENDED* MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| LIBERTY INSURANCE UNDERWRITERS, INC. and DOES 1 through 100, | |
| Defendants. | Hearing Date:   February 24, 2014<br>Hearing Time:   2:00 p.m.<br>Courtroom:       Hon. Virginia A. Phillips |

Date Complaint Filed: May 1, 2013
Trial Date: August 5, 2014

Filed concurrently with:
1. *Notice of Amended Motion and Amended Motion;*
2. *Points and Authorities;*
3. *Statement of Undisputed Facts;*
4. *Declaration of Bryan R. Gerstel;*
5. *Declaration of Alan Lux;*
6. *Declaration of Robert C. Manion;*
7. *Declaration of John J. McLeod;*
8. *Request for Judicial Notice; and*
9. *[Proposed] Order.*

---

Declaration of Joshua Tanner ISO Ironwood's Motion for Partial Summary Judgment

**I, JOSHUA TANNER, declare:**

1.     I am the General Manager and Chief Operating Officer of Ironwood Country Club ("Ironwood").  I have personal knowledge of the matters set forth herein and if called upon to testify I could and would competently do so, except as to those matters stated on information and belief and, as to those matters, I believe them to be true.

2.     I have been employed as Ironwood's General Manager and Chief Operating Officer since February 2010.  As part of my overall responsibilities, I work with Ironwood's insurance broker, Alan Lux of Tanenbaum-Harber of CA, Inc., with respect to the marketing and procurement of insurance policies to suit Ironwood's coverage needs.  I am also responsible for working with Mr. Lux with respect to the handling of claims and suits against Ironwood, including providing notice of such claims or suits to Ironwood's insurance carriers.  In addition, I am responsible for working with and assisting Ironwood's Board of Directors ("Board") on matters that they bring to my attention so as to facilitate their decision-making process.

3.     Philadelphia Insurance Company ("Philadelphia") issued a policy to Ironwood affording Directors & Officers Liability coverage and Employment Practices Liability coverage for the policy period of October 1, 2010 to October 1, 2011.  In or about the mid-2011, Philadelphia informed Ironwood that it would not be renewing the policy.

4.     Accordingly, in July 2011, I began working with Mr. Lux with respect to marketing and procuring a policy to replace the outgoing Philadelphia policy.  I am informed and believe that Mr. Lux marketed Ironwood's coverage needs to several different insurance companies in an effort to obtain quotes for a policy to replace the Philadelphia policy.  One quote Ironwood received was from Liberty Insurance Underwriters, Inc. ("Liberty").

/ / /

/ / /

Declaration of Joshua Tanner ISO Ironwood's Motion for Partial Summary Judgment

5.      On October 5, 2011, I completed Liberty's "Application for Nonprofit Executive Advantage Policy."  I caused the completed application to be forwarded to Mr. Lux.  I am informed and believe that Mr. Lux thereafter submitted the completed application to Liberty.  A true and correct copy of the October 5, 2011 application that I forwarded to Mr. Lux is attached hereto as Exhibit 1.  The application attached hereto as Exhibit 1 has been redacted to protect Ironwood's confidential financial information set forth on page one of the application.

6.      The application that I completed and forwarded to Mr. Lux (Exhibit 1 hereto) did not provide a response to Question #14.  I have conferred with the other members of Ironwood's management team, including Ironwood's Controller, Lydia Magat, as well as with Mr. Lux.  However, I am not aware of who, if anyone, provided a "no" response to Question #14.

7.      I am informed and believe that Liberty thereafter issued a "Nonprofit Executive Advantage Policy" to Ironwood, policy number DOCH216747-211, for the policy period of October 1, 2011 to October 1, 2012 ("Policy").  A true and correct copy of the Liberty Policy that was delivered to Ironwood is attached hereto as Exhibit 2.  The Policy attached hereto as Exhibit 2 has been redacted so as not to reveal confidential premium information set forth on the "Declarations" page.

8.      In 2010, soon after my employment at Ironwood began, I learned that the club members had approved an assessment in 1999 of $25,500 per member ("Assessment").   The Assessment was to be repaid to a member when they subsequently sold their membership.  Members sold their memberships by placing them on a resale list.  I further learned that in addition to members selling their memberships, some members had forfeited their membership to the club rather than have it sold to an incoming member.  The forfeited memberships became club property and were called Treasury memberships.  I learned that the club had a business practice of selling these Treasury memberships to incoming new members and repaying the Assessment to the original member when that Treasury sale occurred years after the member forfeited it.

Declaration of Joshua Tanner ISO Ironwood's Motion for Partial Summary Judgment

Sometime after my employment began, the Board brought to my attention that it was discussing the nature and terms of its business practice of repaying the Assessment to a forfeiting member when the Treasury membership was sold.  I am informed and believe that dating back several years before my employment with the club, the previous Boards had been intermittently discussing the nature and terms of this business practice.

9.      I worked with and assisted the Board while it discussed this practice.  I am informed and believe that this included consultations with many individuals, including past Presidents, myself and other members of Ironwood's management team, and Ironwood's counsel, Bryan Gerstel.  In my position as General Manager and Chief Operating Officer, I attend all Board meetings.  Prior to January 2012, the matter of changing this business practice was never presented to the Board for a vote by motion or otherwise.  It was simply a matter that had been discussed a number of times.  I am informed and believe that no Board made any decision on this issue prior to January 2012.  And, since the matter had never come up to the Board for a vote or decision prior to January 19, 2012, I did not have any knowledge or information of any fact or circumstance that might give rise to a claim against Ironwood or the Board regarding the contemplated change to Ironwood's business practice of repaying the Assessment to forfeiting members at any time prior to January 2012 – and certainly not when I was filling out the Liberty application on October 5, 2011.

10.      On January 19, 2012, as part of my overall responsibilities, I attended the regularly-scheduled meeting of the Board.  During this meeting, the Board voted to change the practice of repaying the Assessment to former members who had resigned from the club, stopped paying dues, and forfeited their membership.  The Board voted to cease all such repayments going forward.  I am informed and believe that this was the first time any Board ever voted on the issue of whether to change this business practice.

/ / /

3

11.     On January 24, 2012, the Board's then-President, Ken Delf, sent a letter to Ironwood's members summarizing the decisions that were made during the January 19 Board meeting, including the decision to stop repaying the Assessment to forfeiting members. I received a copy of Mr. Delf's January 24 letter in the normal course of business as Ironwood's General Manager and Chief Operating Officer. A true and correct copy of Mr. Delf's January 24 letter is attached hereto as Exhibit 3.

12.     From 2010 (when I learned the Board was discussing a change to its business practice of repaying the Assessment to forfeiting members) up through January 19, 2012 (when the board for the first time voted to change its business practice), I was not aware of any fact or circumstance that might give rise to a claim against Ironwood or the Board as a result of the Board considering making the change to its practice of repaying the Assessment to forfeiting members.

13.     In the normal course of business, I kept the Board informed about the insurance policies affording coverage for Ironwood. As of October 5, 2011, when I caused to be submitted the insurance application to Liberty, I personally had no knowledge or information of any fact or circumstance that might give rise to a claim against Ironwood or the Board regarding the possibility of a future change to Ironwood's business practice. I am informed and believe that the Board, too, had no such knowledge or information. Indeed, the decision to change that business practice was not made until January 19, 2012 – more than three months after October 5, 2011.

14.     On or about May 7, 2012, I received via email a demand letter from William S. Cobb, Jr. Mr. Cobb's May 7 letter was the first claim of which I was aware regarding Ironwood's above-described January 19, 2012 vote. A true and correct copy of Mr. Cobb's May 7 letter is attached hereto as Exhibit 4.

15.     I subsequently discussed Mr. Cobb's May 7, 2012 demand letter with Mr. Lux. He asked me to forward the letter to him so that he could put Liberty on notice of the claim, which I did. I am informed and believe that, on or about May 15, 2012, Mr. Lux caused Mr. Cobb's May 7, 2012 demand letter to be forwarded to Liberty and that,

on or about May 16, 2012, Liberty acknowledged receipt of the claim.

16.    I am informed and believe that, on or about August 21, 2012, Mr. Cobb filed a lawsuit against Ironwood regarding many of the same issues set forth in his May 7, 2012 demand letter.

17.    On or about September 13, 2012, Mr. Lux informed me that Liberty had agreed to defend Ironwood in the Cobb matter.  Mr. Lux asked me to forward to him copies of any and all bills that Ironwood had received in the Cobb matter.  Mr. Lux did not tell me to limit the scope of the invoices to only those that post-dated the May 15, 2012 notice of the Cobb claim to Liberty.  It was my understanding that Liberty had requested the invoices for purposes of processing them for reimbursement to Ironwood after deducting the $10,000 retention under the Policy.

18.    As part of my overall responsibilities at Ironwood, I review all invoices that Ironwood receives for legal services.  Copies of such invoices are maintained by Ironwood's accounting department.

19.    After Mr. Lux requested copies of any and all bills that Ironwood had received, I caused the club's accounting department to forward all of the invoices for legal services to Mr. Lux.  As a result, the bills that Ironwood sent to Mr. Lux, who I am informed and believe thereafter submitted the bills to Liberty, included invoices dating back to June 2011 – almost a year prior to Mr. Cobb's May 7, 2012 demand letter.  I am not an attorney and I do not have any formal legal training.  So, I did not understand that Liberty was only asking for the bills reflecting legal fees incurred in defense of the Cobb claim.  And, again, Mr. Lux did not advise me to include only post-tender invoices.  Consequently, it was by innocent mistake that invoices pre-dating receipt of the May 2012 Cobb claim were disclosed to Liberty.

20.    I have since reviewed each of the invoices that were sent to Liberty, which included copies of the following invoices that Ironwood's counsel, Bryan Gerstel, had previously issued to Ironwood: invoice dated June 30, 2011 (for work performed throughout June 2011), invoice dated September 6, 2011 (for work performed

5

throughout July 2011 and August 2011), invoice dated October 13, 2011 (for work performed throughout September 2011), invoice dated December 8, 2011 (for work performed throughout November 2011), invoice dated March 5, 2012 (for work performed throughout February 2012), invoice dated April 3, 2012 (for work performed throughout March 2012), and invoice dated May 1, 2012 (for work performed throughout April 2012) (collectively the "Pre-Tender Invoices").

21.    The Pre-Tender Invoices pre-date May 2012 and, as such, they do not include any billing entries related to the defense of the Cobb claim.  Instead, the Pre-Tender Invoices contain attorney-client communications describing work performed by Mr. Gerstel on various matters unrelated to the defense of the Cobb claim.  Ironwood has always kept Mr. Gerstel's invoices and their contents confidential in the normal course of its attorney-client relationship.  Consequently, for the above reasons, these pre-May 2012 invoices were mistakenly and inadvertently disclosed to Liberty and were not provided to Liberty with any intention of waiving the attorney-client privilege.

22.    Upon learning of this mistake, I am informed and believe that Ironwood's counsel of record in this action, McLeod Law Group, A.P.C., requested the return of the pre-May 2012 invoices and requested that Liberty destroy any copies that had been made.  As of the date of this declaration, I am informed and believe that Liberty has refused to return any such invoices to Ironwood or McLeod Law Group.

23.    In addition to the Pre-Tender Invoices, the invoices that Mr. Lux sent to Liberty included copies of the following invoices that Mr. Gerstel had previously issued to Ironwood: invoice dated June 4, 2012 (for work performed throughout May 2012), invoice dated July 2, 2012 (for work performed throughout June 2012), invoice dated August 10, 2012 (for work performed throughout July 2012), and invoice dated September 1, 2012 (for work performed throughout July 2012) (collectively the "Post-Tender Invoices").  These are the only invoices issued by Mr. Gerstel to Ironwood (for that period of time) that include billing entries related to the defense of the Cobb matter.

Declaration of Joshua Tanner ISO Ironwood's Motion for Partial Summary Judgment

24.     In addition to the Pre-Tender Invoices and Post-Tender Invoices, the invoices that Mr. Lux sent Liberty also included copies of the following invoices that the Lavely & Singer firm had previously issued to Ironwood: invoice dated June 30, 2012 (for work performed throughout June 2012) and invoice dated July 31, 2012 (for work performed throughout July 2012) (collectively "Lavely & Singer Invoices"). Ironwood did not retain the Lavely & Singer firm to assist Mr. Gerstel with the defense of the Cobb matter.  I have reviewed the Lavely & Singer Invoices and they do not include billing entries related to the defense of the Cobb matter.

25.     Moreover, having reviewed all of the invoices that Ironwood submitted to Liberty, the Post-Tender Invoices are the only invoices that should have been sent in response to Liberty's request for copies of bills related to the Cobb matter.

26.     As Ironwood's General Manager and Chief Operating Officer, I do not have authority to waive any privileges, including the attorney-client privilege, on behalf of Ironwood.  Any such waiver would require authorization from Ironwood's Board.  I did not ask for and did not receive authority from the Board to waive any privileges applicable to the Pre-Tender Invoices.

27.     On or about October 25, 2012, I received a letter from Liberty confirming its agreement to defend Ironwood in the Cobb matter through Mr. Gerstel's firm.  A true and correct copy of the October 25, 2012 letter I received from Liberty is attached hereto as Exhibit 5.

28.     On or about February 21, 2013, in the normal course of business, Ironwood sent to Mr. Gerstel check no. 45870 in the amount of $10,000.00.  This payment was made to satisfy the $10,000.00 retention under the Liberty Policy.  A true and correct copy of Ironwood check no. 45870, which has been redacted to keep Ironwood's bank account number private and confidential, is attached hereto as Exhibit 6.

/ / /

/ / /

7

29.   I have conferred with Ironwood's accounting department.  As of the date of this declaration, Liberty has not paid any money to Ironwood in connection with the Cobb matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at ⎵Palm Desert⎵, California, on December ⎵20⎵, 2013.


Joshua Tanner

8

# EXHIBIT 1



**LIBERTY INSURANCE UNDERWRITERS INC.**
55 Water Street, 18th Floor
New York, New York 10041
(a member of the Liberty Mutual Group and hereinafter "the Insurer")
Liberty Insurance Underwriters Inc.'s toll free number is: 800-677-9163

## APPLICATION FOR
## NONPROFIT EXECUTIVE ADVANTAGE POLICY

THIS IS AN APPLICATION FOR A CLAIMS-MADE POLICY. THE POLICY FOR WHICH THIS APPLICATION IS MADE COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED TO THE APPLICABLE RETENTION.

THE POLICY PROVIDES THE DUTY ON THE PART OF THE INSURER TO DEFEND.

*Instructions*
* *Please complete all questions.*
* *The term "Insured Organization" means the parent organization whose directors and officers are proposed to be insured under the Nonprofit Executive Advantage Policy for which this Application is made, along with any other entities in which such parent organization has or controls the right to elect more than 50% of the Board of Directors or other governing body of such entity if such right exists.*

1. Name of the **Insured Organization**: <u>Ironwood Country Club</u>

2. Address of the **Insured Organization**: <u>73-735 Irontree Drive</u>
   City: <u>Palm Desert</u>  County: <u>Riverside</u>      State: <u>CA</u>  Zip Code: <u>92260</u>

3. Individual at **Insured Organization** designated to receive correspondence and notices from the Insurer:
   <u>Joshua Tanner</u>      <u>General Manager/COO</u>
   (Name)                    (Title)

   Telephone: <u>(760) 346-0551</u>  Fax: (760) 766-1098  E-Mail Address: <u>jtanner@ironwoodcountryclub.com</u>

4 **Insured Organization's** nature of operations: <u>Golf and Country Club</u>

5. a) Tax status: o Exempt under Section 501(c) <u>7</u>  or o Taxable  b) Date organized <u>12/03/1984</u>

   c) Number of Employees: <u>100(Full time) 60 (Seasonal)</u>  d) Annual Salary/Wages Expense $

   e) Total Assets $ _____

6. a) What was the employee turnover rate in the last 12 months? <u>3%</u>

   b) Did this exceed the historical average of the prior 3 years?................................................. o Yes ✓ No

Exhibit ____1____
Page ____1____

7.  Have there been any changes in Senior Management for reasons other than death, retirement at normal retirement age or term limitations.................................................................................... o Yes  o No

8.  Has the **Insured Organization** had in the past 12 months, or does it contemplate within the next 12 months consolidation, merger, sale or divestiture of a portion of its business?.................................... o Yes  o No
    If "Yes", was there, or will there be, a reduction in employees as a result?..................*N.A.*  o Yes  o No
    If "Yes", what was, or will be, the reduction as a percentage of prior employee count?..*N/A*  o Yes  o No

9.  Does the **Insured Organization** provide any of the following? :
    a) Promote, sponsor or provide any type of insurance to its members? ........................................ o Yes  o No
    b) Provide standard setting, disciplinary or peer review activities? ........................................ o Yes  o No
    c) Engage in any labor negotiations? ........................................................................ o Yes  o No
    d) Engage in any experimentation, research or product development? ...................................... o Yes  o No
    e) Provide any other professional services?................................................................ o Yes  o No
    f) Engage in any business transactions with **Insured Persons** or businesses they control?...... o Yes  o No
    If "Yes" for any of the above, please attach full details.

10. Has the **Insured Organization** previously held or does it now have any directors and officers liability insurance or similar insurance?.......................................................................... o Yes  o No
    If "Yes", please provide the following details:

    | Insurer | Policy Type | Deductible/Retention | Period From/To | Premium |
    |---------|-------------|----------------------|----------------|---------|
    |         |             |                      |                |         |
    |         |             |                      |                |         |

11. Attach full details of any claim, notice of circumstance, or wrongful act which has been the subject of notice under such insurance in the last 5 years (if none, check the box)........................................ o None

12. Has any Insurer declined, cancelled, or refused to renew any directors and officers liability insurance or similar insurance within the past 5 years? ............................................................ o Yes  o No
    If "Yes", please attach full details.

**Do not complete questions #13 and #14 if this is a renewal policy with the same limit of liability with a member of the Liberty Mutual Group.**

13. During the last 5 years has the **Insured Organization** or any of its directors, officers, or employees been involved in any litigation that could have a material impact on the **Insured Organization**?..o Yes  o No
    If "Yes", please attach full details.

14. Does anyone for whom insurance is sought have any knowledge or information of any act, error, omission, fact, or circumstance which may give rise to a **Claim** which may fall within the scope of the proposed insurance? ........................................................................................................ o Yes  o No
    If "Yes", please attach full details.

IT IS UNDERSTOOD AND AGREED THAT IF ANYONE FOR WHOM THIS INSURANCE IS SOUGHT HAS ANY KNOWLEDGE OF ANY SUCH ACT, ERROR, OMISSION, FACT, OR CIRCUMSTANCE, ANY CLAIM EMANATING THEREFROM SHALL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.

**RENEWAL STATEMENT (Applicable to renewal polices only)** – It is agreed that this Renewal Application is a supplement to the Application(s) attached to the current Policy and said Applications, together with this Renewal Application, constitute the complete Application which shall be the basis of the contract should a Policy be issued and will be attached to and become part of the Policy.

**REQUIRED INFORMATION:** Risks exceeding $300,000 in salaries OR $1,000,000 in assets must submit a financial statement.

Signing this **Application** does not bind the undersigned to purchase or the Insurer to sell any insurance policy. If a policy is issued, this **Application** and its attachments shall be the basis of such policy and shall be deemed attached to and shall form part of such policy.

The undersigned, on behalf of all prospective Insureds, declares that the statements in this **Application** and its attachments are true and accurate. If there are material changes to any statements in this **Application** or its

LIUI00DO110020507                            2 of 4

Exhibit ____1____
Page ____2____

attachments prior to the inception date of the policy, the undersigned shall immediately notify the Insurer of such changes. Upon receipt of such notification, the Insurer shall have the right to modify or withdraw any outstanding terms or proposal.

**NOTICE TO ARKANSAS RESIDENTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO COLORADO RESIDENTS:** It is unlawful to knowingly provide false, incomplete, or misleading facts, or information to an insurance company for the purpose of defrauding or attempting to defraud the company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant with regard to settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance with the department of regulatory agencies.

**NOTICE TO FLORIDA RESIDENTS:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**NOTICE TO KENTUCKY RESIDENTS:**
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**NOTICE TO MAINE RESIDENTS:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NOTICE TO NEW JERSEY RESIDENTS:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**NOTICE TO NEW MEXICO RESIDENTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NOTICE TO NEW YORK RESIDENTS:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**NOTICE TO OHIO RESIDENTS:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA RESIDENTS:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO OREGON RESIDENTS:** Any person who knowingly, and with intent to defraud or solicit another to defraud an insurer: (1) by submitting an application, or (2) by filing a claim containing a false statement as to any material fact, may be violating state law.

**NOTICE TO PENNSYLVANIA RESIDENTS** Any person who knowingly and with intent to defraud any insurance company or other person files and application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Exhibit _____ (
Page _____ 5

**NOTICE TO TENNESSEE RESIDENTS:** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company.  Penalties include imprisonment, fines and denial of insurance benefits

Exhibit _____ l _____
Page _____ 4 _____

This Application must be currently dated and signed by a member of the governing board of the organization.

Signed: _____          Title: **Chief Operating Officer**

Date: _____10/5/11_____

**Submitting Producer Name**

_____

Agency Name

_____

Agency Address

_____

License Number (FL Producers Only)

Exhibit ___1___
Page ___5___

# EXHIBIT 2

## LIBERTY INSURANCE UNDERWRITERS INC.

55 Water Street, 18th Floor
New York, New York 10041
(a member of the Liberty Mutual Group and hereinafter "the Insurer")
Liberty Insurance Underwriters Inc.'s toll free number is: 800-677-9163

## NONPROFIT EXECUTIVE ADVANTAGE POLICY

### DECLARATIONS

NOTICE: THIS IS A CLAIMS-MADE POLICY. THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.

THE INSURER HAS THE DUTY TO DEFEND.

| | |
|---|---|
| POLICY NUMBER: DOCH216747-211 | PRODUCER: ARC Excess & Surplus, LLC |
| RENEWAL OF: NA | |

ITEM I. NAME AND ADDRESS OF PARENT ORGANIZATION:

Ironwood Country Club
73-735 Irontree Dr.
Palm Desert, CA 92260

ITEM II.   POLICY PERIOD:   Inception Date: 10/1/11  Expiration Date: 10/1/12
(12:01 A.M. at the address set forth in Item I)

ITEM III.   LIMIT OF LIABILITY:   $2,000,000 in the aggregate for the Policy Year

ITEM IV.   RETENTION:   $10,000 – Directors & Officers in the aggregate each Claim

ITEM V.   PRIOR LITIGATION DATE:   10/1/11

ITEM VI.   PREMIUM:   $:

ITEM VII.   ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE: 3

This Declarations page, together with the **Application**, the attached Nonprofit Executive Advantage Policy Form, and all endorsements thereto, shall constitute the contract between the Insurer and the **Insureds**. This Policy is valid only if signed below by a duly authorized representative of the Insurer.

_____
Authorized Representative

LIUI00DO030010307

Exhibit _____ 2
Page _____

# LIBERTY INSURANCE UNDERWRITERS INC.

### (A Stock Insurance Company, hereinafter the "Insurer")

### NONPROFIT EXECUTIVE ADVANTAGE POLICY

(Words and phrases printed in **bold**, other than
in the headings, are defined in Section 23 below.)

In reliance upon the truthfulness and accuracy of the statements made in the **Application**, in consideration of, and subject to, the payment of premium when due, and subject to the terms, conditions, and exclusions of this Policy, the Insurer and the **Insureds** agree as follows:

1. **Insuring Agreement:** The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**.

2. **Defense Costs and Settlements:**

    2.1    It shall be the right and duty of the Insurer to defend any **Claim**. The Insurer may investigate, as it deems appropriate, any **Claim**, circumstance, or **Wrongful Act** involving the **Insureds**.

    2.2    The **Insureds** shall not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements, or settlements made by the **Insureds** without the Insurer's prior written consent.

    2.3    The Insurer has the right to negotiate the settlement of any **Claims** it deems expedient, but only with the **Insured's** consent. If the **Insureds** withhold consent to such settlement, the Insurer's liability for such **Claim** is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the **Insured** consented to the settlement, and 70 percent (70%) of any additional covered **Loss**, including **Defense Costs**, incurred subsequent to such refusal to settle.

3. **Cooperation:** As a condition precedent to the **Insureds'** rights under this Policy, they shall give to the Insurer all information and cooperation as the Insurer reasonably may require and shall do nothing that may prejudice the Insurer's position or its rights of recovery.

4. **Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured**:

    4.1    for:

        (a)    bodily injury, sickness, disease, death; or

        (b)    emotional distress, mental anguish, false arrest or imprisonment, abuse of process, malicious prosecution, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction; or

LIUI00DO010010507                              1 of 11

Exhibit    2
Page       2

(c)     libel, slander, defamation; or

(d)     damage to, destruction of, or loss of use of any tangible property;

provided that parts (b) and (c) of this exclusion shall not apply to any **Claim** brought by or on behalf of any **Third Person**, or any past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**; also provided that part (c) of this exclusion shall not apply to any **Claim** for any other **Wrongful Act** other than an **Employment Practices Wrongful Act**. However, coverage afforded for libel, slander or defamation for **Wrongful Acts** other than **Employment Practices Wrongful Acts** shall be excess of any coverage afforded by the **Insured's** general liability policy;

4.2     for any error, misstatement, misleading statement, act, omission, neglect or breach of duty by **Insured Persons** of any **Subsidiary** in such capacity or by the **Subsidiary** itself if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a **Subsidiary**;

4.3     based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time;

4.4     for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar federal, state, local or common law;

4.5     based upon, arising from, or in any way related to:

(a)     any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or

(b)     the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding;

4.6     brought or maintained by or on behalf of the **Insured Organization**;

4.7     based upon, arising from, or in any way related to the actual, alleged, or threatened discharge, dispersal, release or escape of **Pollutants, Fungi** or **Microbes**, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants, Fungi** or **Microbes**;

4.8     based upon, arising from, or in any way related to an **Insured Person** serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the **Insured Organization**; or

4.9     based upon, arising from, or in any way related to:

(a)     any **Insureds** gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled; or

Exhibit ____2____
Page ____3____

(b)   any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured;**

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred.

For purposes of determining the applicability of Section 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

5.     **Loss Exclusions:** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim:**

    5.1   for any obligation of the **Insured Organization** to modify any building or property in order to affect compliance with the Americans With Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common laws; or

    5.2   for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement.

Provided, however, that these exclusions shall not apply to the Insurer's duty to defend and to pay **Defense Costs.**

6.     **Application Representations and Severability:**

    6.1   The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such statements and representations.

    6.2   The **Insureds** agree that if the **Application** contains any statements or representations that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person.**

7.     **Reporting Requirements:**

    7.1   The **Insureds**, as a condition precedent to their rights under this Policy, shall report every **Claim** to the Insurer as soon as practicable from the date any **Executive Officer** has knowledge of the **Claim**, and in no event later than ninety (90) days after the end of the **Policy Period.**

    7.2   Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded to **Liberty International Underwriters, 55 Water Street, 18th Floor, New York, NY 10041 Attention: Specialty Casualty Claims.**

    7.3   All notices under this Policy shall be sent in writing by mail, prepaid express courier, or facsimile and shall be effective upon receipt thereof by the addressee.

8.     **Notice of Circumstance or Wrongful Act:**  If during the **Policy Period** or the Discovery Period the **Insureds** become aware of any circumstance or **Wrongful Act** that reasonably may be expected to give rise to a **Claim**, and if such circumstance or **Wrongful Act** is reported to the Insurer

                  3 of 11

Exhibit _____ 2
Page _____ 4

during the **Policy Period** in writing with details as to the nature and date of such circumstance or **Wrongful Act**, the identity of any potential claimant, the identity of any **Insured Person** involved in such circumstance or **Wrongful Act**, and the manner in which the **Insureds** first became aware of such circumstance or **Wrongful Act**, then any **Claim** subsequently arising from such circumstance or **Wrongful Act** shall be deemed under this Policy to be a **Claim** made during the **Policy Period** in which the circumstance or **Wrongful Act** was first duly reported to the Insurer.

9.   **Limit of Liability:**

   9.1   The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations. Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability.

   9.2   All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period.**

   9.3   With respect to all **Claims** deemed to have been made in a **Policy Year**, should the Limit of Liability be exhausted by payment of **Loss** resulting from one or more of such **Claims**, the Insurer's duty to defend shall cease and any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished and the Insurer shall have no further obligations hereunder of any kind or nature.

10.   **Retentions:**   The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations. Such Retention shall not be applicable to **Defense Costs** except in the instance noted in Section 2.3 in which the **Insureds** withhold consent to settlement. Such applicable Retention shall be uninsured and shall be borne by the **Insured Organization**. However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0. This change in Retention shall not affect any other terms or conditions of this Policy.

11.   **Allocation:**   If a **Claim** gives rise to **Loss** covered under this Policy and loss not covered under this Policy, either because a **Claim** includes both covered and uncovered matters or both covered and uncovered parties, the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered loss.

12.   **Other Insurance:**   If any **Loss** arising from any **Claim** is insured by other valid and collectible insurance, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

13.   **Discovery Period:**

   13.1   If the Insurer or the **Parent Organization** fails or refuses to renew this Policy or if the **Parent Organization** cancels this Policy, any **Insured** shall have the right to an extension of the coverage granted by this Policy following the effective date of such cancellation or

Exhibit _____2_____
Page _____5_____

non-renewal.  Such extension of coverage shall apply solely with respect to **Wrongful Acts** taking place before the effective date of such cancellation or non-renewal.

13.2   If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discovery Period** of ninety (90) days.  If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period**.  Such Discovery Period Premium shall be deemed fully earned as of such date. This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

13.3   If the **Parent Organization** fails or refuses to renew or cancels this Policy the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**.  Such Discovery Period Premium shall be deemed fully earned as of such date.

13.4   The extension of coverage for the **Discovery Period** shall not in any way increase the Limit of Liability set forth in Item III of the Declarations.  For purposes of the Limit of Liability, the **Discovery Period** is considered to be part of and not in addition to the last **Policy Year**.

13.5   If the **Parent Organization** shall cancel or non-renew this Policy for any reason other than being sold, acquired or bankrupt, each director or officer that was an **insured**, but did not serve as a director or officer at the time of cancellation or non-renewal, shall be provided an unlimited extension of coverage granted by this Policy to report any **Claim(s)** first made against the director or officer after the date of such cancellation or non-renewal.  However, this extension of coverage shall only be afforded in the event that the **Wrongful Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extension period, is in effect at the time the **Claim** is made.

14.   Conversion to Automatic Run-off:

14.1   In the event of a **Change in Control** during the **Policy Period**, coverage under this Policy shall continue until the end of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** taking place prior to the effective date of such **Change in Control**.  The entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**.

14.2   The **Parent Organization** shall give written notice of such **Change in Control** to the Insurer as soon as practicable, together with such information as the Insurer may reasonably require.

15.   **Subrogation**:  If the Insurer pays any **Loss** under this Policy, the Insurer shall be subrogated to the extent of such payment to all rights of recovery thereof.  The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in

Exhibit __2__
Page __6__

the name of the **Insureds**. The obligations of the **Insureds** pursuant to this Section 15 survive the termination of the **Policy Period**.

16. **Parent Organization as Authorized Representative**: The **Insureds** agree that the **Parent Organization** shall act on their behalf with respect to all matters under this Policy, including without limitation the giving and receiving of notices hereunder, the payment or return of premiums, and the negotiation and acceptance of endorsements.

17. **Amendment, Assignment and Headings:**

    17.1    Any amendment to this Policy or assignment of an interest in this Policy, in whole or in part, shall be effective only if made by endorsement to this Policy signed by an authorized representative of the Insurer.

    17.2    The headings to the provisions in this Policy, including those found in any endorsements attached hereto, are provided for convenience only and do not affect the construction hereof.

18. **Territory**: This Policy applies to **Wrongful Acts** occurring anywhere in the world, provided that a **Claim** is brought against the **Insured** within the United States of America, its territories or possessions or Canada.

19. **Spousal Benefit**: If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse where the claimant asserts such claim by reason of spousal status or seeks to obtain recovery against property in which such spouse has an interest, the amount which such spouse becomes legally obligated to pay in respect of such **Claim** (including defense costs) shall be deemed the **Loss and Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions. In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse.

20. **Estates and Legal Representatives**: In the event of the death, incapacity, or bankruptcy of an **Insured Person**, any **Claim** made against the estate, legal representatives, heirs, or the assigns of such **Insured Person** for a Wrongful Act by such **Insured Person** shall be deemed to be a **Claim** against such **Insured Person**.

21. **Termination:**

    21.1    The Insurer may not cancel this Policy except for non-payment of premium when due. Such cancellation shall be effective as of the inception date of the **Policy Period**.

    21.2    The **Parent Organization** may cancel this Policy by sending notice of cancellation to the Insurer. Such cancellation shall be effective on the date the Insurer receives such notice. The **Parent Organization** may not cancel this Policy in anticipation of or after the effective date of a **Change in Control**. In the event the **Parent Organization** cancels this Policy, the Insurer shall retain the customary short rate premium. Payment of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

    21.3    If the Insurer elects not to renew this Policy, the Insurer shall provide the Parent **Organization** with not less than sixty (60) days advance notice thereof.

22. **Action Against Insurer:**

LIUI00DO010010507                6 of 11

Exhibit _____ 2 _____
Page _____ 2 _____

22.1   No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, or the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial, or by written agreement of the Insureds, the claimant and the Insurer.

22.2   No person or organization shall have the right under this Policy to join the Insurer as a party to any action against the Insureds, nor shall the Insurer be impleaded by the Insureds or their legal representatives.

23.   **Definitions:**

23.1   "Application" means all signed applications, including attachments and materials submitted therewith or as a part thereof, or incorporated therein, for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a direct or indirect renewal or replacement. All such applications, attachments, and materials are deemed attached to and incorporated into this Policy.

23.2   **"Change in Control"** means:

(a)   the acquisition by another entity of voting rights resulting in voting control by such other entity of more than 50% of the outstanding voting rights representing the present right to vote for election of directors or equivalent positions of the **Parent Organization**;

(b)   the merger of the **Parent Organization** into another entity such that the **Parent Organization** is not the surviving entity, or the consolidation of the **Parent Organization** with another entity; or

(c)   the loss of the **Parent Organization's** not-for-profit tax status.

23.3   **"Claim"** means:

(a)   a written demand for monetary or non-monetary relief against an **Insured**;

(b)   the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**; or

(c)   the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured**, including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency;

including any appeal therefrom. A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

23.4   **"Defense Costs"** means reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim** and cost of attachment or

Exhibit _____ 2
Page _____ 8

similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers or employees of the **Insured Organization**.

23.5   "**Discovery Period**" means the period of time set forth in Section 13.

23.6   "**Employment Practices Wrongful Act**" means:

    **(a)**   wrongful dismissal or discharge or termination of employment, whether actual or constructive;

    **(b)**   discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation or disability;

    **(d)**   sexual or other harassment in the workplace;

    **(e)**   employment related misrepresentation;

    **(f)**   violation of employment laws;

    **(g)**   wrongful failure to employ, promote or grant tenure;

    **(h)**   wrongful discipline;

    **(i)**   negligent evaluation;

    **(j)**   retaliation; and/or

    **(k)**   failure to provide adequate workplace or employment policies or procedures.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party, Employment Practices Wrongful Act** means any actual or alleged, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Insured Person** in his/her capacity as an **Insured Person** or by the **Insured Organization**.

23.7   "**Executive Officer**" means the president, chief executive officer, chief operating officer, chief financial officer, managing director, any executive vice president and any equivalent executive position of the **Insured Organization**.

23.8   "**Fungi**" means any form of fungus, including but not limited to yeast, mold, mildew, rust, smut or mushroom, and any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of fungi.

23.9   "**Insolvency**" means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage, or liquidate the **Insured Organization**, or the **Insured Organization** becoming an insolvent debtor-in-possession.

LiUl00DO010010507                              8 of 11

Exhibit ___2___
Page ___9___

23.10  "Insured(s)"   means the **Insured Persons** and the **Insured Organization**.

23.11  "**Insured Organization**" means any entity named in Item I of the Declarations and any **Subsidiary**, including any such entity operating as a debtor-in-possession.

23.12  "**Insured Person(s)**" means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization**, or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

23.13  "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes.

23.14  "**Loss**" means:

    (a)    sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

    (b)    any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

Loss shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

23.15  "**Microbes**" means any non-fungal microorganisms or non-fungal colony-form organisms that causes infection or disease including but not limited to any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of microbes.

23.16  "**Parent Organization**" means the **Insured Organization** first named in Item I of the Declarations.

23.17  "**Policy Period**" means the period from the inception date set forth in Item II of the Declarations to the expiration date set forth in Item II of the Declarations, or its earlier termination pursuant to Section 21.

23.18  "**Policy Year**" means the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the **Policy Period**; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period.

23.19  "**Pollutants**" means any substance exhibiting hazardous characteristics as is or may be identified on any list of hazardous substances issued by the United States Environmental Protection Agency, or any state, local, or foreign counterpart.  This definition shall include, without limitation, any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products,

Exhibit ____2____
Page ____10____

radiation, asbestos or asbestos-containing products, waste (including material to be recycled, reconditioned or reclaimed), and any electric, magnetic or electromagnetic field of any frequency, as well as any air emission, waste water, infectious medical waste, nuclear materials, or nuclear waste.

23.20 **"Subsidiary"** means any entity which qualifies as a not-for-profit organization under the Internal Revenue Code and for which the **Parent Organization** has or controls the right to elect or appoint more than fifty percent (50%) of the Board of Directors or other governing body of such entity if such right exists:

   (a) prior to inception date of the **Policy Period**;

   (b) after the inception date of the **Policy Period** and the assets of such entity do not exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement; or

   (c) after the inception date of the **Policy Period** and the assets of such entity exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement but only upon the condition that the **Parent Organization**:

   (i) give written notice of such transaction to the Insurer within 90 days after the effective date of such transaction;

   (i) provide the Insurer with such information as the Insurer may require; and

   (ii) pay any additional premium required by the Insurer.

23.21 **"Third Party"** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Insured Organization**.

23.22 **"Wrongful Act"** means:

   (a) any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, or **Employment Practices Wrongful Act** committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization**; or

   (b) any matter claimed against the **Insured Persons** solely by reason of their status as **Insured Persons**.

23.23 **"Outside Entity"** means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended).

23.24 **"Outside Position"** means the position of director, officer, trustee, or other equivalent position held by an **Insured Person** in any **Outside Entity**, if service in such position is with the knowledge and express consent or at the express request of the **Insured Organization**.

24. **Outside Position Liability:**

LIUI00DO010010507                     10 of 11

Exhibit ___2___
Page ___11___

24.1    This Policy, subject to its terms, conditions, and exclusions, covers any **Insured Person** serving in an **Outside Position**. Such coverage shall be specifically excess of any: (i) indemnification provided by the **Outside Entity** in which the **Insured Person** serves in such **Outside Position**; and (ii) insurance available from or provided by such **Outside Entity**, regardless of whether or not such other insurance policy is written specifically excess of this Policy or refers to this Policy's policy number.

24.2    Payment by the Insurer or any member company of the Liberty Mutual Group under another insurance policy as a result of a **Claim** against an **Insured Person** in an **Outside Position** shall reduce, by the amount of such payment, the Insurer's Limit of Liability under this Policy.

24.3    Coverage under this Section 2 shall not apply to any **Claim** that is brought or maintained with the solicitation, assistance or participation of the **Outside Entity** in which an **Insured Person** serves in an **Outside Position** or any director, officer, trustee, regent, governor or employee of such **Outside Entity**.

24.4    Nothing in this Section 24 shall be construed to extend coverage under this Policy to the **Outside Entity** in which such **Insured Person** serves in such **Outside Position**, or to the other directors, officers, or employees of such **Outside Entity**.

In Witness Whereof, the Insurer has caused this Policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.

President

Secretary

Exhibit _____ 2
Page _____ 12



LIBERTY INSURANCE UNDERWRITERS INC.

ENDORSEMENT NO. 1

This endorsement, effective October 1, 2011          forms part of

Policy No. DOCH216747-211                            issued to Ironwood Country Club

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Application of Retention to Defense Costs

It is agreed that Section 23.14 (a) of the Policy is deleted and replaced as follows:

23.14 (a)     sums which the Insureds are legally obligated to pay solely as a result of any Claim insured by this Policy, including Defense Costs, damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

It is further agreed that for such Claims, Section 10 is deleted and replaced with the following:

10.     Retention:  The Insurer shall be liable to pay only the amount of covered Loss in excess of the applicable Retention amount set forth in Item IV of the Declarations. Such applicable Retention shall be uninsured, shall be applicable to Defense Costs and shall be borne by the Insured Organization. However, if an Insured Person is not indemnified for Loss solely by reason of the Insured Organization's financial insolvency or because indemnification is not legally permissible, an Insured Person's Retention shall be $0. This change in Retention shall not affect any other terms or conditions of this Policy.

All other terms, conditions, and exclusions of this Policy remain unchanged.

LIUI00DO381290207

Exhibit ___2___
Page ___13___



LIBERTY INSURANCE UNDERWRITERS INC.

ENDORSEMENT NO. 2

This endorsement, effective October 1, 2011 ·      forms part of

Policy No. DOCH216747-211      issued to Ironwood Country Club

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Sub-Retention Endorsement

It is agreed that Item IV of the Declarations Page is hereby amended by the addition of the following:

ITEM IV.      RETENTION: $100,000 in the aggregate each Claim

It is further agreed that the Retention provided under this endorsement shall only apply as respects to:

EMPLOYMENT PRACTICES LIABILITY

All other terms, conditions, and exclusions of this Policy remain unchanged.

LIU100DO380300507

Exhibit ___2___
Page ___14___



Liberty
International
Underwriters.

## LIBERTY INSURANCE UNDERWRITERS INC.

### ENDORSEMENT NO. 3

This endorsement, effective October 1, 2011          forms part of

Policy No. DOCH216747-211          issued to Ironwood Country Club

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the above captioned policy.

A. **Cap On Certified Terrorism Losses**
   "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

   If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

B. **Application Of Exclusions**
   The terms and limitations of any terrorism exclusion, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

Exhibit _____ 2
Page _____ 1

## DISCLOSURE - TERRORISM RISK INSURANCE ACT

**THIS ENDORSEMENT IS MADE PART OF YOUR POLICY PURSUANT TO THE TERRORISM RISK INSURANCE ACT.**

In accordance with the Terrorism Risk Insurance Act, including all amendments, ("TRIA" or the "Act"), we are required to provide you with a notice of the portion of your premium attributable to coverage for "certified acts of terrorism," the federal share of payment of losses from such acts, and the limitation or "cap" on our liability under the Act.

**Disclosure of Premium**

The Company has made available coverage for "certified acts of terrorism" as defined in the Act. If purchased, the portion of your premium attributable to coverage for "certified acts of terrorism" is shown in the Declarations, Declarations Extension Schedule or elsewhere by endorsement in your policy.

**Federal Participation In Payment Of Terrorism Losses**

If an individual insurer's losses exceed a deductible amount specified in the Act, the federal government will reimburse the insurer for 85% of losses paid in excess of the deductible, provided that aggregate industry losses from a "certified act of terrorism" exceed $100 million.

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. Nor shall Treasury make any payment for any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

TRIA-N004-0208

Exhibit ___2___
Page ___16___

EXHIBIT 3



**IRONWOOD**
**COUNTRY CLUB**

January 24, 2012

Dear Members,

Our last Board meeting was held January 19th. The more important decisions and discussions follow.

We continue to perform well against the operating budget and we believe that we have an excellent chance of equalling or exceeding the dues revenue for the full fiscal year that we achieved last year. All departments are functioning ahead of plan, reflecting the excellent efforts by management and staff and increasing member usage of the club.    Revenues in all departments are up over last year while costs have been contained to approximately last year's levels.

I am constantly asked about membership levels, the key factor in our success. At the end of December 2011, half way through our fiscal year, our membership sales results are:

> ➢ We have added 2 proprietary, 8 CTIM and 9 TFS, for a total of 19 new members.

> ➢ At the end of December 2011 we have 660 total members versus 659 on June 30.

> ➢ Golfing members (Charter and Regular Proprietary, CTIM, Non-Proprietary, and Emeritus) totalled 517 versus 522 a year ago.

We've added members in all categories in January so we will have more up to date figures at the Annual Meeting later this week.

We monitor this very closely and continue to remind members that we need to always be looking for prospective members. A big thank you to all of you who have introduced new members!

Our Annual General Membership meeting is January 28, at 3 pm. We urge you to attend, listen to the committee reports, and take the opportunity to ask questions.

The Board passed resolutions as follows:

1. Rules. "The Board may waive one or more provisions of Rule 8 for promotional or membership development purposes." This is not detrimental or a change in anything we are doing now.

Exhibit _____ 3 _____
Page _____ 1 _____

2. In order to increase the use of the tennis courts we have authorized non-members, who are renters from Ironwood/Monterra/The Summit property owners, to use the tennis facility by paying normal guest fees. We expect that this will increase exposure to our wonderful facility and attract permanent members. In addition, it helps all leasing brokers with leasing Ironwood member property.

3. The Board has voted informally to build the three-hole, par 3 course at the South end of the driving range behind the putting and chipping greens. The final decision will occur at our next Board meeting. The total cost will be less than $80,000 and the work will mostly be done by our staff this coming summer. The existing pitching area would be relocated to two locations, one at each end of the main driving range. After two years of study we have concluded that such a facility will provide another important dimension to Ironwood for new and experienced golfers alike. It will provide a great opportunity to improve the short game, provide those who wish less of a challenge an excellent venue, and be an attraction to new golfers who may be intimidated by the full course experience. We encourage all members to walk the site. You will soon receive notice as to when "tours" will be held. We encourage you to attend one of these guided tours to preview first hand this beautiful site and receive more detail. Delaying the final approval until our February meeting will allow us to conduct tours of the site, provide more detail to members, and further review our capital spending priorities. We have received many comments and the majority are in favor of this addition. Every new amenity is a key selling point to prospective members.

4. The Board has agreed to help the Ironwood Community Association (ICA) by providing interim financial assistance to fund the redevelopment of the front entrance gate at Mariposa and Portola. The assistance is in the form of prepayment of our normal share of dues and minimal contingency financing. Any funds advanced will be fully repaid with repayment protected by a promissory note. The bottom line is that the full cost of the Mariposa Gate Project, which will greatly benefit the Club, will be paid by the ICA. We all look forward to arriving back next November and celebrating this most needed improvement. Congratulations and thank you to the ICA for their hard work on this project.

5. Over the last year the Board had three major goals:

   a) Membership;
   b) Capital Reserve analysis; and
   c) Detailed forward planning.

   Items (a) and (c) are well in hand and item b), the study of Capital Reserves has come a long way.

Exhibit ___3___
Page ___2___

Our review and analysis has revealed a mistaken belief, that began in about 2003, which led to a Club practice of repaying the $25,500 Land Assessment to members who resigned from the Club, stopped paying dues, and forfeited their memberships, rather than selling the memberships through the procedures set up by the Club.

After substantial due diligence, including consultation with past Presidents, our auditor and Counsel, this Board has concluded that the practice of repaying the Land Assessment to forfeiting members, when their forfeited membership is subsequently sold by the Club as a Treasury membership, must cease effectively immediately. Of course, this does NOT apply to any member who sells his/her active membership through the club procedures. The Club will continue to repay the Assessment to all such members when they sell their membership.

A forfeiting member (one who has resigned and stopped paying dues) whose forfeited membership is subsequently sold by the Club as a Treasury membership may, if circumstances warrant it, seek repayment of the assessment and have that request considered on an individual basis.

In appreciation for the financial commitment made at the time and in order to allow current members to enjoy some financial benefit from that commitment while they are still at the Club, the Board has created an option for any current member who is willing to waive the repayment. The offer and a letter of explanation have been mailed by separate cover to those current members who participated in the program. This is a **voluntary** program only and any current member wishing to be paid in full when they sell their membership, may certainly do so.

6. We are pleased to announce that the Nominating Committee has concluded their work and has selected Blomberg, Ray Coad, and Gene Grant be supported by the Board as the regular ticket nominees for election to the Board of Directors. If you have missed this process thus far you can, with the support of 25 proprietary members, submit you name for the ballot. We want to ensure that anyone who has the interest and requisite experience and knowledge of Ironwood is not overlooked.

7. Tarbell Realtors has brought the Young Americans and more recently Annika Sorenstam to the club to sold out audiences. We thank them for their generous support. Many members have asked how they might help out the Sorenstam Foundation. If you are interested in supporting her initiative, click on www.annikafoundation.org.

We constantly strive to build on the sense of community we share, deliver the best product we can in both the short and long term interests of the Club, and continue to find ways to better the experience of being an Ironwood member. As this current board has only one more meeting as a group I would like to thank those who have served us so well and are leaving the Board after a

Exhibit _____3_____
Page _____3_____

three year term, Barbara Sue Seal (served two three year terms), Al Olson and Mike Flood. Please take a moment and thank them for their tireless effort on our behalf.

See you on the course.

Sincerely,

President
Ironwood Board of Directors

Exhibit _____ 3
Page _____ 4

# EXHIBIT 4

William S. Cobb, Jr.
73-132 Carrizo Circle
Palm Desert, CA 92260


May 7, 2012


<u>Via Email</u>

Bob Manion, Board President
Ironwood Country Club
73-735 Iron Tree Drive
Palm Desert, CA 92260

      RE: <u>Repayment of $25,500 Loan</u>

Dear Bob:

      As you have no doubt become aware, a large number of current and former members of Ironwood Country Club ("ICC") have become very concerned about the manner in which ICC is repaying the $25,500 loans to former members whose memberships have sold. Briefly stated, the Board is calculating the loan reimbursement and the net membership refund upon sale as one transaction, instead of as two separate transactions, which is required by the Board's loan approval correspondence to ICC members and ICC's financial statements, among other documentation.

      Many former members who resigned are also concerned about the Board's new policy announced in January, 2012, to the effect that resigned members will no longer receive reimbursement of their loans when their treasury memberships are sold, reversing the Board's previous position and practice.

      These concerned members and I have formed Concerned ICC Members ("CIM") to bring these and other important issues to your attention and to reach a satisfactory resolution. As of the date of this letter, more than 50 current and former members have joined CIM and more are joining every day. Furthermore, I have retained an attorney to represent me in this matter.

      Enclosed is a list of the demands of CIM. If you have a genuine interest in settling this matter out of court, we request that you provide a positive written response within seven (7) days of the date of this letter. If I do not receive a timely affirmative response from you, CIM will have no choice but to conclude that the Board is not interested in reaching a settlement.

Exhibit    4
Page     1

## CIM Demands
### May 7, 2012

**Proper Repayment of the $25,500 refundable assessment.**

1) According to the Club, 280 members who paid the $25,500 have sold their memberships. These members were not paid in accordance with the transaction approved by the members in 1999.
   a) As such, the Club underpaid these members by approximately $5 to $6 million.
   b) Our demand is that the Club pay the required additional monies to any former member in this group that contacts the Club and requests the adjusted payment.

2) Resigned/converted (Proprietary to Tennis, Social & Fitness or Emeritus) members must be repaid the $25,500, or the portion they paid, once their corresponding Treasury membership is resold.

3) According to the Club, 76 existing members are on the Members Sales List. Based upon the level of membership resignations and conversions, it is also apparent that far more than 100 former equity members are on the Treasury Sales List.
   a) Our first demand is for the Club to reduce its initiation fee to no more than $25,500, until the Club has at least 500 Proprietary members. As of April 30, 2012, the Club had 440 Proprietary members.
   b) Second, the sales ratio should be changed from three Treasury membership sales for one Member's membership sale to two Treasury membership sales for one Member's membership sale, as this is more consistent with the number of memberships in each category.
   c) Third, the Members Sales List, the Treasury Sales List and the combined list should be provided to any current or former member listed thereon upon request.
   d) Fourth, when a Member's membership is sold in the future, the selling member would receive the sales proceeds specified by the By-Laws plus $25,500, or the portion, if any, of the refundable assessment he or she paid.

**Treat all members in the same membership class equally.**

As evidenced most recently by the Board's decision to forgive unpaid $25,500 installment payments from approximately 30 members, the Club has not always treated all members in the same class equally. This must stop now. Adjustments to correct existing discrepancies within each membership class should also be made immediately.

**Follow the By-Laws.**

As I have pointed out before, the Club has violated and continues to violate its own By-Laws. Our demand is that this be stopped immediately.

Exhibit ___4___
Page ___2___

Bob Manion, Board President
May 7, 2012
Page 2

     Since additional litigation would not be in the best interest of ICC or its members, we look forward to hearing from you soon and reaching a fair resolution.

          Sincerely,

          WILLIAM S. COBB, JR.

Enclosure: CIM Demands

Cc: Concerned ICC Members (via email)
Steven W. DeLateur, Esq. (via email)
ICC Board of Directors (via email)
Josh Tanner (via email)
Dale Echols (via email)

Exhibit ____4____
Page ____2____

# EXHIBIT 5



Liberty
International
Underwriters

Christine J. Testaverde
55 Water Street, 18th Floor
New York, NY 10041
Telephone No: (212) 898-4360
Fax No: (212) 208-4290
Email: Christine.Testaverde@LibertyIU.com

October 25, 2012

BY E-MAIL and
CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Mr. Josh Tanner
Ironwood Country Club
73-735 Irontree Drive
Palm Desert, California 92260

| | |
|---|---|
| Re: | Nonprofit Executive Advantage Policy |
| Insured: | Ironwood County Club |
| Insurer: | Liberty Insurance Underwriters Inc. |
| Policy No: | DOCH216747-211 |
| Policy Period: | October 1, 2011 to October 1, 2012 |
| Limit of Liability: | $2 million in the Aggregate for the Policy Year |
| Retention: | $10,000 in the Aggregate each Claim |
| Matter: | *William S. Cobb, Jr., et al. v. Ironwood Country Club* |
| File No.: | CHISPC000006429 |

Dear Mr. Tanner:

Further to our prior correspondence,[1] Liberty International Underwriters, on behalf of Liberty Insurance Underwriters Inc. ("Liberty"), has received information regarding the captioned matter, including a copy of the complaint filed in the action styled *William S. Cobb, Jr., Patrick J. Kelley, Helen H. Riedstra and Elizabeth Richards v. Ironwood Country Club* (the "Complaint"), pending in the Superior Court of California, in and for the County of Riverside, Indio Branch, naming Ironwood Country Club ("ICC") as a defendant (the "Action"). The

---

[1] This letter adopts, incorporates and supplements all prior correspondence to, or on behalf of the Insureds regarding the captioned matter.

Exhibit _____5_____
Page _____1_____

Action has been submitted for coverage under the Nonprofit Executive Advantage Policy No. DOCH216747-211 (the "Policy"), issued to ICC by Liberty.

We have considered the provisions of the Policy in light of the allegations contained in the information provided to us, including the Complaint. Liberty recognizes that the allegations against ICC are entirely unsubstantiated and nothing in this letter is intended to imply that Liberty believes the allegations have any factual or legal merit. Based on our preliminary review of this matter, Liberty confirms the defense that Liberty has agreed to provide to ICC and that coverage is triggered for the Action, subject to the reservation of rights discussed below.

We are directing this letter to you in your capacity as the authorized representative of ICC. If you are not acting in this capacity, please forward this letter to the appropriate party and let us know immediately.

<u>Background and Complaint</u>

On May 7, 2012, William S. Cobb, Jr. issued a letter to Bob Manion, listed as Board President of ICC. The caption indicates that the letter pertains to the "Repayment of $25,500 Loan."[2]

Mr. Cobb represents that "a large number of current and former members" of ICC have become concerned regarding the "manner in which ICC is repaying the $25,500 loans to former members whose memberships have been sold. Mr. Cobb raises an issue regarding the accounting for the transactions. Mr. Cobb also raises a concern on behalf of former members who resigned, regarding a "new" policy announced by the Board in January 2012. In particular, Mr. Cobb represents that pursuant to the new policy, resigned members will no longer receive reimbursement of their loans when their "Treasury" memberships are sold. According to Mr. Cobb, the new policy reverses the Board's previous position and practice.

Mr. Cobb indicates that he has formed a committee to bring these and other issues to the attention of Mr. Manion and to provide a list of demands to the Board. Included in the list of general demands are the proper repayment of the $25,500 refundable assessment; the treatment of all members in the same membership class equally; and a demand to follow the by-laws. There are also several additional items, such as a demand to reduce the initiation fee; a demand to change the sales ratio between "Treasury membership" sales and "Member membership" sales; and the demand to receive the sales proceeds specified in the by-laws, plus $25,500 or the portion of the refundable assessment a Member paid, when a Member's membership is sold in the future.

Mr. Cobb requests a positive written response within seven days of the date of his letter. Mr. Cobb also indicates that additional litigation would not be in the best interests of ICC or its members and looked forward to a "fair resolution."

---

[2] Mr. Cobb's May 7, 2012 letter was reported to Liberty on or about May 16, 2012. The letter was reported as "notice only."

Page 2

Exhibit ___5___
Page ___2___

We understand that the firm of Lavely & Singer, on behalf of ICC, issued a letter to Mr. Cobb, dated June 7, 2012. The letter includes a demand that Mr. Cobb cease and desist from making any further false accusations pertaining to ICC's business practices and that he cease and discontinue all communications with current, former and prospective members "that are intended to interfere with ICC's current or prospective business relationships with those individuals or in any manner dissuade current and prospective members from continuing and/or commencing their membership with ICC respectively." ICC threatens litigation against Mr. Cobb, should he ignore the demand to cease and desist.

On or about August 21, 2012, ICC was served with the Complaint. Mr. Cobb, Patrick J. Kelley, Helen H. Riedstra and Elizabeth Richards are the named plaintiffs. ICC is the sole defendant.

The plaintiffs allege that in or about late 1998 or early 1999, ICC "devised a plan" to purchase the real estate surrounding the club from the Coachella Valley Water District, for approximately $14,860,000. According to the plaintiffs, ICC's plan was to purchase and make loan payments on the subject property by using $15,054,595 worth of "interest free loans" collected from approximately 588 members at the time. In connection with the transaction, a "Statement of Information / Loan Agreement" was provided to the members, which governed the terms of the land purchase. The Statement of Information / Loan Agreement provides that a land purchase assessment for each Proprietary Member will be $25,500. The Statement of Information / Loan Agreement also details ICC's obligation to repay the assessment.

On or about April 17, 1999, the membership, including the plaintiffs, approved the acquisition of the land and the loan funding proposal contained in the Statement of Information / Loan Agreement.

The plaintiffs contend, however, that ICC has not properly repaid the loan amounts to its members. In particular, the plaintiffs contend that in January 2012, ICC made the decision to breach the Statement of Information / Loan Agreement by unilaterally restructuring and/or redefining the terms and conditions of its loan repayment obligations, which "directly affected all members of" ICC, past and present. Toward this end, ICC's President, Ken Delf, sent a letter to the membership, dated January 24, 2012, advising that ICC would no longer repay the $25,500 Land Assessments "to Members who had or will *resign* and thereby *forfeit* their membership from the Club."

The plaintiffs further contend that ICC issued a document, dated May 15, 2012, which "attempted to *explain and/or further clarify*" ICC's position. The May 15, 2012 letter also offered an enhanced benefit package to members willing to forgive the $25,500 repayment right. The plaintiffs contend, however, that the May 15, 2012 letter "created even greater confusion and contradiction."

The plaintiffs allege that ICC has breached, and will continue to breach, the Statement of Information / Loan Agreement in several ways, as well as its contractual duties and other obligations owed to the plaintiffs. The plaintiffs contend that ICC has wrongfully profited from each of the loan transactions with its members, including the plaintiffs. The plaintiffs also allege that ICC breached its duty of good faith and fair dealing with the plaintiffs. Further, the

Exhibit _____ 5 _____
Page _____ 2 _____

plaintiffs contend that ICC breached its fiduciary duty to "appropriately handle, administer and fairly transact" all membership sales transactions. As such, ICC has been unjustly enriched.

The Complaint is comprised of one cause of action, seeking declaratory relief. The plaintiffs seek a declaration that: ICC owes each plaintiff the specific amount in each applicable "Members' Land Purchase Account" at the time of the ultimate sale of their club membership "however and by whomever held"; ICC's representation that it will no longer repay its $25,500 loan obligations to any former club member who resigned his or her membership to the club, or any current club member who decides to resign his/her membership at any time in the future, constitutes an anticipatory breach of contract by ICC and breach of contractual and fiduciary obligations, if the sale has already occurred; the current loan repayment accounting methodology being used by ICC violates the Statement of Information / Loan Agreement and is prohibited; and ICC has underpaid its past members by using an inappropriate payment methodology, and that such sums wrongfully withheld shall be calculated and set aside in trust. The plaintiffs also seek attorneys' fees under California Civil Procedure §1021.5.

<u>Status of the Action</u>

At ICC's request, Bryan R. Gerstel of Green Bryant & French LLP, was appointed to defend ICC in connection with the Action. A demurrer and motion to strike were filed by Mr. Gerstel on behalf of ICC, in response to the Complaint. To our knowledge, the briefing of the demurrer and motion to strike has not yet been completed.

<u>The Policy</u>

Consistent with its terms, conditions, provisions and exclusions, the Policy provides that Liberty will pay on behalf of the **Insureds**[3] all **Loss** that they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**. The **Policy Period** is October 1, 2011 to October 1, 2012. The Policy includes a **Limit of Liability** of $2 million in the aggregate for the **Policy Year**, subject to a $10,000 Retention applicable in the aggregate to each **Claim** pursuant to Item IV of the Declarations. Liberty shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention.

Pursuant to Section 2 of the Policy, it is the right and duty of Liberty to defend any **Claim**. The **Insureds** shall not incur any **Defense Costs**, admit to any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without Liberty's prior written consent, which shall not be unreasonably withheld. Liberty shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements or settlements made by the **Insureds** without Liberty's prior written consent.

Paragraph 23.14 of the Policy, as modified by Endorsement No. 1, provides that "**Loss**" includes sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including **Defense Costs**, damages, judgments, settlement amounts, legal fees and

---

[3] Please note that the terms in bold in this letter correspond to their definitions set forth in the Policy.

Exhibit ___5___
Page ___4___

costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award. **Loss** does not include coverage for certain taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

Section 23.3 provides that a **"Claim"** shall mean a written demand for monetary or non-monetary relief against an **Insured** or the commencement of a civil judicial proceeding against an **Insured**. In addition, Section 23.22(a) provides that **"Wrongful Act"** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted by the **Insured Organization**. Pursuant to Section 23.13, **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause of series of causally connected facts, circumstances, situations, events, transactions or causes.

<u>Coverage Discussion</u>

The Demand Letter received by or on behalf of ICC on or after May 7, 2012, which involves allegations that ICC failed to pay members in accordance with the transaction approved in 1999, constitutes a **Claim** first made during the **Policy Period** against the **Insured** for a **Wrongful Act**. In addition, the Action, commenced by the service of the Complaint on ICC on or about August 21, 2012, which involves allegations that ICC has not properly repaid the loan amounts to its members, also constitutes a **Claim** first made during the **Policy Period** against the **Insureds** for a **Wrongful Act**. Accordingly, Liberty will provide a defense for the Action to the Association, and coverage is triggered.

We note that Section 9.2 of the Policy provides that all **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. The Demand Letter and the Action involve the same allegations that ICC has not properly repaid the 1999 loan amounts to its members. As such, the Demand Letter and the Action shall be deemed to be one **Claim**, subject to a single limit of liability of $2 million and one Retention.

<u>Reservation of Rights</u>

Although coverage for the **Claim** is triggered, the Policy contains certain provisions that could limit or otherwise preclude coverage in its entirety with respect to the Action. Therefore, Liberty reserves the right to apply the following and any other applicable Policy provisions in connection with this matter:

Exclusion 4.3 provides that the Policy does not apply to any **Claim** made against any **Insured** based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time.

Please advise whether ICC reported this matter to any prior carrier. In the interim, Liberty must reserve its rights pursuant to Exclusions 4.3.

Exhibit ___5___
Page ___5___

Exclusion 4.9(a) provides that the Policy does not apply to any **Claim** made against any **Insured** based upon, arising from, or in any way related to any **Insureds** gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled. This exclusion applies, however, only if it is finally adjudicated that such conduct in fact occurred.

The plaintiffs allege that ICC has wrongfully profited from each of the loan transactions with its members, including the plaintiffs. In the event there is a final adjudication that ICC gained in fact any personal profit, remuneration or advantage to which it was not legally entitled, Liberty reserves its rights pursuant to Exclusion 4.9(a).

The Policy, at Section 5.2, provides that Liberty shall not be liable to pay any **Loss** in connection with any **Claim** for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement. This exclusion shall not apply to Liberty's duty to defend and to pay **Defense Costs**. In light of the plaintiffs' allegations, including but limited to the contention that ICC breached the Statement of Information / Loan Agreement, Liberty reserves its rights pursuant to Section 5.2.

Section 12 provides that the Policy shall only apply as excess over any other valid and collectible insurance. Please provide us with a copy of the notice letters to, and the coverage responses from, any other carriers that were placed on notice of this matter.

Liberty also directs your attention to the **Application**, dated October 5, 2011. Specifically, question 6, *Prior Knowledge*, asks whether anyone for whom insurance is sought has any knowledge or information of any act, error, omission, fact or circumstance which may give rise to a **Claim** which may fall within the scope of the proposed insurance. The answer to question 6 in the **Application** is "no."

The **Application** further provides that:

> It is understood and agreed that if anyone for whom this insurance is sought has any knowledge of any such act, error, omission, fact or circumstance, any Claim emanating therefrom shall be excluded from coverage under the proposed insurance.

Recently, ICC submitted several billing statements to Liberty, for services rendered by Mr. Gerstel and Lavely & Singer, to consider for coverage in connection with this **Claim**. All of the billings are for services rendered to ICC without the knowledge of Liberty and thus, without Liberty's prior written consent, as required by Section 2 of the Policy. At the request of Alan Lux, of Tanenbaum Harber, Liberty has agreed to examine these statements. However, no waiver of any rights or defenses under the Policy shall be assumed by virtue of Liberty's review of same. All such rights and defenses are specifically reserved.

Nevertheless, Liberty has been provided with a billing statement for Mr. Gerstel, dated September 6, 2011, for "Legal Services Months July & August 2011." This statement includes the entry "telecom Tanner re additional information on Insurance and sales of memberships."

Exhibit ___5___
Page ___6___

An additional statement from Mr. Gerstel, dated October 13, 2011, for "Legal Services Month of September 2011," includes the following entry:

> Review and analyze legal issues and facts re: Assessment, Mistake of Fact and Law issues, Estoppel, Class action issues and Liability; Declaratory Relief issues and Liability; Insurance issues re potential claims and coverage; Transferability of assessment rights; Contractual liability for assessment payments by forfeiting members; potential for present member claims; analysis of statutes, case law and Club documentation re issues; prepare Memo to Board of Directors on these issues[.]

In light of this information, the response in the **Application** to question 6 may have been inaccurate at the time the **Application** was executed. Specifically, it appears that ICC and counsel were considering "Insurance issues re potential claims and coverage," prior to the execution of the **Application** on October 5, 2011. Thus, by necessity, Liberty reserves its right to invoke the provisions of the **Application** quoted above.

In order for Liberty to further consider this issue, please explain the reason for such an analysis in July, August and September 2011. Also, please provide to us a copy of the memorandum referenced above, as well as any additional information that you believe Liberty should consider in connection with same.

Moreover, the preamble to the Policy provides that the Policy is issued in reliance upon the truthfulness and accuracy of the statements made in the **Application**. Section 6.1 of the Policy provides that the **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by Liberty under the Policy. Moreover, Section 6.1 provides that the Policy was issued in reliance upon the truth of such statements and representations. Section 6.2 of the Policy indicates that the **Insureds** agree that if the **Application** contains any material statements or representations that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.

In light of the above, Liberty necessarily reserves its rights pursuant to Section 6.1 and 6.2 of the Policy.

*   *   *

Liberty expressly reserves all of its rights and defenses under the Policy, at law, and in equity, including the right to recoup **Defense Costs** paid in connection with the defense of the Action, and the right to deny and/or void coverage on any of the foregoing bases and to deny and/or void coverage on additional and alternative bases as other terms, conditions, provisions and exclusions of the Policy, including matters contained in any **Application**, are found to apply. Liberty's position with respect to coverage for this matter is based on a review of the allegations in the Demand Letter, the Complaint and the exhibits attached thereto, the billing statements provided to us, and currently known facts. We also reserve the right to supplement Liberty's

Exhibit ____5____
Page ____7____

position based upon the submission of any additional information regarding this matter, including but not limited to the information requested herein.

If you have any questions or concerns regarding your insurance coverage, you are entitled to have your claim reviewed by the California Department of Insurance. Your inquiry may be directed as follows:

California Department of Insurance
Consumer Services Division
300 South Spring Street, 11th Floor
Los Angeles, California 90013
(800) 927-4357 / (213) 897-5961

Of course, we encourage you to first contact the undersigned with any questions or comments you may have regarding the foregoing.

Very truly yours,

Christine J. Testaverde
Liberty International Underwriters
for Liberty Insurance Underwriters

cc: Mr. Todd Weber / Liberty International Underwriters
    Mr. Alan Lux / Tanenbaum Harber of CA, Inc.

Exhibit _____5_____
Page _____8_____

EXHIBIT 6

73710 Fred Waring Dr.
Suite 120
Palm Desert, CA 92260

PLEASE DETACH
THIS REMITTANCE ADVICE
BEFORE DEPOSITING CHECK

CHECK DATE: 02/21/2013

**IRONWOOD COUNTRY CLUB**

0126
Bryan R. Gerstel, ap

THIS ATTACHED CHECK
IS IN PAYMENT OF THE
ITEMS LISTED BELOW

| INVOICE DATE | INVOICE NUMBER | INVOICE AMOUNT | DISCOUNT | AMOUNT PAID | DESCRIPTION | |
|---|---|---|---|---|---|---|
| 02/01/2013 | 32881 | 4991.25 | .00 | 4991.25 | | |
| Cobb vs ICC | | | | | 91-712-00 | 4991.25 |
| 02/01/2013 | 33184 | 5036.96 | .00 | 5036.96 | | |
| Cobb vs ICC | | | | | 91-712-00 | 5036.96 |
| 02/01/2013 | 33595 | 5752.44 | .00 | 5752.44 | | |
| Cocc vs ICC | | | | | 91-712-00 | 5752.44 |
| 02/21/2013 | CR | 5780.65- | .00 | 5780.65- | | |
| DISC CREDIT | | | | | 00-260-04 | 5780.65- |

CHECK PAYABLE TO:
CHECK #:   45870

| | 10000.00 | .00 | 10000.00 | | |
|---|---|---|---|---|---|
| | T    O | T    A | L    S | | |

---

WARNING: THIS DOCUMENT CONTAINS A TRUE WATERMARK. ABSENCE OF THIS FEATURE WILL INDICATE A FORGERY. HOLD UP TO LIGHT TO VIEW.

**IRONWOOD COUNTRY CLUB**
GENERAL ACCOUNT
73-735 IRONTREE DRIVE
PALM DESERT, CA 92260-6799

PACIFIC WESTERN BANK
Palm Springs Office
601 E. Tahquitz Canyon Way
Palm Springs, CA 92282

90-3620/1222

NO. 45870

DATE              AMOUNT
02/21/2013    $ 10000.00

EXACTLY ****10000 DOLLARS AND 00 CENTS

PAY
TO THE
ORDER
OF

Bryan R. Gerstel, apc
73710 Fred Waring Dr.
Suite 120
Palm Desert, CA 92260

VOID AFTER 180 DAYS

Exhibit ___6___
Page _____